UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

RONALD HESTER,

                                        Plaintiff,

                                                                    6:23-cv-01171-AMN-TWD

v.

CITY OF ONEIDA et al.,

                                        Defendants.

_____

APPEARANCES:

RONALD HESTER
Plaintiff, *pro se*
2723 Emerson Lane
Kissimmee, FL 34743

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

**I.      INTRODUCTION**

        The Clerk has sent the Court a civil rights complaint filed by Ronald Hester ("Plaintiff")

for initial review pursuant to 28 U.S.C. § 1915.  (Dkt. No. 1.)  Plaintiff also filed a motion to

proceed *in forma pauperis* ("IFP").  (Dkt. No. 2.)

**II.     IFP APPLICATION**

        Plaintiff has not paid the filing fee for this action and seeks leave to proceed IFP.  (Dkt.

No. 2.)  After reviewing Plaintiff's application, this Court finds he is financially eligible for IFP

status.  Therefore, Plaintiff's IFP application is granted.

## III.     STANDARD OF REVIEW

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims."  *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)).  The Court shall dismiss a complaint in a civil action if the Court determines it is frivolous, malicious, fails to state a claim on which relief may be granted, or seeks monetary relief against a defendant who is immune from such relief.  *See* 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

A claim is frivolous when it "lacks an arguable basis either in law or in fact."  *Neitzke v. Williams*, 490 U.S. 319, 325 (1989), *abrogated on other grounds by Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007); *see also Denton v. Hernandez*, 504 U.S. 25, 33 (1992) (holding that "a finding of factual frivolousness is appropriate when the facts alleged rise to the level of the irrational or the wholly incredible"); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ("[A]n action is 'frivolous' when either: (1) the factual contentions are clearly baseless . . . or (2) the claim is based on an indisputably meritless legal theory.").

To survive dismissal for failure to state a claim, a complaint must contain a short and plain statement of the claim showing that the pleader is entitled to relief.  Fed. R. Civ. P. 8(a)(2). This short and plain statement of the claim must be "plausible on its face."  *Twombly*, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The statement of the claim must do more than present "an unadorned, the-defendant-harmed-me accusation."  *Id.*  It must "give the defendant fair notice of what the claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted); *see also* Fed. R. Civ. P. 8(a)(2).

In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Moreover, a court should not dismiss a *pro se* complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). However, an opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## IV.   BACKGROUND

### A.   The Arrest, Search, and Questioning of Plaintiff

On the morning of January 5, 2023, Det. Salle[1] of the Rome Police Department was conducting surveillance in the "500 block" of North Madison Street in Oneida County in relation to a recent "shots fired" investigation. (Dkt. No. 1 at 5; Dkt. No. 1-1 at 2.) During the surveillance of the residence located at 506 North Madison Street, Det. Salle observed two black males and one white female exit the residence and enter a red Honda sedan. (Dkt. No. 1 at 5; Dkt. No. 1-1 at 2.) Det. Salle contacted other members of the Rome Police Department and relayed that the sedan had an expired Florida registration; the owner of the sedan, Plaintiff, had a

---

[1] Although Det. Salle's last name is spelled "Salley" in the caption of the complaint, the Court uses the spelling provided in the attached state court opinion. (Dkt. No. 1-1 at 1-13.) The Clerk is directed to correct the spelling to Salle on the docket.

3

suspended New York Driver's License; and Jessica Reed was driving the vehicle.  (Dkt. No. 1 at 5.)  Officers Page and Zonnevylle conducted a traffic stop of the sedan due to its expired registration in the "400 block" of North George Street.  *Id.*  Ms. Reed told the officers she had a suspended license.  *Id.* at 5, 7.  The officers took Ms. Reed into custody and placed her in the back of the patrol vehicle.  *Id.* at 7.

Per his bodycam footage, Officer Page spoke with the two black males who were still in the vehicle.  *Id.*  Plaintiff was sitting in the front passenger seat and identified himself to Officer Page.  *Id.*  Upon being told the vehicle was being towed, Plaintiff and the other man exited the vehicle.  *Id.*  Because they were not detained, they left the scene shortly after exiting the vehicle.  *Id.*

According to Officer Page, he began an inventory search of the vehicle pursuant to Rome Police Department policy prior to the arrival of the tow truck.  *Id.*  However, Officer Page "did not complete the inventory record of the entire contents of the vehicle."  (Dkt. No. 1 at 7; Dkt. No. 1-1 at 3.)  As Officer Page "searched for 'something big,'" he came across a handgun in the spare tire compartment of the vehicle.  (Dkt. No. 1-1 at 3.)  Per his bodycam footage, Officer Page told Officer Zonnevylle he ceased the inventory search upon finding the gun.  *Id.*  Officer Zonnevylle later testified he completed the inventory search record of the vehicle the next day. *Id.*

After securing the gun, the police located Plaintiff and took him into custody.  *Id.* at 4. While at the Rome Police Station, Det. Salle read Plaintiff his *Miranda* warnings.  *Id.*  Plaintiff stated he understood his rights and agreed to speak with the detective.  *Id.*

Det. Salle interviewed Plaintiff twice.  *Id.*  At the first interview, Plaintiff denied any knowledge of the recovered gun.  *Id.*  Plaintiff then underwent a visual body cavity search.  *Id.*

Plaintiff was directed to remove his clothes and then squat and cough in the presence of Officer White. *Id.* Officer White observed a "foreign object" under Plaintiff's scrotum and directed him to remove the item and place it on the floor. *Id.* The item was suspected to be cocaine. *Id.*

Det. Salle later testified the search was conducted "based solely on [Plaintiff's] history for a drug offense and no other reason." *Id.* On the police department's "Unclothed Search Form," Det. Salle indicated "the sole reason the unclothed search was performed was based upon the fact that [Plaintiff's] criminal history showed him having an undated 'CSCS 3rd' offense." *Id.*

After the visual body cavity search, Det. Salle interviewed Plaintiff again and Plaintiff discussed the recovered gun. *Id.*

### B.    Suppression of Certain Evidence

Plaintiff was indicted for Criminal Possession of a Controlled Substance in the Third Degree; Criminal Possession of a Weapon in the Second Degree; and Criminal Possession of a Firearm. *Id.* at 1. Plaintiff moved to suppress certain oral statements he made to law enforcement personnel "involuntarily" and certain evidence that was allegedly seized in violation of his constitutional rights. *Id.*

Hon. Robert L. Bauer of Oneida County Court found the inventory search of Plaintiff's car was not legal as it was equivalent to an "impermissible 'general rummaging' to discover incriminating evidence" and accordingly suppressed the recovered gun from evidence. *Id.* at 9 (citation omitted).

Judge Bauer further found previous drug offenses from nine years ago, standing alone "with no further 'specific, articulable, factual basis supporting a reasonable suspicion to believe

the arrestee secreted evidence inside a body cavity' [were] not enough to justify the distinctly

elevated level of intrusion'" of the visual body cavity search and accordingly suppressed the

cocaine recovered from Plaintiff's person. *Id.* at 10 (citation omitted).

Additionally, Judge Bauer found the statements Plaintiff made to the officers at the scene

prior to his arrest were voluntarily made, were not subject to *Miranda*, were not in violation of

Plaintiff's constitutional rights, and would be admissible at trial. *Id.* at 11.

However, Judge Bauer held "those statements [Plaintiff] made after having duly waived

his [*Miranda*] rights resulted from the aforementioned illegal searches and are accordingly

suppressed as fruit of the poisonous tree." *Id.* at 12 (citations omitted).  Judge Bauer noted

> the testimony and evidence admitted at the hearing, the police
> actions in stopping the Honda and impounding same as no valid
> driver was on scene, to searching its contents and finding the gun,
> then subsequently directing that defendant be taken into custody,
> Mirandized and interviewed regarding the recovered gun, then
> strip searched whereupon drugs were recovered, which led to
> defendant's second interview, constituted one continuous chain of
> events.

*Id.*

Further, there was nothing in the record "to show the taint of the illegal search of the

vehicle had become attenuated so that the gun would have been independently discovered or that

for any other reason the gun was not come by exploitation of that illegality." *Id.* (internal

quotation marks and citations omitted).  Judge Bauer applied the same reasoning to the "illegal,

invasive search" of Plaintiff's person which yielded cocaine. *Id.* at 13.

C.      **The Current Action**

Plaintiff commenced this action on September 12, 2023, against the City of Oneida, the

Rome Police, the Oneida County Police, the Oneida County Sheriff's Department, Det. Salle,

Officer Zonnevylle, Officer Page, and Officer White alleging violations of his Fourth

6

Amendment rights, false arrest, false imprisonment, and an illegal cavity search of his person. (Dkt. No. 1 at 6.)  He seeks $5,000,000 in damages and "the [s]uspension and/or [t]ermination of all officers involved."  *Id.*

## V.    DISCUSSION

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States."  *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (internal quotations and citations omitted).  To state a valid claim under 42 U.S.C. § 1983, a plaintiff must allege that the challenged conduct: (1) was attributable to a person acting under color of state law; and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States.  *Whalen v. Cty. of Fulton*, 126 F.3d 400, 405 (2d Cir. 1997).  To establish liability under the statute, a plaintiff must plead that each government official defendant violated the Constitution through that official's own individual actions. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020).  An official may not be held liable for constitutional violations simply because he held a high position of authority.  *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016).  "Section 1983 claims against municipal employees sued in their official capacity are treated as claims against the municipality itself."  *Ortiz v. Wagstaff*, 523 F. Supp. 3d 347, 361 (W.D.N.Y. 2021) (internal quotations and citation omitted).  A municipality cannot be held liable under Section 1983 unless the challenged action was undertaken pursuant to a municipal policy, custom, or practice.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978).

### A.    City of Oneida

To begin, Plaintiff's claims against the City of Oneida must be dismissed.  A municipality can be liable under § 1983 only if a plaintiff can show that a municipal policy or

custom caused the deprivation of his constitutional rights.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–91 (1978).  The doctrine of respondeat superior cannot be used to establish municipal liability.  *Connick v. Thompson*, 563 U.S. 51, 60 (2011); *Cash v. County of Erie*, 654 F.3d 324, 333-34 (2d Cir. 2011); *Dzugas–Smith v. Southhold Union Free School Dist.*, No. 08 CV 1319, 2012 WL 1655540, at *20 (E.D.N.Y. May 9, 2012).  Here, Plaintiff does not allege, and nothing in his complaint suggests, that any of the allegedly wrongful acts or omissions on the part of any City employee are attributable to a municipal policy or custom.  Thus, Plaintiff has not made a showing, in his pleadings, sufficient to impose *Monell* liability on the City of Oneida.  *See Hayward v. City of New York*, No. 12-CV-3220 ENV, 2012 WL 3580286, at *1 (E.D.N.Y. Aug. 17, 2012).  Therefore, the Court recommends dismissing the complaint against the City of Oneida without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B).

### B.    Oneida County Police, Oneida County Sheriff's Department, and Rome Police

Plaintiff lists Oneida County Police, Oneida County Sheriff's Department, and Rome Police as defendants in the caption of his complaint.  A "police department cannot sue or be sued because it does not exist separate and apart from the municipality and does not have its own legal identity." *Baker v. Willett*, 42 F. Supp. 2d 192, 198 (N.D.N.Y. 1999) (dismissing claims against county sheriff's department) (citations omitted); *see also Jackson v. Cty. of Nassau*, No. 07-CV-245, 2010 WL 335581, at *5 (E.D.N.Y. Jan. 22, 2010) ("Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued."); *see, e.g.*, *La Grande v. Town of Bethlehem Police Dep't*, No. 1:08-CV-0738 (LEK/DRH), 2009 WL 2868231, at *2 (N.D.N.Y. Sept. 1, 2009) ("Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, [the plaintiff's] [c]omplaint is dismissed as against the Town of Bethlehem Police

8

Department."); *Jenkins v. Liadka*, No. 5:10-CV-1223 (GTS/DEP), 2012 WL 4052286, at *5 (N.D.N.Y. Sept. 13, 2012) ("Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant.").

Therefore, the Court recommends dismissing the complaint against the Oneida County Police, the Oneida County Sheriff's Department, and the Rome Police with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B).

### C.    Det. Salle, Officer Zonnevylle, Officer Page, and Officer White

The Court liberally construes Plaintiff's general claim for Fourth Amendment violations to be equivalent to his claims for false arrest, false imprisonment, and an illegal cavity search of his person. (*See* Dkt. No. 1 at 5-9.) Based on the facts in the complaint, the Court construes the false arrest and false imprisonment claims to pertain to Det. Salle, Officer Zonnevylle, and Officer Page and the illegal cavity search claim to pertain to Det. Salle and Officer White. (Dkt. No. 1 at 5, 7-9; Dkt. No 1-1 at 1-13.)

#### 1.    False Arrest and False Imprisonment

"A Section 1983 claim for false arrest [or false imprisonment] rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Cea v. Ulster Cty.*, 309 F. Supp. 2d 321, 329 (N.D.N.Y. 2004) (quoting *Sulkowska v. City of N.Y.*, 129 F. Supp. 2d 274, 287 (S.D.N.Y. 2001)). Such claims are one and the same because "[f]alse arrest and false imprisonment overlap; the former is a species of the latter." *Wallace v. Kato*, 549 U.S. 384, 388 (2007).

The elements of a claim for false arrest under § 1983 are the same elements as a claim for false arrest under New York law. *Lewis v. City of New York*, 18 F. Supp. 3d 229, 235 (E.D.N.Y. 2014) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). "Under New York law, the elements of a false arrest and false imprisonment claim are: '(1) the defendant intended to

confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'" *Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019) (quoting *McGowan v. United States*, 825 F.3d 118, 126 (2d Cir. 2016)).

"For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause." *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (N.Y. 2016); *accord Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("Probable cause is a complete defense to an action for false arrest.") (citation and internal quotation marks omitted).  Probable cause exists where the officer has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citation and internal quotation marks omitted).  "[T]he court looks only to the information the arresting officer had at the time of the arrest." *Peterson v. Cty of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998).  "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." *Ricciuti v. N.Y.C. Trans. Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

Here, the Court construes Plaintiff's complaint to allege that because Judge Bauer ruled the search of Plaintiff's car to be illegal and consequently suppressed the recovered gun, that there was no probable cause to arrest and confine him.  (*See* Dkt. No. 1-1 at 1-13.)  However, "[f]or federal false arrest claims, even in circumstances where a preceding search is illegal, police officers may use evidence obtained in that illegal search to establish probable cause for an arrest." *Hatcher v. City of New York*, No. 15-CV-7500 (VSB), 2018 WL 1583036, at *3

10

(S.D.N.Y. Mar. 27, 2018) (citing *Townes v. City of New York*, 176 F.3d 138, 144-49 (2d Cir. 1999)); *see also Serrano v. City of New York*, No. 16-CIV-8105(AKH), 2018 WL 3392869, at *6 (S.D.N.Y. July 12, 2018), *aff'd*, 793 F. App'x 29 (2d Cir. 2019) ("Under *Townes*, the fruit of the poisonous tree doctrine cannot be used to 'link the unreasonable search and seizure' to what came next—the discovery of the marijuana cigarette on plaintiff's person—which unquestionably gave officers probable cause to arrest plaintiff[.]").

In New York State, a person is guilty of Criminal Possession of a Weapon in the second degree if he or she possesses a loaded firearm and does not have a license to possess such a firearm. *See Bannister v. Luis*, No. 18-CV-7285 (EK) (ST), 2022 WL 19402512, at *45 (E.D.N.Y. Feb. 16, 2022) (citing N.Y. Penal Law § 265.03), *report and recommendation adopted as modified*, 2023 WL 2325680 (E.D.N.Y. Mar. 2, 2023).  Under New York law, the existence of a firearm in an automobile creates a permissive presumption that all occupants of the vehicle have common constructive possession of the firearm, absent certain statutory exceptions which are inapplicable here. *Id.* (citing N.Y. Penal Law § 265.15(3)).  "If a jury may make a presumption of possession under the law, it is reasonable for a police officer to do the same." *Id.*  "Therefore, upon finding the loaded handgun in the car, the officers had probable cause" to arrest and confine Plaintiff, defeating his false arrest and false imprisonment claims. *Id.*  As noted above, because the fruit of the poisonous tree doctrine does not apply to § 1983 claims, the gun recovered from the illegal search of Plaintiff's car created probable cause for officers to arrest and confine him. *Id.* at *5 (citing *Townes*, 176 F.3d at 145).  Accordingly, Plaintiff's false arrest and false imprisonment claims necessarily fail.

Plaintiff's Fourth Amendment false arrest and false imprisonment claims are also frivolous because a dispositive defense (i.e., probable cause) appears on the face of the

complaint.  *Ferguson*, 130 F. Supp. 2d at 565; *Harrell*, 268 F.3d at 148-49; *Woods*, 921 F. Supp. at 1144-45; *see also Garcia*, 279 F. Supp. 2d at 298.  The undersigned accordingly recommends the Court dismiss Plaintiff's Fourth Amendment false arrest and false imprisonment claims because they are frivolous.  *See* 28 U.S.C. § 1915(e)(2)(B)(i).

### 2. Body Cavity Search

The Fourth Amendment protects individuals against searches of their person without a warrant.  *Johnson v. City of New York*, No. 21-CV-5268 (PKC), 2022 WL 4133284, at *3 (S.D.N.Y. Sept. 12, 2022).  A search incident to an arrest, however, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment.  *Riley v. California*, 573 U.S. 373, 382 (2014).  Nevertheless, there are limitations upon the scope of an appropriate search incident to an arrest.  *See Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995).  Indeed, whether a search incident to an arrest was lawful turns upon whether such search was reasonable.  *Id.*

Visual body cavity searches in particular are "invasive and degrading" and a "serious invasion of privacy," even more intrusive than a typical strip search.  *Sloley v. VanBramer*, 945 F.3d 30, 38 (2d Cir. 2019).  As such, "a visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity."  *Sloley*, 945 F.3d at 38 (citation and quotation marks omitted).  To determine whether a visual body cavity search was reasonable under the circumstances, "courts also consider whether the individual's preceding arrest was for a misdemeanor or felony, whether it involved drugs, whether the individual would soon be surrounded by other inmates or arrestees or housed alone, whether the search occurred privately, and whether the search was performed pursuant to reasonable suspicion or because of a blanket policy."  *Monroe v. Gould*, 372 F. Supp. 3d 197,

204 (S.D.N.Y. Mar. 14, 2019) (citing *Gonzalez v. City of Schenectady*, 728 F.3d 149, 162 (2d Cir. 2013)).

Based on relevant authority from New York State courts, *Sloley* identified various factors which can support a reasonable suspicion that an arrestee is secreting narcotics inside his person. *See* 945 F.3d at 46.  For example, officers may have reasonable suspicion where the arrestee is seen placing his hands down his pants or making similarly suspicious movements.  *People v. Hunter*, 902 N.Y.S.2d 678, 679-80 (3d Dep't 2010) (finding reasonable suspicion based in part on the officers' observation of the arrestee "fidgeting with his hands down the back of his pants"); *People v. Harry*, 884 N.Y.S.2d 712, 712-13 (1st Dep't 2009) (finding reasonable suspicion where an arrestee was placed in a patrol car and observed "moving around a lot, like sliding up and down in his seat and making movements with his hands" as though he were attempting to place or remove something from his pants); *People v. Clayton*, 868 N.Y.S.2d 303, 305-06 (2d Dep't 2008) (finding reasonable suspicion where the arrestee was observed "wiggling around" in the patrol car and placing his hands in an area where the officer had felt a hard object during a pat-and-frisk).  An officer may also have reasonable suspicion based on information that a particular arrestee is secreting objects in his person, or that he has a custom of doing so.  *See Hunter*, 902 N.Y.S.2d at 680 (finding reasonable suspicion based in part on information the officers had received from a confidential informant that the arrestee "had a habit of carrying narcotics in his rectum"); *Clayton*, 868 N.Y.S.2d at 306 (finding reasonable suspicion based in part on the defendant's "history of secreting contraband in his rectum").  Finally, an officer has reasonable suspicion where he has watched a suspect "retriev[e] an item from his buttocks area and exchang[e] it for money from a person found in possession of drugs minutes later."  *People v. Barnville*, 819 N.Y.S.2d 234, 236 (1st Dep't 2006).

None of these factors appear to be present here.  *See Falls v. (Police Officer) Detective Michael Pitt*, No. 16-CV-8863 (KMK), 2021 WL 1164185, at *23–27 (S.D.N.Y. Mar. 26, 2021). Det. Salle testified "the visual body cavity search of [Plaintiff's] person was based solely on [his] history for a drug offense and no other reason."  (Dkt. No. 1-1 at 4, 10.)  Further, on the "Unclothed Search Form," Det. Salle indicated "the sole reason the unclothed search was performed was based upon the fact that [Plaintiff's] criminal history showed him having an undated 'CSCS 3rd offense.'"  *Id.* at 4, 10.  Judge Bauer ultimately found

> [n]o other justification was offered for the search at issue.  Prior drug offenses, the last nine years prior, standing alone, with no further 'specific, articulable, factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity' are not enough to justify the 'distinctly elevated level of intrusion' of this search.

*Id.* (citation omitted).

Given what is alleged, the Court recommends Plaintiff's Fourth Amendment claim based on the visual body cavity search survives initial review under 28 U.S.C. § 1915(e) and requires a response.  In so recommending, the undersigned expresses no opinion regarding whether the claim could survive a properly filed motion to dismiss or motion for summary judgment.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED**,[2] and it is

**RECOMMENDED** that Plaintiff's Fourth Amendment claim based on the body cavity search against Det. Salle and Officer White **SURVIVES** *sua sponte* review; and it is further

---

[2]  Plaintiff should note that although his motion to proceed IFP has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**RECOMMENDED** that Plaintiff's Fourth Amendment false arrest and false imprisonment claims against Det. Salle, Officer Zonevylle, and Officer Page be **DISMISSED WITH LEAVE TO AMEND**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), Plaintiff has fourteen days within which to file written objections to the foregoing report.[3]  Such objections shall be filed with the Clerk of the Court. **<u>FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW</u>**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated:  November 14, 2023
        Syracuse, New York

Therese Wiley Dancks
United States Magistrate Judge

---

[3]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. 6(a)(1)(C).

2012 WL 1655540
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Donna DZUGAS–SMITH, Plaintiffs,
v.
SOUTHOLD UNION FREE SCHOOL DISTRICT,
Dr. Christopher Gallagher, Virginia Thompson,
Richard Caggiano, Paulette Ofrais, Judi Fouchet, Dr.
Robert Walsh, Jeananne Dempsey, Patricia Mellas,
David Riddell, Elaine White, Scott Desimone, Susan
Nobile, Gail Andrews Butta, Mary Fitzpatrick,
Mary Lou Cahill and Bruce Kollmar, Defendants.

No. CV–08–1319 (SJF)(WDW).
|
May 9, 2012.

OPINION & ORDER

FEUERSTEIN, District Judge.

 *1  On April 1, 2008, *pro se* plaintiff Donna Dzugas–
Smith ("plaintiff") commenced an action ("Action No.
1"), individually and on behalf of her child "B.D.S.,"
against defendants Southold Union Free School District ("the
UFSD"), Dr. Christopher Gallagher, Virginia Thompson,
Richard Caggiano, Paulette Ofrais, Judi Fouchet, Dr.
Robert Walsh, Jeananne Dempsey, Patricia Mellas, Lori
Cariello, David Riddell, Elaine White and Scott Desimone,
(collectively, the "UFSD defendants"), State Review Officer
Paul F. Kelly ("Kelly") and Ingerman and Smith L.L.P.
("Ingerman Smith"). On June 26, 2008, plaintiff filed an
amended complaint in Action No. 1 alleging violations of,
*inter alia,* the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. § 1400, *et seq.;* the Rehabilitation Act of
1973 ("the Rehabilitation Act"), 29 U.S.C. § 792, *et seq.;* the
Civil Rights Act of 1871, 42 U.S.C. §§ 1983 ("Section 1983")
and 1985 ("Section 1985"); Title II of the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12131, *et seq.;* New
York Education Law §§ 4401, *et seq.* ("New York Education
Law"); and the New York State Constitution Article XI, § 1
("New York Constitution").

On May 8, 2008, *pro se* plaintiff commenced a separate
action ("Action No. 2"), individually and on behalf of B.D.S.,

against all of the same defendants as named in Action No. 1,
as well as against Susan Nobile, Gail Andrews Butta, Mary
Fitzpatrick, Mary Lou Cahill and Bruce Kollmar (collectively,
"the additional UFSD defendants") and the New York State
Education Department ("NYSED"). On September 4, 2008,
plaintiff filed an amended complaint in Action No. 2 alleging
violations of, *inter alia,* the IDEA, the Rehabilitation Act,
Section 1983, 42 U.S.C. § 1988 ("Section 1988"), the ADA,
the New York Education Law and the New York Constitution.

Thereafter, Ingerman Smith and Kelly moved, *inter alia,*
pursuant to Rule 12 of the Federal Rules of Civil Procedure
to dismiss the amended complaints in both actions as against
them. By order entered June 26, 2009, this Court, *inter
alia:* (1) consolidated Actions No. 1 and 2; (2) dismissed
plaintiff's Section 1983, Section 1985 and state law claims
as against Ingerman Smith without prejudice and *sua sponte*
dismissed plaintiff's Section 1985 claims as against all
defendants without prejudice; (2) dismissed plaintiff's ADA
and Rehabilitation Law claims as against Ingerman Smith,
Kelly and all individual defendants with prejudice; (3)
dismissed plaintiff's claims as against Kelly with prejudice,
with the exception that plaintiff was granted leave to amend
the pleadings to assert a claim seeking a declaratory judgment
based upon any ongoing violation of federal law by Kelly; (4)
*sua sponte* dismissed plaintiff's ADA claims in both actions,
and her Rehabilitation Act claims in Action No. 2, as against
the UFSD and NYSED without prejudice; and (5) directed
plaintiff to retain counsel, or move for the appointment of
counsel, on behalf of B.D.S. within thirty (30) days or all
claims asserted on behalf of B.D.S. would be dismissed
without prejudice. [1]

[1]     On July 22, 2009, Ingerman Smith filed a notice
        of appeal of the June 26, 2009 order. By mandate
        entered December 28, 2010, the United States
        Court of Appeals for the Second Circuit dismissed
        Ingerman Smith's appeal as not ripe for review.

 *2  On September 21, 2009, plaintiff, individually and on
behalf of B .D.S., filed an amended complaint, which became
the operative pleading in the consolidated action, against all
defendants [2] and moved for the appointment of counsel on
behalf of B.D.S. By order entered October 2, 2009, plaintiff's
motion to appoint counsel on behalf of B.D.S. was denied
with leave to renew within thirty (30) days upon submission
of an appropriate financial affidavit and plaintiff was advised
that her failure to timely renew the motion, to secure pro bono
counsel or to retain counsel on behalf of B.D.S. would result

in all claims asserted on behalf of B.D.S. in this action being dismissed without prejudice.

2       Although not named in the caption of the amended complaint filed in the consolidated action, the body of the amended complaint refers to Laurie Cariello as a defendant and contains factual allegations against her.

Kelly and the NYSED subsequently moved pursuant to Rules 12(b) (1) and (5) of the Federal Rules of Civil Procedure to dismiss the amended complaint against Kelly as barred by the doctrine of absolute immunity and against Kelly and the NYSED for improper service of process, respectively; and Ingerman Smith moved pursuant to Rules 12(b) and (c) of the Federal Rules of Civil Procedure to dismiss the amended complaint as against it and for judgment on the pleadings, respectively. By order dated April 26, 2011, *inter alia:* (1) the branches of Ingerman Smith's motion seeking judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure was granted and plaintiffs claims were dismissed in their entirety with prejudice as against Ingerman Smith; (2) the branch of Kelly's and the NYSED's motion seeking dismissal of plaintiff s claims against Kelly as barred by the doctrine of absolute immunity was granted and plaintiff's claims were dismissed in their entirety with prejudice as against Kelly; (3) the branch of Kelly's and the NYSED's motion seeking dismissal of the amended complaint against the NYSED pursuant to Rule 12(b)(5) for insufficient service of process was granted and the amended complaint was dismissed in its entirety without prejudice as against the NYSED; (4) plaintiff s Section 1985 claims were dismissed in their entirety with prejudice; and (5) all claims asserted on behalf of B.D.S. were dismissed in their entirety without prejudice. Accordingly, only the following claims remain in this action: (1) the Section 1983 and 1988 claims asserted by plaintiff, individually, against the UFSD defendants and additional UFSD defendants (collectively, "defendants"); (2) the IDEA, Rehabilitation Act and ADA claims asserted by plaintiff, individually, against the UFSD; and (3) Ingerman Smith's counterclaim against plaintiff Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiff's remaining claims in their entirety. 3

3       Defendants served plaintiff with their motion for summary judgment on or about September 15, 2011, in accordance with a briefing schedule set by this Court, as amended during a July 25, 2011 status conference. When plaintiff failed to timely serve any opposition to the motion in accordance with the amended briefing schedule, i.e., by October 12, 2011, or to seek an extension of time to do so, defendants twice moved for leave to file their motion as unopposed. Plaintiff did not respond to either of those motions, filed October 24, 2011 and November 16, 2011, respectively. Accordingly, by order dated November 18, 2011, defendants were granted leave to file their summary judgment motion as unopposed. Defendants filed their unopposed motion on November 28, 2011. Only thereafter did plaintiff belatedly seek an extension of time to oppose the motion, more than six (6) weeks after the deadline to serve her opposition set forth in the amended briefing schedule had expired. In light of plaintiff s unreasonable failure to timely oppose the motion or to seek an extension of time to do so, her request for an extension of time to oppose the motion was denied by order dated January 26, 2012.

I. Background

A. Factual Background 4

4       The facts are taken from defendants' Statement of Undisputed Facts pursuant to Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1"), to the extent supported by the administrative record, as well as from the administrative record itself.

1. The Parties

Plaintiff is the mother and natural guardian of B.D.S., a child with a history of developmental and learning problems who received a public education in the UFSD through and including the 2005–2006 academic year (her sixth grade year). (56.1 Stat., ¶ 1).

**\*3** The following defendants were employed by the UFSD in the following capacities at all relevant times: (1) Virginia Thompson ("Thompson"), as the director of special education, the chairperson of the Committee of Special Education ("CSE") and the administrator of pupil personnel services; (2) Dr. Christopher Gallagher ("Gallagher"), as superintendent; (3) David Riddell ("Riddell"), as the special education teacher designated on the individualized education program ("IEP") developed for B.D.S.; (4) Laurie Cariello

("Cariello"), as the English language arts teacher of the sixth (6th) grade "teaching team" for B.D.S.; (5) Jeananne Dempsey, a/k/a Jeanne Dempsey ("Dempsey"), as the science and math teacher of the sixth (6th) grade "teaching team" for B.D.S.; (6) Patricia Mellas, a/k/a Patti Mellas ("Mellas"), as the social studies teacher of the sixth (6th) grade "teaching team" for B.D.S .; (7) Elaine White ("White"), as the school psychologist at Southold Elementary School within the UFSD; (8) Susan Nobile ("Mobile"), as a reading specialist; (9) Mary Fitzpatrick ("Fitzpatrick"), as the principal and building administrator of the Junior/Senior High School within the UFSD; (10) Gail Andrews Butta ("Butta"), as the head of special education in the Junior/Senior High School within the UFSD; and (11) Mary Lou Cahill ("Cahill"), as the special education teacher assigned to B.D.S. by the UFSD. In addition, at all relevant times, the Board of Education of the UFSD was comprised of the following defendants: Richard Caggiano ("Caggiano") as President, and Paulette Ofrias ("Ofrias"), Judi Fouchet ("Fouchet"), Dr. Robert Walsh ("Walsh") and Scott DeSimone ("DeSimone"), as members (collectively, the "BOE defendants"). Moreover, defendant Bruce Kollmar ("Kollmar") was, at all relevant times, the "Out of District CSE Chairperson" under contract with the UFSD.

### 2. B.D.S.'s Performance in Fifth Grade

An "Evaluation Review" completed by Nobile in September 2004, at the beginning of B.D.S.'s fifth grade year, indicates that B.D.S. "demonstrated average regression over the summer, meaning her levels [were] consistent with those normally demonstrated over a long vacation," and, therefore, that extended year ("EY") services [5] for B.D.S. were not warranted. In an October 2004 progress report, Nobile further indicated, *inter alia:* (1) that B.D.S. demonstrated consistent growth in sight word development skills over time; (2) that although test scores revealed a "slight regression" in B.D.S.'s decoding skills over the summer, B.D.S. was able to "retrieve[ ] and surpass[ ] her 4/01/04 level of performance, indicating consistent growth in [those] skills over time;" and (3) that B.D.S.'s word reading efficiency was within normal limits for her age. By November 2004, Nobile reported, *inter alia,* that B.D.S. no longer demonstrated any summer regression. Furthermore, in December 2004, Nobile, *inter alia:* (1) reported that B.D.S.'s sight word and decoding skills were "firmly within the average range;" and (2) recommended that the CSE discontinue the reading services previously provided by the UFSD for B.D.S. in order to allow her more time to apply her reading skills within the classroom setting.

**5** New York Education Law provides, in relevant part, that "[t]he board of education * * * shall be required to furnish suitable educational opportunities for children with [disabilities] by one of the special services or programs listed [in that statute]. The need of the individual child shall determine which of such services shall be rendered. Each district shall provide to the maximum extent appropriate such services in a manner which enables children with [disabilities] to participate in regular education services when appropriate. Such services or programs shall be furnished *between the months of September and June of each year,* except that * * * with respect to the students whose [disabilities] are severe enough to exhibit the need for a structured learning environment of twelve months duration *to maintain developmental levels,* the board of education * * * upon the recommendation of the [CSE] * * * shall also provide * * * for the provision of special services and programs * * * during the months of July and August as contained in the [IEP] for each eligible child * * *." N.Y. Educ. Law § 4402(2)(a) and (b) (emphasis added). In addition, regulations promulgated by the New York State Commissioner of Education ("the Commissioner") provide, in relevant part, that "[s]tudents shall be considered for twelve month special services and/or programs in accordance with their need to prevent substantial regression, if they are: * * * students who * * * because of their disabilities, exhibit the need for a twelve month special service and/or program provided in a structured learning environment of up to twelve months duration *in order to prevent substantial regression* as determined by the [CSE]. * * * All [EY services] programs * * * offered during July and August shall have been approved by the commissioner [of Education] in the first year in which the program is offered and periodically thereafter." 8 N.Y.C.R.R. § 200.6(k) (emphasis added). "Substantial regression" is defined in the regulations as "a student's inability to maintain developmental levels due to a loss of skill or knowledge during the months of July and August of such severity as to require an inordinate period of review at the beginning of the school year to reestablish and maintain IEP goals and objectives

mastered at the end of the previous school year." 8 N.Y.C.R.R. § 200.1(aaa).

**\*4** On her final report card for the 2004–2005 academic year, B.D.S. received grades of "3," with the highest grade attainable being a "4," in all areas of the four (4) academic subjects, i.e., English language arts, mathematics, science and social studies, indicating that her performance in those subjects met grade level expectations, with the exception that she received a grade of "2" in the area of reading, indicating that she displayed difficulty meeting grade level expectations in that one (1) area.

3. The 2005–2006 Academic Year

On May 11, 2005, the CSE met to conduct its annual review. The IEP developed for B.D.S. for the 2005–2006 academic year (her sixth grade year) included: (1) resource room services for three (3) days out of the six (6)-day cycle, individual remedial reading services for one (1) hour twice a week and individual speech therapy services for two (2) days out of the six (6)-day cycle; (2) support services, including use of a graphic organizer with Inspiration software, use of an auditory enhancer and testing accommodations; and (3) academic intervention ("AI") services [6] during the summer of 2005, including speech therapy twice a week for six (6) weeks and one-to-one reading services twice a week for eight (8) weeks. (56.1 Stat, ¶¶ 6–7). B.D.S.'s parents agreed with the CSE's recommendations for the 2005–2006 academic year and for the summer of 2005 and B.D.S. received the AI services during the summer 2005 in accordance with the IEP.

[6]   Regulations promulgated by the Commissioner authorize school districts to provide AI services to students within their district who score below the state designated performance level on state elementary assessments in English language arts, mathematics, science and/or social studies or who "are determined, through a district-developed or district adopted procedure \* \* \* to be at risk of not achieving State standards in English language arts, mathematics, social studies and/ or science. *See* 8 N.Y.C.R.R. § 100.2(ee)(2). School districts are responsible for "develop [ing] a description of [AI] instructional and/or student support services to be provided in schools to students in need of such services \* \* \* ." 8 N.Y.C.R.R. § 100.2(ee)(4)(l)(i). The description of available AI services "shall specifically describe: (a) the district-wide procedure(s) used to determine

the need for [AI] services; (b) [AI] instructional and/or student support services to be provided pursuant to paragraph (5) of this subdivision; (c) whether instructional services and/or student support services are offered during the regular school day or during an extended school day or year; and (d) the criteria for ending services, \* \* \*." *Id* . School districts may: (i) "use time available for [AI] instructional and/or student support services during the regular school day [,][and] (ii) \* \* \* provide students with extended academic time beyond the regular school day and school year." 8 N.Y.C.R.R. § 100.2(ee)(5).

In October 2005, near the beginning of B.D.S.'s sixth grade year, Deborah Kinahan ("Kinahan"), B.D.S.'s reading teacher, conducted an educational evaluation of B.D.S. and reported, *inter alia,* that B.D.S.'s developmental level on basic reading skills and reading comprehension was within the average range of scores obtained by others at her grade level.

In November 2005, White conducted a cognitive and educational evaluation of B.D.S. and reported, *inter alia:* (1) that B.D.S.'s working memory capacity was limited, but within the low average range; (2) that B.D.S.'s academic achievement in broad written language and written expression was within the average range and her overall reading ability was limited; (3) that B.D.S.'s fluency (a) in mathematics problems and writing was average and (b) with reading tasks was limited; (4) that B.D.S.'s nonverbal reasoning abilities were within the high average range and were much better developed that her verbal reasoning abilities, which were within the average range; (5) that B.D.S.'s abilities to sustain attention, concentrate and exert mental control were in the low average range and were a weakness relative to her nonverbal and verbal reasoning abilities; and (6) that B.D.S.'s ability to process simple or routine visual material without making errors was in the average range.

In December 2005, an independent auditory and language processing re-evaluation of B.D.S. was conducted by Donna Geffner ("Geffner"), who reported, *inter alia:* (1) that B.D.S. had a borderline deficit in auditory processing, with difficulties in reading accuracy, comprehension, short-term memory, distractability, figure-ground listening, receptive and expressive language and attentional issues, similar to those presented during Geffner's initial evaluation of B.D.S. in September 2004; (2) that B.D.S.'s test scores had improved in the areas of (a) phonemic synthesis, which was above the criterion for her age, and (b)

auditory conceptualization, which continued to be below the criterion for her grade level, but only by one (1) year as opposed to her previous test score which was below the criterion in that area by two (2) grade levels; (3) that B.D.S.'s temporal integration was not completely developed, her working memory was impaired and her short-term memory, word retrieval ability, auditory comprehension and receptive language skills remained compromised; (4) that B.D.S. displayed difficulty in the area of rapid naming; (5) that there was (a) "a significant improvement" in B.D.S.'s expressive language, which was within the average range upon reevaluation, (b) "a small improvement" in B.D.S.'s receptive language, (c) improvement in B.D .S.'s core language, language content, Word Classes, semantic relationships and all expressive language tasks, i.e., word definitions, formulated sentences and sentence assembly, (d) "a slight decrease" in B.D.S.'s language memory, which was still within the low average range, and (e) no improvement in B.D.S.'s ability to understand concepts and spoken paragraphs and to follow directions; (6) that B.D.S. had made progress and improvement through accommodations, "appropriate intervention" and reading instruction, but continued to present with an auditory processing disorder and receptive language disorder that contributed to her language-based learning disability and dyslexia; (7) that B.D.S.'s scores on the Clinical Evaluation of Language Fundamentals–Fourth Edition ("CELF–4") test placed her in the average range of functioning in the areas of core language, receptive language, expressive language, language content and language memory; and (8) that "[w]ith continued parental support, school accommodations, and specific intervention programs, prognosis for continued growth [was] positive." Geffner recommended, *inter alia:* (1) that B.D.S.'s classification be changed from "Learning Disabled" to "Speech-language impaired;" (2) that the UFSD continue to provide B.D.S. with classroom and testing accommodations and with reading instruction; (3) that B.D.S. be permitted to use a laptop with Inspiration software in class; (4) that B.D.S. be provided (a) a personal FM ear level unit, i.e., an auditory enhancer, (b) speech-language therapy twice a week, (c) EY services with a reading specialist and speech-language services, (d) support services for writing and a graphic organizer and (e) a Fast ForWord computer program; (5) that B.D.S. be permitted to take a foreign language on a pass-fail basis; and (6) that B.D.S.'s attention in the classroom be monitored.

**\*5** Progress reports for B.D.S. during the 2005–2006 academic year indicate: (a) that as of March 2006, B.D.S.

achieved scores of seventy-two (72), eighty-eight (88) and eighty-three (83) in English language arts subjects, seventy-three (73) in mathematics, seventy-nine (79) in social studies and eighty-one (81) in science; and (2) that as of June 2006, B.D.S. achieved scores of sixty-five (65), ninety (90) and ninety (90) in English language arts subjects, eighty-one (81) in mathematics, seventy-nine (79) in social studies and seventy-eight (78) in science. In addition: (1) Dempsey indicated that B.D.S.'s academic performance fell within the average band; and (2) Kinahan reported that although B.D.S. was progressing in the area of reading, her decoding and fluency skills continued to be weak and she had difficulty with comprehension and organization.

On her final report card for the 2005–2006 academic year, B.D.S. received a grade of "3" in all areas of all subjects, indicating that her performance in all subjects met grade level expectations.

### 3. Development of B.D.S.'s IEP for the 2006–2007 Academic Year

The CSE met on March 9, 2006 to review the evaluations of Geffner and White, as well as an assistive technology evaluation that had been completed by Tom Rosati. The meeting was attended by B.D.S.; her parents; three (3) of plaintiff s friends, as "family support" members; Thompson; White; Dempsey; Riddell; Mellas; Carriello; the principal of the elementary school; and a parent member. During the meeting: (1) Dempsey reported that B.D.S.'s science skills development and math skills testing scores were within the average range; (2) Mellas reported that B.D.S. actively participated in social studies classes and attained average grades, although she occasionally needed assistance to organize her thought processing and to remind her of the techniques or compensatory skills she was learning; (3) Cariello commended B.D.S. for her persistence of effort in reading and writing skills development; (4) White reported that B.D.S.'s verbal abilities were within the average range, her ability to work with visual perception was above average, her processing speed was "very good," her full scale IQ was in the average band, her working memory was an area of weakness and her fluency and proficiency of computing tasks was delayed; and (5) Geffner recommended that the UFSD provide B.D.S. with EY services in a six (6)-week program at the Landmark School ("Landmark") [7] . The CSE approved the following additional services for B.D.S.: (a) a personal laptop with Microsoft Office for students including One Note; (b) an auditory enhancer, i.e., a Lightspeed Sound System

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

in B .D.S.'s classroom; and (c) one-to-one tutoring three (3) hours a week, to be provided as an AI service during the summer of 2006. B.D.S.'s parents did not agree with the summer AI services being offered, as opposed to B.D.S.'s placement at Landmark for the summer, but consented to the other additional services for B.D.S.

7      Landmark is a private, not-for-profit school, located in Prides Crossing, Massachusetts, for students with average to above average IQ who have a specific language-based learning disability.

**\*6** On April 24, 2006, Kinahan reported that she did not see any regression in B.D.S.'s skills after long school breaks; that she did not observe B.D.S. as performing significantly below grade level; that she observed B.D.S. to be an average student; that B.D.S.'s decoding skills were "a little weak," but she compensated well for that weakness and her comprehension was good; and that she did not believe B.D.S. was a good candidate for Landmark because it was too restrictive for her.

On April 26, 2006, the CSE met to discuss summer services for B.D .S following her interview and assessment by Landmark. The meeting was attended by B.D.S., plaintiff, three (3) of plaintiff s friends, Thompson, White, Dempsey, Riddell, Mellas, B.D.S.'s speech therapist, the principal and a parent member. During the meeting, Mr. Hicks, who tested B.D.S. for purposes of setting up a program for her at Landmark, reported, *inter alia:* (1) that B.D.S. had attained "some very high scores," particularly on the Linda Mood auditory conceptualization test and word attack skills test, but that her word identification was "significantly lower," and her accuracy and fluency on oral directions was "even lower" yet; (2) that B.D.S. displayed "some difficulty" in raw auditory memory; (3) that B.D.S.'s scores on block design and matrix reasoning were "very strong;" and (4) that B.D.S.'s vocabulary and long term learning were good. Thompson and White indicated that B.D.S. did not legally fit the criteria for EY services and, thus, that any summer program at Landmark for the summer of 2006 could only be approved as an AI service, and Thompson also indicated that Landmark did not quality as a legitimate summer program for EY services under state regulations. Nonetheless, the CSE agreed to allow B.D.S. to attend a summer program at Landmark as an AI service during the summer of 2006. (56.1 Stat., 19). Plaintiff consented to the summer services being provided as an AI service, (56.1 Stat., ¶ 13), although she alleges that she and Thompson "agree [d] to disagree about the service being delivered through the AIS budget * * * [and] about [B.D.S.'s] classification, so long a[sic] [B.D.S.] [received] the service

that [met] her needs as decided at the CSE." (Amend.Compl., ¶ 6.56).

4. B.D.S.'s IEP for the 2006–2007 Academic Year
On May 26, 2006, the CSE conducted its annual review to develop B .D.S.'s IEP for the 2006–2007 academic year (her seventh grade year). (56.1 Stat., ¶ 14). The meeting was attended by B.D.S., her parents, Thompson, the UFSD psychologist, a special education teacher, Riddell, Mellas, Dempsey, Cariello, and two (2) of plaintiff's friends. During the meeting: (1) B.D.S. requested that she be provided with the previously-approved laptop; (2) B.D.S.'s parents reported that the Lightspeed Sound System was not being used in B.D.S.'s classroom; (3) Kinahan reported that B.D.S.'s comprehension and organization were improving and that B.D.S. did not present with weakness in decoding; (4) B.D.S.'s speech therapist reported that B.D.S. continued to present with weakness in auditory word, auditory memory, sentence memory and interpretation of directions, but also presented in the high average range in auditory ability to use thinking and reasoning skills to solve verbal problems and in discrimination of auditory words; and (5) Riddell reported that B.D.S. had not had to use the extended-time testing accommodation. The IEP developed for B.D.S. during the annual review meeting provided for: (1) resource room services to be increased from three (3) days in every six (6)-day cycle to daily, commencing on September 6, 2006 until June 13, 2007; (2) use of a graphic organizer with Inspiration software, an individual auditory enhancer and a laptop in all classes from September 6, 2006 to June 21, 2007; (3) testing accommodations; and (4) textbooks and literature books to be provided on CD. Plaintiff agreed with the CSE's recommendations for B.D.S.'s 2006–2007 IEP, including the placement of B.D.S. in the program at Landmark for the summer of 2006 as an AI service, and signed a consent form indicating such agreement, (56.1 Stat., ¶ 15).

**\*7** B.D.S. attended the summer program at Landmark during the summer of 2006, which was provided by the UFSD as an AI service. (56.1 Stat ., ¶ 10). At all relevant times, Landmark was not approved by the Commissioner as a school with which the UFSD may contract to instruct students with disabilities. (56.1 Stat., ¶ 12).

On July 31, 2006, the CSE sub-committee met in order to get feedback from Landmark regarding B.D.S.'s performance in its summer program and to ascertain "what more [the CSE] can do for [B.D.S.] on [its] end." The meeting was attended by Thompson, White, a special education teacher, a

regular education teacher, B.D.S., B.D.S.'s parents, three (3) of plaintiff's friends, a liaison for Landmark, the academic dean for Landmark and a case manager from Landmark. During the meeting, Thompson, *inter alia,* advised: (1) that she had made it a priority to get the previously-approved laptop to B.D.S.; that B.D.S.'s books had been ordered on CD; and that the individual listening device would be ordered as soon as B.D .S. picked out the one that she wanted; (2) that B.D.S. had made progress in the public school setting, had demonstrated success on the New York State benchmark exams without having any testing modifications and had improved in her ability to read, although her fluency was still delayed; (3) that B.D.S. had had a lead role in a school play and was able to memorize her lines and to speak them with "great articulation;" and (4) that there was no indication that the more restrictive Landmark program could be approved by the CSE or UFSD under state regulations. The CSE sub-committee recommended continued placement in the least restrictive environment of UFSD mainstream classes; again offered B.D.S. daily resource room services and accommodations, such as, *inter alia,* use of a graphic organizer with Inspiration software program, a personal auditory enhancer, a laptop in all regular classes, books on CD in English, science and social studies classes, modified homework assignments and preferential seating; and additionally offered B.D.S. a daily one-to-one tutorial period with a special education teacher and individual reading remediation services twice a week. (56.1 Stat ., ¶¶ 16–18, 54–56). B.D.S.'s parents did not agree with the CSE sub-committee's recommendations and requested that B.D.S. be placed in Landmark for the 2006–2007 academic year and that the full CSE meet prior to the beginning of that school year. (56.1 Stat., ¶¶ 19–20). After meeting with plaintiff, Gallagher denied her request for a full CSE meeting to be held during the summer and advised her that he had instead instructed that a CSE meeting be scheduled during the beginning of the academic year. (56.1 Stat., ¶¶ 21–22).

On August 18, 2006, plaintiff requested an impartial hearing, (56 .1 Stat., ¶ 23), alleging, *inter alia,* that B.D.S. was being denied an FAPE for the 2006–2007 academic year and seeking pendency placement for B.D.S. at Landmark and reimbursement for B.D.S.'s tuition at Landmark. (56.1 Stat., ¶¶ 28–29). By letter dated August 25, 2006, plaintiff was notified that a full CSE meeting had been scheduled, in accordance with Gallagher's instructions, for September 11, 2006. (56.1 Stat., ¶ 24). By letter dated September 8, 2006, plaintiff requested that the CSE meeting be cancelled because

she had filed a request for an impartial hearing. (56.1 Stat ., ¶ 25).

**\*8** B.D.S. attended Landmark during the 2006–2007 academic year (her seventh grade year) and her parents paid the tuition therefor. (56.1 Stat., ¶¶ 26–27).

An eight (8) day hearing was conducted before IHO Michael Lazan ("IHO Lazan") between October 23, 2006 and April 27, 2007, during which, *inter alia:* (1) Dempsey testified that B.D.S. "fell within the average range," performed in the average band, i.e., in the mid-seventies to low eighties, in her mainstream science and math classes, and was an average student academically, (56.1 Stat., ¶¶ 30–32); (2) Mellas testified that B.D.S. was "fairly proficient," performed as well as most of the other students and was an average performer in social studies class, i.e., averaging test scores in the high seventies to low eighties range, (56.1 Stat., ¶¶ 34–35); (3) Cariello testified that B.D.S. was in the average band in reading and in the low average band for written language and overall language skills as compared to her peers in the class, that B.D.S. had accomplished all of the sixth grade material and demonstrated growth during her sixth grade year and that B.D.S. had played a lead role in the school play in 2005, (56.1 Stat., ¶¶ 37–40); and (4) Riddell testified that he focused on the skills with which B.D.S. displayed difficulty and tried to improve her study and work habits during resource room instruction, that B.D .S.'s November 2005 cognitive and educational evaluations were "acceptable," with the exception that her grade equivalent scores for working memory, broad reading and reading fluency were low compared to her performance in the resource room, and that B.D.S.'s level of effort was on line with most sixth graders. (56.1 Stat., ¶¶ 41–44). In addition, evidence was presented during the hearing that B.D.S. was liked by her peers; did not exhibit any behavioral problems; was active with extracurricular activities, including skiing and drama; achieved an average level on the New York State English Language Arts assessment without IEP accommodations; and performed within acceptable grade level expectations during the 2005–2006 academic year (her sixth grade year). (56.1 Stat., ¶¶ 45–49).

By decision dated January 19, 2007, IHO Lazan, *inter alia,* effectively denied plaintiff's request for pendency at Landmark by deeming pendency to be "the resource room 5:1 program agreed to and implemented from the May 11, 2005 IEP." IHO Lazan found, *inter alia,* that B.D.S.'s placement at

Landmark was "clearly temporary for the summer of 2006." IHO Lazan's January 19, 2007 decision was never appealed.

By decision dated September 5, 2007, IHO Lazan, *inter alia,* denied plaintiff's request for reimbursement of B.D.S.'s tuition at Landmark for the 2006–2007 academic year, finding, *inter alia:* (1) that B.D.S. had attained passing grades in all of her subjects and had largely performed in the average band during the 2005–2006 academic year at the UFSD; (2) that test results showed that B.D.S. had achieved "significant progress" in certain areas, including semantic relationships, word definitions, formulated sentences, sentence assembly, Word Classes 1 and 2, Word Classes receptive ability and Word Classes expressive ability; (3) that the special education program and services offered by the UFSD for B.D.S. for the 2006–2007 academic year were very similar to the program and services she had during the 2005–2006 academic year, with which she had progressed, and, thus, "would have been likely to produce progress for 2006–2007;" and (4) that although the UFSD had committed certain procedural violations, B.D.S.'s parents had failed to show how those violations significantly impacted B.D.S.'s FAPE. (56.1 Stat., ¶¶ 57–59).

**\*9** On October 13, 2007, plaintiff petitioned for review of IHO Lazan's September 5, 2007 decision by the NYSED State Review Office pursuant to 20 U.S.C. § 1415(g). By decision dated January 2, 2008, state review officer ("SRO") Kelly dismissed the appeal of IHO Lazan's September 5, 2007 decision, finding, *inter alia:* (1) that the hearing record supported IHO Lazan's determinations (a) that B.D.S.'s parents had failed to show how the procedural violations by the UFSD had significantly impacted B.D.S.'s FAPE and (b) that the UFSD had offered B.D.S. a FAPE for the 2006–2007 academic year; and (2) that since there was no basis in the record to conclude that B.D.S. required a full-time special education program in order to meet her needs, placement at Landmark would have been overly restrictive for B.D.S. (56.1 Stat., ¶¶ 60–62).

5. Facts Pertaining to Services for the Summer of 2007

On June 15, 2007, the CSE met via teleconference to conduct B.D.S .'s annual review and to prepare her IEP for the 2007–2008 academic year (her eighth grade year). (56.1 Stat., ¶¶ 67, 71). The meeting was attended by Thompson, White, Butta, Cahill, a parent member, three (3) of plaintiff s friends, plaintiff, B.D.S., the school liaison for Landmark, a case manager for Landmark, and five (5) teachers from Landmark. Before the meeting, Landmark had provided the CSE with a student report, dated January 12, 2007, which included progress reports prepared by B.D.S.'s teachers at Landmark during the 2006–2007 academic year, a draft IEP prepared by Landmark staff, results of tests that had been administered by Landmark and samples of work that had been completed by B.D.S. while attending Landmark. (56.1 Stat., ¶ 68). During the meeting: (1) the CSE reviewed Landmark's draft IEP; (2) Landmark staff advised the CSE that B.D.S's test scores had improved in the areas of word attack, word identification, reading rate, reading accuracy and reading fluency when compared to her test scores in 2006; (3) the CSE reviewed B.D.S.'s test scores, which reflected improvement in the areas of reading vocabulary, reading comprehension, math problem solving, math procedures and spelling; and (4) the liaison for Landmark recommended that B.D.S. (a) receive EY services at Landmark for the summer of 2007 and (b) attend Landmark during the 2007–2008 academic year. (56.1 Stat., ¶¶ 73, 74, 77). Both plaintiff and B.D.S. contributed significantly to the information provided during the meeting. (56.1 Stat., ¶ 76). Thompson: (1) advised the CSE that based upon the information presented during the meeting, B.D.S.'s needs could be met within the UFSD and, therefore, the recommendation was for B.D.S. to return to the UFSD; and (2) explained that B.D.S.'s test scores (a) did not support an out-of-state placement, (b) supported a public school placement as B .D.S.'s least restrictive environment and (c) did not support EY services during the summer of 2007 because there was no evidence of regression. (56.1 Stat., ¶ 78–81, 91). The CSE recommended that B .D.S.: (1) be placed in the UFSD's inclusion classes with accommodations, including Kurtzweil software on her laptop, use of a graphic organizer with Inspiration software and use of an individual auditory enhancer; and (2) receive (a) daily one-on-one tutoring with a certified reading teacher and daily resource room support during the 2007–2008 academic year [8] and (b) reading remediation as an AI service for three (3) hours a week for eight (8) weeks during the summer of 2007. (56.1 Stat., ¶¶ 75, 82, 91).

[8]     The IEP for B.D.S. for the 2007–2008 academic year (eighth grade) is not at issue in this case.

**\*10** On July 16, 2007, B.D.S., plaintiff, three (3) of plaintiff's friends and Thompson attended a resolution meeting regarding the summer services being offered by the UFSD for B.D.S. At the meeting, Thompson indicated, *inter alia:* (1) that B.D.S. had been approved to receive reading remedial services three (3) times a week for eight (8) weeks with a qualified reading instructor over the summer of 2007,

but did not qualify for EY services because there was no history of regression; (2) that the IEP developed during the June 15, 2007 meeting transposed all of the goals from Landmark's draft IEP but was for services to be provided within the UFSD from September 5, 2007 to June 17, 2008; (3) that the UFSD would approve a neuropsychological evaluation of B.D.S., following which plaintiff could request an independent neuropsychological evaluation if she did not agree with the results; and (4) that the UFSD would approve an independent evaluation of B.D.S. for auditory processing disorder and speech by Dr. Geffner. Plaintiff agreed with the additional evaluations but not with the summer services being offered and requested that another CSE meeting be scheduled to discuss the issue of whether B.D.S. qualified for EY services.

On June 22, 2007, plaintiff filed a due process complaint relating to the services to be provided to B.D.S. during the summer of 2007 and seeking pendency placement for B.D.S. at Landmark. On August 13, 2007, plaintiff amended her due process complaint to seek reimbursement for ninety (90) hours of compensatory services in lieu of pendency placement at Landmark, since B.D.S. had not attended a summer program at either the UFSD or Landmark during the summer 2007. (56.1 Stat, ¶¶ 63–66).

On June 28, 2007, IHO Susan Lushing ("IHO Lushing") denied plaintiff's request for pendency at Landmark during the summer of 2007, which plaintiff appealed to the NYSED. By decision dated September 19, 2007, SRO Kelly dismissed plaintiff's appeal.

Between August 22, 2007 and September 27, 2007, a four (4) day hearing was held before IHO Lushing relating to the services offered to B.D.S. for the summer of 2007. (56.1 Stat., ¶ 84). During the hearing, *inter alia,* Riddell, Mellas and Dempsey all testified that they saw little or no regression in B.D.S.'s skills after she returned from long school breaks; Nobile explained that her testing of B.D.S. in 2004, near the beginning of the academic year, presented a student whose regression was within normal limits; and evidence was presented of testing performed by Landmark in September 2007 which did not support Landmark's expectation of regression in B .D.S.'s skills. (56.1 Stat., ¶¶ 85–89).

By decision dated November 11, 2007, IHO Lushing: (1) found, *inter alia:* (a) that the UFSD correctly determined that B.D.S. did not meet the definition to qualify for EY services, and (b) that even though B.D.S. had not attended

summer services at the UFSD, her parents had established that such services would have been "uncertain at best and possibly unavailable" and, therefore, had plaintiff placed B.D.S. in the Landmark program during the summer of 2007, IHO Lushing would have ordered the UFSD to reimburse her tuition therefor; and (2) awarded B.D.S. twenty-four (24) hours of supplementary one-to-one remedial tutoring at Landmark, not to exceed two thousand four hundred dollars ($2,400.00), as compensatory services. (56.1 Stat., ¶¶ 92–94).

**\*11** In or about December 2007 or January 2008, the UFSD petitioned the NYSED for review of so much of IHO Lushing's November 11, 2007 decision as awarded plaintiff compensatory services. (56.1 Stat., ¶ 95). By decision dated February 8, 2008, SRO Kelly sustained the appeal and annulled IHO Lushing's decision, finding, *inter alia:* (1) that plaintiff had not sustained her burden of establishing that the AI services offered by the UFSD for the summer of 2007 were not appropriate; (2) that the record showed that the UFSD had historically offered and provided summer services to both its regular education and special education students, including B.D.S.; (3) that the UFSD had offered the AI services referred to in B.D.S.'s IEP during the summer of 2007 but B.D.S. had not availed herself of those services; and (4) that the 1HO had improperly awarded compensatory services absent any determination that B.D.S. had been denied an FAPE by the UFSD. (56.1 Stat., ¶¶ 96–99).

B. Procedural History
On April 1, 2008, plaintiff, individually and on behalf of B.D.S., commenced an action against the UFSD defendants, Kelly and Ingerman Smith, alleging, *inter alia,* violations of the IDEA, the Rehabilitation Act, Sections 1983 and 1985, the ADA, the New York Education Law and the New York Constitution. On May 8, 2008, plaintiff, individually and on behalf of B.D.S., commenced a second action against the same defendants, the additional UFSD defendants and the NYSED. Thereafter, Ingerman Smith and Kelly moved, *inter alia,* pursuant to Rule 12 of the Federal Rules of Civil Procedure to dismiss the amended complaints filed in both actions as against them.

By order entered June 26, 2009, this Court, *inter alia:* (a) consolidated Actions No. 1 and 2; (b) denied, *inter alia,* the branches of Ingerman Smith's motion seeking dismissal of the amended complaints pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure; (c) dismissed plaintiff's Section 1983, Section 1985 and state law claims as against Ingerman Smith without prejudice pursuant to Rule 12(b)(6)

of the Federal Rules of Civil Procedure for failure to state a claim, and *sua sponte* dismissed plaintiff's Section 1985 claims as against all other defendants without prejudice for failure to state a claim; (d) dismissed plaintiff's ADA and Rehabilitation Law claims as against Ingerman Smith, Kelly and all individual defendants with prejudice for failure to state a claim; (e) dismissed plaintiff's claims as against Kelly with prejudice, but granted her leave to amend the pleadings to assert a claim seeking a declaratory judgment based upon any ongoing violation of federal law by Kelly; (f) *sua sponte* dismissed plaintiff's ADA claims in both actions, and her Rehabilitation Act claim in Action No. 2, as against the UFSD and NYSED without prejudice; and (g) directed plaintiff to retain counsel or move for the appointment of counsel on behalf of B.D.S. within thirty (30) days or all claims asserted on behalf of B.D.S. would be dismissed in their entirety without prejudice.

 **\*12**  On July 22, 2009, Ingerman Smith filed a notice of appeal of so much of the June 26, 2009 order as denied the branches of its motion seeking dismissal of plaintiff s claims against it with prejudice as barred by the doctrines of absolute or qualified immunity. By mandate entered December 28, 2010, the United States Court of Appeals for the Second Circuit dismissed Ingerman Smith's appeal as not ripe for review in light of this Court's finding, undisputed by Ingerman Smith on the appeal, that the amended complaints in both actions did not adequately allege any conduct by Ingerman Smith sufficient to state a claim for a violation of plaintiff s rights. *B.D.S. v. Ingerman Smith L.L.P.,* No. 09–3177–cv (2d Cir. Oct. 22, 2010) (summary order).

On September 21, 2009, plaintiff filed an amended complaint, which became the operative pleading in the consolidated action, and moved for the appointment of counsel on behalf of B.D.S. By order entered October 2, 2009, plaintiff's motion for the appointment of counsel was denied with leave to renew within thirty (30) days upon submission of an appropriate financial affidavit and plaintiff was advised that her failure to timely renew the motion, to secure pro bono counsel or to retain counsel on behalf of B.D.S. would result in dismissal of the claims asserted on behalf of B.D.S. in their entirety without prejudice.

Kelly and the NYSED subsequently moved pursuant to Rules 12(b) (1) and (5) of the Federal Rules of Civil Procedure to dismiss the amended complaint against Kelly as barred by the doctrine of absolute immunity and against Kelly and the NYSED for improper service of process, respectively;

and Ingerman Smith moved pursuant to Rules 12(b) and (c) of the Federal Rules of Civil Procedure to dismiss the amended complaint as against it and for judgment on the pleadings, respectively. By order dated April 26, 2011, *inter alia:* (1) the branches of Ingerman Smith's motion seeking judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure were granted and plaintiff's claims were dismissed in their entirety with prejudice as against Ingerman Smith; (2) the branch of Kelly's and the NYSED's motion seeking dismissal of plaintiff's claims against Kelly as barred by the doctrine of absolute immunity was granted and plaintiff's claims were dismissed in their entirety with prejudice as against Kelly; (3) the branch of Kelly's and the NYSED's motion seeking dismissal of the amended complaint against the NYSED pursuant to Rule 12(b)(5) for insufficient service of process was granted and the amended complaint was dismissed in its entirety without prejudice as against the NYSED; (4) plaintiff's Section 1985 claims were dismissed in their entirety with prejudice; and (5) all claims asserted on behalf of B.D.S. were dismissed in their entirety without prejudice. Accordingly, only the following claims remain in this action; (1) the Section 1983 and 1988 claims asserted by plaintiff, individually, against the UFSD defendants and additional UFSD defendants; (2) the IDEA, Rehabilitation Act and ADA claims asserted by plaintiff, individually, against the UFSD; and (3) Ingerman Smith's counterclaim against plaintiff.

### 1. The Amended Complaint in the Consolidated Action

 **\*13**  With respect to the remaining Section 1983 claims, the amended complaint filed in the consolidated action alleges, *inter alia:* (1) that Thompson, White, Butta, Cahill, Mellas, Riddell and Dempsey denied B.D.S. her right to a FAPE by "deliberately misconstru[ing] special education services awarded to [B.D.S.] as general education services," (first Section 1983 causes of action [9] ) (Amend.Compl ., ¶¶ 7.4, 8.4); (2) that the BOE defendants and Gallagher denied B.D.S. her right to a FAPE by refusing to enact a "policy on providing AIS services to their students," as required by the New York State Education Law, (Amend.Compl., ¶¶ 7.5, 8.7) (second Section 1983 causes of action); (3) that Gallagher denied B.D.S. her right to a FAPE by "misusing his authority" to recommend that the BOE defendants approve her "special education services as AIS services in addition to the hiring of outside providers for [B.D.S.'s] so called [sic] 'AIS' services," (third Section 1983 causes of action) (Amend.Compl., ¶¶ 7.6, 8.9); and (4) that the UFSD's attempt "to strip [B.D.S.] of her right to special education services by

disguising them * * * [as] AIS Services, is illegal." (fourth Section 1983 cause of action (Lushing)) (Amend.Compl.¶ 8.12). In addition, plaintiff alleges, *inter alia:* (1) that the UFSD violated the IDEA by, *inter alia:* (a) failing to properly evaluate B.D.S. or to develop an appropriate IEP; and (b) denying to fund the private school educational services B.D.S. needed at Landmark, (Amend. Compl., ¶¶ 11.06–11.14; 12.6–12.14); and (2) that the UFSD retaliated against plaintiff in violation of the Rehabilitation Act and the ADA, *inter alia:* (a) by rejecting, "for the first time ever," a CSE's recommendation, i.e., placement at Landmark for the 2008–2009 academic year and EY services for B.D.S.'s sibling; (b) by hiring Kollmar, an outside contractor, to conduct B.D.S.'s CSE meetings; and (c) as a result of public comments made by Gallagher about plaintiff and her family, (Amend.Compl., ¶¶ 13.2–14.1).

9   Plaintiff designates two (2) causes of action as "First Cause of Action Under 42 USC § 1983," one pertaining to IHO's Lazan decision, (Amend.Compl., ¶ 7.4), and one pertaining to IHO Lushing's decision, (Amend.Compl., ¶ 8.4). The two (2) causes of action are essentially identical, with the exception that the one pertaining to IHO Lazan's decision is asserted against Thompson, White and Dempsey only, whereas the cause of action pertaining to IHO Lushing's decision is asserted against Butta, Cahill, Mellas and Riddell as well. Similarly, plaintiff asserts two (2) Section 1983 causes of action designated as "Second," "Third," "Fifth" and "Sixth," respectively, (Amend.Compl., ¶¶ 7.5–7.6, 7.11–7.16, 8 .7–8.8, 8.14–8.20), but those duplicate causes of action are virtually identical, in relevant part. Accordingly, there is no need to distinguish between those causes of action.

Plaintiff seeks: (1) judgment declaring (a) that the UFSD denied B.D.S. a FAPE for the 2006–2007 academic year and the summer of 2007, (b) that B.D.S. "is entitled to educational services to compensate for her loss of educational opportunity caused by the [UFSD's] failure to provide her appropriate programming and services from September 2006" through August 30, 2007, and (c) that B.D.S. "has derived meaningful educational benefit from the special education services she has received at Landmark School;" (2) reimbursement (a) "for all costs of [B.D.S.'s] lost [sic] of Educational services, educational opportunity and documented regression" and (b) "for all costs of [B.D.S.'s] placement at Landmark School, * * *," for the academic years * * * 2006–2007, and the summer

of 2007; and (3) costs and attorney's fees on this action and the administrative proceedings pursuant to 20 U.S.C. § 1415(i) (3)(B). (Amend.Compl., pp. 79–80).

**\*14** Defendants now move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing plaintiff's remaining claims in their entirety. Plaintiff has failed to timely oppose the motion.

## II. Discussion

### A. Rehabilitation Act, ADA and Section 1983 Claims

**1. Standard of Review**

Summary judgment should not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir.2007) (internal quotations and citations omitted); *see Ricci v. DeStefano,* 557 U .S. 557, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (Emphasis added) (internal quotations and citation omitted)). "A fact is material if it 'might affect the outcome of the suit under governing law.' " *Spinelli v. City of New York,* 579 F.3d 160, 166 (2d Cir.2009) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98, 104 (2d Cir.2011), *cert. denied,* 132 S.Ct. 1744 (2012) (accord. "Where the undisputed facts reveal that there is an absence of sufficient proof as to one essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment." *Chandok v. Klessig,* 632 F.3d 803, 812 (2d Cir.2011); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding that summary judgment is appropriate when the non-moving party has no evidentiary support for an essential element for which it bears the burden of proof).

Dzugas-Smith v. Southold Union Free School Dist., Not Reported in F.Supp.2d (2012)

2012 WL 1655540

If the district court determines that there is a genuine dispute as to a material fact, the court must then "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment," *Spinelli,* 579 F.3d at 166 (internal quotations and citation omitted), to determine whether there is a genuine issue for trial. *See Ricci,* 557 U.S. 557, 129 S.Ct. at 2677. "An issue is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Roias,* 660 F.3d at 104 (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505); *see also Beyer v. County of Nassau,* 524 F.3d 160, 163 (2d Cir.2008) (holding that a genuine issue exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor." (citation omitted)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci,* 557 U.S. 557, 129 S.Ct. at 2677 (quoting *Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

**\*15** "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact," *F.D.I.C. v. Great American Ins. Co.,* 607 F.3d 288, 292 (2d Cir.2010) (quotations and citation omitted); *see also Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010) (accord), after which the burden shifts to the nonmoving party to "come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir.2011); *see also Spinelli,* 579 F.3d at 166. Once the moving party meets its burden, the nonmoving party can only defeat summary judgment "by coming forward with evidence that would be sufficient, if all reasonable inferences were drawn in [its] favor, to establish the existence of" a factual question that must be resolved at trial. *Spinelli,* 579 F.3d at 166 (internal quotations and citations omitted); *see also Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548. "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 743 (2d Cir.2003) (alterations in original). "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.' " *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 75 (2d Cir.2005) (quoting *Matsushita Elec.,* 475 U.S. at 586, 106 S.Ct. 1348).

Rule 56(c) (1) of the Federal Rules of Civil Procedure provides, in relevant part, that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record \* \* \*; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Rule 56(e) provides, in relevant part, that "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may: \* \* \* (2) consider the fact undisputed for purposes of the motion; [or] (3) grant summary judgment if the motion and supporting material─including the facts considered undisputed─show that the movant is entitled to it; \* \* \*." Fed.R.Civ.P. 56(e). "Rule 56(e) \* \* \* requires the nonmoving party to *go beyond the pleadings* and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file [as well as documents, electronically stored information, stipulations and other materials, *see* Fed.R.Civ.P. 56(c)(1)(A) ],' designate 'specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548 (emphasis added). "Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves* \* \* \*," *Id.* (emphasis added); *see also Fitzgerald v. Henderson,* 251 F.3d 345, 360– 61 (2d Cir.2001) ("In general, a party opposing a properly supported motion for summary judgment is not entitled to rely solely on the allegations of her pleading, but must show that there is admissible evidence sufficient to support a finding in her favor on the issue that is the basis for the motion."), unless the pleadings are verified in a manner "equivalent of the oath that would be given with respect to an affidavit," *Fitzgerald,* 251 F .3d at 361, and assert factual matters other than upon "information and belief." *Id.* "In ruling on a motion for summary judgment, the district court may rely on any material that would be admissible or usable at trial." *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008) (internal quotations and citations omitted). "A party opposing summary judgment does not show the existence of a genuine issue of fact to be tried merely by making assertions that are conclusory \* \* \* or based on speculation." *Id.* at 310; *see also Brown,* 654 F.3d at 358 (holding that the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation" to defeat summary judgment).

**\*16** "Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit a statement of the allegedly

undisputed facts on which the moving party relies, together with citation to the admissible evidence of record supporting each such fact. * * * If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted." *Giannullo v. City of New York,* 322 F.3d 139, 140 (2d Cir.2003); *see also Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir.2001) ("A party opposing summary judgment must respond with a statement of facts as to which a triable issue remains. See Local Rule 56.1(b). The facts set forth in a moving party's statement 'will be deemed to be admitted unless controverted' by the opposing party's statement. Local Rule 56.1(c)."); Local Civ. R. 56.1(a)-(c). Local Civil Rule 56.1(d) requires that "[e]ach [56.1] statement by the movant or opponent * * *, including each statement controverting any statement of material fact, [ ] be followed by citation to evidence which would be admissible, set forth as required by Fed.R.Civ.P. 56(c)." Courts may decline to "consider as disputed any statement [in the movants' Local Rule 56.1 statement] supported by admissible evidence to which [the non-movant] objects, but does not support with evidence, * * *, in perfect accordance with Local Rule 56.1(d), * * *." *Feis v. United States,* 394 Fed. Appx. 797, 799 (2d Cir. Oct. 1, 2010) (summary order) (quotations and emphasis omitted). "[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record." *Holtz,* 258 F.3d at 74. "[A]llegations * * * cannot be deemed true simply by virtue of their assertion in a Local Rule 56.1 statement." *Id.* at 73. "[W]here there are no[ ] citations or where the cited materials do not support the factual assertions in the [56.1] Statements, the Court is free to disregard the assertion," *Id.* at 73–4 (quotations and citations omitted), and review the record independently. *Id.* at 74.

2. Rehabilitation Act and ADA Claims
Defendants allege that the Rehabilitation Act and ADA claims set forth in plaintiff's amended complaint must be dismissed because plaintiff failed to correct the pleading deficiencies upon which those claims, as set forth in the original complaints, had previously been dismissed.

In the June 26, 2009 order, plaintiff's Rehabilitation Act and ADA claims were dismissed without prejudice on the basis that plaintiff only conclusorily referred to those statutes in the original complaints and did not assert any specific cause of action under those statutes. *See, e.g. Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *

* * While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). In order to state a claim under either statute, a plaintiff must allege: (1) that he or she is a qualified individual with a disability; (2) that the defendants are subject to the relevant statute; and (3) that he or she was denied the opportunity to participate in or benefit from the defendants' services, programs or activities, or was otherwise discriminated against by defendants, by reason of his or her disability. *See Shomo v. City of New York,* 579 F.3d 176, 185 (2d Cir.2009); *Harris v. Mills,* 572 F.3d 66, 73–74 (2d Cir.2009).

**\*17** "Under the ADA and the Rehabilitation Act, a demand for 'reasonable accommodations to assure access to an existing program' is cognizable; but a demand for 'additional or different substantive benefits' is not." *Streck v. Board of Education of East Greenbush School District,* 280 Fed. Appx. 66, 68 (2d Cir. May 30, 2008) (summary order) (quoting *Wright v. Giuliani,* 230 F.3d 543, 548 (2d Cir.2000) (per curiam)); *see also J.D. ex rel. J.D. v. Pawlet School District,* 224 F.3d 60, 70 (2d Cir.2000) ("[U]nder [Rehabilitation Act] regulations, a student may have a viable discrimination claim * * * provided [he or she] establishes that he or she does not enjoy equal access to the school's programs. * * * [T]he duty to provide a [FAPE] is not without limits. * * * [T]he Rehabilitation Act distinguishes 'between the evenhanded treatment of qualified handicapped persons and affirmative efforts to overcome the disabilities caused by handicaps.' *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). While a federal funds recipient must offer 'reasonable' accommodations to individuals with disabilities to ensure meaningful access to its federally funded program, § 504 [of the Rehabilitation Act] does not mandate 'substantial' changes to its program.")

Although plaintiff was afforded the opportunity to re-plead the Rehabilitation Act and ADA claims, she has not corrected the pleading deficiencies with respect to those claims, i.e., she only conclusorily refers to those statutes and fails to allege, *inter alia,* any discrimination by reason of disability beyond a purported failure to provide B.D.S. with an FAPE, which is insufficient to state a claim under either statute. *See, e.g. French v. New York State Department of Education,* No. 10–4298–cv, 2011 WL 5222856, at * 4 (2d Cir. Nov. 3, 2011) (summary order) (affirming dismissal of the plaintiff's ADA and Rehabilitation Act claims on the basis that a violation of the IDEA, without more, is insufficient to support a claim of disability-based discrimination under the ADA or Section 504 of the Rehabilitation Act); *E.H. v. Board of Education*

*of Shenendehowa Central School District,* 361 Fed. Appx. 156, 161 (2d Cir. Oct. 16, 2009) (summary order) (accord). Moreover, the record establishes, *inter alia,* that defendants identified B.D.S. as a student with a disability and created and implemented an IEP for B.D.S. with which she had previously shown significant progress and, therefore, that B.D.S. had been afforded access to an existing program. *See, e.g. Streck,* 280 Fed. Appx. at 68 (finding that the plaintiff had been afforded access to an existing program by virtue of his classification as a student with a disability and the creation and implementation of an IEP); *J.D. ex rel. J.D.,* 224 F.3d at 71 (finding that the School District's refusal to fund the infant plaintiff's enrollment in a private school, without more, did not amount to discrimination where the School District had proposed a multi-component IEP that responded to the major recommendations of the infant plaintiff's psychologist, particularly since the Rehabilitation Act's "regulatory scheme expresses a preference for mainstreaming students with disabilities in a school district's regular school environment, unless that objective cannot be achieved even with the aid of supplementary services.") Plaintiff's challenges to the contents and sufficiency of the IEP developed for B.D.S. for the 2006–2007 academic year and summer of 2007 demand "additional or different substantive benefits" not cognizable under the Rehabilitation Act or ADA. *See, e.g. Streck,* 280 Fed. Appx. at 68 (affirming dismissal of the plaintiff's ADA and Rehabilitation Act claims since he challenged only the content and sufficiency of the IEP created and implemented for him and, thus, demanded "additional or different substantive benefits.") Neither stature "require[s] a public school district to provide students with disabilities with potential-maximizing education, only reasonable accommodations that give those students the same access to the benefits of a public education as all other students." *J.D. ex rel. J.D.,* 224 F.3d at 71. Since the record establishes that defendants offered B.D.S. a specific program designed to address her needs within the UFSD and that her attendance at Landmark was not necessary in order to provide her with an FAPE, the branch of defendants' motion seeking dismissal of plaintiff s Rehabilitation Act and ADA claims is granted and those claims are dismissed in their entirety with prejudice.

3. Section 1983 Claims

**\*18** Although monetary damages are available in claims brought pursuant to Section 1983 for the denial of procedural safeguards or access to administrative remedies under the IDEA, *see Polera v. Board of Education of Newhurgh Enlarged Citv School District,* 288 F.3d 478, 483 n. 5 (2d

Cir.2002); *Quackenbush v. Johnson City School District,* 716 F.2d 141, 148 (2d Cir.1983), the record does not establish that plaintiff was denied such procedural safeguards or administrative remedies in violation of the IDEA, The IDEA provides, in relevant part, that "[a]ny State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies." 20 U.S.C. § 1415(a). The relevant procedures required by the IDEA include: (1) "[a]n opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a [FAPE] to such child, and to obtain an independent educational evaluation of the child;" (2) "[w]ritten prior notice to the parents of the child * * * whenever the local educational agency-(A) proposes to initiate or change; or (B) refuses to initiate or change, the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to the child;" and (3) "[a]n opportunity for any party to present a complaint(A) with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child; * * *." 20 U.S.C. § 1415(b)(1), (3) and (6).

The IDEA further provides that "[w]henever a complaint has been received under subsection (b)(6) * * *, the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing * * *." 20 U.S.C. § 1415(f)(1)(A). The IDEA requires the hearing officer to render a decision "on substantive grounds based on a determination of whether the child received a [FAPE]," 20 U.S.C. § 1415(f)(3)(E) (i), and, where procedural violations are alleged, allows a hearing officer to "find that a child did not receive a [FAPE] only if the procedural inadequacies(I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (III) caused a deprivation of educational benefits," 20 U.S.C. § 1415(f)(3)(E)(ii). "A decision made in a [due process] hearing * * * shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (g) and paragraph (2)." 20 U.S.C. § 1415(i)(1)(A).

**\*19** Subsection (g) provides that "any party aggrieved by the findings and decision rendered in [an impartial due process] hearing may appeal such findings and decision to the State educational agency * * * [which] shall conduct an impartial review of the [hearing officer's] findings and decision * * *." 20 U.S.C. § 1415(g). The statute requires the state review officer to "make an independent decision upon completion of such review," 20 U.S.C. § 1415(g)(2), which "shall be final, except that any party may bring an action under paragraph (2) [of the statute]," 20 U.S.C. § 1415(i)(l)(B).

In addition, regulations promulgated by the Commissioner provide the following procedural due process requirements: (1) that prior written notice be given to the parents of a student with a disability within "a reasonable time before the school district proposes to or refuses to initiate or change the * * * educational placement of the student or the provision of a [FAPE] to the student;" (2) that "reasonable efforts" be made to obtain the written informed consent of the parent whenever required; (3) that written notification be provided of all CSE meetings at least five (5) days prior to the meeting; (4) that reasonable steps be taken "to ensure that one or both of the student's parents are present at each [CSE] meeting or are afforded the opportunity to participate * * *;" (5) that the confidentiality of personally identifiable data, information or records pertaining to the student be preserved; (6) that the procedural safeguards notice prescribed by the Commissioner be used; (7) that an independent educational evaluation be made available at public expense each time the school district conducts an evaluation with which the parent disagrees; (8) that procedures be implemented to allow resolution of any disputes through a voluntary mediation program; and (9) that opportunities be provided (a) to file a due process complaint "with respect to any matter relating to the * * * educational placement of a student with a disability, * * * or the provision of a [FAPE] to such student," (b) to request an impartial due process hearing and (c) to appeal the findings of fact and decisions of the independent hearing officer to a state review officer of the NYSED. 8 N.Y.C.R.R. § 200.5.

Since plaintiff was afforded, *inter alia:* (1) meaningful opportunities (a) to discuss the educational placement of B.D.S. and the provision of an FAPE to her, including the designation of the services provided to B.D.S. as AI services, as opposed to EY services, and (b) to present due process complaints relating to the educational placement of B.D.S. and the provision of an FAPE to her; (2) impartial due process hearings, at which she raised, *inter alia,* the designation of the services provided to B.D.S. as AI services; and (3)

impartial review of the findings and decisions of the IHOs by a state review officer, she was afforded substantially all of the procedural safeguards of the IDEA and all of the process due her. Accordingly, the branch of defendants' motion seeking dismissal of plaintiff s Section 1983 claims is granted and those claims are dismissed in their entirety with prejudice. *See, e.g., French,* 2011 WL 5222856, at \*4 (affirming dismissal of Section 1983 claim which lacked any factual basis other than the alleged IDEA violations and the related allegation of discrimination); *Streck,* 280 Fed. Appx. at 68 (holding that the plaintiffs may not rely on Section 1983 to pursue monetary damages for violations of the IDEA where they had been afforded a hearing by an IHO and review by an SRO).

### a. *Monell* Claim

**\*20** Plaintiff has also not established a claim against the UFSD pursuant to *Monell v. Department of Social Services of City of New York,* 436 U.S. 658, 690–1, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

A municipality or municipal entity cannot be held liable under Section 1983 on a *respondeat superior* theory. *See Monell,* 436 U .S. at 691, 98 S.Ct. 2018; *see also Connick v. Thompson,* 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011) (5–4 decision) (holding that under Section 1983, governmental bodies are not vicariously liable for their employees' actions); *Los Angeles County, California v. Humphries,* 131 S.Ct. 447, 452, 178 L.Ed.2d 460 (2010) ( "[A] municipality cannot be held liable solely for the acts of others, *e.g., solely* because it employs a tortfeasor." (emphasis in original) (quotations and citation omitted)). Rather, "a plaintiff must demonstrate that, through its deliberate conduct, the municipal[ ] [entity] was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury,* 542 F.3d 31, 37 (2d Cir.2008) (quoting *Board of County Commissioners of Bryan County, Okl. v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)): *see also Amnesty America v. Town of West Hartford,* 361 F.3d 113, 125 (2d Cir.2004) ( "Demonstrating that the municipality itself caused or is implicated in the constitutional violation is the touchstone of establishing that a municipality can be held liable for unconstitutional actions taken by [its] employees.")

"For purposes of § 1983, school districts are considered to be local governments and are subject to similar liability as local governments under *Monell.*" *Kantrowitz v. Uniondale Union Free School District,* 822 F.Supp.2d 196, 217 (E.D.N.Y.2011) (quoting *Booker v. Board of Education. Baldwinsville Central School District,* 238 F.Supp.2d 469, 475 (N.D.N.Y.2002)); *see*

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 31 of 166
Dzugas-Smith v. Southold Union Free School Dist., Not Reported in F.Supp.2d (2012)
2012 WL 1655540

*also Schreiber v. East Ramapo Central School District,* 700 F.Supp.2d 529, 560 (S.D.N.Y.2010); *Rafano v. Patchogue–Medford School District,* No. 06–CV–5367, 2009 WL 789440, at * 8 (E.D.N.Y. Mar. 20, 2009). Thus, to prevail on a Section 1983 claim against a school district, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and (5) that an official policy of the [school district] caused the constitutional injury." *Roe,* 542 U.S. at 36; *see also Connick,* 131 S.Ct. at 1359 ("Plaintiffs who seek to impose liability on local governments under Section 1983 must prove that 'action pursuant to official municipal policy' caused their injury." (quoting *Monell,* 436 U.S. at 691, 98 S.Ct.2018)); *Humphries,* 131 S.Ct. at 452 ("[A] municipality may be held liable when execution of a government's *policy or custom* ... inflicts the injury." (emphasis in original) (quotations and citation omitted)).

"A municipal policy may be pronounced or tacit and reflected in either action or inaction." *Cash v. County of Erie,* 654 F.3d 324, 334 (2d Cir.2011), *cert. denied,* 132 S.Ct. 1741 (2012), "In the latter respect, a '[school district's] policy of inaction in light of notice that its program will cause constitutional [or statutory] violations is the functional equivalent of a decision by the [school district] itself to violate the Constitution [or federal law].' " *Id.* (quoting *Connick,* 131 S.Ct. at 1360).

**\*21** "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick,* 131 S.Ct. at 1359; *see also Hurdle v. Board of Education of City of New York,* 113 Fed. Appx. 423, 424–25 (2d Cir.2004) (summary order) ("A school district's liability under *Monell* may be premised on any of three theories: (1) that a district employee was acting pursuant to an expressly adopted official policy; (2) that a district employee was acting pursuant to a longstanding practice or custom; or (3) that a district employee was acting as a 'final policymaker.' " (quoting *Lytle v. Carl,* 382 F.3d 978, 982 (9th Cir.2004) (quotations and citations omitted))). In addition, "[i]n limited circumstances, a \* \* \* decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of Section 1983." *Connick,* 131 S.Ct at 1359.

Moreover, "where a policymaking official exhibits deliberate indifference to constitutional [or statutory] deprivations caused by subordinates, such that the official's inaction

constitutes a deliberate choice, that acquiescence may be properly thought of as a [municipal] policy or custom that is actionable under § 1983." *Amnesty America,* 361 F.3d at 126. The deliberate indifference standard is "a stringent standard of fault," *Cash,* 654 F.3d at 334 (quoting *Connick,* 131 S.Ct. at 1360), with "[t]he operative inquiry [being] whether th[e] facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' " *Id.* (quoting *Connick,* 131 S.Ct. at 1360). "Thus, deliberate indifference may be inferred where the need for more or better supervision to protect against constitutional [or statutory] violations was obvious, \* \* \* but the policymaker failed to make meaningful efforts to address the risk of harm to plaintiffs \* \* \*." *Id.* (quotations, alterations and citations omitted).

The basis of plaintiff's *Monell* claim against the UFSD is that it, acting through its officials, "illegal[ly]" attempted "to strip [B.D.S.] of her right to special education services by disguising them \* \* \* [as] AIS services \* \* \*," as opposed to EY services. (Amend.Compl., § 8.12). Plaintiff does not allege that any of the individual defendants acted pursuant to an official policy or longstanding practice or custom or challenge the UFSD's supervision or training of the individual defendants, nor does the record contain any evidence from which a reasonable jury could find that any policymaking official of the UFSD exhibited deliberate indifference to a known or obvious constitutional or statutory deprivation caused by a subordinate.

To the extent plaintiff's *Monell* claim is based upon the acts of the UFSD's final policymakers, i.e., the BOE defendants, that claim is merely a reiteration of her IDEA claim, insofar as she challenges only the BOE defendants' noncompliance with the IDEA, i.e., its purported failure to enact a policy on providing AI services to its students. As noted above, plaintiff has not established that she was denied any procedural safeguards or administrative remedies under the IDEA with respect to such a claim. *See, e.g. French v. New York State Department of Education,* No. 5:04–CV–434, 2010 WL 3909163, at \* 11 (N.D.N.Y. Sept. 30, 2010), *aff'd,* —— Fed. Appx. ——, 2011 WL 5222856 (2d Cir. Nov. 3, 2011). Nor is there any basis in the record from which a reasonable fact finder may infer: (1) that the Board of Education in fact failed to enact a policy on providing AI services to the students within the UFSD; or (2) that the Landmark program could have been provided to B.D.S. as anything other than AI services absent any determination that B.D.S. qualified for EY services or that the Commissioner had ever approved the Landmark

2012 WL 1655540

program as an EY services program. Accordingly, the branch of defendants' motion seeking summary judgment dismissing plaintiff's Section 1983 *Monell* claim is granted and plaintiff's Section 1983 *Monell* claim is dismissed in its entirety with prejudice.

### B. IDEA Claim

#### 1. Standard of Review

**\*22** "A summary judgment approach to IDEA cases * * * is different" than in other cases. *T.Y. v. New York City Department of Education,* 584 F.3d 412, 418 (2d Cir.2009), *cert denied,* 130 S.Ct. 3277, 176 L.Ed.2d 1183 (2010). "Instead of dispute resolution, a motion for summary judgment can serve as an aid to the court within a statutory scheme whose purpose is to ensure that children with disabilities receive the educational benefits to which they are entitled." *Id.; see also T.P. ex rel. S.P. v. Mamaroneck Union Free School District,* 554 F.3d 247, 252 (2d Cir.2009) ("Summary judgment in th[e] context [of an IDEA case] involves more than looking into disputed issues of fact; rather it is a pragmatic procedural mechanism for reviewing administrative decisions." (quotations and citation omitted)). "Though the court must show deference to administrative board findings, the court is also empowered to conduct an independent review of the record as a whole and even hear additional evidence." *T.Y.,* 584 F.3d at 418. With regard to the role of Rule 56.1 statements on a motion for summary judgment in an IDEA case, the Second Circuit has held that "[a] rule 56.1 statement, while not required, may assist the court's inquiry into whether IDEA procedures were followed and whether the result was reasonably designed to confer educational benefits. But while a Rule 56.1 statement may assist the court in reviewing particular issues, it is not in and of itself dispositive." *T.Y.,* 584 F.3d at 418. "The court's inquiry [on a motion for summary judgment] is a results-based standard in many respects, concerned more with a just outcome for a disabled student than with judicial efficiency." *Id.*

The IDEA provides, in relevant part, that " * * * [a]ny party aggrieved by the findings and decision made [by the state review officer on appeal of the findings of fact and decision of an IHO], shall have the right to bring a civil action with respect to the [due process] complaint presented pursuant to this section, which action may be brought * * * in a district court of the United States, without regard to the amount in controversy." 20 U.S.C. § 1415(i)(2)(A). "In any action brought under th[e] [IDEA], the court(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).

Nonetheless, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed." *Gagliardo v. Arlington Central School District,* 489 F.3d 105, 112 (2d Cir.2007) (quotations and citation omitted); *see also P. ex rel. Mr. and Mrs. P. v. Newington Board of Education,* 546 F.3d 111, 118 (2d Cir.2008); *D.F. ex rel. N.F. v. Ramapo Central School District,* 430 F.3d 595, 598 (2d Cir.2005) (holding that judicial review of state administrative decisions under the IDEA is "strictly limit [ed].") "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *A.C. ex rel. M.C. v. Board of Education of Chappaqua Central School District,* 553 F.3d 165, 171 (2d Cir.2009) (quotations, alterations and citations omitted); see *also Board of Education of Hendrick Hudson Central School District, Westchester County v. Rowley,* 458 U.S. 176, 206, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review. * * * The fact that [the IDEA] requires that the reviewing court 'receive the records of the [state] administrative proceedings' carries with it the implied requirement that due weight shall be given to these proceedings."); *P. ex rel. Mr. and Mrs. P ., 546 F.3d at 118* ("Although school officials' decisions are subject to 'independent' judicial review, the responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers. * * * [W]hile federal courts do not simply rubber stamp administrative decisions, they are expected to give 'due weight' to these proceedings * * *." (quotations and citation omitted)). "[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States." *Rowley,* at 207, 102 S.Ct. 3034. "In reviewing the administrative proceedings, it is critical to recall that IDEA'S statutory scheme requires substantial deference to state administrative bodies on matters of educational policy." *Cerra v. Pawling Central School District,* 427 F.3d 186, 191 (2d Cir.2005).

**\*23** The Supreme Court has held that in suits brought under the IDEA, the appropriate inquiry is two-fold: (1) whether the State complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA'S procedures was "reasonably calculated to enable the child to receive educational benefits." *Rowley,* at 206–07, 102 S.Ct. 3034. If both of those requirements are met, "the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207, 102 S.Ct. 3034.

Moreover, "[i]f a state fails in its obligation to provide a [FAPE] to a handicapped child, the parents may enroll the child in a private school and seek retroactive reimbursement for the cost of the private school from the state." *Frank G. v. Board of Education of Hyde Park,* 459 F.3d 356, 363 (2d Cir.2006); *see also Forest Grove School District v. T.A.,* 557 U.S. 230, 129 S.Ct. 2484, 2496, 174 L.Ed.2d 168 (2009) (holding that the IDEA "authorizes reimbursement for the cost of private special-education services when a school district fails to provide a FAPE and the private-school placement is appropriate \* \* \*.") When a plaintiff seeks tuition reimbursement and either the procedural requirements of the IDEA have not been met or the school district has failed to provide the child with an FAPE, a court must also inquire into "whether the private schooling obtained by the parents [was] appropriate to the child's needs." *T.Y.,* 584 F.3d at 417 (quoting *Cerra,* 427 F.3d at 192); *see also T.P. ex rel. S.P.,* 554 F.3d at 252; *Frank G.,* 459 F.3d at 363. The party commencing the administrative review bears the burden of persuasion as to the appropriateness of the child's IEP and the private services for which the parent is seeking reimbursement. *See T.P. ex rel. S.P.,* 554 F.3d at 252; *A.C. ex rel. M.C.,* 553 F.3d at 171–72; *Gagliardo,* 489 F.3d at 112.

### 2. Substantive Violations

"By passing the [IDEA], Congress sought primarily to make public education available to handicapped children. But in seeking to provide such access to public education, Congress did not impose upon the States any greater substantive educational standard than would be necessary to make such access meaningful." *Rowley,* 458 U.S. at 192, 102 S.Ct. 3034. The IDEA "imposes no clear obligation upon recipient States beyond the requirement that handicapped children receive some form of specialized education \* \* \*." *Id.* at 195, 102 S.Ct. 3034. "[T]he requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential

commensurate with the opportunity provided other children." *Id.* at 198, 102 S.Ct. 3034 (quotations omitted); *see also Cerra,* 427 F.3d at 195 ("A school district is not \* \* \* required to furnish every special service necessary to maximize each handicapped child's potential." (quotations and citation omitted)). "Rather, Congress sought primarily to identify and evaluate handicapped children, and to provide them with access to a free public education ." *Rowley,* 458 U.S. at 200, 102 S.Ct. 3034.

**\*24** Under the IDEA, an FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley,* 458 U.S. at 188–89, 102 S.Ct. 3034; *see also Frank G.,* 459 F.3d at 363 ("A free appropriate public education must include special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." (quotations and citations omitted)). "[S]uch instruction and services [must] be provided at public expense and under public supervision, meet the State's educational standards, approximate the grade levels used in the State's regular education, and comport with the child's IEP." *Rowley,* 458 U.S. at 189, 102 S.Ct. 3034. A child receives an FAPE "if personalized instruction is being provided with sufficient supportive services to permit the child to benefit from the instruction, and the other items on the definitional checklist are satisfied \* \* \*." *Id.* "In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the [IDEA] and, if the child is being educated in the regular classrooms of the public education system, should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 203–04, 102 S.Ct. 3034.

The Second Circuit has held that "a school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement." *Cerra,* 427 F.3d at 195 (quotations and citation omitted); *see also P. ex rel. Mr. and Mrs. P.,* 546 F.3d at 119 ("Under th[e] second 'substantive' prong of the *Rowley* test, \* \* \* the door of public education must be opened in a 'meaningful way,' and the IEP must provide the opportunity for more than only 'trivial advancement.' " (internal quotations and citations omitted)); *D.F. ex rel. N.F.,* 430 F.3d at 598 ("A valid IEP should provide for the

opportunity for more than trivial advancement * * *, such that the door of public education is opened for a disabled child in a meaningful way." (quotations and citations omitted)). Courts "must examine the record for objective evidence that indicates whether the child is likely to make progress or regress under the proposed plan." *Gagliardo,* 489 F.3d at 113 (quotations and citation omitted); *see also Cerra,* 427 F.3d at 195. "[I]n the regular classrooms of a public school system, the achievement of passing marks and regular advancement from grade to grade will be one important factor in determining educational benefit." *Frank G.,* 459 F.3d at 364 (quoting *Rowley,* 458 U .S. at 207 n. 28, 102 S. Ct 3034); *see also Cerra,* 427 F.3d at 196 ("[W]hen a learning-disabled child is in a mainstream class, the attainment of passing grades and regular advancement from grade to grade will generally constitute evidence of satisfactory progress ." (quotations and citation omitted)).

**\*25** "Moreover, there is a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *A.C. ex rel. M.C.,* 553 F.3d at 173 (quotations and citation omitted); *see also Rowley,* 458 U.S. at 202, 102 S.Ct. 30304 (holding that the IDEA "requires participating States to educate handicapped children with nonhandicapped children whenever possible."); 8 N.Y.C.R.R. § 200.2(b) ("Each board of education * * * shall adopt written policy that establishes administrative practices and procedures: (1) to ensure that students with disabilities residing in the district have the opportunity to participate in school district programs to the maximum extent appropriate to the needs of the student * * * [and] (4) to provide special services or programs, to the extent appropriate to the needs of the student, to enable the student to be involved in and progress in the general education curriculum.") "Educating a handicapped child in a regular education classroom ... is familiarly known as 'mainstreaming'." *P. ex rel. Mr. and Mrs. P.,* 546 F.3d at 119 (quotations and citation omitted). Mainstreaming is inappropriate, however, "where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily." *Id.* (quotations and citation omitted). In determining whether an IEP places a student in the least restrictive environment, courts should consider: (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child, and, [2] if not, then whether the school has mainstreamed the child to the maximum extent appropriate." *Id.* (quotations and citations omitted). With respect to the first prong, the following factors are relevant: "(1) whether the

school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative effects of the inclusion of the child on the education of the other students in the class." *Id.* at 120. Nonetheless, "this list of factors is not exhaustive; [and] courts * * * must engage in an individualized and fact-specific inquiry into the nature of the student's condition and the school's particular efforts to accommodate it, ever mindful of the IDEA'S purpose of educating children with disabilities 'to the maximum extent appropriate' together with their non-disabled peers." *Id.* (quotations and citation omitted).

"Because administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy." *Cerra,* 427 F.3d at 195; *see also Frank G.,* 459 F.3d at 367 ("[A]n assessment of educational progress is a type of judgment for which the district court should defer to the SRO's educational experience, particularly where ... the district court's decision was based solely on the record that was before the SRO." (quotations and citation omitted)). "If the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision 'may be afforded diminished weight.' " *A.C. ex rel. M.C.,* 553 F.3d at 171 (quoting *Gagliardo,* 489 F.3d at 113 n. 2). Courts must " 'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer.' " *Id.* (quoting *Karl ex rel. Karl v. Board of Education of Geneseo Central School District,* 736 F.2d 873, 877 (1984)).

**\*26** IHO Lazan's and SRO Kelly's findings of fact and decisions were well-reasoned and thorough and, therefore, deserve deference. [10] *See, e.g. T.P. ex rel. S.P.,* 554 F.3d at 254; *P.,* 546 F.3d at 118 ("Deference is particularly appropriate when ... the state hearing officers' review has been thorough and careful." (quotations and citation omitted)); *Cerra,* 427 F.3d at 196 (accord). Moreover, there is available evidence in the record indicating: (1) that B.D.S. was likely to progress with the programs and services being offered within the UFSD by the CSE during the 2006–2007 academic year; (2) that the UFSD's recommendations were in accordance with the strong policy preference to educate students in the least restrictive environment appropriate to the student's needs and abilities; and (3) that B.D.S. did not qualify for EY services during the summer of 2007. The IEP for B.D.S. for the 2006–2007 academic year included

daily resource room services, a daily one-to-one tutorial period with a special education teacher, individual reading remediation services twice a week and assistive technology and testing accommodations, such as a graphic organizer, Inspiration software program, preferential seating, a personal auditory enhancer and a laptop. Those special education services and supports being offered to B.D.S. within the UFSD were tailored to meet B.D.S.'s specific needs and were essentially similar, or more, than the services that had been provided to her during the previous academic year and from which B.D.S. had received significant educational benefit. Specifically, B.D.S. had performed at or above grade level in almost every area tested and had met grade level standards, advancing a grade each academic year, with the special education programs and services previously provided to her. Accordingly, the services and programs being offered to B.D.S., which increased the services previously provided to B.D.S. by increasing the frequency of the resource room component and adding one daily period of individual tutoring by a special education teacher, were likely to produce continued non-trivial progress during the 2006–2007 academic year and, thus, did not deprive B.D.S. of an FAPE. *See, e.g. S.H. ex rel. W.H. v. Eastchester Union Free School District,* 10–cv–3927, 2011 WL 6108523, at *10 (S.D.N.Y. Dec. 8, 2011) ("Although past progress is not dispositive, it does strongly suggest that an IEP modeled on a prior one that generated some progress was reasonably calculated to continue that trend." (quotations and citations omitted)).

10    Since IHO Lushing's decision conflicts with SRO Kelly's decision, IHO Lushing's decision is afforded diminished weight. *See A.C. ex rel. M.C.,* 553 F.3d at 171.

With respect to summer of 2007, B.D.S. did not qualify for EY services, insofar as there is nothing in the record indicating that she experienced any substantial regression during extended school breaks. In any event, plaintiff's failure to appeal IHO Lazan's January 19, 2007 decision finding that B.D.S. was not entitled to EY services and that her placement at Landmark during the summer of 2006 was "clearly temporary" precludes judicial review of that issue, absent any indication that pursuing an appeal before the SRO would have been futile. *See, e.g. Coleman v. Newburgh Enlarged City School District,* 503 F.3d 198, 204–05 (2d Cir.2007); *J.S. ex rel. N.S. v. Attica Central Schools,* 386 F.3d 107, 112 (2d Cir.2004).

*27    In sum, there is no apparent reason to second guess the reasonable determinations of IHO Lazan and the SRO: (1) that the UFSD had provided B.D.S. with an FAPE for the 2006–2007 academic year; and (2) that B.D.S. was not entitled to EY services at Landmark during the summer of 2007.

### 3. Procedural Violations

Not "every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *A.C. ex rel. M.C.,* 553 F.3d at 172. "Rather, a procedural flaw necessitates a finding that a child was denied his or her right to a [FAPE] only if it results in the loss of an educational opportunity or seriously infringes the parents' opportunity to participate in formulating the IEP." *J.G. ex rel. N.G. v. Kiryas Joel Union Free School District,* 777 F.Supp.2d 606, 638 (S.D.N.Y.2011); *see also Matrejek v. Brewster Central School District,* 471 F.Supp.2d 415, 419 (S.D.N.Y.2007), *aff'd,* 293 Fed. Appx. 20 (2d Cir.2008) ("Only procedural irregularities that cause substantive harm-meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the IEP-constitute a denial of a FAPE."). In considering whether a school district satisfied the procedural requirements of the IDEA, courts must "focus on whether the [parents] had an adequate opportunity to participate in the development of [the] IEP." *T.P. ex rel. S.P.,* 554 F.3d at 253 (alterations in original) (quoting *Cerra,* 427 F.3d at 192). "Parental participation requires an opportunity to examine records, participate in meetings, and to obtain an independent evaluation." *T.L. ex rel. B.L. v. Department of Education of City of New York,* No. 10–CV–3125, 2012 WL 1107652, at *14 (E.D.N.Y. Mar. 30, 2012) (quoting *Z.D. v. Niskayuna Central School District,* No, 06–CV–1190, 2009 WL 1748794, at *3 (N.D.N.Y. June 19, 2009)).

Plaintiff actively and meaningfully participated in the IEP process, had considerable input into the services and programs to be provided to B.D.S. for the 2006–2007 academic year and summer of 2007, obtained independent evaluations and was afforded the opportunity to examine all relevant records. The IEP from the May 26, 2006 annual CSE meeting, to which B.D.S.'s parents had consented, was provided to plaintiff in advance of the July 31, 2006 meeting, which was held to determine whether any adjustments should be made to the programs provided in the IEP following B.D.S.'s attendance at Landmark's summer program during the summer of 2006. Thus, plaintiff was afforded meaningful opportunity to review B.D.S .'s IEP for the 2006–2007

academic year, including the goals and objectives contained therein, and to raise objections and questions to the IEP. Notwithstanding that defendants offered to provide B.D.S. with the same, or more, services and programs during the 2006–2007 academic year from which she had previously received educational benefit, plaintiff enrolled B.D.S. in Landmark. Plaintiff's "actions suggest that [she] seek[s] a 'veto' over school choice, rather than 'input'a power the IDEA clearly does not grant [her]." *T.Y.,* 584 F.3d at 420.

**\*28** Moreover, services for B.D.S. for the summer of 2007 were discussed during the annual CSE meeting held on June 15, 2007, at which plaintiff actively participated, and B.D.S. was offered reading remediation three (3) hours per week for eight (8) weeks as an AI service during the summer of 2007, of which she failed to avail herself. Accordingly, any procedural irregularities during the development of the IEP or summer program were not significant enough to have rendered them legally inadequate. *See, e.g. R.R. ex rel. M.R. v. Scarsdale Union Free School District,* 615 F.Supp.2d 283, 292 (S.D.N.Y.2009), *aff'd,* 366 Fed. Appx. 239 (2d Cir.2010); *T.L. ex rel. B.L.,* 2012 WL 1107652, at \* 14; *S.H. ex rel. W.H.,* 2011 WL 6108523, at \* 6.

Since B.D.S.'s IEP for the 2006–2007 academic year was not procedurally flawed or substantively deficient, and she did not qualify for EY services during the summer of 2007, the branch of defendants' motion seeking summary judgment dismissing plaintiff's IDEA claims against the UFSD is granted and plaintiff's IDEA claims are dismissed in their entirety with prejudice. [11]

[11] In light of this determination, it is not necessary to consider the appropriateness of plaintiff's unilateral placement of B.D.S. at Landmark. *See, e.g. T.P. ex rel. S.P.,* 554 F.3d at 254; *A.C. ex rel. M.C.,* 553 F.3d at 173.

### III. Conclusion

For the reasons stated herein, defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted and all of plaintiff's remaining claims in this action are dismissed with prejudice. The Clerk of the Court is directed to enter judgment in favor of defendants and against plaintiff on all of the claims in the amended complaint.

Ingerman Smith is directed to advise the Court in writing, **on or before May 23, 2012,** whether it intends to prosecute its counterclaim against plaintiff, which is the only unresolved claim in this action, or its counterclaim will be dismissed with prejudice for failure to prosecute pursuant to Rule 41(b) of the Federal Rules of Civil Procedure.

The Clerk of the Court is directed to service notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure, including mailing a copy of the Order to the *pro se* plaintiff at her last known address, *see* Fed.R.Civ.P. 5(b)(2)(C).

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1655540

---

End of Document        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3580286
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

David HAYWARD, Plaintiff,
v.
The CITY OF NEW YORK; P.O. Jeffrey
Hill, 73rd Precinct, Badge# Unknown;
P.O. John Doe, 73rd Precinct, Defendants.

No. 12–CV–3220 (ENV).
|
Aug. 17, 2012.

**Attorneys and Law Firms**

David Hayward, Sonyea, NY, pro se.

### MEMORANDUM AND ORDER

VITALIANO, District Judge.

**\*1** Plaintiff David Hayward, who is currently incarcerated at the Groveland Correctional Facility, files this *pro se* civil rights complaint pursuant to 42 U.S.C. § 1983 against the City of New York and several individual defendants. Plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 is granted. For the reasons discussed below, the City of New York and defendant John Doe are dismissed from the action. The claims, however, against defendant Jeffrey Hill shall proceed.

### BACKGROUND

Plaintiff alleges that on August 16, 2011, he was falsely arrested at his home in Brooklyn, New York by Police Officer Jeffrey Hill of the 73rdr Precinct. He states that the charges against him were subsequently dismissed, but resulted in a parole violation and one-year prison sentence. Plaintiff seeks monetary damages.

### STANDARD OF REVIEW

*Pro se* complaints are held to less stringent standards than pleadings drafted by attorneys. The Court is required to read a plaintiff's *pro se* complaint liberally and interpret it as raising the strongest arguments it suggests. *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980); *Sealed Plaintiff v. Sealed Defendant # 1,* 537 F.3d 185, 191–93 (2d Cir.2008). Moreover, at the pleadings stage of the proceeding, the Court must assume the truth of "all well-pleaded, nonconclusory factual allegations" in the complaint. *Kiobel v. Royal Dutch Petroleum Co.,* 621 F.3d 111, 123 (2d Cir.2010) (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678–79, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). A complaint must plead sufficient facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

Under 28 U.S.C. § 1915A, a district court "shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity." 28 U.S.C. § 1915A. Upon review, a district court shall dismiss a prisoner's complaint *sua sponte* if the complaint is "frivolous, malicious, or fails to state a claim upon which relief may be granted; or seeks monetary relief from a defendant who is immune from such relief." *Id.; Liner v. Goord,* 196 F.3d 132, 134 & n. 1 (2d Cir.1999) (noting that under the Prison Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is not only permitted but mandatory); *see also Tapia–Ortiz v. Winter,* 185 F.3d 8, 11 (2d Cir.1999).

### DISCUSSION

*Claims against the City of New York and John Doe*
Plaintiffs claims against the City of New York must be dismissed. A municipality can be liable under § 1983 only if a plaintiff can show that a municipal policy or custom caused the deprivation of his constitutional rights. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The doctrine of *respondeat superior* cannot be used to establish municipal liability. *Connick v. Thompson,* ––– U.S. ––––, ––––, 131 S.Ct. 1350, 1359, 179 L.Ed.2d 417 (2011); *Cash v. County of Erie,* 654 F.3d 324, 333–34 (2d Cir.2011); *Dzugas–Smith v. Southhold Union Free School Dist.,* No. 08 CV 1319, 2012 WL 1655540, at \*20 (E.D.N.Y. May 9, 2012). Here, plaintiff does not allege, and nothing in his complaint suggests, that any of the allegedly wrongful acts or omissions on the part of any City employee are attributable to a municipal policy or custom.

2012 WL 3580286

Thus, plaintiff has not made a showing, in his pleadings, sufficient to impose *Monell* liability on the City of New York.

**\*2**  Furthermore, "[i]t is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" \* *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1991)). Here, although plaintiff names Police Officer John Doe as a defendant in the caption of the complaint, he fails to make any allegations against or otherwise discuss that defendant in the body of his pleading. Plaintiff's claims against Police Officer John Doe are, therefore, dismissed without prejudice.

## CONCLUSION

Accordingly, all claims against the City of New York and Police Officer John Doe are dismissed without prejudice pursuant to 28 U.S.C. § 1915A. No summonses shall issue as to these defendants and the Clerk of Court is directed to amend the caption to reflect their dismissal. Plaintiff's claims, however, shall proceed against Police Officer Jeffrey Hill of the 73rd Precinct.

The United States Marshal Service is directed to serve the summons, complaint, and this Memorandum and Order upon the remaining defendant without prepayment of fees. A courtesy copy of the same papers shall be mailed to the Corporation Counsel for the City of New York. All pretrial matters are referred to Magistrate Judge Cheryl L. Pollak. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal would not be taken in good faith and therefore *in forma pauperis* status is denied for purpose of an appeal. *Coppedge v. United States,* 269 U.S. 438, 444–45 (1962).

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3580286

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Distinguished by Hogan v. County of Lewis, N.Y., N.D.N.Y., March 8, 2013

2010 WL 335581
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial
staff and not assigned editorial enhancements.**

United States District Court,
E.D. New York.

Erwin JACKSON, Plaintiff,
v.
COUNTY OF NASSAU, Nassau County
Police Department, and Office of the Nassau
County District Attorney, Defendants.

No. 07-CV-245 (JFB)(AKT).
|
Jan. 22, 2010.

**Attorneys and Law Firms**

Erwin Jackson, pro se.

Ralph J. Reissman and Sara A. Wells of the Nassau County
Attorney's Office, Mineola, NY, for defendants.

**MEMORANDUM AND ORDER**

JOSEPH F. BIANCO, District Judge.

 **\*1** On January 17, 2007, pursuant to 42 U.S.C. § 1983, *pro se*
plaintiff Erwin Jackson ("plaintiff" or "Jackson") brought this
action against defendants County of Nassau ("the County"),
Nassau County Police Department, and the Office of the
Nassau County District Attorney alleging that defendants
violated plaintiff's rights under the First, Fourth, and
Fourteenth Amendments of the United States Constitution.
Specifically, Jackson claims that his constitutional rights
were violated during his pretrial proceedings when police
officers allegedly withheld exculpatory evidence, made
perjurous statements, and falsely verified felony complaints
against plaintiff when they had no personalknowledge of the
underlying facts. Jackson further contends that the County
of Nassau has a policy of committing these constitutional
violations. Jackson also alleges that the County of Nassau

has a policy of failing to investigate criminal complaints
regarding these types of violations if they are filed by pretrial
detainees or criminal defendants. The defendants now move,
jointly, for summary judgment pursuant to Rule 56 of the
Federal Rules of Civil Procedure. For the reasons set forth
below, defendants' motion is granted.

**I. FACTS**

The Court has taken the facts set forth below from the
parties' depositions, affidavits, and exhibits, and from the
defendants' respective Rule 56.1 statements of facts. [1] Upon
consideration of a motion for summary judgment, the Court
shall construe the facts in the light most favorable to the
non-moving party-here, the plaintiff. *See Capobianco v. City
of New York,* 422 F.3d 47, 50 n. 1 (2d Cir.2001). Unless
otherwise noted, where a party's 56.1 statement or deposition
is cited, that fact is undisputed or the opposing party has
pointed to no evidence in the record to contradict it. [2]

[1]     The Court notes that plaintiff failed to file and
        serve a response to defendant's Local Rule 56.1
        Statement of Facts in violation of Local Civil
        Rule 56.1. Generally, a "plaintiff['s] failure to
        respond or contest the facts set forth by the
        defendants in their Rule 56.1 statement as being
        undisputed constitutes an admission of those facts,
        and those facts are accepted as being undisputed."
        *Jessamy v. City of New Rochelle,* 292 F.Supp.2d
        498, 504 (S.D.N.Y.2003) (quoting *NAS Elecs.,
        Inc. v. Transtech Elecs. PTE Ltd.,* 262 F.Supp.2d
        134, 139 (S.D.N.Y.2003)). However, "[a] district
        court has broad discretion to determine whether
        to overlook a party's failure to comply with local
        court rules." *Holtz v. Rockefeller & Co.,* 258 F.3d
        62, 73 (2d Cir.2001) (citations omitted); *see also
        Gilani v. GNOC Corp.,* No. 04 Civ. 2935(ILG),
        2006 WL 1120602, at \*2 (E.D.N.Y. Apr. 26,
        2006) (exercising court's discretion to overlook the
        parties' failure to submit statements pursuant to
        Local Civil Rule 56.1). In plaintiff's opposition
        papers, he specifically identified those paragraphs
        of defendants' Rule 56.1 statement with which he
        agreed that there were no material disputed issues
        of fact. The Court, in its discretion, thus relies on
        those paragraphs as equivalent to plaintiff's Rule
        56 .1 statement of facts for the purposes of this

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 40 of 166

opinion. In the exercise of its broad discretion and given plaintiff's *pro se* status, the Court will also only deem admitted those facts in defendant's Rule 56.1 statement that are supported by admissible evidence and not controverted by other admissible evidence in the record. *See Jessamy,* 292 F.Supp.2d at 504-05.

2      Because plaintiff is *pro se,* the Court has independently reviewed plaintiff's deposition testimony. Plaintiff's deposition contains no additional evidence other than plaintiff's speculation and conclusory allegations.

A. The Underlying Prosecution

On November 22, 2005, plaintiff Erwin Jackson was arrested by Nassau County police officers for attempted robbery of the Bank of America located in Baldwin, New York, on November 21, 2005. (Defs.' 56.1 Statement ¶ 4.) Plaintiff was brought to the Bellmore police station, where he was questioned about the November 21, 2005 robbery. (Deposition of Irwin Jackson, Defs.' Ex. E (hereinafter "Pl.'s Dep.") at 32-33.) At the station, Jackson was also questioned about other bank robberies. (*Id.* at 34-35.) Plaintiff was arrested and arraigned on November 23, 2005. He was charged for the November 21 robbery and four additional robberies that had occurred in Nassau County on November 13, 2005, October 1, 2005, September 2, 2005, and July 23, 2005. (*Id.* at 40-41; Defs.' 56.1 Statement ¶ 5.) Plaintiff was indicted by a grand jury on thirteen counts on December 19, 2005. (Pl.'s Dep. at 44-45.) In June 2006, a pretrial suppression hearing was held, at which Police Officer Joseph Hughes testified. (*Id.* at 45-46.) Plaintiff proceeded to trial on the charges and, on February 6, 2007, was found guilty on nine counts of Robbery in the First Degree (New York Penal Law 160.15) and one count of Conspiracy in the Fourth Degree (New York Penal Law 105.10). (*Id.* at 53-54.) On July 30, 2008, Jackson was sentenced to fifteen years for each of the nine counts of Robbery in the First Degree, plus one year and four months for Conspiracy in the Fourth Degree. (Defs.' 56.1 ¶ 8.) Jackson's minimum aggregate sentence was set at twenty-five years, eight months and sixteen days. (*Id.* ¶ 9.)

B. Officer Hughes

**\*2**  By letter dated September 17, 2006, while a pretrial detainee, Jackson filed three criminal complaints against Police Officer Joseph Hughes with the Nassau County District Attorney's Criminal Complaint Unit. (*Id.* ¶ 10.) The complaints were based on Officer Hughes's allegedly inconsistent testimony at a pretrial suppression hearing. Jackson alleges that while testifying before the Grand Jury in December 2005, Officer Hughes stated that he observed five black males fleeing a four-door Buick wearing face masks. During a subsequent pretrial hearing on July 10, 2006, plaintiff cross-examined Officer Hughes. At that hearing, Officer Hughes stated that only some of the males he observed were wearing face masks. The testimony at the July 10 pretrial hearing was as follows:

Q: This individual jumps out of the car. This is the individual that you pursued after?

A: Correct. * * *

Q: Did he have mask on? A: No mask.

Q: No mask. You testified in the grand jury that all five of the occupants of that car that fled had masks on?

A: I was incorrect about that. I stated that before.

Q: That information wasn't true?

A: It was incorrect. * * *

Q: You testified they all had masks on. Now, you're saying, you take the mask off one-

A: I believe in that statement. I was describing all the occupants. I said, they all had masks on. I was incorrect. I should have said, some had masks on.

(*Id.* ¶ 12 (citing Ex. AB at 485-86).)

Jackson also claims Officer Hughes made a "punishable false written statement" and committed the crime of "offering a false instrument for filing" by verifying and signing five felony complaints against plaintiff, although Officer Hughes had no personal knowledge of the information contained in those complaints and relied on information provided by other officers. (*Id.* ¶¶ 13-14.) According to Jackson, during the pretrial hearing and trial of his co-defendant Paul Henry, Officer Hughes testified that it was police procedure for officers to verify and swear to felony complaints even though they lacked knowledge of the underlying facts or crimes alleged therein. (Pl.'s Dep. at 61.) Jackson also alleges that Hughes testified to this at Jackson's own trial on cross-examination. (*Id.* at 61-62.)

On September 21, 2006, Assistant District Attorney ("ADA") Thurer transferred plaintiff's perjury complaint against Officer Hughes to ADA Barbara Kornblau, Chief of the Public Corruption Bureau. (*Id.* ¶ 15.) ADA Kornblau reviewed plaintiff's complaint against Officer Hughes. Because plaintiff's case was still pending and "the issues alleged by plaintiff all pertained to credibility," (Defs.' Ex. K ¶ 6), ADA Kornblau notified Daniel Looney, the ADA prosecuting plaintiff, and plaintiff's attorney, Jeffrey Groder, of plaintiff's claims. The District Attorney's Office later informed Jackson that it also forwarded the case to the Internal Affairs Bureau of the Nassau County Police Department for administrative action at their discretion. (Pl.'s Dep. at 56; Defs.' 56.1 ¶ 16.) After receiving plaintiff's complaint from the District Attorney's Office, the Nassau County Police Department's Internal Affairs Bureau "determined that plaintiff's complaint against Officer Hughes for perjury was unfounded, since plaintiff had been convicted in a jury trial on February 6, 2007." (Defs.' 56.1 ¶ 18.)

### C. Detective Comiskey

**\*3** Jackson also filed criminal complaints against Detective Joseph Comiskey with the Nassau County District Court. (Pl.'s Dep. at 58-59.) According to Jackson, Detective Comiskey committed "official misconduct" and perjury for allegedly failing to provide plaintiff with "exculpatory material" in July 2006 at a pretrial hearing, and for advising the court that he had turned over all of his notes when, according to Jackson, he had not done so. (Defs.' 56.1 ¶ 19.) ADA Steven L. Schwartz, Chief of the Nassau County District Attorney's District Court Bureau, investigated these two complaints against Detective Comiskey, and found the claims in them unfounded. (*Id.* ¶ 20.) Plaintiff was subsequently informed that the District Attorney's Office declined to prosecute these complaints. (*Id.*) These complaints were also reviewed by ADA Kornblau, who determined that Detective Comiskey's actions were not a crime. (*Id.* ¶ 22.) Subsequently, as she had done with the complaint against Officer Hughes, she forwarded the complaints to the Nassau County Police Department Internal Affairs Bureau. (*Id.* ¶ 22.) ADA Kornblau also sent a letter to Jeffrey Groder, plaintiff's trial counsel, informing him of plaintiff's allegations, since they pertained to an incident in which Groder was involved. (*Id.*)

### D. The Instant Complaint

Jackson alleges eleven causes of action against the County of Nassau and two of its administrative arms, the Nassau County District Attorney's Office and the Nassau County Police Department, arguing that these entities had unconstitutional policies, practices, and customs that infringed his constitutional rights. Jackson asserts three claims specifically against the County of Nassau. First, he alleges that the County had a policy of failing to discipline its employees for any alleged perjury or cover-ups with respect to evidence. (Compl. at 5; Pl.'s Dep. at 93.) Jackson's second cause of action claims that the County has a policy, practice, procedure and custom of failing to take steps to terminate the unconstitutional practices of "its legal subordinates," defendants Nassau County Police Department and the Nassau County District Attorney's Office. (Compl. at 5; Pl.'s Dep. at 93-94.) Jackson's third cause of action alleges that the County has failed to properly train and supervise its employees with regard to "the proper constitutional and statutory requirements in the exercise of their authority." (Compl. at 5; Pl.'s Dep. at 94.)

Jackson asserts four claims against the Nassau County Police Department. The fourth cause of action in Jackson's complaint alleges that the Nassau County Police Department has a policy that authorizes subordinates to falsely verify and file criminal felony complaints without "knowledge of or knowledge based upon belief" of the underlying facts. (Compl. at 5; Pl.'s Dep. at 95.) The fifth cause of action alleges that the Nassau County Police Department failed to properly train and supervise its employees in the processing of arrestees. (Compl. at 5-6.) Specifically, Jackson contends that, due to inadequate training, employees of the Nassau County Police Department do not realize "that they are not authorized to swear or fill out a felony complaint that they have absolutely no knowledge of." (Pl.'s Dep. at 96.) The sixth cause of action in Jackson's complaint claims that the Nassau County Police Department has an illegal practice or custom that condones and sanctions its employees who commit perjury, which is demonstrated by the fact that plaintiff, a pretrial criminal defendant, attempted to file criminal charges against the defendants' subordinates, but the defendants took no corrective actions. (*Id.* at 96-97; Compl. at 6.) Jackson's seventh cause of action alleges that the Nassau County Police Department, as a policy maker, has a defective and illegal policy whereby it does not correct or punish wrongdoings,

such as those alleged in causes of action numbers four, five, and six. (Compl. at 6; Pl.'s Dep. at 97-98.)

 **\*4** Jackson asserts his four final claims against the Nassau County District Attorney's Office. Jackson's eighth cause of action alleges that the Nassau County District Attorney's Office has a history and practice of ignoring criminal defendants' and arrestees' complaints, ignoring evidence of police misconduct, and shielding police officers and other assistant district attorneys from prosecution. (Compl. at 6.) Jackson's ninth cause of action alleges that the Nassau County District Attorney's Office does not give "any credence to pretrial criminal defendants who seek to file and give any credence to pretrial criminal defendants that seek to commence criminal actions in the court against public officials." (*Id.* at 130.) Specifically, plaintiff contends that the Nassau County District Attorney's Office declines to investigate, arrest, and/or prosecute public officials when illegal conduct is alleged by pretrial or criminal defendants. (Compl. at 6-7.) Jackson's tenth cause of action alleges that the Nassau County District Attorney's Office has failed to punish the illegal practices and wrongdoings of their employees and the Nassau County Police Department. (Compl. at 7.) Jackson's eleventh and final cause of action contends that the Nassau County District Attorney's Office has a policy and procedure whereby the district court clerk does not submit or file any claims or complaints against a public official made by criminal defendants. (Compl. at 7.)

## II. PROCEDURAL HISTORY

Jackson filed the complaint in this action on January 17, 2007. The Court granted plaintiff leave to proceed *in forma pauperis* on January 31, 2007. Defendants filed an answer to the complaint on May 23, 2007. On March 14, 2008, plaintiff filed a motion to amend the complaint. This Court denied that motion on February 13, 2009. On May 15, 2009, defendants submitted their motion for summary judgment and provided *pro se* plaintiff with the notice required by Local Civil Rule 56.2. Defendant submitted supplemental papers to their motion on June 5, 2009. Plaintiff submitted opposition papers on May 28, 2009. [3] Defendants filed their reply to plaintiff's opposition on June 5, 2009. Plaintiff also submitted a motion for sanctions against defendants on June 10, 2009. Defendants submitted their opposition to the motion for sanctions on June 11, 2009. This matter is fully submitted.

3  Due to delay, it appears that plaintiff's response was not filed with the Court until June 11, 2009.

## III. STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may not grant a motion for summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Globecon Group, LLC v. Hartford Fire Ins. Co.,* 434 F.3d 165, 170 (2d Cir.2006). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Huminski v. Corsones,* 396 F.3d 53, 69 (2d Cir.2005). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

 **\*5** Once the moving party has met its burden, the opposing party " 'must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*' " *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir.2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986) (emphasis in original). As the Supreme Court stated in *Anderson,* "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249-50 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth " 'concrete particulars' " showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)). Accordingly, it is insufficient for a party opposing summary

judgment " 'merely to assert a conclusion without supplying supporting arguments or facts.' " *BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, 615 (2d Cir.1996) (quoting *Research Automation Corp.,* 585 F.2d at 33).

Where the plaintiff is proceeding *pro se,* the Court must "construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel v. Bd. of Educ. of the City of N.Y.,* 287 F.3d 138, 145-46 (2d Cir.2002) (alterations in original) (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000)). Though a *pro se* litigant's pleadings and other submissions are afforded wide latitude, a *pro se* party's conclusory assertions, completely unsupported by evidence, are not sufficient to defeat a motion for summary judgment. *Shah v. Kuwait Airways Corp.,* --- F.Supp.2d ----, No. 08 Civ. 7371(GEL), 2009 WL 2877604, at *2 (S.D.N.Y. Sept. 9, 2009) ("Even a *pro se* party, however, 'may not rely simply on conclusory allegations or speculation to avoid summary judgment, but instead must offer evidence to show that its version of the events is not wholly fanciful.' " (quoting *Auguste v. N.Y. Presbyterian Med. Ctr.,* 593 F.Supp.2d 659, 663 (S.D.N.Y.2009))).

## IV. DISCUSSION

### A. Proper Defendants

Plaintiff alleges specific causes of action against the Nassau County Police Department and Nassau County District Attorney's Office as defendants. However, "under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *See Davis v. Lynbrook Police Dep't,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002) (dismissing claim against Lynbrook Police Department); *see also Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002) ("Because plaintiff has named the City of White Plains as a defendant, any claims against the [White Plains Department of Public Safety] are redundant. WPDPS does not have its own legal identity, and therefore the claims against it are dismissed."); *Polite v. Town of Clarkstown,* 60 F.Supp.2d 214, 216 (S.D.N.Y.1999) ("[M]unicipal departments in this State-such as the Clarkstown Police Department-are not amenable to suit, and no claims can lie directly against them."); *Wilson v. City of New York,* 800 F.Supp. 1098, 1101 (E.D.N.Y.1992) ("The court also dismisses the claims against the New York City Police Department, which cannot be sued

independently because it is an agency of the City of New York." (citations omitted)). Plaintiff's allegations against the Police Department are more properly raised in claims against Nassau County, which plaintiff has also brought in his first, second, and third causes of action. Accordingly, the Nassau County Police Department is dismissed as a defendant.

**\*6** For the same reason, plaintiff cannot bring claims against the Nassau County District Attorney's Office. *See Conte v. County of Nassau,* No. 06-CV-4746 (JFB)(ETB), 2008 WL 905879, at *1 n. 2 (E.D .N.Y. Mar. 31, 2008) (dismissing Section 1983 claims against the Nassau County District Attorneys Office because the entity is an " 'administrative arm[ ]' of the same municipal entity-the County ... and thus lack[s] the capacity to be sued"). Plaintiff's allegations against the District Attorneys Office are more properly brought as claims against Nassau County. Plaintiff has brought substantially the same claims against the District Attorney's Office as he has brought against the County of Nassau. Accordingly, the Nassau Count District Attorney's Office is dismissed as a defendant in this case. [4] Because the plaintiff is proceeding *pro se,* the Court, in its discretion, does not dismiss plaintiff's fourth through eleventh causes of action in their entirety, but rather construes those claims, which are largely duplicative of causes of action one through three, as against the County of Nassau.

[4]    The Court further notes that it has previously denied plaintiff's attempt to amend his complaint to state claims against Lawrence Mulvey, the Commissioner of the Nassau County Police Department, and Kathleen Rice, the Nassau County District Attorney. *See Jackson v. County of Nassau,* No. 07-CV-0245 (JFB)(AKT), 2009 WL 393640 (E.D.N.Y. Feb. 13, 2009).

### B. Section 1983 Liability

As stated *supra,* Jackson has brought his claims pursuant to Section 1983. Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan,* 443 U.S. 137, 145 n. 3 (1979). [5] For claims under Section 1983, a plaintiff must prove that "(1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution of

the United States." *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citation omitted). Here, the parties do not dispute that defendants were acting under color of state law. The question presented, therefore, is whether defendants' conduct deprived Jackson of the rights he asserts.

[5]    Specifically, Section 1983 provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law....

> 42 U.S.C. § 1983.

Although *pro se* plaintiff alleges eleven separate causes of action against the County of Nassau and its administrative arms, the claims alleged by plaintiff in his complaint are as follows: (1) the County of Nassau has a policy or practice of permitting its employees (or employees of its administrative arms) to commit perjury and a policy or practice of failing to discipline its employees who do commit perjury; (2) the County of Nassau has a policy or practice of permitting its police officers to falsely verify criminal complaints; and (3) the County of Nassau has a policy of not investigating, responding to, or prosecuting complaints or cross-criminal complaints of pretrial detainees and criminal defendants that allege crimes and misconduct against police officers and assistant district attorneys. (Plaintiff's Opposition (hereinafter "Opp.") at 14.)

Defendants argue that they are entitled to summary judgment on the grounds that Jackson has failed to provide any evidence that would raise a genuine issue of fact as to municipal liability for any of these claims. As set forth below, the Court agrees. First, plaintiff has failed to provide any evidence that there was an underlying constitutional violation with respect to his arrest and conviction, which would be a necessary element of any municipal liability claim. In fact, under well-settled Supreme Court and Second Circuit precedent, plaintiff's valid conviction precludes him from litigating any of his claims in the instant case because success on such claims (that is, demonstrating his constitutional rights were violated in connection with the investigation and prosecution of his case) would necessarily implicate the unconstitutionality of his conviction. Second, plaintiff has

provided absolutely no evidence of an unconstitutional policy or custom of the County of Nassau and, thus, his municipal liability claims against the County cannot survive summary judgment.

### (1) Plaintiff Cannot Demonstrate Violation of His Constitutional Rights

**\*7** To bring a successful Section 1983 claim, plaintiff must first demonstrate that he was injured as a result of a constitutional violation. In the instant case, plaintiff cannot do so. First, Supreme Court precedent prevents a prisoner, like Jackson, from bringing a Section 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence. Second, even assuming this rule did not apply, plaintiff has presented no evidence of any constitutional violations relating to his conviction.

#### a. *Heck v. Humphrey*

As a threshold matter, although not explicitly raised by defendants, plaintiff's claims fail as a matter of law, by virtue of his conviction. Specifically, the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477 (1994), entitles defendants to a decision in their favor as a matter of law with respect to these claims.

#### i. The *Heck* Rule

In *Heck v. Humphrey,* the Supreme Court "confronted the question of whether, given the overlap between § 1983 and the federal habeas corpus statute, a prisoner seeking civil damages may proceed with a § 1983 claim where success on the claim necessarily would implicate the unconstitutionality of the prisoner's conviction or sentence." *Amaker v. Weiner,* 179 F.3d 48, 51 (2d Cir.1999) (citing *Heck,* 512 U.S. at 480-90). The Supreme Court in that case explained:

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a

§ 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983. Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.

512 U.S. at 486-87 (footnote omitted) (emphasis in original); *see also Wilkinson v. Dotson,* 544 U.S. 74, 81 (2005) ("Heck specifies that a prisoner cannot use § 1983 to obtain damages where success *would* necessarily imply the unlawfulness of a (not previously invalidated) conviction or sentence." (emphasis in original)).

Thus, pursuant to *Heck,* courts routinely dismiss claims brought under Section 1983 when such claims bear on the validity of an underlying conviction or sentence. *See, e.g., Guerrero v. Gates,* 442 F.3d 697, 703-04 (9th Cir.2006) (holding that Heck bars plaintiff's § 1983 claims of wrongful arrest, malicious prosecution, and conspiracy); *Amaker,* 179 F.3d at 51-52 (holding that *Heck* applies to Section 1983 conspiracy); *Perez v. Cuomo,* No. 09 Civ. 1109(SLT), 2009 WL 1046137, at *7 (E.D.N.Y. Apr. 17, 2009) ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[.]") (internal quotation marks and citations omitted); *Younger v. City of N.Y.,* 480 F.Supp.2d 723, 730 (S.D.N.Y.2007) (holding that plaintiff's claims for false arrest/imprisonment and malicious prosecution were barred by his plea of guilty pursuant to *Heck); cf. Jovanovic*

*v. City of N.Y.,* No. 04 Civ. 8437, 2006 WL 2411541, at *12 (S.D.N.Y. Aug. 17, 2006) (applying *Heck* to a Section 1983 claim for denial of the right to a fair trial in the context of a statute of limitations issue).

## ii. Application

**\*8** Here, as stated *supra,* Jackson was convicted after a trial in state court of nine counts of Robbery in the First Degree and one count of Conspiracy in the Fourth Degree on July 30, 2008. It is apparent that Jackson is still incarcerated for this conviction and, to date, has been unsuccessful in challenging his conviction or has not even attempted to do so. Under these circumstances, the Supreme Court's holding in *Heck* precludes plaintiff from bringing claims in this Court under Section 1983 for municipal liability, because a plaintiff bringing such claims must demonstrate a constitutional violation in connection with his conviction, and a successful result in this case on any one of plaintiff's claims would bear on the validity of that underlying conviction.

Indeed, *Heck'*s application to the instant matter is straightforward. Plaintiff's complaint claims that he was "subsequently indicted based upon officer Hughes['s] 'inaccurate' testimony." (Compl.¶ 9.) Plaintiff also contends that during his pretrial hearings there was extensive "late disclosure of [exculpatory] material." (*Id.* ¶ 11.) Although it is true that not all claims brought under Section 1983 necessarily implicate the validity of the underlying conviction, in this case, plaintiff's assertions of perjury, withheld evidence, and falsely sworn documents during his trial by police officers do necessarily implicate the validity of his conviction and are thus barred by the *Heck* rule. [6] *See, e.g., McCloud v. Jackson,* 4 F. App'x 7, 10 (2d Cir.2001) ("[Plaintiff] could not assert [municipal liability] claims under § 1983 against the county defendants for holding him in jail because any claim for money damages which, as here, necessarily imputes the invalidity of a conviction, is barred under *Heck v. Humphrey,* 512 U.S. 477, 484, 486-87 (1994), until such time as the conviction is vacated or otherwise invalidated."); *Channer v. Mitchell,* 43 F.3d 786, 787-88 (2d Cir.1994) (per curiam) (affirming *Heck*-based dismissal of claim that police officers committed perjury and coerced witnesses to identify plaintiff wrongfully); *Williams v. Schario,* 93 F.3d 527, 529 (8th Cir.1996) ("[A] judgment in Williams's favor on his damages claim that defendants engaged in malicious prosecution and presented perjured testimony would 'necessarily imply the invalidity of his conviction or sentence' " (quoting *Heck,*

512 U.S. at 487)); *Smithart v. Towery,* 79 F.3d 951, 952-53 (9th Cir.1996) (per curiam) (affirming *Heck*-based dismissal of § 1983 claim of conspiracy to "bring unfounded criminal charges" against plaintiff); *Jasper v. Fourth Court of Appeals,* No. 08 Civ. 7472(LAP), 2009 WL 1383529, at *1 (S.D.N.Y. May 18, 2009) ("The Court liberally construes this complaint as asserting that plaintiff was denied his constitutional right to a fair trial. [However, s]ince plaintiff's conviction remains valid, plaintiff's fair trial claim is not cognizable under § 1983, and it must be dismissed as to all defendants[.]"); *Perez,* 2009 WL 1046137, at *7 ("A § 1983 claim for the violation of the due process right to a fair trial is, in essence, a claim for damages attributable to an unconstitutional conviction.... Since plaintiff's conviction remains valid, plaintiff's claim for violation of his right to a fair trial is not cognizable under § 1983, and must be dismissed as to all defendants[ .]") (internal quotation marks and citations omitted); *Fernandez v.. Holzbach,* No. 3:04 Civ. 1664(RNC), 2007 WL 1467182, at *1 (D.Conn. May 15, 2007) (holding that plaintiff's allegations that his convictions were based on perjury and fabricated evidence pursuant to a conspiracy to violate his federal rights "necessarily impl[ied] that he was wrongly convicted" and could not be litigated "until he show[ed] that the convictions have been invalidated"); *Duamutef v. Morris,* 956 F.Supp. 1112, 1115-16 (S.D.N.Y.1997) (dismissing § 1983 claims for, *inter alia,* malicious prosecution, false arrest, and perjury during trial due to a failure to state a claim under *Heck* because of the valid underlying criminal conviction). Thus, in order to bring a cognizable Section 1983 claim in this Court for the harms alleged, plaintiff must first establish the invalidity of his state court conviction.

[6] With respect to plaintiff's claim that the County of Nassau has a policy of declining to investigate criminal complaints filed by pretrial detainees and criminal defendants, as discussed *infra,* plaintiff has failed to present any evidence that his claim was not investigated, whereas the County has presented substantial evidence demonstrating that plaintiff's claim was, in fact, investigated. Moreover, the prosecution of plaintiff's criminal complaints against Officer Hughes and Detective Comiskey would have implicated the validity of his underlying conviction, in contravention of the *Heck* rule. Accordingly, *Heck* can be construed to preclude all of plaintiff's Section 1983 claims.

***9** The fact that plaintiff is seeking to assert municipal liability claims against the County of Nassau, rather than against individual defendants, does not vitiate the application

of the *Heck* rule to plaintiff's claims. To prevail against the County of Nassau in his Section 1983 action under any of these theories, a plaintiff must plead and prove: (1) there was an official municipal policy or custom; and (2) that policy or custom caused him to be subjected to a denial of a constitutional right. *See Monell v. Dep't Soc. Servs.,* 436 U.S. 658, 690-91 (1978). There must be a "direct causal link" between the alleged municipal action and the deprivation of the plaintiff's constitutional rights. *City of Canton, Ohio v. Harris,* 489 U.S. 378, 385 (1989); *Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985); *see also Lynch v. Suffolk County Police Dep't,* No. 07-3684-cv, 2009 WL 3287565, at *2 (2d Cir. Oct. 14, 2009) ("In order to prevail on a claim against a municipality under *Monell,* a plaintiff must allege, among other things, that a 'municipal policy of some nature caused a constitutional tort.' " (citations omitted)). In the instant case, because the Court finds as a matter of law on summary judgment that *Heck v. Humphrey* prevents a finding that a constitutional violation was committed against plaintiff by any of the defendants, *see supra,* no *Monell* claim can lie against the County of Nassau pursuant to § 1983.[7] *See, e.g., Lynch,* 2009 WL 3287565, at *2 ("Insofar as plaintiff alleges that a municipal policy caused prosecutorial misconduct in the trial that led to his felony convictions, plaintiff's claim seeks to 'recover damages for [an] allegedly unconstitutional conviction or imprisonment' and is barred by *Heck,* 51 U.S. at 486." (alteration in original)); *Segal v. City of N.Y.,* 459 F.3d 207, 219 (2d Cir.2006) ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."); *accord Vippolis,* 768 F.2d at 44 ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that the municipality was, in the language of the statute, the 'person who ... subjected, or cause[d][him] to be subjected,' to the deprivation of his constitutional rights." (citing 42 U.S.C. § 1983)); *see also Ewolski v. City of Brunswick,* 287 F.3d 492, 516 (6th Cir.2002) ("Having concluded that the Appellant has not shown a genuine issue of material fact as to any of the asserted constitutional claims, we therefore conclude that the district court correctly dismissed the Appellant's municipal liability claims.").

[7] In any event, summary judgment would also be warranted in favor of the County of Nassau because, as discussed *infra,* plaintiff has failed to proffer any evidence of a policy, custom, or

failure to train, that led to any alleged constitutional violation.

In sum, even accepting plaintiff's allegations as true and drawing all reasonable inferences in plaintiff's favor, the Court finds that plaintiff cannot successfully bring a claim because the *Heck* rule, as a matter of law, prevents plaintiff from demonstrating a violation of his constitutional rights, which is a necessary predicate to any municipal liability claim pursuant to Section 1983.

### b. No Evidence of Violation of Plaintiff's Constitutional Rights

**\*10** Moreover, even assuming that the validity of plaintiff's underlying conviction is not implicated by his claim that the County of Nassau had a policy of ignoring criminal complaints filed by pretrial detainees and criminal defendants, he has presented no evidence to support his contention that the County did not investigate his claims. Thus, because there is no evidence from which a rational jury could find a violation of his constitutional rights, there is no predicate for his municipal liability claim.

The only forms of evidence offered by plaintiff on this issue are his bald assertions and the fact that the County did not prosecute Officer Hughes or Detective Comiskey for their alleged misconduct in relation to plaintiff's trial. Plaintiff's exhibits consist merely of copies of the letters and complaints that he filed with Nassau County entities. Plaintiff presents no evidence to contradict the evidence put forth by defendants, which demonstrates that plaintiff's complaints were investigated. In two affidavits submitted by ADA Kornblau, former Bureau Chief of the District Attorney's Public Corruption Bureau, she asserts that she personally investigated plaintiff's complaints against the officers. (*See* Defs.' Exs. K, X.) According to ADA Kornblau's affidavit, upon investigating Jackson's complaints, "[it] was clear from the minutes that [Jackson's] criminal attorney raised the issue of the failure to turn over *Rosario* material to the trial court, which is the proper venue for such an allegation." (Defs.' Ex K ¶ 4.) Subsequently, ADA Kornblau determined that the remainder of plaintiff's claims were unfounded, and declined to prosecute the matter. (*See id.* ¶ 4 ("Subsequent to reviewing Jackson's complaint and after determining that the [complaint] did not allege conduct which constituted a crime, I referred the matter to the Internal Affairs Bureau of the Nassau County Police Department ...."); *id.* ¶ 6 ("In view of the fact that the trial of this case

was still pending, and the issues alleged by [Jackson] all pertained to credibility, I notified Daniel Looney, the Assistant District Attorney assigned to Jackson's prosecution, as well as defense counsel, Jeffrey Groder, of Jackson's claims. I also forwarded Jackson's complaint to the Internal Affairs Bureau of the Nassau County Police Department for whatever administrative action they deemed necessary.").) In a separate affidavit, ADA Steven L. Schwartz, Bureau Chief of the District Court Trial Bureau in the Nassau County District Attorney's Office, states that he personally investigated plaintiff's proposed accusatory instruments and found them to be unfounded; accordingly, they were not prosecuted. (Defs.' Ex. Q ¶ 9.) [8]

[8] The Court further notes that in the absence of any evidence that the Nassau County District Attorney's Office failed to investigate Jackson's complaints, the decision not to prosecute those complaints is protected by prosecutorial immunity. *See, e.g., Fields v. Soloff,* 920 F.2d 1114, 1119 (2d Cir.1990) ("[U]nless a prosecutor proceeds in the clear absence of all jurisdiction, absolute immunity exists for those prosecutorial activities intimately associated with the judicial phase of the criminal process.... This protection extends to the decision to prosecute as well as the decision not to prosecute." (internal quotations and citations omitted)).

Here, as in *Staley v. Grady,* 371 F.Supp.2d 411 (S.D.N.Y.2005), "[s]imply because defendants disagreed with plaintiff as to the merits of the proposed [complaint] and chose not to prosecute the same, does not give rise to an equal protection violation." *Id.* at 417. Here, too, the Nassau County District Attorney's Office received Jackson's criminal complaints, reviewed and investigated them, and declined to prosecute them based upon the conclusion that the complaints were without merit. (*See* Defs.' Exs. K, Q.)

**\*11** In short, due to plaintiff's inability to set forth any evidence from which a rational jury could find a deprivation of his constitutional rights, plaintiff's *Monell* claims against the County of Nassau cannot survive summary judgment.

### (2) Plaintiff Has Set Forth No Evidence to Support a *Monell* Claim

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 48 of 166

Even assuming *arguendo* that plaintiff had put forth evidence to create a genuine issue of fact on whether his constitutional rights were violated, his municipal liability claims still cannot survive summary judgment because there is no evidence of a policy, practice or custom to support a finding by a rational jury of municipal liability under *Monell.*

### i. Applicable Standard

Municipalities cannot be held vicariously liable for the actions of an employee under § 1983. *Monell,* 463 U.S. at 691 ("[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."). Thus, "[a] municipality will not be held liable under Section 1983 unless the plaintiff can demonstrate that the allegedly unconstitutional action of an individual law enforcement official was taken pursuant to a policy or custom 'officially adopted and promulgated by that [municipality's] officers.' " *Abreu v. City of N.Y.,* No. 04-CV-1721 (JBW), 2006 U.S. Dist. LEXIS 6505, at *11 (E.D.N.Y. Feb. 22, 2006) (quoting *Monell,* 436 U.S. at 690) (alteration in original). " '[M]unicipal liability under § 1983 attaches where-and only where-a deliberate choice to follow a course of action is made from among various alternatives' by city policymakers ." *City of Canton,* 489 U.S. at 389 (quoting *Pembaur v. Cincinnati,* 475 U.S. 469, 483-84 (1986)). Thus, an individual's misconduct will not result in *respondeat superior* liability for his supervisors absent specific allegations that he acted pursuant to an official policy or custom. *Ricciuti v. N.Y.C. Transit A uth .,* 941 F.2d 119, 123 (2d Cir.1991). However, "[a] court may draw the inference of the existence of a policy or custom 'when a plaintiff presents evidence that a municipality so failed to train its employees as to display a deliberate indifference to the constitutional rights of those within its jurisdiction.' " *Caidor v. M & T Bank,* No. 05-CV-297 (FSJ), 2006 U.S. Dist. LEXIS 22980, at *35-36 (N.D.N.Y. Mar. 27, 2006) (quoting *Grifin-Nolan v. Providence Wash. Ins. Co.,* No. 04-CV-1453 (FJS), 2005 U.S. Dist. LEXIS 12902, at *10 (N.D.N.Y. June 20, 2005) (quotation omitted)). But, " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995) (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 100 (2d Cir.1993)).

### ii. Application

Even if plaintiff could prove that his constitutional rights were violated, whether at trial or by the subsequent failure to prosecute his criminal complaint for the actions by municipal actors at his trial, this is not sufficient to demonstrate a policy or custom by the County of Nassau. "[A] single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy." *Ricciuti,* 941 F.2d at 123; *see also Oklahoma City v. Tuttle,* 471 U.S. 808, 823-24 (1985) ("Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell,* unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker."); *McAllister v. N.Y.C. Police Dep't,* 49 F.Supp.2d 688, 706 (S.D.N.Y.1999) (same); *Palmer v. City of Yonkers,* 22 F.Supp.2d 283, 290 (S.D.N.Y.1998) ("[T]he court will not infer the existence of a municipal policy from a single incident."). As discussed *supra,* " 'the mere assertion ... that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference.' " *Zahra,* 48 F.3d at 685 (quoting *Dwares,* 985 F.2d at 100). [9]

[9]   Plaintiff contends that the persons who violated his constitutional rights were policymakers. (Opp. at 14 ("All of plaintiff's claims were made against the 'policy makers' and not against employees below the policy making level.").) First, as discussed *supra,* plaintiff's claims regarding alleged perjury, withholding of evidence, or falsely verified complaints relating to his trial are barred by *Heck.* In addition, however, plaintiff presents no evidence in support of this argument. Moreover, for purposes of plaintiff's causes of action regarding the failure to investigate his criminal complaints against those persons, plaintiff would need to allege that the persons who allegedly failed to investigate his accusations were policymakers. Plaintiff does not do so. Instead, he acknowledges that the policy maker is District Attorney Kathleen Rice, and the individuals who submitted the defendants' supporting affidavits-those who investigated plaintiff's allegations-are subordinates to the policy maker. (Opp. at 15.)

For the reasons contained in our earlier opinion, this Court declines to add District Attorney Rice as a defendant in this action. *See Jackson, 2009 WL 393640, at \*3-5.* In light of Jackson's repeated argument that the actions of the Nassau County District Attorney's Office's and Nassau County Police Department's actions were part of a policy, procedure, or custom, the Court interprets his complaint and opposition papers to argue municipal liability based only on a theory of municipal policy, procedure, or custom, and not on a theory of unconstitutional action by a policymaker.

**\*12** Plaintiff's complaint, statements at his deposition, and opposition papers to defendants' motion for summary judgment contain vague allegations regarding the existence of a policy or procedure by the County of Nassau of refusing to investigate criminal complaints of pretrial detainees and criminal defendants. (*E.g.,* Opp. at 5-6 ("Plaintiff also stated that he never received any response or letters of acknowledgment from either office though he wrote numerous letters inquiring about the status of his complaints and criminal charges."); Opp. at 6 ("The complaints were never investigated and plaintiff never received any response."); Opp. at 7 ("During the deposition plaintiff continuously testified to the fact that no one ever investigated nor responded to his complaints and grievances.").) These conclusory allegations as to the existence of a policy or custom are insufficient to withstand summary judgment. *See Bishop v. Toys "R" Us-NY, LLC, No. 04 Civ. 9403(PKC), 2009 WL 440434, at \*4 (S.D.N.Y. Feb. 19, 2009)* ("[P]roceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' completely unsupported by evidence, is not sufficient to overcome a motion for summary judgment." (quoting *Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir.1995)*). Indeed, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Id*. (citing *Matsushita, 475 U.S. 574, 587 (1986)*); Order, *McCrary v. County of Nassau,* No. 06 CV 4982(SJF)(ARL) (E.D.N.Y. Sept. 22, 2008) ("Magistrate Judge Lindsay properly found that [p]laintiff had proffered no evidence to support his assertion that a custom, policy and/or practice, which precludes the consideration of criminal charges brought by an accused against police officers and assistant district attorneys, existed" when plaintiff merely asserted that a police officer was "aware of alleged police misconduct regarding Plaintiff's apprehension, [the] affidavits in support of County

Defendants' summary judgment motion were not sufficiently detailed, and that there was no record of any investigation having been conducted by [County Defendants] in regards to the [complaints]"). Plaintiff has presented no actual evidence of a policy or custom whereby the County would decline to review the criminal complaints of pretrial detainees or criminal defendants.

The County of Nassau, however, has put forward extensive evidence regarding the policies that it has in place to review criminal complaints filed by all citizens. In two separate affidavits, ADA Kornblau affirms that the County does investigate criminal complaints against police officers and ADAs-including those made by pretrial and criminal defendants: "[M]any of the [District Attorney's Public Corruptions Bureau's] cases are referred from members of the public, including direct complaints of police misconduct that the Bureau receives from defendants and/or their attorneys." (Defs.' Ex. X. ¶ 5.) Similarly, "[t]o facilitate the investigation into complaints by incarcerated individuals including pretrial detainees, the Public Corruption Bureau maintains a hotline in the Nassau County Correctional Center for the purpose of allowing inmates to file complaints directly with the Public Corruption Bureau, without having to have their complaints reviewed first by any other entity, agency, or person." (*Id.*) Moreover, ADA Kornblau's affidavit states that "[e]ach criminal complaint is afforded individual attention and investigation ... [and if] after investigation, it is determined that a complaint is supported by credible evidence, the Nassau County District Attorney's Public Corruption Bureau will recommend prosecution, after which those cases will be prosecuted in criminal court." (*Id.* ¶¶ 6-7.)

**\*13** The County of Nassau has also submitted evidence that the system utilized by the Nassau County District Attorney's Office for examining criminal complaints filed by private citizens does not differentiate between complaints based on the individual who files the complaint. ADA Kornblau explains that:

> Complaints are retrieved from within the computerized complaint system in one of three ways: (1) a complainant's name; (2) a defendant's name; or, (3) a complaint number. Therefore, there is no way to retrieve criminal complaints made specifically by pretrial detainees from within the computer complaint

system since complaints are placed into the system without complainant classification (e.g., civilian, pretrial detainee, police officer, etc.).

(*Id.* ¶ 8; *see also* Defs.' 56.1 ¶ 47; Defs.' Ex. W ¶ 11.) In plaintiff's opposition papers, he stated that he did not dispute these facts. (Opp. at 12.)

The County of Nassau also submitted an affidavit from ADA Warren Thurer, the Bureau Chief of the Nassau County Criminal Complaint Unit. According to ADA Thurer, "[s]pecifically with respect to allegations of an assistant district attorney's or police officer's criminal conduct, such allegations will be individually investigated and if appropriate, will be forwarded to the Public Corruption Bureau of the Nassau County District Attorney's Office." (Defs.' Ex. W ¶ 10; *see also* Defs.' Ex. Q ¶ 10 ("There is no policy, practice, or custom within the Nassau County District Attorney's Office that precludes the consideration, investigation, and/or acceptance of criminal cross-complaints brought by an accused against police officers and/or assistant district attorneys based upon the status of the complainant as a pretrial detainee").) An affidavit provided by ADA Steven L. Schwartz, Bureau Chief of the District Court Trial Bureau in the Nassau County District Attorney's Office, states that:

> All proposed accusatory instruments are given individual attention and investigation. There is no distinction made for the status of the complainant and pretrial detainees are not treated any differently than other individuals proposing accusatory instruments to be filed. Each proposed accusatory instrument is investigated for possible criminality and, if appropriate, any case may be forwarded and assigned to one of the investigative bureaus within the District Attorney's Office, or prosecuted within the District Attorney's District Court Bureau. If the allegations in a proposed accusatory instrument are determined to be unfounded, I send a letter to the Associate Court Clerk stating that the District Attorney's Office has declined

to prosecute the matter.... Specifically, with respect to allegations of an assistant district attorney's or police officer's criminal conduct, such allegations are individually investigated and if appropriate, are forwarded to the Nassau County District Attorney's Office Public Corruption Bureau.

**\*14** (Defs.' Ex. Q ¶¶ 7-8.) Plaintiff has presented no evidence to contradict the information contained in these affidavits or to suggest otherwise.

Nor has plaintiff presented evidence of a policy or custom of committing perjury, withholding evidence, or falsely verifying criminal complaints. Plaintiff has merely asserted that "he can testify based upon personal knowledge to the undisputed facts and that he has credible witnesses and documental evidence to support said factual claims." (Opp. at 11.) Plaintiff has not alleged with specificity other instances of perjury, withheld evidence, or falsified complaints, nor has he presented any other evidence of police officers' commission of perjury, withholding of evidence, or filing of falsely sworn complaints. The County of Nassau, by contrast, has put forward evidence regarding its arrest processing procedures and arrest records. (*See* Defs.' Ex. Z.) Nowhere in the County's arrest policies is false verification of criminal complaints, withholding of evidence, or perjury authorized. Furthermore, the "collective knowledge doctrine" or "fellow officer rule" permits arresting officers to rely upon other law enforcement officers' knowledge to justify probable cause to arrest. *See Savino v. City of New York,* 331 F.3d 63, 74 (2d Cir.2003) ( [F]or the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, ... the knowledge of one is presumed shared by all.' "); *Stokes v. City of New York,* No 05-CV-0007 (JFB) (MDG), 2007 U.S. Dist. LEXIS 32787, at \*17 (E.D.N.Y. May 3, 2007) ("[U]nder the collective knowledge doctrine, defendant Buskey is permitted to rely on knowledge obtained by any other officers during the investigation"); *Phelps v. City of New York,* No. 04 CIV. 8570(DLC), 2006 U.S. Dist. LEXIS 42926, at \*9-10 (S.D.N.Y. June 29, 2006) ("The rationale behind the [collective knowledge] doctrine is that in light of the complexity of modern police work, the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on

facts known only to his superiors or associates. Although the doctrine is typically used to establish probable cause for the purpose of admitting evidence at trial, it is equally applicable here. As the Supreme Court has recognized, police officers called upon to aid other officers in making an arrest are entitled to assume that the officers requesting aid have acted properly." (internal quotations and citations omitted)). Accordingly, it is not improper for an officer to verify a criminal complaint based upon facts learned from another officer and plaintiff has put forth no evidence of a policy, practice, or custom of Nassau County police officers falsifying information in criminal complaints or committing perjury.

Moreover, the County of Nassau has put forward an affidavit from a former Nassau County ADA, who investigated and prosecuted a complaint against a Nassau County Police Officer in an unrelated matter that alleged that the officer had committed perjury by falsely testifying before the grand jury. (Defs.' Ex. Y ¶¶ 2-5.) That police officer was prosecuted and convicted of perjury in the third degree. (*Id.* ¶ 8.) In the face of this undisputed evidence of the County prosecuting perjury when it is uncovered, plaintiff has not identified any specific instances of police officers' commission of perjury that were not prosecuted.

**\*15** In sum, the undisputed facts demonstrate the following: (1) plaintiff's conviction prevents him from disputing any alleged constitutional violations relating to his trial; (2) defendants did investigate plaintiff's criminal complaints regarding Officer Hughes's and Detective Comiskey's alleged behavior; (3) defendants do have in place policies and procedures whereby criminal complaints filed by private citizens are investigated-even if those citizens are pretrial detainees or criminal defendants; and (4) the County of Nassau does not have a policy or procedure of permitting its employees to commit perjury, to falsely verify criminal complaints, or to withhold exculpatory evidence at trial. In short, plaintiff has failed to provide any factual support for his conclusory allegations that the defendants have engaged in unconstitutional policies or procedures. Accordingly, defendant's motion for summary judgment is granted.

### C. Motion for Sanctions

The Court has also reviewed plaintiff's motion for sanctions and, for the reasons stated throughout this opinion, finds plaintiff's claims to be without merit. Accordingly, plaintiff's motion for sanctions is also denied. *See S.E. C. v. Shainberg, 316 F. App'x 1, 2 (2d Cir.2008).*

### V. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety. Because the Court grants defendants' motion for summary judgment in its entirety, it also denies plaintiff's motion for sanctions against defendant.

The Court certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this order would not be taken in good faith, and, therefore, *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).*

SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2010 WL 335581

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 2868231

2009 WL 2868231
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Quentin LA GRANDE, Plaintiff,

v.

TOWN OF BETHLEHEM POLICE
DEPARTMENT, et al., Defendants.

No. 1:08–CV–0738 (LEK/DRH).
|
Sept. 1, 2009.

**Attorneys and Law Firms**

Quentin La Grande, Albany, NY, pro se.

Nannette R. Kelleher, Bailey, Kelleher Law Firm, Albany,
NY, for Defendants.

### DECISION AND ORDER

LAWRENCE E. KAHN, District Judge.

 **\*1** Plaintiff *pro se* Quentin La Grande ("Plaintiff" or "La
Grande") commenced the instant action against Defendants
Robert Helligrass [1], Stephen Kraz [2] and the Town of
Bethlehem Police Department (collectively, "Defendants")
pursuant to 42 U.S.C. § 1983. Complaint (Dkt. No. 1).
Presently before this Court is Defendants' Motion to dismiss
(Dkt. No. 13) and Plaintiff's Motion for summary judgment
(Dkt. No. 12). For the following reasons, Defendants' Motion
to dismiss is granted and Plaintiff's Motion for summary
judgment is denied.

[1]  Incorrectly named in the Complaint as "R.J.
Helliergrass." *See generally* Complaint (Dkt. No.
1).

[2]  Incorrectly named in the Complaint as "William
Craz." *See generally* Complaint.

### I. BACKGROUND

According to Plaintiff, "[o]n April 1, 2008 I was threaten
by Patrol Officer William Craz. Patrol Officer called me a
'Nigger,' and also threaten to cause bodily harm to me. On
April 2, 2008 I met with Seargent R.J. Helliergrass and was

interogated, and racial harrassed. On or about April 5, 10, 15,
May 6, 8, 10, 15, and June 6, 2008, I have been followed by
the Bethlehem Police Department." Compl. at 2. Plaintiff's
jurisdictional statement asserts that the Complaint is being
brought pursuant to 42 U.S.C. § 1983. *Id.* at 1.

In lieu of filing an answer, on March 11, 2009, Defendants
filed the Motion to dismiss presently before the Court. Mot.
to Dismiss (Dkt. No. 13). Plaintiff also filed a Motion for
summary judgment on February 24, 2009, which is now
before the Court. Mot. for Sum. Judg. (Dkt. No. 12).

### II. DISCUSSION

#### A. Defendants' Motion to Dismiss

#### a. Standard of Review

In order to withstand a motion to dismiss, "a [pleading] must
contain sufficient factual matter ... to 'state a claim to relief
that is plausible on its face.' " *Ashcroft v. Iqbal,* ––– U.S.
––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting
*Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct.
1955, 167 L.Ed.2d 929 (2007)). A party must plead with such
factual detail so as to sufficiently " 'nudge [ ][its] claims ...
across the line from conceivable to plausible.' " *Iqbal,* 129
S.Ct. at 1950–51 (quoting *Twombly,* 550 U.S. at 570). While
stating a claim does not require the recitation of detailed
factual allegations, it does, however, require facts sufficient to
state a claim to relief that is *prima facie* plausible. *Iqbal,* 129
S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555). The Court
must accept the allegations in the well-pleaded complaint as
true, *Albright v. Oliver,* 510 U.S. 266, 268, 114 S.Ct. 807,
127 L.Ed.2d 114 (1994), and draw all inferences in favor
of the non-moving party. *Scheuer v. Rhodes,* 416 U.S. 232,
236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1973); *Global Network
Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d
Cir.2006); *King v. Am. Airlines, Inc.,* 284 F.3d 352, 356 (2d
Cir.2002).

In assessing the legal sufficiency of the Complaint, the
Court is mindful that La Grande is a *pro se* litigant and
his submissions are subject to "less stringent standards than
formal pleadings drafted by lawyers." *Hughes v. Rowe,* 449
U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) (quoting
*Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d
652 (1972)). The Court must "read the pleadings of a *pro se*
plaintiff liberally and interpret them 'to raise the strongest
arguments they suggest.' " *McPherson v. Coombe,* 174 F.3d
276, 280 (2d Cir.1999); *see Hemphill v. New York,* 380 F.3d

680, 687 (2d Cir.2004) (" "It is well-established that 'when a plaintiff proceeds *pro se* the court is obligated to construe his pleadings liberally, particularly when they allege civil rights violations' ") (quoting *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004)). However, a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983).

### b. Analysis

**\*2** Defendants move to dismiss Plaintiff's Complaint in its entirety pursuant to Rules 12(b)(6) of the Federal Rules of Civil Procedure.[3] Mot. to Dismiss (Dkt. No. 13) at 1. Defendants specifically argue that all causes of action against the Town of Bethlehem Police Department must be dismissed as it is not a legal entity subject to suit under 42 U.S.C. § 1983 and further that Plaintiff's entire Complaint should be dismissed for failing to state a cause of action. *Id.* at 4.

[3]    Defendants argue, alternatively, that Plaintiff's Complaint should be dismissed pursuant to 28 U.S.C. § 1915(e) and for failing to adhere to Rule 8(a) of the Federal Rules of Civil Procedure. The Court need not address these arguments as it is dismissing Plaintiff's Complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).

### i. Town of Bethlehem Police Department

The Town of Bethlehem moves to dismiss Plaintiff's Complaint on the ground that it is not susceptible to suit under 42 U.S.C. § 1983. While a municipality may be susceptible to suit under 42 U.S.C. § 1983, a municipal police department is not. *See Walker v. Waterbury Police Dep't.,* 08–cv–959 (JG)(AKT), 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (E.D.N.Y. Feb. 4, 2009). "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Id.* (citing *Hall v. City of White Plains,* 185 F.Supp.2d 293, 303 (S.D.N.Y.2002)). Accordingly, claims asserted under 42 U.S.C. § 1983 will be dismissed against a municipality's police department. *See Walker,* 2009 U.S. Dist. LEXIS 7933, at \*5, 2009 WL 261527 (internal citation omitted); *see also Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

Here, Plaintiff has sued the Town of Bethlehem Police Department along with two individual officers of the

department. *See generally* Compl. Plaintiff's Complaint asserts that it is brought pursuant to 42 U.S.C. § 1983 and does not provide any other basis for the claims. *Id.* at 1. Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, Plaintiff's Complaint is dismissed as against the Town of Bethlehem Police Department.

Even assuming *arguendo* that Plaintiff's claims against the Town of Bethlehem Police Department can be construed as a claim against the Town of Bethlehem, Plaintiff's Complaint would still be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

In order to state a cause of action for municipal liability under 42 U.S.C. § 1983, "a plaintiff must allege that the municipality has adopted a custom or policy which is the moving force behind the [alleged constitutional violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 649 (N.D.N.Y.1997). A municipality cannot be held liable on the basis of *respondeat superior* and "a single incident alleged in a complaint, especially if it involved only actors below the policymaking level, generally will not suffice to raise an inference of the existence of a custom or policy." *Campanaro v. City of Rome,* 999 F.Supp. 277, 281 (N.D.N.Y.1998); *see also Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993).

Plaintiff's Complaint is devoid of any allegations that the Town of Bethlehem had a policy or custom of violating constitutional rights, nor does plaintiff allege or even allude that the Town was deliberately indifferent to his constitutional rights. The complete failure to plead such warrants dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as the Complaint fails to state a cause of action for which relief can be granted under 42 U.S.C. § 1983. *See Campanaro,* 999 F.Supp. at 281; *Dwares,* 985 F.2d at 100.

### ii. Defendants Kraz and Helligrass

**\*3** La Grande's Complaint alleges that between April and June 2008, he was "racially harassed," "threatened" and "interrogated" by Defendants Kraz and Helligrass, two officers of the Bethlehem Police Department. Compl. at 2. Specifically, La Grande alleges that on multiple occasions the officers addressed him with a racial epithet and followed him through town. *Id.* It is well settled in this Circuit that "42 U.S.C. § 1983 is not designed to rectify harassment or verbal abuse." *Murray v. Pataki,* No. 9:03–cv–1263, 2007 U.S. Dist. LEXIS 26959, at \*22, 2007 WL 956941 (N.D.N.Y. Mar. 29, 2007) (Kahn, J.) (quoting *Gill v. Hoadley,* 261 F.Supp.2d 113, 129 (N.D.N.Y.2003)) (collecting cases).

La Grande v. Town Of Bethlehem Police Dept., Not Reported in F.Supp.2d (2009)

2009 WL 2868231

"[V]erbal harassment or profanity alone, unaccompanied by an injury no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." *Murray,* 2007 U.S. Dist. LEXIS, at * 22 (quoting *Moncrieffe v. Witbeck,* 2000 U.S. Dist. LEXIS, at *3, 2000 WL 949457 (N.D.N.Y. June 29, 2000)); *see also Zeno v. Cropper,* 650 F.Supp. 138, 141 (S.D.N.Y.1986) ("vile and abusive language ... no matter how abhorrent or reprehensible cannot form the basis for a § 1983 claim) (internal citation and quotation omitted). Further, "threats do not amount to violations of constitutional rights." *Murray,* 2007 U.S. Dist. LEXIS, at *23 (quoting *Malsh v. Austin,* 901 F.Supp. 757, 763 (S.D.N.Y.1995)).

In this case, Plaintiff's claim for verbal harassment in the form of racial slurs and threats is not actionable under § 1983 and, therefore, fails to state a claim entitled to relief. Compl. at 2.

**B. Plaintiff's Motion for Summary Judgment**

Even assuming *arguendo* that this Court did not grant Defendants' Motion to dismiss, Plaintiff's Motion for summary judgment would still be denied. Under the Local Rules, *"all* motions ... require a memorandum of law, supporting affidavit, and proof of service on all the parties." N.D.N.Y. L.R. 7.1(a) (emphasis added). "All memoranda of law shall contain a table of contents and, wherever possible, parallel citations." *Id.* at 7 .1(a)(1). Further "[a]ny motion for summary judgment shall contain a Statement of Material Facts ... *Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion." Id.* at 7 .1(a)(3) (emphasis in original).

Here, not only did the Plaintiff fail to submit a memoranda of law in support of his Motion for summary judgment and an affidavit but he also failed to submit a Statement of Material Facts. In fact, in his Motion for summary judgment filed on February 24, 2009, Plaintiff explicitly stated, "I will provide this Court with a 'Law Memorandum' in support of my motion; such will contain applicable law, and case law. I will submit this to the Court on or before March 6, 2009." Mot. for Sum. Judg. at 1. To date, this Court has nor received said memorandum of law. While this Court recognizes Plaintiff's *pro se* status, he has failed to comply with *all* of the Local Rules. *See Traguth v. Zuck,* 710 F.2d 90, 92 (2d Cir.1983) (a plaintiff's *pro se* status "does not exempt [him] from compliance with relevant rules of procedural and substantive law"). Accordingly, Plaintiff's Motion for summary judgment

is denied for failing to comply with the relevant rules of procedure. *See, e.g.,* N.D.N.Y. L.R. 7.1(a), 7.1(a)(3).

**C. Amended Complaint**

**\*4** Plaintiff also moves to amend his Complaint. Response (Dkt. No. 27). While *pro se* litigants are generally afforded wide latitude and an opportunity to amend, a District Court need not permit an amendment to a Complaint where it would be futile. *See Forman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (holding that although leave to amend should be freely given where justice so requires, a district court need not grant leave if amendment would be futile); *Acito v. Imcera Group, Inc.,* 47 F.3d 47, 55 (2d Cir.1995).

Here, Plaintiff's Complaint does not state any viable causes of action under 42 U.S.C. § 1983. Further, Plaintiffs Complaint does not state which, if any, of his constitutional rights were violated by Defendants nor does it plead any facts to establish municipal liability. Plaintiff's Complaint also does not plead any facts supporting his allegations that he was "racially harassed," "threatened" or "interrogated." Since, as the Court discussed above, none of the complained of actions provides the basis for a cognizable cause of action, leave to cure these defects would be futile. These deficiencies may have been excusable, albeit not cureable, had this Court not previously informed Plaintiff of the requirements for pleading a cause of action under 42 U.S.C. § 1983 against a municipality. *See La Grande v. Albany Police Dep't,* 1:07–CV–757 (Dkt. No. 4). [4] Given that leave to amend would be futile, this Court denies Plaintiff's request.

[4]      Notably, Plaintiff has also filed numerous Complaints in the Northern District, many of which include assertions of civil rights violations and racial discrimination or harassment, wherein Plaintiff has been granted leave to amend his complaints. Plaintiff has filed eleven suits in the Northern District since 2000, including the instant matter. In fact, on May 12, 2008, Chief United States District Judge Norman A. Mordue entered an order enjoining Plaintiff from filing any further actions or pleadings in this district without the prior permission of the Chief Judge. Dkt. No. 6. This Order was entered based on a record of vexatious and frivolous pleadings previously filed by La Grande.

2009 WL 2868231

### III. CONCLUSION
Based on the foregoing, it is hereby

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 13) is **GRANTED in its entirety;** and it is further

**ORDERED,** that Plaintiff's request to amend his Complaint (Dkt. No. 27) is **DENIED;** and it is further

**ORDERED,** that Plaintiff's Motion for summary judgment (Dkt. No. 12) is **DENIED in its entirety;** and it is further

**ORDERED,** that the Clerk serve a copy of this Decision and Order on all parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 2868231

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

 © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4052286
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Sylvia JENKINS, Plaintiff,
v.
Mr. LIADKA, Syracuse Police Officer; Mr. Sands,
Syracuse Police Officer; John Doe, Syracuse Police
Officer; and Syracuse Police Dep't, Defendants.

No. 5:10–CV–1223 (GTS/DEP).
|
Sept. 13, 2012.

**Attorneys and Law Firms**

Sylvia Jenkins, Syracuse, NY, pro se.

Hon. Mary Anne Dougherty, Corporation Counsel for
City of Syracuse, Catherine Ena Carnrike, Esq., Assistant
Corporation Counsel, of Counsel, Syracuse, NY, for
Defendants.

### *MEMORANDUM–DECISION and ORDER*

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Sylvia Jenkins ("Plaintiff") against Mr. Liadka,
Mr. Sands, John Doe, and Syracuse Police Department
("Defendants"), is Defendants' motion to dismiss Plaintiff's
Complaint for insufficient service of process pursuant to
Fed.R.Civ.P. 12(b)(5) and/or for failure to state a claim
pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 13.) For the
reasons set forth below, Defendants' motion is granted in part
and denied in part.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Complaint

Generally, construed with the utmost of special liberality,
Plaintiff's Complaint asserts three claims against Defendants
arising from an investigatory stop in September 2010, in
Syracuse, New York: (1) a claim that three Syracuse Police
Officers unreasonably searched her in violation of the Fourth
Amendment; (2) a claim that they unlawfully seized, and
failed to return, her personal property in violation of the

Fourth, Fifth, and/or Fourteenth Amendments; and (3) a claim
that they subjected her to excessive force in violation of
the Fourth Amendment. (*See generally* Dkt. No. 1 [Plf.'s
Compl].)

Generally, in support of these claims, Plaintiff alleges as
follows: (1) on the evening of September 9, 2010, she was
stopped on Butternut Street in the City of Syracuse by
two officers, who questioned her regarding a call they had
received; (2) when she told the two police officers that she
did not know what they were talking about and "attempted
to go on about [her] business," the officers became "uptight,
rude, [and] abnormal in their conversations [and] behavior,"
and threatened her; (3) the officers then proceeded to conduct
a search of "all [of Plaintiff and her] personal property,"
and, in the process of doing so, twisted her arm and forced
her onto the front of their police vehicle; (4) a third police
officer arrived, and she was assaulted by all three officers
(hereinafter "Defendants"), who hit her on the back and threw
her onto the police vehicle; (5) following the deprivation on
September 9, 2010, Defendants denied her a post-deprivation
remedy through a combination of threats, intimidation and/
or nonresponsiveness; and (6) Defendants took these actions
against her intentionally because they did not personally like
her, given her previous interactions with the Syracuse Police
Department. (*Id.*)

Plaintiff further alleges that, as a result of this incident,
she suffered various injuries and losses, including (1) a
"tremendous setback in already trying to recover in an [sic]
grave overall manner of my life [and] lifestyle involving
officials internally [and] externally," (2) head and back pain,
and mental suffering, (3) loss of personal property, and, (4)
loss of employment. (*Id.*) As relief, Plaintiff requests an award
of twelve thousand dollars ($12,000) in damages. (*Id.* at ¶ 6.)

Familiarity with the remaining factual allegations supporting
Plaintiff's three claims is assumed in this Decision and Order,
which is intended primarily for review by the parties. (*See
generally* Dkt. No. 1.)

### B. Defendants' Motion

**\*2** On May 6, 2011, Defendants filed a motion to dismiss.
(Dkt. No. 13, Attach 2.) Generally, in support of their motion,
Defendants assert the following two arguments: (1) because
the Complaint was not served within the time allowed by
Fed.R.Civ.P. 4 or Local Rule 4.1 of the Local Rules of Practice
for this Court, the Court lacks jurisdiction over Defendants in
accordance with Fed.R.Civ.P. 4; and (2) the Complaint fails

to state a claim upon which relief can be granted, because (a) the Complaint fails to identify what constitutional rights Plaintiff is attempting to vindicate, (b) even if the Complaint has sufficiently identified a constitutional violation, the Complaint fails to allege facts plausibly suggesting the personal involvement of the individual Defendants in any such constitutional violation, (c) the City of Syracuse Police Department does not have the legal capacity to be sued, (d) even if Plaintiff's Complaint can be liberally construed as attempting to assert a claim against the City of Syracuse, the Complaint fails to allege facts plausibly suggesting that the individual Defendants' actions the result of a city policy or custom sufficient to confer municipal liability upon the City, (e) the Fifth Amendment does not govern a plaintiff's deprivation-of-property claim against state actors, (f) the Complaint fails to allege facts plausibly suggesting that force was used or that if force was used it was excessive for purposes of a Fourth Amendment claim, and (g) based on Plaintiff's factual allegations, Defendants Liadka and Sands are protected from liability as a matter of law by the doctrine of qualified immunity. (*See generally* Dkt. No. 13, Attach. 2.)

On June 2, 2011, Plaintiff filed a response to Defendants' motion. Generally, Plaintiff's response, which is handwritten and three pages in length, states that she "definitely oppose[s] [Defendants'] request" for the dismissal of her Complaint. (*See generally* Dkt. No. 17.) However, Plaintiff's response does not address the legal arguments asserted by Defendants for the dismissal of Plaintiff's Complaint. (*Compare* Dkt. No. 17 *with* Dkt. No. 13, Attach. 2.) Although Plaintiff's response was submitted two days after the expiration of the responsedeadline, the Court has accepted it, out of an extension of special solicitude to her as a *pro se* civil rights litigant.

In addition, Plaintiff has filed three letters to the Court on the following dates: July 6, 2011, August 22, 2011, and January 13, 2012. (Dkt. No. 18–20.) Generally, these letters contain assertions that Plaintiff believes that the police are treating her, treating her negatively, and responding unsatisfactorily to her telephone calls. (*Id.*) To the extent that these three letters are intended to constitute papers in opposition to Defendants' motion, the Court will not consider them, because (1) they are not responsive to the motion, and/or (2) they were not submitted in a timely manner. Moreover, to the extent that these three letters are intended to constitute a request for relief, the Court will not consider them, because do not state the relief sought, state with particularity the grounds for seeking the order, and attach a memorandum of law and

affidavit, as required by Fed.R.Civ.P. 7(b) and Local Rule 7.1 of the Local Rules of Practice for this Court.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions to Dismiss for Insufficient Service of Process

**\*3** Rule 4(m) of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

> If a defendant is not served within 120 days after the complaint is filed, the court-on motion or its own after notice to the plaintiff-must dismiss the action without prejudice against that defendant or order that service be made within a specified time. But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period.

Fed.R.Civ.P. 4(m).

The Local Rules of Practice for this Court shorten the service requirements under Fed.R.Civ.P. 4. Specifically, Local Rule 4.1(b) requires "service of process upon all defendants within sixty (60) days of the filing of the complaint. This expedited service is necessary to ensure adequate time for pretrial discovery and motion practice. In no event shall service of process be completed after the time specified in Fed.R.Civ.P. 4." N.D.N.Y. L.R. 4.1(b).

### B. Legal Standard Governing Motions to Dismiss for Failure to State Claim

It has long been understood that a defendant may base a motion to dismiss for failure to state a claim upon which relief can be granted on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such motions are often based on the first ground, a few words on that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading

contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n. 17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

**\*4** Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turning on the *conceivability* of an actionable claim,

the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.* [1]

[1]   It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but it has not show[n]-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 [internal quotation marks and

citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[2] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[3] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28.

[2]   See *Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N . Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

[3]   See *Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

**\*5** Finally, a few words are appropriate regarding what documents are considered on a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). The court may consider the following documents without triggering the summary judgment standard: "(1) documents attached as an exhibit to the complaint or answer, (2) documents incorporated by reference into the complaint (and provided by the parties),

(3) documents that, although not incorporated by reference, are "integral" to the complaint, or (4) any matter of which the court can take judicial notice for the factual background of the case." *Planck v. Schenectady Cnty.,* 12–CV–0336, 2012 WL 1977972, at \*5 (N.D.N.Y. June 1, 2012) (Suddaby, J.). Moreover, "a pro se plaintiff's papers in response to a defendant's motion to dismiss for failure to state a claim may be considered as effectively amending the allegations of [her] complaint-to the extent those papers are consistent with the allegations in the complaint." *Planck,* 2012 WL 1977972, at \*5.

### C. Legal Standard Governing Unopposed Motions

In this District, when a non-movant fails to oppose a legal argument asserted by a movant in support of a motion, the movant's burden with regard to that argument has been lightened such that, in order to succeed on that argument, the movant need only show that the argument possesses facial merit, which has appropriately been characterized as a "modest" burden. *See* N.D.N.Y. L.R. 7.1(b) (3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein...."); *Rusyniak v. Gensini,* 07–CV–0279, 2009 WL 3672105, at \*1, n. 1 (N.D.N.Y.Oct.30, 2009) (Suddaby, J.) (collecting cases); *Este–Green v. Astrue,* 09–CV–0722, 2009 WL 2473509, at \*2 & n. 3 (N.D.N.Y. Aug.7, 2009) (Suddaby, J.) (collecting cases).

### D. Legal Standards Governing Plaintiff's Claims

Because the Court has, in its Decision and Order of March 7, 2011, addressed the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not again recite, in their entirety, those legal standards in this Decision and Order, 9 which is intended primarily for review by the parties. (*See generally* Dkt. No. 5 [Decision and Order].)

### E. Legal Standards Governing Defendants' Defenses

#### 1. Defense of Lack of Separate Identity

"Under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality, and therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dept.,* 224 F.Supp.2d 463, 477 (E.D.N.Y.2002). "Pursuant to Fed.R.Civ.P. 17, New York governs the capacity of

a police department to sue or be sued. In New York, police departments like the defendant, which are merely administrative arms of a municipal corporation, do not have a legal identity separate and apart from the town." *Loria v. Irondequoit* 775 F.Supp. 599, 606 (W.D.N.Y.1990). While a municipality can sue or be sued, the police department, which does not exist separate from that municipality, can not. *Baker v. Willett,* 42 F.Supp.2d 192, 198 (N.D.N.Y.1999).

### 2. Defense of Limited Municipal Liability

 **\*6**  It is well established that "[a] municipality may not be held liable in a Section 1983 action for the conduct of a lower-echelon employee solely on the basis of *respondeat superior.*" [4]  "Rather, to establish municipal liability under § 1983 for unconstitutional acts by a municipality's employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy ." [5]  "Thus, to hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to ... prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." [6]

[4]  *Powell v. Bucci,* 04–CV–1192, 2005 WL 3244193, at \*5 (N.D.N.Y. Nov.30, 2005) (McAvoy, J.); *see also Monell v. Dept. of Soc. Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents."); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("[A] [municipality] may not be held for the actions of its employees or agents under a theory of *respondeat superior." ).*

[5]  *Powell,* 2005 WL 3244193, at \*5; *Monell,* 436 U.S. at 690–691 ("[L]ocal governments ... may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels."); *Batista,* 702 F.2d at 397 ("[M]unicipalities may be sued directly under § 1983 for constitutional deprivations inflicted upon private individuals pursuant to a governmental custom, policy, ordinance, regulation, or decision."); *Smith v. City of New York,* 290 F.Supp.2d 317, 321 (S.D.N.Y.2003) ("In order to establish the liability of [municipal] defendants in an action under §

1983 for unconstitutional acts by [its] employees, a plaintiff must show that the violation of [his or] her constitutional rights resulted from a municipal custom or policy.").

[6]  *Batista,* 702 F.2d at 397, *accord, Zahra v. Town of Southold,* 48 F.3d 674, 685 (2d Cir.1995), *McKeon v. Daley,* 101 F.Supp.2d 79, 92 (N.D.N.Y.2000) (Hurd, J.), *Merriman v. Town of Colonie, NY,* 934 F.Supp. 501, 508 (N.D.N.Y.1996) (Homer, M.J.); *Douglas v. Cnty. of Tompkins,* 90–CV–0841, 1995 WL 105993, at \*12 (N.D.N.Y. March 2, 1995) (McCurn, J.), *Keyes v. Cnty. of Albany,* 594 F.Supp. 1147, 1156 (N.D.N.Y.1984) (Miner, J.).

With regard to the first element (the existence of a policy or custom), a "[p]laintiff may establish the 'policy, custom or practice' requirement by demonstrating: (1) a formal policy officially endorsed by the municipality ...; (2) actions taken by government officials responsible for establishing municipal policies related to the particular deprivation in question ...; (3) a practice so consistent and widespread that it constitutes a 'custom or usage' sufficient to impute constructive knowledge to the practice of policymaking officials ...; or (4) a failure by policymakers to train or supervise subordinates to such an extent that it amounts to 'deliberate indifference' to the rights of those who come in contact with the municipal employees...." [7]  With regard to the second element (causation), a plaintiff must show "a direct causal link" or "an affirmative link" between the municipal policy or custom and the alleged constitutional deprivation (i.e., that the policy or custom was the "moving force" behind the deprivation). [8]

[7]  *Dorsett–Felicelli, Inc.,* 371 F.Supp.2d 183, 194 (N.D.N.Y.2005) (Kahn, J.) (citing three Supreme Court cases for these four ways), *accord, Dunbar v. Cnty. of Saratoga,* 358 F.Supp.2d 115, 133–134 (N.D.N.Y.2005) (Munson, J.); *see also Clayton v. City of Kingston,* 44 F.Supp.2d 177, 183 (N.D.N.Y.1999) (McAvoy, J.) (transposing order of second and third ways, and citing five more Supreme Court cases).

[8]  *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("[O]ur first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional

deprivation."); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823, n. 8, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) ("The fact that municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell′* s requirement that the particular policy be the 'moving force' behind a constitutional violation. There must at least be an affirmative link between [for example] the training inadequacies alleged, and the particular constitutional violation at issue."); *Monell,* 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible under § 1983. Since this case unquestionably involves official policy as the moving force of the constitutional violation [at issue] ... we must reverse the judgment below."); *Vippolis v. Village of Haverstraw,* 768 F.2d 40, 44 (2d Cir.1985) ("A plaintiff who seeks to hold a municipality liable in damages under section 1983 must prove that ... an official policy or custom [was] the cause of the deprivation of constitutional rights.... [T]he plaintiff must establish a causal connection-an affirmative link-between the policy and the deprivation of his constitutional rights.") [internal quotation marks and citation omitted]; *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983) ("Absent a showing of a causal link between an official policy or custom and the plaintiff's injury, *Monell* prohibits a finding of liability against the City."); *Powell,* 2005 WL 3244193, at \*5 ("Ultimately, the plaintiff must demonstrate a direct causal link between a municipal policy or custom, and the alleged constitutional deprivation.") [internal quotation marks and citation omitted].

### 3. Defense of Qualified Immunity

"Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams v. Smith,* 781 F.2d 319, 322 (2d Cir.1986) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). As a result, a qualified immunity inquiry in a civil rights case generally involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff establish a constitutional violation"; and (2) "whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation confronted." *Sira v. Morton,* 380 F.3d 57, 68–69 (2d

Cir.2004) [citations omitted], *accord, Higazy v. Templeton,* 505 F.3d 161, 169, n. 8 (2d Cir.2007) [citations omitted].

In determining the second issue (i.e., whether it would be clear to a reasonable official that his conduct was unlawful in the situation confronted), courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*7** *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) [citations omitted], *cert. denied,* 503 U.S. 962, 112 S.Ct. 1565, 118 L.Ed.2d 211 (1992). [9] "As the third part of the test provides, even where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton,* 505 F.3d 161, 169–70 (2d Cir.2007) [citations omitted]. [10] This "objective reasonableness" part of the test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). [11] As the Supreme Court has explained,

[9] *See also Pena v. DePrisco,* 432 F.3d 98, 115 (2d Cir.2005); *Clue v. Johnson,* 179 F.3d 57, 61 (2d Cir.1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir.1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir.1996); *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *Prue v. City of Syracuse,* 26 F.3d 14, 17–18 (2d Cir.1994); *Calhoun v. New York State Division of Parole,* 999 F.2d 647, 654 (2d Cir.1993).

[10] *See also Anderson v. Creighton,* 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)

2012 WL 4052286

("[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") [citation omitted]; *Davis v. Scherer,* 468 U.S. 183, 190, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984) ("Even defendants who violate [clearly established] constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

11    *See also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) [citing cases]; *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996).

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341.[12]

12    *See also Hunter v. Bryant,* 502 U.S. 224, 299, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) ("The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.") [internal quotation marks and citation omitted].

## III. ANALYSIS

### A. Whether Plaintiff's Complaint Should Be Dismissed for Failure to Serve Process in Timely Manner

After carefully considering the matter, the Court must answer this question in the negative. By Defendants' own calculations, Plaintiff's Complaint was served on April 18, 2011–a mere 42 days after the Court granted Plaintiff's motion to proceed *in forma pauperis,* approved the filing of her

Complaint, and directed the Clerk of the Court to issue summonses and forward them with the Complaint to the United States Marshal's Service, for service on Defendants. (Dkt. No. 5 [Decision and Order filed March 7, 2011].) Indeed, Defendants acknowledge that Plaintiff completed the Civil Summonses and USM285 form, and returned them to the Clerk's Office (so that the Clerk's Office could forward them to the U.S. Marshal's Service for service of Plaintiff's Complaint) less than eight days after receiving them from the Clerk's Office. (Dkt. No. 13, Attach. 1, at ¶¶ 6–7; Dkt. No. 13, Attach. 2, at 9 [attaching page "8" of Defs.' Memo. of Law]; *see also* Dkt. Nos. 6, 8.) After that point in time, service was largely if not entirely outside of Plaintiff's control.

Under the circumstances, the Court finds that good cause exists to extend the deadline for service by 42 days. The Court notes that a contrary conclusion (e.g., a conclusion that Plaintiff had to serve her Complaint by December 13, 2010 pursuant to Local Rule 4.1, or even February 11, 2011 pursuant to Fed.R.Civ.P. 4) would render meaningless the Court's directive to the Clerk of the Court, on March 5, 2011, to take sufficient action to enable the United States Marshal's Service to effect service for Plaintiff.

### B. Whether Plaintiff's Complaint Should Be Dismissed for Failure to State a Claim Upon Which Relief Can Be Granted

### 1. Whether Plaintiff's Complaint Should Be Dismissed for Failing to Sufficiently Identify What Constitutional Rights She Is Attempting to Vindicate

**\*8** After carefully considering the matter, the Court must answer this question also in the negative. In construing the pleadings of a *pro se* civil rights litigant in this Circuit, a district court's imagination should be limited only by the plaintiff's factual allegations, not by the legal claims set out in his or her pleadings. *See Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, Phillips has raised. In so doing, the court's imagination should be limited only by Phillips' factual allegations, not by the legal claims set out in his pleadings.").

Here, based on Plaintiff's (albeit scant and confused) factual allegations, the Court can imagine that she is attempting to assert the following three claims: (1) a claim of an unreasonable search under the Fourth Amendment; (2) a claim of an unlawful seizure of, and failure to return, her personal property under the Fourth, Fifth and/or Fourteenth

Amendments; and (3) a claim of excessive force under the Fourth Amendment.

**2. Whether Plaintiff's Claims Against the Individual Defendants Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Their Personal Involvement in the Constitutional Violations Alleged**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 13 [attaching page "12" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. *See, supra,* Part III.C. of this Decision and Order. [13] Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, even when construed with the utmost of special liberality, the Complaint does not identify the precise location of the incident, which officers were responsible for violating her rights, how she suffered the head injury she alleges, what property was taken from her, and how Defendants frustrated her efforts to recover that property. *See Vogeler v. Colbath,* 04–CV–6071, 2005 U.S. Dist. LEXIS 44658, at *29, 2005 WL 2482549 (S.D.N.Y. Oct. 6, 2005) ("Plaintiffs must also allege ... the personal involvement of the Defendant in the actions underlying their claim."). [14]

[13]   Under the circumstances, the Court finds that Plaintiff had sufficient notice of the consequences of failing to respond to the arguments asserted in Defendants' motion. For example, on October 14, 2010, Plaintiff was given a courtesy copy of the District's *Pro Se* Handbook and a courtesy copy of the Local Rules of Practice for the Northern District of New York. (Dkt. No. 4.) In addition, on May 6, 2011, Defendants advised Plaintiff of her need to respond to their arguments. (Dkt. No. 15.) Also, Plaintiff had extensive experience as a *pro se* civil rights litigant in this District, before responding to the motion in question. *See, infra,* Part III.D. of this Decision and Order.

[14]   Indeed, the Court notes that one of the officers that Plaintiff lists in her Complaint has not been identified. In a prior decision by the Court, Plaintiff was ordered to take reasonable steps to ascertain the identity of the unnamed officer, immediately notify the Court, amend her complaint to include the identity of the third Defendant, and also to have that officer served. (Dkt. No. 5, at 14.) Because Plaintiff has not done so, her alleged physical injuries remain attributable to an unidentified person.

For all of these alternative reasons, Plaintiff's claims against the individual Defendants are dismissed.

**3. Whether the Syracuse Police Department Should Be Dismissed as a Defendant**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach 2, at 13.) The Court would add only the following three brief points.

**\*9** First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, and finally, "as Plaintiff has been told several times, under New York State law, departments, like the Onondaga County Sheriff's Department, that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality and may not sue or be sued." *Jenkins v. Onondaga Cnty. Sheriff's Dep't,* 12–CV–0855, Report– Recommendation, at 5 (N.D.N.Y. filed June 28, 2012) (Baxter, J.) (citing *Hayes v. Cnty. of Sullivan,* 07–CV– 0667, 2012 WL 1129373, at *24 [S.D.N.Y. March 30, 2012] ). Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant in this case. The real party in interest is the City of Syracuse itself.

For all of these alternative reasons, the Syracuse Police Department dismissed as a Defendant.

**4. Whether, Even if the City of Syracuse Were Substituted for the Police Department, Plaintiff's Claims Against the City Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Municipal Liability**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 14–15 [attaching pages "13" and "14" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, even when it is construed with the utmost of special liberality, Plaintiff's Complaint has not alleged facts plausibly suggesting a widespread policy or custom promulgated by the municipal policy maker necessary to hold the City liable for her injuries. As indicated above in Part II.E.2. of this Decision and Order, Plaintiff must allege facts plausibly suggesting that the municipality "has adopted a 'custom' or 'policy' which is the 'moving force' behind [the violation]." *Zappala v. Albicelli,* 980 F.Supp. 635, 639 (N.D.N.Y.1997) (Scullin, J.) (citing, *inter alia, Monell v. Dept. of Soc. Servs. of City of New York,* 436 U.S. 658, 689 [1978] ). However, Plaintiff has not alleged *any* official policy or custom adopted by the City of Syracuse or its Police Department, [15] let alone one responsible for the alleged injuries she received. Because *Monell* prohibits the finding of liability against a City when there is no causal connection between a municipal policy and a resulting injury, Syracuse City Police Department cannot be responsible for Plaintiff's alleged injuries. *Monell,* 436 U.S. at 692. As a result, the City of Syracuse cannot be maintained as a Defendant in this action, and Plaintiff's Section 1983 claims against it are dismissed.

[15]  In addition to not alleging facts plausibly suggesting the existence of a department-wide policy or custom, Plaintiff has not alleged facts plausibly suggesting that Officers Liadka, Sands, and the unnamed officer created or promulgated that policy, or even that they were final policymakers. "A municipal official that exercises discretion, whether it be in a constitutional or unconstitutional manner, in an area of which that official is not the final policymaker, cannot, by itself, establish municipal liability." *Clayton v. City of Kingston,* 44 F.Supp.2d 177, 184 (N.D.N.Y.1999) (McAvoy, C.J.).

**\*10** For all of these reasons, Plaintiff's claims against the City of Syracuse Police Department and/or the City of Syracuse are dismissed on this alternative ground.

### 5. Whether, in the Alternative, Plaintiff's Deprivation–of–Property Claim Should Be Dismissed to the Extent It Is Grounded on the Fifth Amendment

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 16–17 [attaching pages "15" and "16" of Defs.' Memo. of Law].) The Court would add only the following four brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach the same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, a takings claim is not ripe where a state remedy is potentially available. *Vandor Inc. v. Militello,* 301 F.3d 37, 39 (2d. Cir.2002). As the Supreme Court has explained,

> An unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

*Hudson v. Palmer,* 468 U.S. 517, 533, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). Police are not required to provide the owner with notice for state-law remedies, which are "established by published, generally available state statutes and case law." *City of W. Covina v. Perkins,* 525 U.S. 234, 240–241, 119 S.Ct. 678, 142 L.Ed.2d 636 (1999). "Once the property owner is informed that his property has been seized,

he can turn to these public sources to learn about the remedial procedures that are available to him. The City need not take other steps to inform him of his options." *City of W. Covina, 525 U.S. at 241.* Here, Plaintiff has not alleged facts plausibly suggesting that she attempted to recover her property in the proper manner (or even what property was taken). Fourth, and finally, Plaintiff does not allege facts suggesting that her property was taken for public use in an unconstitutional manner that would require her to be paid just compensation. Instead, Plaintiff alleges that, after she attempted to escape from their investigation and was restrained by officers, she was searched and had property taken from her.

For all of these alternative reasons, Plaintiff's deprivation-of-property claim is dismissed to the extent that it is grounded on the Fifth Amendment.

**6. Whether, in the Alternative, Plaintiff's Excessive Force Claim Should Be Dismissed for Failing to Allege Facts Plausibly Suggesting Either that Force Was Used or that Any Such Force Was Excessive**

**\*11** After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 17–18 [attaching pages "16" and "17" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as stated in the Court's Decision and Order of March 7, 2011, in evaluating a Fourth Amendment excessive-force claim, "courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." (Dkt. No. 5, at 13.) [16] Here, Plaintiff alleges the following facts, which could be construed as plausibly suggesting that, at the time the incident occurred, she had given Defendants probable cause to use the force at issue against her: (1) Defendants were dispatched to that location regarding a problem; (2) Defendants specifically chose to question Plaintiff about the incident; (3) Plaintiff was attempting to get away from Defendant when they were attempting to question her; (4) she acted in such a way as to cause Defendants to become "worked up"; (5) it became

necessary for a third unnamed officer to step in and assist Defendants Sands and Liadka in controlling Plaintiff. (Dkt. No. 1, at ¶ 4 & Attachment.) Simply stated, it is plausible, based on Plaintiff's factual allegations, that the amount of force used by the officers to pull her hands behind her back and detain her was necessary to keep her from getting away and "going about [her] business." (*Id.* at ¶ 4.) It is important to note that Plaintiff does not allege facts plausibly suggesting any physical injury other than vague "head & back pains." (*Id.* at ¶ 5.) [17]

[16]    More specifically, the standard governing constitutional excessive-force claims against government officials in "the course of making an arrest, investigatory stop, or other seizure" of a person is the Fourth Amendment's objective reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 388, 391, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Pursuant to this standard, three elements must be objectively examined to determine whether excessive force was used for Fourth Amendment violations: "(1) the need for the application of force; (2) the relationship between that need and the amount of force that was used; and (3) the extent of the injury inflicted." *Graham,* 490 U.S. at 390, 397. It is essential to look at surrounding circumstances in each case, and analyze "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The "extent of intrusion on the suspect's rights" must be balanced against the "importance of governmental interests." *Tennessee v. Garner,* 471 U.S. 1, 8, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

[17]    More specifically, Plaintiff's Complaint does not allege facts plausibly suggesting that her injuries were significant, how long the pain lasted, or that medical treatment was necessary (or even sought) following the incident. *See Smith v. City of New York,* 04–CV–3286, 2010 U.S. Dist. LEXIS 88774, at *27, 2010 WL 3397683 (S.D.N.Y. Aug. 27, 2010) ("Courts in this Circuit have consistently held that an injury is de minimis when it is temporary and/or minor in severity.") (collecting cases).

For all of these reasons, Plaintiff's excessive force claim is dismissed on this alternative ground.

**Case 6:23-cv-01171-AMN-TWD** **Document 4** **Filed 11/14/23** **Page 66 of 166**

**7. Whether, in the Alternative, Plaintiff's Claims Against the Individual Defendants Should Be Dismissed Because, Based on the Factual Allegations of the Complaint, Defendants Are Protected from Liability as a Matter of Law by the Doctrine of Qualified Immunity**

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated by Defendants in their memorandum of law. (Dkt. No. 13, Attach. 2, at 19–20 [attaching pages "18" and "19" of Defs.' Memo. of Law].) The Court would add only the following three brief points.

First, at the very least, Defendants have met the lightened burden that was created by Plaintiff's failure to respond to this argument for dismissal. Second, in any event, the Court would the reach same conclusion even if it were to subject Defendants' argument to the more rigorous scrutiny appropriate for a contested argument. Third, as indicated above in Part I.E.3. of this Decision and Order, "[u]nder federal law, a police officer is entitled to qualified immunity where (1) his conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the challenged act." *Jenkins v. City of New York,* 478 F.3d 76, 87 (2d Cir.2007) (internal quotations and other citations omitted). Here, based on Plaintiff's own factual allegations, it is plausible that police officers of reasonable competence could disagree as to whether Defendants' actions were unlawful (e.g., given their need to question her, and her attempt to flee the scene).

**\*12** For all of these reasons, Plaintiff's claims against the individual Defendants are dismissed on this alternative ground.

**C. Whether the Court Should Give Plaintiff an Opportunity to File an Amended Complaint Before Dismissing This Action**

Generally, when a district court dismisses a *pro se* action, the plaintiff will be allowed to amend his action. *See Gomez v. USAA Fed. Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999). However, an opportunity to amend is not required where the defects in the plaintiff's claims are substantive rather than merely formal, such that any amendment would be futile. As the Second Circuit has explained, "[w]here it appears that

granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted), *accord, Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at \*1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile.") (citation omitted); *see also Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) (denial not abuse of discretion where amendment would be futile); *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with Cuoco's causes of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied.") (citation omitted); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (citation omitted); *Health–Chem Corp. v. Baker,* 915 F.2d 805, 810 (2d Cir.1990) ("[W]here ... there is no merit in the proposed amendments, leave to amend should be denied").

This rule applies even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103; *Brown,* 1997 WL 599355, at \*1. As explained above in Part II.B. of this Decision and Order, while the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12; rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.

Here, the Court has some difficulty finding that the referenced defect in Plaintiff's Complaint is merely formal. Nor is the Court confident that granting Plaintiff an opportunity to amend her Complaint will be productive. The Court notes that the errors made by Plaintiff in this action were previously made by her, and not corrected, on many occasions. Plaintiff has been ordered numerous times to file amended complaints at risk of dismissal of her case.[18] Of the seven times an amended complaint was required, Plaintiff submitted an amended complaint only three times.[19] Two of these were one page documents which did not state a claim upon which relief could be granted and were rejected by the Court, and the other did not correct the deficiencies of the original complaint.[20] Plaintiff did not comply with the Court's order

to amend her complaint at all on four occasions. [21] In one case, Plaintiff was given an additional thirty day period to file her amended complaint after she failed to do so within the first 30 day period granted to her. *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006). Similarly, in a separate case, Plaintiff did not follow up on her original claim because she failed to appear for three hearings the Court rescheduled despite warnings of her need to comply with the Court Orders. *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005). All seven of these cases resulted in dismissal, most for failure to prosecute, failure to comply with Court Orders, or failure to state a claim. Five of Plaintiff's cases were not given leave to amend because granting such leniency would have been futile. [22]

[18]    *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012).

[19]    *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins v. Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan 17, 2006); *Jenkins v. Sheriff's Dep't.,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007).

[20]    *Id.*

[21]    *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Onondaga Sheriff's Dep't.,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 12–CV–0855 (N.D.N.Y. filed May 23, 2012)

[22]    *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. Sheriff's*

*Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. USA,* 09–CV0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011).

**\*13** However, the Court is mindful of the special solicitude that should be afforded to *pro se* civil rights litigants. For these reasons, before the Court dismisses Plaintiff's action, the Court will afford her an opportunity to file an Amended Complaint correcting the above-described pleading defects within thirty (30) days from the date of the filing of this Decision and Order.

If Plaintiff submits an Amended Complaint, she is encouraged to describe the acts of misconduct alleged therein and identify each individual who participated in the misconduct. Moreover, Plaintiff is advised that her Amended Complaint must be a complete pleading that will replace and supersede her original Complaint in its entirety. Finally, Plaintiff is cautioned that, if she fails to file, in a timely fashion, an Amended Complaint that successfully states a claim upon which relief can be granted, her action will be dismissed with prejudice without further Order of the Court.

### D. Whether This Case Should Be Forwarded to the Chief Judge with a Recommendation that an Anti–Filing Injunction Order Be Issued Against Plaintiff

A review of Plaintiff's litigation history on Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service reveals that, before filing the current action on October 13, 2010, she filed thirteen *pro se* civil actions in this District alone-twelve of which have been dismissed and the thirteen of which is being considered for dismissal. [23] A review of Plaintiff's litigation history has caused the undersigned to believe that (1) Plaintiff lacks a good-faith expectation in prevailing in her lawsuits, (2) she is vexatious and indeed incorrigible when proceeding pro se, (3) she has caused needless expense to other parties and placed an unnecessary burden on the Court and its personnel, and (4) no lesser sanctions (e.g., such as dismissal or chastisement) would be adequate to protect the Court and other parties.

[23]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621 (N.D.N.Y. filed May 19, 2006); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060 (N.D.N.Y. filed Jan. 17, 2006); *Jenkins v. City*

*of Syracuse,* 06–CV–1005 (N.D.N.Y. filed Aug. 21, 2006); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167 (N.D.N.Y. filed Sept. 29, 2006); *Jenkins v. City of Syracuse,* 07–CV–0930 (N.D.N.Y. filed Sept. 7, 2007); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Murphy,* 08–CV–0921 (N.D.N.Y. filed Aug. 8, 2008); *Jenkins v. USA,* 09–CV–0603 (N.D.N.Y. filed May 11, 2009); *Jenkins v. Rice,* 11–CV–1037 (N.D.N.Y. filed Aug. 31, 2011); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

For example, eight of Plaintiff's actions have resulted in a dismissal for failure to state a claim or frivolousness, another has resulted in the pending recommendation of a dismissal on that ground, three others have resulted in a dismissal for lack of subject-matter jurisdiction, and another has resulted in a dismissal for failure to prosecute. [24]

[24]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457, Decision and Order (N.D.N.Y. filed Apr. 25, 2006) (Scullin, J.); *Jenkins Comm'r of Soc. Sec. Admin.,* 06–CV–0059, Decision and Order (N.D.N.Y. filed March 29, 2007) (Hurd, J.); *Jenkins v. Emergency Dep't Upstate Univ. Hosp.,* 06–CV–0060, Memorandum–Decision and Order (N.D.N.Y. filed April 14, 2006) (Scullin, J.); *Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. City of Syracuse,* 06–CV–1005, Order (N.D.N.Y. filed Oct. 5, 2006) (Mordue, C.J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Decision and Order, (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.); *Jenkins v. Mohawk Corr. Facility,* 06–CV–1167, Decision and Order (N.D.N.Y. filed Oct. 12, 2006) (Mordue, C.J.); *Jenkins v. City of Syracuse,* 07–CV–0930, Decision and Order (N.D.N.Y. filed Oct. 7, 2007) (Mordue, C.J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Murphy,* 08–CV–0921, Order (N.D.N.Y. filed Oct. 14, 2008) (McCurn, J.); *Jenkins v. USA,* 09–CV–0603, Decision and Order (N.D.N.Y. filed May 28, 2009) (McAvoy, J.); *Jenkins v. Rice,* 11–CV–1037, Decision and Order (N.D.N.Y. filed Oct. 11, 2011) (Kahn, J.); *Jenkins*

*v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation (N.D.N.Y filed June 28, 2012) (Baxter, M.J.).

Moreover, Plaintiff has sued the Onondaga County Sheriff's Department four times. [25] As a result, she has been repeatedly instructed on the legal standard for suing a municipality. For example, on October 6, 2006, she was specifically informed of the need to establish a custom or policy which is the moving force behind a resulting injury. *Jenkins v. Onondaga Cnty. Sheriff's Dep't.,* 06–CV–1092, Decision and Order, at 4 (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.). However, despite receiving that specific information, she has *repeatedly* continued to file improper claims against the Onondaga County Sheriff's Department. [26]

[25]    *Jenkins v. Onondaga Sheriffs' Dep't,* 05–CV–1457 (N.D.N.Y. filed Nov. 21, 2005); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092 (N.D.N.Y. filed Sept. 12, 2006); *Jenkins v. Sheriff's Dep't,* 07–CV–0939 (N.D.N.Y. filed Sept. 11, 2007); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855 (N.D.N.Y filed May 23, 2012).

[26]    *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 3 (N.D.N.Y. filed Oct. 2, 2007) (Hurd, J.); *Jenkins v. Sheriff's Dep't,* 07–CV–0939, Decision and Order at 2 (N.D.N.Y. filed Nov. 21, 2007) (Hurd, J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV0855, Decision and Order, at 4–5 (N.D.N.Y filed May 24, 2012) (Baxter, M.J.); *Jenkins v. Onondaga Cnty. Sheriff's Dept.,* 12–CV–0855, Report–Recommendation, at 5–6 (N.D.N.Y filed June 28, 2012) (Baxter, M.J.); *see also, supra,* Part III.B.4. of this Decision and Order.

Finally, Plaintiff has repeatedly had to be ordered to comply with the Local Rules, and reminded that all factual allegations should be contained in the complaint itself, that paragraphs ought to be numbered, and that the individuals she alleges violated her rights must be identified. *See, e.g., Jenkins v. Dep't Corr. Servs.,* 06–CV–0621, Decision and Order (N.D.N.Y. filed July 5, 2006) (Kahn, J.); *Jenkins v. Onondaga Sheriff's Dep't,* 06–CV–1092, Order (N.D.N.Y. filed Oct. 6, 2006) (McAvoy, J.).

**\*14** Under such circumstances, a federal district court may impose reasonable filing restrictions on a *pro se* litigant in that particular court, pursuant to 28 U.S.C. § 1651(a) and its inherent authority to control and manage its own docket

so as to prevent abuse in its proceedings. For example, a federal district court may, after providing an appropriate opportunity to be heard, prohibit a vexatious litigant from filing, in that particular court, any action *pro se* (that is, without counsel), without prior leave of that court. *See Hong Mai Sa v. Doe,* 406 F.3d 155, 158 (2d Cir.2005) ("If a litigant has a history of filing vexatious, harassing or duplicative lawsuits, courts may impose sanctions, including restrictions on future access to the judicial system.") [internal quotations and citations omitted]; *In re Sassower,* 20 F.3d 42, 44 (2d Cir.1994) (where a *pro se* plaintiff has demonstrated a "clear pattern of abusing the litigation process by filing vexatious and frivolous complaints," a "leave to file" requirement may be instituted by the court as an appropriate sanction); *Moates v. Barkley,* 147 F.3d 207, 208 (2d Cir.1998) ( "[T]he district court may not impose a filing injunction on a litigant *sua sponte* without providing the litigant with notice and an opportunity to be heard."); *Azubuko v. Unknown Boston Police Officers,* 08–CV–0330, 2008 WL 1767067, at * 1 (N.D.N.Y. Apr.16, 2008) (McCurn, J.).

For all of these reasons, this case is forwarded to Chief United States District Judge Gary L. Sharpe with a recommendation that an Anti–Filing Injunction Order be issued against Plaintiff.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 13) is *GRANTED* **in part** and *DENIED* **in part;** and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is conditionally *DISMISSED;* and it is further

**ORDERED** that Plaintiff is permitted to file an Amended Complaint within **THIRTY (30) DAYS** of the filing date of this Order; and it is further

**ORDERED** that, *if Plaintiff fails to timely file an Amended Complaint, the Clerk shall enter judgment dismissing this action without further Order of this Court;* and it is further

**ORDERED** that, upon filing of the Amended Complaint, this file in this matter be returned to the Court for further review; and it is further

**ORDERED** that the Clerk of the Court is directed to forward this case to Chief United States District Judge Gary L. Sharpe with the recommendation of the undersigned that an AntiFiling Injunction Order be issued against Plaintiff.

*The Court hereby certifies, for purposes of 28 U.S.C. § 1915(a) (3), that any appeal taken from the Court's final judgment in this action would not be taken in good faith.*

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4052286

---

**End of Document** © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 6:23-cv-01171-AMN-TWD  Document 4  Filed 11/14/23  Page 70 of 166

Hatcher v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1583036

2018 WL 1583036
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dominique HATCHER, Plaintiff,

v.

The CITY OF NEW YORK, a municipal entity;
and New York City Police Officers Jesus Capo,
John Paul Pennacchia (Shield #9573), and John
Doe, in their individual capacities, Defendants.

15-CV-7500 (VSB)
|
Signed 03/27/2018

**Attorneys and Law Firms**

Luna Droubi, Beldock Levine & Hoffman LLP, New York,
New York, Counsel for Plaintiff

Alan Howard Scheiner, Cheryl Leah Shammas, New York
City Law Department, New York, New York, Counsel for
Defendants

### OPINION & ORDER

Vernon S. Broderick, United States District Judge

 **\*1**  Plaintiff Dominique Hatcher brings this action under 42
U.S.C. § 1983, alleging claims for unreasonable search and
seizure, false arrest and false imprisonment, and malicious
prosecution in violation of her Fourth and Fourteenth
Amendment rights, as well as numerous state law claims.
Before me is the motion of the City of New York (the "City"),
Police Officer Jesus Capo, and Police Officer Johnpaul
Pennacchia (together with the City, "Defendants"), to dismiss
all of the causes of action in Plaintiff's Complaint under
Federal Rule of Civil Procedure 12(b)(6).

For the reasons that follow, Defendants' motion to dismiss is
GRANTED IN PART and DENIED IN PART. Specifically,
because I find that the officers had arguable probable cause
and are thus entitled to qualified immunity as to Plaintiff's
false arrest, false imprisonment and malicious prosecution
claims under both state and federal law, Defendants' motion
to dismiss as to these claims is GRANTED. Further, because
I find that Plaintiff has not plausibly alleged claims for state
law intentional infliction of emotional distress or assault and

battery, Defendants' motion to dismiss as to those claims is
also GRANTED. Because I find that Plaintiff has plausibly
alleged a violation of her Fourth Amendment rights and
related damages with respect to her unlawful search and
seizure claims, Defendants' motion to dismiss Plaintiff's
unlawful search and seizure claims is DENIED. Further,
Defendants' motion to dismiss Plaintiff's claims against the
City is DENIED only with respect to the claim against the
City arising out of Plaintiff's state law claims of unlawful
search and seizure. All other claims against the City are
dismissed.

## I. **Background** [1]

[1]
   The following factual summary is drawn from
   the allegations of the Complaint, unless otherwise
   indicated, which I assume to be true for purposes of
   this motion. *See Kassner v. 2nd Ave. Delicatessen
   Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). My
   references to these allegations should not be
   construed as a finding as to their veracity, and I
   make no such findings.

Plaintiff alleges that on July 4, 2014, after spending time at
her mother's house in Harlem, New York, she walked from her
mother's home to her car with her two-year-old stepdaughter
and fifteen-year-old nephew. (Compl. ¶¶ 14–15.) [2] Plaintiff
put a tray of food in the backseat of her car and, around the
same time, noticed an unmarked police car pass by slowly.
(*Id.* ¶¶ 15–16.) After placing the tray of food in the back
seat of her car, Plaintiff took her stepdaughter and nephew
to a local store to buy a toy, stopped briefly along the way
to speak with an old neighborhood friend, purchased the toy
at the store, and walked back to her car. (*Id.* ¶¶ 17–19.) As
she was walking back to her car, Capo, Pennacchia, and Doe
(the "Officers") jumped out of the unmarked police car and
Capo "aggressively shoved [Plaintiff] against the gate, pushed
her arms behind her back, and handcuffed her." (*Id.* ¶¶ 20–
21.) Plaintiff's mother arrived at the location and attempted
to reason with the Officers. (*Id.* ¶ 22.) The Officers refused
to provide Plaintiff's mother with any information about
Plaintiff's arrest. (*Id.* ¶ 23.)

[2]
   "Compl." refers to the Complaint filed in this action
   on September 22, 2015. (Doc. 1.)

 **\*2**  Capo noticed that the car doors of Plaintiff's car were
locked, searched Plaintiff, took her car keys, and opened both
the doors and trunk to her car. (*Id.* ¶ 24.) Capo, Pennacchia,
and Doe then searched Plaintiff's car, including containers

Hatcher v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1583036

and bags located in the car and the trunk. The Officers found a black garbage bag in Plaintiff's trunk that contained a box of fireworks purchased in North Carolina. (*Id.* ¶¶ 25–26.) A second police car arrived, and the Officers put Plaintiff in the backseat of the second police car and took her to the police precinct, where she was fingerprinted and searched. (*Id.* ¶¶ 27–28.) After spending approximately three hours at the police precinct, Plaintiff was given a Desk Appearance Ticket, and was told she could leave. (*Id.* ¶ 29.) Pennacchia thereafter signed a criminal complaint charging Plaintiff with violating New York Penal Law § 270.00(2)(b)(i) for unlawfully dealing in fireworks. [3] (*Id.* ¶¶ 2, 30.) After Plaintiff made three court appearances, the charges were dismissed on December 14, 2014. (*Id.* ¶ 31.)

[3]   New York Penal Law § 270.00 was amended effective December 20, 2014, and again effective January 21, 2018. *See* 2014 N.Y. Sess. Laws Ch. 477 (S. 7888); 2017 N.Y. Sess. Laws Ch. 371 (S. 724-A). The relevant provision, which is substantially the same, is now New York Penal Law § 270.00(2)(a)(iii), which states that "[e]xcept as herein otherwise provided, or except where a permit is obtained ... any person who shall possess ... any fireworks or dangerous fireworks is guilty of a violation." Because Plaintiff was arrested in July 2014, I will reference the pre-2014 version of New York Penal Law § 270.00 for the purpose of this Opinion and Order.

On October 1, 2014, Plaintiff served a notice of claim on the City of New York (the "Notice of Claim"). (*Id.* ¶ 33.) Plaintiff then attended a hearing under section 50-h of the New York General Municipal Law on March 10, 2015. (*Id.* ¶ 34.) The City did not offer an adjustment or payment for her claim. (*Id.* ¶ 35.)

## II. Procedural History

On September 22, 2015, Plaintiff filed the Complaint, alleging causes of action under § 1983 for unreasonable search and seizure, false arrest and false imprisonment, and malicious prosecution all in violation of her Fourth and Fourteenth Amendment rights, and numerous state law claims. (*See id.* ¶¶ 36–57.) On January 20, 2016, Defendants filed a pre-motion letter in anticipation of filing a motion to dismiss, (Doc. 17), to which Plaintiff responded on January 22, 2016, (Doc. 18). I held a pre-motion conference on Defendants' anticipated motion on February 25, 2016. (*See* Dkt. Entry Feb. 25, 2016.)

In accordance with the deadlines set during that conference, Defendants submitted their motion to dismiss on March 24, 2016. (Docs. 22–24.) Plaintiff filed her opposition on May 5, 2016, (Doc. 27), and on May 19, 2015, Defendants filed their reply, (Doc. 29).

## III. Legal Standards

### A. *Motion to Dismiss*

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* This standard demands "more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Plausibility ... depends on a host of considerations: the full factual picture presented by the complaint, the particular cause of action and its elements, and the existence of alternative explanations so obvious that they render plaintiff's inferences unreasonable." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011).

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *See Kassner*, 496 F.3d at 237. A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

### B. *Section 1983*

**\*3** Section 1983 provides a civil claim for damages against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws...." 42 U.S.C. § 1983. In other words, "[t]o state a claim under § 1983, a plaintiff

Hatcher v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1583036

must allege that defendants violated plaintiff's federal rights while acting under color of state law." *McGugan v. Aldana-Bernier*, 752 F.3d 224, 229 (2d Cir. 2014), *cert. denied*, 135 S. Ct. 1703 (2015). Further, "in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013).

## IV. Discussion

### A. *False Arrest and False Imprisonment*

Defendants argue with respect to Plaintiff's claims for false arrest and false imprisonment that the Officers had probable cause to arrest Plaintiff. (Defs.' Mem. 2.)[4] In the alternative, Defendants argue that the Officers are entitled to qualified immunity. (*See id.* at 11–15.) Because I find that, in light of the facts known to the Officers at the time of the arrest, an officer of reasonable competence could have concluded that the arrest was justified by probable cause, thus entitling the Officers to qualified immunity, I grant Defendants' motion to dismiss as to Plaintiff's state and federal claims for false arrest and false imprisonment.

[4]     "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of Their Motion to Dismiss the Complaint in its Entirety Pursuant to Fed. R. Civ. P. 12(b)(6), filed March 24, 2016. (Doc. 24.)

### 1. Applicable Law

A § 1983 claim for false arrest that is alleged to have occurred in New York is "substantially the same as a claim for false arrest under New York law." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013). Further, "[u]nder New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under § 1983." *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 515 (S.D.N.Y. 2013). Under federal and state law, a plaintiff bringing a false arrest and/or false imprisonment claim must demonstrate that "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cty. Sheriff*, 63 F.3d

110, 118 (2d Cir. 1995) (citation omitted); *see also Hershey*, 938 F. Supp. 2d at 515.

"[T]he existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006); *see also Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 373 (S.D.N.Y. 2015) (citing *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)). Probable cause exists when an officer "has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Jaegly*, 439 F.3d at 152 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)).

For federal false arrest claims, even in circumstances where a preceding search is illegal, police officers may use evidence obtained in that illegal search to establish probable cause for an arrest. *See Townes v. City of New York*, 176 F.3d 138, 144–49 (2d Cir. 1999) ("The fruit of the poisonous tree doctrine ... is inapplicable to civil § 1983 actions."). There is some dispute, however, as to whether this principle applies when the underlying claim is a state, rather than federal, false arrest claim. *Compare Ostrover v. City of New York*, 600 N.Y.S.2d 243, 244–35 (1st Dep't 1993) (finding that the "fruit of an illegal search cannot give rise, in a juristic sense, to probable cause to arrest"), *Fakoya v. City of New York*, 982 N.Y.S.2d 335, 336 (2d Dep't 2014) ("Evidence which is illegally obtained in violation of a plaintiff's rights may not be used to establish probable cause."), *and Tetreault v. New York*, 485 N.Y.S.2d 864, 865–66 (3d Dep't 1985) (holding that plaintiff's arrest was without justification where troopers' observation of drug capsules in plaintiff's car was the result of an unlawful traffic stop), *with Martinez v. City of Schenectady*, 735 N.Y.S.2d 868, 872–73 (2001) (holding that "[t]he existence of probable cause serves as a legal justification for the arrest and an affirmative defense to the claim" even where part of the evidence establishing probable cause was suppressed due to the illegality of the search yielding that evidence).

**\*4** Although there is some ambiguity as to whether New York courts apply the same reasoning as *Townes*, qualified immunity protects an officer "so long as he had 'arguable probable cause' to arrest, which 'exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met.' " *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (quoting

2018 WL 1583036

*Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)). In other words, arguable probable cause may be established where, "in light of the facts known to police at the time of [the plaintiff's] arrest, an officer of reasonable competence could have concluded that the arrest was justified by probable cause." *Figueroa v. Mazza*, 825 F.3d 90, 99 (2d Cir. 2016) (internal quotation marks omitted); *see also Cabral v. City of New York*, 662 Fed.Appx. 11, 13 (2d Cir. 2016) (summary order) (finding that officers were entitled to qualified immunity for a state false arrest claim even though it was uncertain, under New York case law, whether evidence obtained through an unlawful search could be considered as probable cause for an arrest). Thus, even where evidence establishing probable cause is suppressed or found to be obtained pursuant to an unlawful search, such evidence may nonetheless provide "the reasonable basis necessary for qualified immunity" for a plaintiff's state false arrest claim. *Cabral*, 662 Fed.Appx. at 13 (internal quotation marks omitted); *see also Gonzalez*, 728 F.3d at 158 & n.4 (disposing of plaintiff's state false imprisonment claim where officers had arguable probable cause to arrest because "New York law grants government officials qualified immunity on state-law claims except where the officials' actions are undertaken in bad faith or without a reasonable basis" (internal quotation marks omitted)). Further, qualified immunity can be established at the pleading stage. *See Garcia v. Does*, 779 F.3d 84, 97 (2d Cir. 2015) ("The Supreme Court has made clear that qualified immunity can be established by the facts alleged in a complaint.").

### 2. Application

Defendants claim that Plaintiff's arrest for possession of fireworks in violation of New York Penal Law § 270.00(2)(b)(i) was preceded by the Officers finding a box of fireworks in the trunk of Plaintiff's car, and therefore there was probable cause to arrest Plaintiff. (Defs.' Mem. 2.) They then argue that to the extent Plaintiff posits the argument that the search of Plaintiff and her car were illegal thereby vitiating her arrest under the "fruit of the poisonous tree" doctrine, such an argument must be rejected pursuant to the Second Circuit's decision in *Townes v. City of New York*, 176 F.3d 138 (2d Cir. 1999). (*See* Defs.' Mem. 3–4.) Defendants also cite *Martinez v. City of Schenectady*, 735 N.Y.S.2d 868 (2001), to support their assertions. [5] (*See id.* at 23.) While Plaintiff concedes that *Townes* bars her federal false arrest claim under § 1983, she argues that *Townes* does not apply to her state false arrest claim, citing to a number of state court decisions electing not to apply the reasoning in *Townes*, such

as *Ostrover v. City of New York*, 600 N.Y.S.2d 243 (1st Dep't 1993). (Pl.'s Opp. 4 n.2, 22–23.) [6]

[5]     To be certain, the New York Court of Appeals in *Martinez* addressed a markedly different scenario, both because probable cause was supported by reasons apart from the suppressed evidence, and because the plaintiff had the chance to challenge the inclusion of the evidence at the prior criminal proceeding. *See Martinez*, 735 N.Y.S.2d at 872–73.

[6]     "Pl.'s Opp." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's Complaint Pursuant to Fed. R. Civ. P. 12(b)(6), filed May 5, 2016. (Doc. 27.)

Although, as I acknowledged above, New York courts have issued seemingly conflicting holdings with respect to this issue, I find that the Officers had at least arguable probable cause to arrest Plaintiff, and are thus entitled to qualified immunity for Plaintiff's state false arrest claim. The Officers noticed that the car doors of Plaintiff's car were locked, took Plaintiff's car keys, and searched Plaintiff's car, finding a black garbage bag in Plaintiff's trunk that contained a box of fireworks. (Compl. ¶¶ 24–26.) New York Penal Law § 270.00(2)(b)(i) stated that "any person who shall possess ... any fireworks or dangerous fireworks is guilty of a violation." Therefore, in light of the facts known to the Officers at the time of Plaintiff's arrest and drawing all reasonable inferences in Plaintiff's favor, "an officer of reasonable competence could have concluded that the arrest was justified by probable cause." *Figueroa*, 825 F.3d at 99 (internal quotation marks omitted); *see also Cabral*, 662 Fed.Appx. at 13 ("Whatever ambiguity may exist as to *Martinez*'s adoption of *Townes*'s reasoning, the existence of such a decision by New York's highest court would afford at least the reasonable basis necessary for qualified immunity with regard to the state claim against [the officer]." (citation and internal quotation marks omitted)). Because the Officers had, at minimum, arguable probable cause to arrest Plaintiff for possession of fireworks, they are entitled to qualified immunity as to Plaintiff's state false arrest claim.

*5 Thus, Defendants' motion to dismiss as to Plaintiff's state false arrest and false imprisonment claims is granted, and these claims are dismissed with prejudice. As noted above, Plaintiff acknowledges that she "does not assert a false arrest claim under [§] 1983 based on the discovery of the fireworks." (Pl.'s Opp. 4 n.2.) To be clear, to the extent that Plaintiff asserts any federal false arrest claims, Defendants'

2018 WL 1583036

motion to dismiss is also granted as to these claims, *see Townes*, 176 F.3d at 144–49, and Plaintiff's federal false arrest claims pursuant to § 1983 are also dismissed.

### B. *Malicious Prosecution*

Defendants also argue that I should dismiss Plaintiff's claim for malicious prosecution for three reasons: there was probable cause to commence the proceeding; Plaintiff has not shown a sufficient post-arrangement liberty restraint to implicate her Fourth Amendment rights; and Plaintiff has not shown that the proceeding terminated in her favor. (*See* Defs.' Mem. 5–11.) Because I find that the Officers had arguable probable cause and are entitled to qualified immunity as to the malicious prosecution claim as well, Defendants' motion to dismiss this claim under both state and federal law is granted.

### 1. Applicable Law

To state a malicious prosecution claim under § 1983, a plaintiff must allege the elements of a state-law malicious prosecution claim. *See Fulton v. Robinson*, 289 F.3d 188, 195 (2d Cir. 2002). The elements of malicious prosecution are: (1) the initiation of a prosecution against a plaintiff; (2) without probable cause; (3) the proceedings were begun with malice; and (4) the matter terminated in plaintiff's favor. *See O'Brien v. Alexander*, 101 F.3d 1479, 1484 (2d Cir. 1996). In addition, in actions brought under § 1983, a plaintiff must also have suffered a sufficient post-arraignment deprivation of liberty implicating his Fourth Amendment rights. *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003); *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000).

As with claims for false arrest brought under § 1983, "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution in New York." *Manganiello v. City of New York*, 612 F.3d 149, 161–62 (2d Cir. 2010) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). However, "[p]robable cause to arrest differs from probable cause to *prosecute* because the evidentiary standard is higher for the latter than for the former." *Hoyos v. City of New York*, 650 Fed.Appx. 801, 802 (2d Cir. 2016) (summary order). "Probable cause, in the context of malicious prosecution, has also been described as such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty." *Stansbury*, 721 F.3d at 95 (quoting *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003)).

Further, even in the absence of probable cause, an officer is entitled to qualified immunity where there is arguable probable cause to arrest. *See Betts v. Shearman*, 751 F.3d 78, 83 (2d Cir. 2014) ("Plaintiff's false arrest, false imprisonment, and malicious prosecution claims therefore turn on whether the defendant officers' probable cause determination was objectively reasonable—that is, whether there was arguable probable cause to arrest." (internal quotation marks omitted)).

### 2. Application

Here, Defendants claim that probable cause existed to prosecute Plaintiff for possession of fireworks under New York Penal Law § 270.00(2)(b)(i) because the Officers found fireworks in the trunk of Plaintiff's car. (Defs.' Mem. 5–7.) As noted above, New York Penal Law § 270.00(2)(b)(i) stated in relevant part that "any person who shall possess ... any fireworks or dangerous fireworks is guilty of a violation." I find that, accepting Plaintiff's allegations in the Complaint as true and drawing all inferences in Plaintiff's favor, the Officers had, at a minimum, arguable probable cause to arrest Plaintiff. Although Plaintiff claims that she legally purchased the fireworks in North Carolina, (Compl. ¶ 26), and it is plausible to infer that at or around the time of her arrest she explained this to the Officers prior to Pennacchia signing the criminal complaint, this does not erase the existence of arguable probable cause to arrest Plaintiff for possessing fireworks. *See Cabral v. City of New York*, No. 12 Civ. 4659(LGS), 2014 WL 4636433, at *8 (S.D.N.Y. Sept. 17, 2014) ("Here, there is no dispute that Defendant Thompson discovered marijuana in Plaintiff's vehicle and that Plaintiff acknowledged it belonged to him. That discovery provides the requisite probable cause underlying the criminal prosecution of Plaintiff, defeating any malicious prosecution claim by Plaintiff against Defendants under state or federal law."), *aff'd*, 662 Fed.Appx. 11 (2d Cir. 2016) (summary order).

**\*6** Plaintiff also argues that the Officers lacked probable cause to prosecute her because the evidence upon which they based the criminal complaint was gathered pursuant to an unlawful search and thus would have been inadmissible to prove guilt of the alleged crime. (*See* Pl.'s Opp. 7–10.) In addressing this point, Defendants again point to the Second Circuit's decision in *Townes* and its progeny in support of the proposition that the "fruit of the poisonous tree doctrine ... is inapplicable to civil § 1983 actions." *Townes*, 176 F.3d at 145. As an initial matter, Defendants need only establish that the Officers had arguable probable cause to demonstrate that

Hatcher v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1583036

the Officers are entitled to qualified immunity. *See Betts,* 751 F.3d at 83. Moreover, although Plaintiff cites another Second Circuit decision, *Boyd v. City of New York,* 336 F.3d 72 (2d Cir. 2003), in support of her conclusion that the exclusionary rule *does* apply in malicious prosecution cases, (*see* Pl.'s Mem. 8–9), *Boyd* does not apply to this case. In a recent decision the Second Circuit clarified the holding in *Boyd,* stating that:

> *Boyd* did not hold that inadmissible evidence cannot be used in evaluating probable cause for a prosecution, but only that where the sole evidence of a defendant's guilt is a single statement that police would have understood at the time could not be used in a criminal case (a circumstance largely limited to the facts of *Boyd* itself) such evidence is not alone sufficient to defeat a malicious prosecution claim.

*Restivo v. Hessemann,* 846 F.3d 547, 570 (2d Cir. 2017) (emphasizing that in *Boyd,* the only evidence tying Boyd to the crime was an obviously inadmissible confession made after the arrest); *see also Cyrus v. City of New York,* 450 Fed.Appx. 24, 26 (2d Cir. 2011) (summary order) (affirming district court's decision to grant summary judgment to the defendant and refusing to apply the exclusionary rule to find that defendant lacked probable cause to prosecute plaintiff for criminal possession of a weapon, even assuming that the weapon was found pursuant to an unlawful arrest). I decline to extend *Boyd* to this case and therefore grant Defendants' motion to dismiss both the state and federal claims for malicious prosecution.

In a footnote, Plaintiff further "requests leave to amplify the allegations that support her malicious prosecution claim." (Pl.'s Opp. 10 n.5.) I interpret this statement to be a request to amend the Complaint. Defendants oppose this request. (Defs.' Reply 3 n.2.) [7] Given that Plaintiff has acknowledged that the fireworks were her property, and does not dispute Defendants' characterization of her failure to allege that she had a permit, (*see* Defs.' Mem. 2; *see generally* Pl.'s Opp.), Plaintiff's request to "amplify the allegations" is denied since I find that any amendment of this cause of action would be futile. In addition, I provided Plaintiff with multiple opportunities to amend, and warned Plaintiff

at the pre-motion conference on February 25, 2016 that I would scrutinize any requests for leave to amend thoroughly if the request was made after a motion to dismiss was fully briefed. (PMC Tr. 10:17–12:1.) [8] Plaintiff has not set forth any justification for not "amplify[ing] the allegations" related to this cause of action by filing an amended complaint after the filing of the motion to dismiss.

[7]   "Defs.' Reply" refers to Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the Complaint in its Entirety Pursuant to Fed. R. Civ. P. 12(b)(6). (Doc. 29.)

[8]   "PMC Tr." refers to the Transcript of the Pre-Motion Conference held before me on February 25, 2016 at 11:30 a.m.

### C. *Unlawful Search and Seizure*[9]

[9]   Plaintiff did not reference the seizure of the fireworks found in her car as part of any of her causes of action. (*See* Compl. ¶ 32 (claiming as financial losses only "loss of income").) In fact, even in her opposition, Plaintiff charges Defendants with failing to move to dismiss her claims "based on the unlawful stop, search of her person, or search of her car," not any seizure of physical property related to those searches. (*See* Pl.'s Opp. at 4–7.) To the extent that Plaintiff does wish to state such a claim, I find that her Complaint has failed to do so. *See Cabral,* 2014 WL 4636433, at *9 (holding that the seizure of a vehicle and cash was justified by the discovery of contraband).

**\*7** Defendants also move to dismiss Plaintiff's unlawful search and seizure claim on the grounds that (1) Plaintiff has not pled a prima facie case for an unreasonable stop, and (2) Plaintiff has not alleged any compensable injury. (Defs.' Mem. 18–20.) Because I find that the allegations in the Complaint plausibly allege a violation of Plaintiff's Fourth Amendment rights and a claim for related damages, Defendants' motion to dismiss Plaintiff's unlawful search and seizure claim is denied.

### 1. Applicable Law

Case 6:23-cv-01171-AMN-TWD    Document 4    Filed 11/14/23    Page 76 of 166

Hatcher v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1583036

In analyzing a claim for unlawful search and seizure under the Fourth Amendment, courts look to the reasonableness of the search when determining whether a search violated a plaintiff's constitutional rights. *See Terry v. Ohio*, 392 U.S.1, 9 (1968) ("[T]he Constitution forbids ... not all searches and seizures, but unreasonable searches and seizures" (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960))). Additionally, the Supreme Court has "consistently accorded law enforcement officials greater latitude in exercising their duties in public places." *Florida v. White*, 526 U.S. 559, 565 (1999).

Because unlawful search and seizure actions brought pursuant to § 1983 are "analogous to state common law tort actions" and "serv[e] primarily the tort objective of compensation," a plaintiff bringing a § 1983 claim must establish "proximate causation." *Townes*, 176 F.3d at 146. Further, "[t]he goal of ...§ 1983 jurisprudence has been to tailor liability to fit the interests protected by the particular constitutional right in question," and thus "damages should be made available only for risks that are constitutionally relevant." *Id.* (internal quotation marks omitted).

## 2. Application

In moving to dismiss Plaintiff's claims of unlawful search and seizure, Defendants do not make any attempt to assert a substantive legal challenge to Plaintiff's allegations that she was subject to an unreasonable stop, frisk, and search, but instead focus their argument on a purported failure to plead any compensable injury. (*See* Defs.' Mem. 18–20 (stating merely that "[e]ven assuming plaintiff has pled a *prima facie case* for an unreasonable stop—which she has not—she has not alleged any actual, compensable injury"); Defs.' Reply 7 n.8 (opposing Plaintiff's argument that Defendants did not move to dismiss this cause of action by citing to pages 18–20 of their moving brief and also citing to their preliminary statement, which argued only that the "stop claims must also be dismissed because it fails the *Iqbal/Twombly* test of plausibility, or at most, should be limited to nominal damages not exceeding one dollar").) With respect to the first part of Plaintiff's claim—pleading a violation of her Fourth Amendment rights—Defendants' failure to raise any legal deficiencies with regard to the allegations in the Complaint is consistent with my analysis and conclusion that Plaintiff has satisfactorily alleged a violation of her Fourth Amendment rights.

Further, regarding Defendants' assertion that Plaintiff failed to allege damages suffered as a result of the actual stop and search, I find the allegations in the Complaint sufficient to survive Defendants' motion to dismiss. By way of relief, Plaintiff seeks "(i) compensatory damages for psychological and emotional distress, and financial loss caused by the illegal actions of the Defendants; (ii) punitive damages to deter such intentional or reckless deviations from well-settled constitutional law; and (iii) such other and further relief." (Compl. ¶ 3.) Plaintiff does not ascribe her injury to any particular conduct by Defendants, but rather states more generally that the deprivation of her constitutional and other rights caused the damages for which she claims compensation. (*See id.* ¶ 32 ("Defendants' conduct caused Plaintiff to suffer loss of liberty, loss of income, emotional and psychological pain, embarrassment, humiliation, and harm to her reputation."); *id.* ¶ 38 ("As a direct and proximate result of being deprived of these constitutional rights, Plaintiff suffered the injuries and damages set forth above.").) In her opposition, Plaintiff further attributes the "psychological pain, embarrassment, humiliation, and harm to her reputation" to Defendants' actions, "including the illegal stop and search" in front of her mother, stepdaughter, and nephew. (Pl.'s Opp. 16–18.)

**\*8** In evaluating Defendants' argument, I find the case *Hayes v. Perotta*, 751 F. Supp. 2d 597 (S.D.N.Y. 2010), to be instructive. The damages allegations in *Hayes* are analogous to Plaintiff's allegations in the Complaint. As in *Hayes*, some of the injuries that Plaintiff allegedly suffered from the unlawful search are indirect and arguably far removed from the alleged unlawful search. *Id.* at 598–99 (stating plaintiff's alleged injuries included "loss of liberty" as a result of officers unlawful search); (*see also* Compl. ¶ 32 (claiming Plaintiff suffered "loss of liberty" and "loss of income").) Additionally, like the plaintiff in *Hayes*, Plaintiff refers to "a number of injuries for which it is unclear whether they were caused by the [arrest and prosecution] or the search itself." *Hayes*, 751 F. Supp. 2d at 599. Furthermore, the Court in *Hayes* still found that under *Townes*, "recovery for injuries that directly result from an unlawful search is permissible." *Hayes*, 751 F. Supp. 2d at 603; *see also Gannon v. City of New York*, 917 F. Supp. 2d 241, 244 (S.D.N.Y. 2013) ("I note that under *Townes*, damages related to the initial search and seizure would be possible." (internal quotation marks omitted)). As a result, a plaintiff may "attempt to recover damages from the loss of privacy and/or property from the search." *Hayes*, 751 F. Supp. 2d at 604.

Case 6:23-cv-01171-AMN-TWD    Document 4    Filed 11/14/23    Page 77 of 166

Hatcher v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 1583036

This is similar to Plaintiff's allegations in this case. (*See* Compl. ¶ 32 (alleging "emotional and psychological pain, embarrassment, humiliation, and harm to her reputation"); *id.* ¶ 3 (alleging "psychological and emotional distress").) Given that the Complaint "alleges damage to [her] ... mental health[ ] and interpersonal relationships," *Hayes*, 751 F. Supp. 2d at 605, to the extent those injuries were caused by the search itself, she has stated a claim for relief under both federal and state law, *see Bancroft v. City of Mount Vernon*, 672 F. Supp. 2d 391, 401 n.4 (S.D.N.Y. 2009) ("The standard for what constitutes a constitutionally reasonable search is the same under federal and New York State law."). [10] Since I find that the allegations in the Complaint plausibly allege a violation of Plaintiff's Fourth Amendment rights and a claim for related damages, I deny Defendants' motion to dismiss Plaintiff's claims of unlawful search and seizure.

[10]     Defendants also argue that, because Plaintiff "failed to produce any medical releases pursuant to Rule 83.10(1) of the Local Civil Rules for the Southern and Eastern Districts," she has waived her right to recover for physical or psychological injury. (Defs.' Mem. 18–19.) However, as Plaintiff notes, Local Civil Rule 83.10 expressly states that provision of a medical release is required only for injuries "other than 'garden variety' emotional distress." (Pl.'s Opp. 18.) As a result, I do not find that Local Civil Rule 83.10 precludes the damages alleged by Plaintiff. *See Kennedy v. Arias*, 12 Civ. 4166 (KPF), 2017 WL 2895901, at *3 (S.D.N.Y. July 5, 2017) (finding in the context of a plaintiff's § 1983 excessive force claim that failure to produce medical records merely restricted the plaintiff to seeking "garden variety emotional distress damages" but did not completely preclude recovery (internal quotation marks omitted)).

### D. *Plaintiff's Remaining State Law Claims*

### 1. Supplemental Jurisdiction

In addition to her § 1983 claims and related state law claims discussed above, Plaintiff alleges causes of action for assault and battery and intentional infliction of emotional distress ("IIED"). (Compl. ¶¶ 43–45, 52–54.) Defendants move to dismiss Plaintiff's these state law claims on three grounds: (1) that, assuming I dismiss all federal law claims, I should decline to exercise supplemental jurisdiction; (2) that

Plaintiff's Notice of Claim to the City was defective under the New York General Municipal Law; and (3) that Plaintiff fails to state any claims. (Defs.' Mem. 20–25.)

Since I have decided that certain of Plaintiff's federal law claims survive, and otherwise find that the state law claims are so related to the federal claims that they form part of the same case or controversy under 28 U.S.C. § 1367, I reject Defendants' jurisdictional argument.

### 2. Notice of Claim

**\*9**  With regard to Plaintiff's Notice of Claim, Defendants' argue that the notice is defective for two reasons: first, that Plaintiff only named the City and not any individual officers in the Notice of Claim, warranting dismissal of all state law claims against the Officers under New York General Municipal Law § 50-e, and second, that Plaintiff did not raise a state law claim related to the unreasonable stop in the Notice of Claim, barring this claim. (*See* Defs.' Mem. 21–23.)

With respect to the first argument, New York courts have split on this question. *Compare Goodwin v. Pretorius*, 962 N.Y.S.2d 539, 541–42 (4th Dep't 2013) (holding that the notice of claim statute does not require plaintiffs to name individual defendants in the claim "as a condition precedent to the commencement of an action against them"), *with Tannenbaum v. City of New York*, 819 N.Y.S.2d 4, 5 (1st Dep't 2006) ("General Municipal Law § 50-e makes unauthorized an action against individuals who have not been named in a notice of claim, thus warranting dismissal of the state claims against [the individual defendants]." (citation omitted)), *abrogated on other grounds by Kapon v. Koch*, 988 N.Y.S.2d 559 (2014).

Many, if not the majority, of recent district court decisions in the Southern District have found that the Fourth Department applies the approach more likely to be accepted by the New York Court of Appeals—that "failure to name individual defendants in a notice of claim is not an independently sufficient ground for dismissal." *Matthews v. City of New York*, No. 15-CV-2311 (ALC), 2016 WL 5793414, at *10 n.5 (S.D.N.Y. Sept. 30, 2016); *see also Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 396–97 (S.D.N.Y. 2013); *W.A. v. Hendrick Hudson Cent. Sch. Dist.*, No. 14-CV-8093 (KMK), 2016 WL 1274587, at *13 n.15 (S.D.N.Y. Mar. 31, 2016); *Garnett v. City of New York*, No. 13-cv-7083-GHW, 2014 WL 3950904, at *11 (S.D.N.Y. Aug. 13, 2014). This

principle is based on the notion that "the primary inquiry regarding a Notice of Claim 'is not whether the individuals were identified *by name* in the Notice of Claim, but whether they were described sufficiently for the municipality to be able to investigate the claim.' " *Chamberlain*, 986 F. Supp. 2d at 397 (quoting *Verponi v. City of New York*, No. 16258/2004, 2011 WL 1991719, at *5 (N.Y. Sup. Ct. May 19, 2011)); *see also Brown v. City of New York*, 718 N.Y.S.2d 4, 6 (2000) ("The test of the sufficiency of a Notice of Claim is merely whether it includes information sufficient to enable the city to investigate." (internal quotation marks omitted)).

I agree with these decisions, particularly in light of the fact that in the instant case, the Notice of Claim presented enough information to allow the City to properly investigate the claim. (*See* Moulter Decl. 4–5); [11] *see also Garnett*, 2014 WL 3950904, at *11 (refusing to dismiss state law claims because the notice of claim failed to identify individual defendants was "particularly warranted where, as is the case here, the Notice of Claim was sufficient to permit the defendant to conduct a proper investigation and assess the merits of the claim" (internal quotation marks omitted)). The Notice of Claim clearly indicates individuals were involved in the alleged violations—stating that Plaintiff's claims arose out of "unlawful police conduct" and "excessive force by officers of the New York City Police Department." (Moulter Decl. 4.) This is sufficient information to enable the city to investigate the claim, *see Chamberlain*, 986 F. Supp. 2d at 397; *Brown*, 718 N.Y.S.2d at 6, and thus Defendants' first argument fails.

[11]     "Moulter Decl." refers to the Declaration of Alex Moulter submitted with Plaintiff's opposition, filed May 5, 2016. (Doc. 27-1.) The page numbers of the Declaration and attached exhibits do not have page numbers, and thus I refer to the pages assigned to it by the Court's Electronic Case Filing ("ECF") system.

 **\*10**  With respect to the second argument, I note that the Notice of Claim referred to an "unlawful search of her person and vehicle" and "unreasonable search and seizure," (Moulter Decl. 4–5), which I find was sufficient to put Defendants on notice of the relevant theory of liability, *cf. Nieblas-Love v. N.Y.C. Hous. Auth.*, 165 F. Supp. 3d 51, 76–77 (S.D.N.Y. 2016) (dismissing negligent and intentional infliction of emotional distress claims where the notice of claim described the nature of the plaintiff's claim as "wrongful termination," "employment discrimination," "negligency," and "harassment"). Therefore, I find the notice of claim is

sufficient to permit Plaintiff's filing of all of his state law claims.

### 3. Sufficiency of the State Law Claims

Turning next to the sufficiency of Plaintiff's remaining state law claims of intentional infliction of emotional distress and assault and battery, Plaintiff has failed to state a claim with regard to both of these claims. First, Plaintiff does not state a claim for IIED because she does not plead "extreme and outrageous conduct" as required to support a finding of IIED. *See Cabral*, 2014 WL 4636433, at *12 (finding, where the plaintiff was handcuffed because he was in the same car as a suspect, arrested when the officers discovered marijuana in the car, strip searched, and prosecuted, "no reasonable juror could find that Defendants' actions were so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency" (internal quotation marks omitted)).

In addition, Plaintiff does not state a claim for assault and battery because the only physical force she alleges—Capo "aggressively shov[ing her] against the gate, push[ing] her arms behind her back, and handcuff[ing] her," (Compl. ¶ 21)—is not the type of unreasonable and excessive force justifying a claim for assault and battery, *see Cabral*, 2014 WL 4636433, at *10–11 (finding that the drawing of a gun and handcuffing of the plaintiff, causing wrist pain, was insufficient to survive summary judgment as to either excessive force under § 1983 or assault and battery under New York law); *see also Chamberlain*, 986 F. Supp. 2d at 398–400 (dismissing certain assault and battery claims for failure to state a claim because "[n]one of [the] actions caused a reasonable apprehension of bodily injury that [was] sufficiently imminent to constitute an assault" (internal quotation marks omitted)); *Espada v. Schneider*, 522 F. Supp. 2d 544, 555 (S.D.N.Y. 2007) (finding that state assault and battery claims are analyzed under the same standard as excessive force claims, and that "not every push or shove" is considered a violation because "officers may need to use some degree of force in the course of an arrest" (quoting *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004))). As a result, Defendants' motion to dismiss Plaintiff's claims for state law IIED and assault and battery is granted.

### E. *Municipal Liability*

Lastly, Defendants argue that dismissal of all claims against the City is warranted because, assuming I find that there are no viable tort claims against the individual Defendants, there is no basis for City liability under a respondeat superior theory. (*See* Defs.' Mem. 25.)

First, I find that Defendants' argument applies, although only to the underlying claims that I have already dismissed —namely those for false arrest and false imprisonment, malicious prosecution, IIED, and assault and battery. Moreover, although Plaintiff's causes of action asserting the right to be free from unreasonable searches and seizures under both federal and state law remain, a respondeat superior theory "cannot be the basis of municipal defendant liability under [§] 1983," and thus Plaintiff's municipal liability claim pursuant to § 1983 is dismissed. *Littlejohn v. City of New York*, 795 F.3d 297, 315 (2d Cir. 2015). Because, however, the respondeat superior doctrine may be applied to state constitutional tort claims, Plaintiff's municipal liability claim arising from state constitutional violations for unlawful search and seizure remains. *See, e.g., Williams v. City of New York*, No. 14-cv-5123 (NRB), 2015 WL 4461716, at *6 (S.D.N.Y. July 21, 2015) ("The City can, however, be liable on a respondeat superior theory with respect to claims arising from state law, including the New York State Constitution and common law."). Accordingly, Plaintiff's claims against the City are dismissed, except with regard to claims against the City arising out of Plaintiff's state law claims of unlawful search and seizure.

### V. **Conclusion**

**\*11** For the foregoing reasons, Defendants' motion to dismiss is GRANTED IN PART and DENIED IN PART.

Because, considering the facts available at the time, the Officers had arguable probable cause to defeat Plaintiff's false arrest, false imprisonment, and malicious prosecution claims under both state and federal law, Defendants' motion to dismiss as to these claims is GRANTED. Furthermore, because Plaintiff has not plausibly alleged claims for IIED or assault and battery, Defendants' motion to dismiss those claims is likewise GRANTED. With respect to the claims against the City for municipal liability under respondeat superior, Defendants' motion to dismiss is GRANTED as to all claims arising out of the false arrest and false imprisonment, malicious prosecution, IIED, and assault and battery claims, as well as the § 1983 claim for false arrest and false imprisonment. Defendants' motion to dismiss is DENIED as to Plaintiff's unlawful search and seizure claim under both federal and state law, as well as Plaintiff's claim against the City arising out of state law unlawful search and seizure.

Parties are directed to meet and confer regarding a proposed date for Defendants to file their answer regarding the remaining claims as well as a schedule for discovery. Parties are directed to submit a joint letter addressing these issues, as well as a proposed Case Management Plan and Scheduling Order, on or before April 10, 2018. The Clerk of Court is respectfully directed to terminate the open motion at Document 22.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1583036

---

**End of Document**                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 3392869
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Steven SERRANO, Michael Serrano,
and Samuel Garcia, Plaintiffs,
v.
CITY OF NEW YORK, et al., Defendants.

16 Civ. 8105 (AKH)
|
Signed 07/11/2018
|
Filed 07/12/2018

**Attorneys and Law Firms**

David Bruce Rankin, Keith Michael Szczepanski, Beldock
Levine & Hoffman LLP, New York, NY, for Plaintiffs.

Kavin Suresh Thadani, New York City Law Department, New
York, NY, for Defendants.

**OPINION AND ORDER GRANTING IN PART
AND DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

ALVIN K. HELLERSTEIN, United States District Judge

 *1 This case concerns the allegedly unlawful arrest
and subsequent prosecution of three individuals outside a
Bronx apartment building. Plaintiffs Steven Serrano, Michael
Serrano, and Samuel Garcia (collectively, "Plaintiffs")
filed this action on October 17, 2016. Broadly stated,
plaintiffs allege that they were falsely arrested as
part of an undercover drug operation conducted by
Defendants City of New York ("City"), Anthony DiSimone
("DiSimone"), Thomas McHale ("McHale"), Undercover
Cop 0244 ("UC244"), and Undercover Cop 0114 ("UC114")
(collectively "Defendants"). After amending the complaint
on September 8, 2017, and withdrawing certain claims
thereafter,[1] plaintiffs allege claims for false arrest, malicious
prosecution, unreasonable search and seizure, assault and
battery, and *respondeat superior*. Plaintiff Steven Serrano
separately maintains a claim for excessive force. Pre-trial
proceedings, including depositions, followed. Defendants
now move for summary judgment on all claims, principally on
the theory that the officers are entitled to qualified immunity

and there was at least arguable probable cause to arrest,
search, and prosecute plaintiffs. For the reasons that follow,
the motion is granted in part and denied in part. The motion is
granted as to all claims asserted by plaintiff Steven Serrano,
and he shall be dismissed from the case. As to all claims raised
by plaintiffs Samuel Garcia and Michael Serrano, the motion
is denied.

[1]       Plaintiffs have withdrawn all claims for negligent
hiring, training, and supervision under federal and
New York state law. Similarly, plaintiffs have
withdrawn their failure to intervene claims and all
claims brought under the Fourteenth Amendment.
Plaintiff Samuel Garcia also has withdrawn all his
state law claims. By not responding to defendants'
collective knowledge arguments, plaintiffs have
also abandoned their false arrest and malicious
prosecution claims against defendants McHale
and DiSimone. *See Plahutnik v. Daikin Am.,
Inc.*, 912 F. Supp. 96, 104 (S.D.N.Y. 2012)
("[A]rguments not made in opposition to a motion
for summary judgment are deemed abandoned.");
*Senno v. Elmsford Union Free Sch. Dist.*, 812
F. Supp. 2d 454, 468 (S.D.N.Y. 2011) ("Plaintiff
did not address this argument in his opposition
papers, which operates as an abandonment of
the argument."). Accordingly, these claims are
dismissed with prejudice.

**Background**

Much of the background leading to plaintiffs' arrests is
undisputed. But significant disputes of fact remain, and these
contested facts make summary judgment inappropriate as to
many of the claims asserted.

At approximately 2:00 p.m. on January 22, 2015, New
York City police officers were conducting a "buy and bust"
narcotics operation in the vicinity of 984 Bronx Park South
in the Bronx, New York.[2] Posing as a drug buyer during
the operation, UC114 solicited "JD White," a nonparty to
this case, seeking to purchase heroin. After agreeing to the
sale, JD White left UC114 and approached "JD Red," another
nonparty to this case who was also standing near 984 Bronx
Park South, and asked him to supply the heroin.

[2]       It appears that officers were investigating a
shooting at a nearby housing complex and

were conducting the "buy and bust" operation in an attempt to leverage potential cooperating witnesses. *See* PL Rule 56.1 Statement, ECF 44, at ¶¶ 7–8.

**\*2** The parties agree that while this transaction was developing, plaintiffs Steven Serrano and Samuel Garcia were standing just outside the apartment building at 984 Bronx Park South, where Steven and his brother Michael Serrano were living at the time. But the parties sharply dispute plaintiffs' role in what followed. Plaintiffs contend that as Steven left his apartment that afternoon, he ran into Samuel, a former acquaintance, and struck up a conversation that lasted approximately thirty minutes. As some point during this time, plaintiffs claim that Michael Serrano arrived home, spoke with Steven and Samuel briefly, and went upstairs to the family's apartment. Plaintiffs claim that while Steven and Samuel were talking, Steven noticed two of the undercover officers, a male and a female, behaving strangely. His suspicions aroused, plaintiffs claim that Steven commented to Samuel—and only to Samuel—that he believed, based on his experience living in the neighborhood, that these two individuals were undercover cops. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 42:6–43:11. Both Steven and Samuel stated in their depositions that Steven made this remark, which was overheard by UC244, two or three times. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 44:7–9 (stating that he made the statement "maybe twice"); Declaration of Szczepanski, ECF 44, Ex. 3, at 33:14 (stating that Steven made the statement "three times, maybe"). Samuel apparently acknowledged the statement, but testified in his deposition that he neither agreed nor disagreed. *See* Declaration of Szczepanski, ECF 44, Ex. 1, 42:12–24; Declaration of Szczepanski, ECF 44, Ex. 2, at 33:2–24, 37:23–38:2. Plaintiffs contend that Michael Serrano, Steven's brother, was not present when these statements were made, and defendants do not suggest otherwise. *See* Def. Response Rule 56.1 Statement, ECF 45, at ¶ 11.

Although the police reports are contradictory, defendants now take the position that Steven made this remark not only to Samuel, but also to JD Red in an effort to warn him that the police were present.[3] In effect, defendants claim that Steven and the other plaintiffs were acting as lookouts for drug dealers in the area. The parties dispute how close Steven and Samuel were standing to JD Red when the statements were made, but Steven testified at his deposition that they were approximately ten feet from JD Red at the time. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 35:8.

[3] The record is somewhat inconsistent on this point. UC244's contemporaneous report stated that Steven "then signal [sic] JD Red, don't do anything 'he's a cop.' " *See* Declaration of Kavin Thadani, ECF 41, Ex. C. However, the Criminal Complaint drafted by Officer DiSimone stated that "defendant MICHAEL SERRANO and defendant GARCIA both pointed at informant #2 and stated in sum and substance, 'THAT GUY IS A COP.' " *See* Declaration of Kavin Thadani, ECF 41, Ex. A, at 2. In any event, plaintiffs' current position renders this inconsistency irrelevant. Plaintiffs now claim that although Steven was speaking only to Samuel, he did state, in sum and substance, that he believed certain individuals in the vicinity were undercover cops. For the reasons explained below, even viewing the evidence in the light most favorable to plaintiff, this statement gave the officers arguable probable cause to arrest plaintiff Steven Serrano.

Meanwhile, JD White returned to UC114 and informed him that the dealers would not complete the transaction because of police presence in the area. JD White then led UC114 to a laundromat around the corner from plaintiffs' apartment. Once out of view, JD White sold UC114 three glassines of heroin. UC114 then left the area, met up with UC244, and together they notified a field team that the transaction was complete.

Having received the notification, the arrest team, which included officers DiSimone and McHale, swarmed the scene and arrested a number of individuals, including JD Red and JD White. Believing that plaintiffs were acting as lookouts in the drug transaction, and based on a positive identification from UC244, Steven, Samuel, and Michael were also arrested. During the course of his arrest, Steven admitted to having a marijuana cigarette on his person, and officers recovered the cigarette during a pat-down search. Based on this information, all three plaintiffs were arrested and charged with Criminal Sale of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Seventh Degree. Although UC244 apparently identified all three plaintiffs, Steven and Michael testified in their respective depositions that Michael was not present when Steven remarked that certain individuals in the area were undercover cops. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 45:23–46:3; Declaration of Szczepanski, ECF 44, Ex. 2, at 34:15–35:15. Plaintiffs also contend that Michael was inside the apartment building when the arrests began

and was arrested only after he returned outside when the uniformed police officers arrived on the scene. *See* Pl. Rule 56.1 Statement, ECF 44, at ¶¶ 11, 22–23. Defendants have not advanced any evidence to the contrary, *see* Def. Response Rule 56.1 Statement, ECF 45, at ¶¶ 11, 22–23, arguing instead that plaintiffs' version of events still supports the officers' actions.

**\*3**  During his arrest, Steven asked the officers to use two sets of handcuffs on him, as they had done with Michael.[4] The officers declined to do so, cuffed Steven with a single set of handcuffs, and placed plaintiffs in the back of an NYPD van. For approximately thirty minutes after his arrest, Steven complained that his handcuffs were too tight and requested that they be loosened. Although officers loosened the handcuffs after multiple requests, plaintiffs claim that Steven suffered physical pain in the interim and had minor abrasions on his wrists. *See* Declaration of Szczepanski, ECF 44, Ex. 1, at 73:7–76:16. It is uncontested that Steven did not seek medical attention for his alleged injuries, either during or after his release from custody, nor did he experience any lasting medical issues.

[4]     Steven testified at his deposition that Michael was double-cuffed because of an accident. Declaration of Szczepanski, ECF 44, Ex. 1, at 74:19.

After a number of court appearances, the charges against Samuel Garcia and Michael Serrano were dismissed on motion by the Bronx County District Attorney's Office. *See* Declaration of Kavin Thadani, ECF 41, Ex. M, at 2:11–15 ("Although People's motion was that there was probable cause to arrest this defendant, on further review, it is the People's position that we would be unable to meet our higher burden of proof at trial and as such are requesting dismissal at this time."). On the same day, the charges against Steven Serrano were dismissed on speedy trial grounds. *See* Declaration of Kavin Thadani, ECF 41, Ex. O, at 2:10–11.

## Discussion

Under the well-established summary judgment standard, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, a Court must "view the evidence in the light most favorable to the party opposing summary judgment, ... draw all reasonable inferences in favor of that party, and ... eschew credibility assessments." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 122 (2d Cir. 2004).

In § 1983 claims of this kind, the Second Circuit has cautioned that because "[t]he issue of probable cause is "predominantly factual in nature," it is "properly presented to the jury." *Moore v. Comesanas*, 32 F.3d 670, 673 (2d Cir. 1994); *see also Farrell v. City of New York*, No. 15 CIV. 8401 (PAE), 2018 WL 944400, at \*10 (S.D.N.Y. Feb. 15, 2018). However, defendants also argue that the officers are entitled to qualified immunity, which is a question of law for the Court. *See Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (describing qualified immunity as a legal question that "ordinarily should be decided by the court long before trial"). The Supreme Court has explained that "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *D.C. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012) ).[5] Although an officer's entitlement to qualified immunity is a question of law for the Court, the Second Circuit has explained that even when the motion is "based on qualified immunity," "resolution of genuine factual issues is inappropriate." *McClellan v. Smith*, 439 F.3d 137, 149 (2d Cir. 2006); *see also Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) ("A defendant should press a qualified immunity defense during pretrial proceedings so that such a claim can be disposed of by summary judgment where possible, or factual disputes material to the defense can be identified and presented to the jury.").

[5]     In the context of a false arrest claim, qualified immunity protects officers provided that they had at least arguable probable cause to support the arrest. *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017). This issue is discussed in greater detail below.

### A. False Arrest

**\*4**  Defendants argue that summary judgment is appropriate on plaintiffs' false arrest claims because the officers had probable cause to support their arrests. Alternatively, defendants argue that the officers are entitled to qualified immunity because they had arguable probable cause.

Serrano v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 3392869

Analyzing each of plaintiff's claims individually, I find that, in light of the facts and circumstances known to the officers at the time of the arrests, the officers are entitled to qualified immunity only with respect to plaintiff Steven Serrano's false arrest claim. But as to plaintiffs Samuel Garcia and Michael Serrano, material disputes of fact make summary judgment inappropriate, and defendants' motion is denied as to those claims.

A § 1983 claim for false arrest that allegedly occurred in New York is "substantially the same as a claim for false arrest under New York law." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013).[6] "To state a claim for false arrest under New York law, a plaintiff must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.' " *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994) ).

[6] Although the parties do not address the issue, the amended complaint also raises a separate claim for false imprisonment. *See* Amended Complaint, ECF 27, at ¶ 64(d). But "[u]nder New York law, false arrest and false imprisonment are one and the same, and the elements for both are the same as for a false arrest claim under § 1983." *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 515 (S.D.N.Y. 2013); *see also Hatcher*, 2018 WL 1583036, at *3. As such, plaintiffs' false imprisonment claims are coterminous with their false arrest claims and can be analyzed together. *See, e.g., Hatcher*, 2018 WL 1583036, at *3.

It is well settled that "the existence of probable cause is an absolute defense to a false arrest claim." *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). The probable cause standard is derived from the Fourth Amendment, which protects individuals from unreasonable searches and seizures, "including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). "A police officer has probable cause for an arrest when he has 'knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime.' " *Swartz v. Insogna*, 704 F.3d 105, 111 (2d Cir. 2013) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) ); *see also Jaegly*, 439 F.3d at

152; *Hatcher v. City of New York*, No. 15-CV-7500 (VSB), 2018 WL 1583036, at *4 (S.D.N.Y. Mar. 27, 2018).

"Even if probable cause for the actual arrest charge did not exist, the existence of probable cause to arrest for any offense precludes a false arrest claim." *Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 373 (S.D.N.Y. 2015); *see also Jaegly*, 439 F.3d at 154 ("[W]e conclude here that a claim for false arrest turns only on whether probable cause existed to arrest a defendant, and that it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of arrest."). Put differently, the actual charges invoked against plaintiffs—Criminal Sale of a Controlled Substance in the Third Degree and Criminal Possession of a Controlled Substance in the Seventh Degree—are irrelevant. The focus of this inquiry is "on the validity of the arrest, ... not on the validity of each charge," *Jaegly*, 439 F.3d at 154, and a claim of false arrest fails if probable cause existed to support any offense, regardless of the charge actually invoked by the arresting officer.

**\*5** Defendants also claim that even if the officers lacked probable cause to arrest plaintiffs, the officers are nonetheless entitled to qualified immunity. It is well settled that "officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.' " *Wesby*, 138 S. Ct. at 589 (quoting *Reichle*, 566 U.S. at 664).[7] When a claim of false arrest is made, "[a]n officer is entitled to qualified immunity ... if he had *arguable* probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged." *Kass v. City of New York*, 864 F.3d 200, 206 (2d Cir. 2017) (emphasis added); *see also Collins v. City of New York*, 295 F. Supp. 3d 350, 364 (S.D.N.Y. 2018) (applying the arguable probable cause standard); *Hatcher*, 2018 WL 1583036, at *4 (same). "Arguable probable cause exists when 'it was objectively reasonable for the officer to believe that probable cause existed, or ... officers of reasonable competence could disagree on whether the probable cause test was met.' " *Kass*, 864 F.3d at 206 (quoting *Myers v. Patterson*, 819 F.3d 625, 633 (2d Cir. 2016) ).

[7] In order for a right to be "clearly established ... at the time of the officer's conduct," the law must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S. Ct. at 589 (internal

Serrano v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 3392869

quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) ). Moreover, "[t]o be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Id.* "It is not enough that the rule is suggested by then-existing precedent;" the "legal principle" must "clearly prohibit the officer's conduct in the particular circumstances before him." *Id.* at 590.

In sum, the doctrine of qualified immunity protects an officer "unless 'no officer of reasonable competence could have made the same choice in similar circumstances,' " *id.* (quoting *Myers*, 819 F.3d at 633), and is intended to "protectQ ... all but the plainly incompetent or those who knowingly violate the law," *Wesby*, 138 S. Ct. at 589 (quoting *Malley v. Briggs*, 475 U.S. 335,341 (1986) ).

### 1. Plaintiff Steven Serrano

Defendants first seek summary judgment with respect to plaintiff Steven Serrano's false arrest claim. Because I find that the officers had at least arguable probable cause to support the arrest, the motion is granted.

The officers arrested Steven Serrano based on the following sequence of events: During the course of a "buy and bust" drug operation, UC244 heard Steven remark, at least once, that certain individuals on the street were undercover cops. Plaintiffs admit that Steven made such a statement multiple times in a conversational tone and in an area directly adjacent to drug activity. Then, apparently in response to Steven's statements, JD White informed UC114 that his dealers would not complete the transaction because of police presence in the area. JD White then led UC114 to a laundromat around the corner to avoid detection by undercover officers and made the sale. Under these facts and circumstances, the officers had at least arguable probable cause to arrest Steven Serrano as a lookout to enable a Criminal Sale of a Controlled Substance in the Third Degree, the crime for which he was charged,[8] and for Criminal Facilitation in the Fourth Degree. His conduct could reasonably be interpreted as "conduct which provides [a third person] with means or opportunity for the commission" of a felony. N.Y. Penal Law § 115.00(1).[9]

[8]    N.Y. Penal Law § 220.39(a) provides that "[a] person is guilty of criminal sale of a controlled substance in the third degree when he knowingly and unlawfully sells ... a narcotic drug."

[9]    In full, N.Y. Penal Law § 115.00(1) provides that "[a] person is guilty of criminal facilitation in the fourth degree when, believing it probable that he is rendering aid ... to a person who intends to commit a crime, he engages in conduct which provides such person with means or opportunity for the commission thereof and which in fact aids such person to commit a felony."

**\*6**  To avoid summary judgment, plaintiffs argue that Steven Serrano made these statements to Samuel Garcia, not JD Red, and that Steven had no knowledge that drug activity was afoot. *See* Pl. Rule 56.1 Statement, ECF 44, at ¶¶ 11–14; *see also* Pl. Memorandum of Law in Opposition, ECF 44, at 10 (arguing that plaintiffs "did not interact with 'JD Red' or 'JD White' nor did they know that a drug sale was taking place near their apartment"). But this argument misapprehends the focus of the inquiry, which centers on the facts and circumstances known to the officers at the time of the arrest. *Swartz*, 704 F.3d at 111. And even viewing the evidence in the light most favorable to plaintiffs—that is, assuming that Steven was speaking only to Samuel—the officers still had at least arguable probable cause to believe that Steven was involved in drug activity. Steven Serrano's repeated statements that undercover officers were present were made in a conversational tone and in the immediate vicinity of a drug transaction. Officers heard these statements, and plaintiffs admit that they were made. And tellingly, after these statements were made, JD White told UC114 that the heroin deal had to be moved around the corner because "the cops [were] out" and his dealers would not complete the transaction otherwise. *See* Declaration of Kavin Thadani, ECF 41, Ex. A, at 2. Taken together and viewed from the perspective of the officers at the time, these facts and circumstances were sufficient to create arguable probable cause to support the arrest.

Moreover, Steven Serrano's false arrest claim must be dismissed for a separate reason: during the officers' pat-down search, plaintiff admitted that he had a marijuana cigarette on his person. This gave officers probable cause to arrest him for possession of marijuana under § 221.05 of the New York Penal Law.[10] To avoid this conclusion, plaintiff argues that because the officers lacked probable cause to arrest Steven in the first place, the search incident to the arrest was also unlawful and any evidence obtained therefrom cannot shield the officers from liability. *See* Pl. Memorandum of Law in Opposition, ECF 44, at 12. In effect, plaintiff is advancing a version of the fruit of the poisonous tree

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 85 of 166

Serrano v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 3392869

doctrine, "an evidentiary rule that operates in the context of criminal procedure" to exclude unlawfully obtained evidence recovered as a consequence of unlawful official conduct. *Townes v. City of New York*, 176 F.3d 138, 145 (2d Cir. 1999). This argument is foreclosed by the Second Circuit's decision in *Townes*. There, the Second Circuit explained that "[t]he fruit of the poisonous tree doctrine is calculated 'to deter future unlawful police conduct' and protect liberty by creating an incentive—avoidance of the suppression of illegally seized evidence—for state actors to respect the constitutional rights of suspects." *Id.* (quoting *United States v. Calandra*, 414 U.S. 338, 347 (1974) ). The need for such an incentive structure is less forceful in the civil context, and the Second Circuit has accordingly held that "[t]he fruit of the poisonous tree doctrine ... is inapplicable to civil § 1983 actions." *Id.*

> 10    N.Y. Penal Law § 221.05 provides that "[a] person is guilty of unlawful possession of marihuana when he knowingly and unlawfully possesses marihuana."

Under *Townes*, the fruit of the poisonous tree doctrine cannot be used to "link the unreasonable search and seizure" to what came next—the discovery of the marijuana cigarette on plaintiff's person—which unquestionably gave officers probable cause to arrest plaintiff Steven Serrano. *Id.* at 145–46; *Jenkins v. City of New York*, 478 F.3d 76, 91 n.16 (2d Cir. 2007); *see also Hatcher*, 2018 WL 1583036, at *3 (S.D.N.Y. Mar. 27, 2018) ("For federal false arrest claims, even in circumstances where a preceding search is illegal, police officers may use evidence obtained in that illegal search to establish probable cause for an arrest."); *Hayes v. Perotta*, 751 F. Supp. 2d 597, 602 (S.D.N.Y. 2010); *Matthews v. City of New York*, 889 F. Supp. 2d 418, 431 (E.D.N.Y. 2012). Therefore, even if the officers lacked arguable probable cause for the initial search, plaintiff Steven Serrano's false arrest claim must be dismissed. [11]

> 11    Although the parties do not raise this issue, "[t]here is some dispute ... as to whether this principle applies when the underlying claim is a state, rather than federal, false arrest claim." *Hatcher*, 2018 WL 1583036, at *3 (collecting cases from New York state courts). But courts in this district have recognized that despite "some ambiguity as to whether New York courts apply the same reasoning as *Townes*, qualified immunity protects an officer" in circumstances of this kind. *Id.* at *4; *see also Cabral v. City of New York*, 662 Fed.Appx. 11,13

(2d Cir. 2016) (holding that "[w]hatever ambiguity may exist as to [the New York Court of Appeals'] adoption of *Townes*'s reasoning," the officer was entitled to "qualified immunity with regard to the state claim") Accordingly, the officers are also entitled to qualified immunity on the same theory for plaintiff Steven Serrano's state law claims for false arrest.

**\*7**  Accordingly, because the officers had at least arguable probable cause to arrest plaintiff Steven Serrano, and because probable cause is a complete defense to a claim of false arrest, plaintiff's claim under § 1983 and state law for false arrest must fail.

### 2. Plaintiff's Samuel Garcia and Michael Serrano

Applying the same framework described above to Samuel Garcia, I cannot say at this stage that the officers had arguable probable cause to support an arrest. As an initial matter, the discovery of a marijuana cigarette at the scene cannot support the arrests of Samuel Garcia or Michael Serrano. The officers found the marijuana cigarette during a pat-down search of Steven Serrano, and defendants do not claim that the officers ever observed Garcia (or Michael Serrano, for that matter) in possession of a controlled substance. [12] It is also clear, and defendants do not suggest otherwise, that neither Garcia nor Michael Serrano had constructive possession over the marijuana cigarette in Steven Serrano's pocket at the time of the arrests. *See People v. Manini*, 79 N.Y.2d 561, 572–73 (1992) ("In New York, the rule has long been that to support a charge that a defendant was in constructive possession of tangible property, the People must show that the defendant exercised 'dominion or control' over the property by a sufficient level of control over the area in which the contraband is found or over the person from whom the contraband is seized."); *United States v. Paulino*, 445 F.3d 211, 222 (2d Cir. 2006) ("Constructive possession exists when a person ... knowingly has the power and the intention at a given time to exercise dominion and control over an object, either directly or through others." (internal quotation marks omitted) (quoting *United States v. Gordils*, 982 F.2d 64, 71 (2d Cir. 1992) ) ); *see also* N.Y. Penal Law § 10.00(8) (defining possession). As such, Samuel Garcia and Michael Serrano's arrests cannot be premised on criminal possession of marijuana.

> 12    Defendants separately argue that "it is undisputed that plaintiff Samuel Garcia was smoking marijuana outside of 984 Bronx Park South a short

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 86 of 166

Serrano v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 3392869

time before his arrest." Def. Memorandum of Law, ECF 43, at 10. But this revelation came out in plaintiffs' depositions. It is uncontested that the officers never observed Garcia smoking marijuana before his arrest; indeed, the criminal complaint alleges *possession* of marijuana. *See* Declaration of Kavin Thadani, ECF 41, Ex. A, at 1; *see also Swartz*, 704 F.3d at 111 (focusing on the officer's knowledge at the time of the arrest).

Moreover, as to Samuel Garcia, there are genuine disputes of fact concerning his involvement in the drug transaction at issue in this case. It is apparently undisputed that only Steven Serrano, and not Garcia, commented aloud on the presence of undercover officers outside of 984 Bronx Park South. In his deposition, Garcia stated that he perhaps acknowledged Steven Serrano's statements concerning police activity, but was uninterested because it had "nothing to do with [him]." Declaration of Szczepanski, ECF 44, Ex. 2, at 33:8. Defendants have not seriously advanced a contrary version of events, arguing instead that Garcia's mere presence next to Steven Serrano at the time the statement was made is sufficient to support the arrest. *See* Def. Memorandum of Law, ECF 43, at 10–11. This argument proves too much. Based on the evidence presented, the Court is left with only a vague impression of Samuel Garcia's conduct prior to his arrest, and what little information is presented suggests that his involvement in the drug transaction was minimal or nonexistent. Even granting defendants the widest possible berth of qualified immunity, the doctrine cannot be used to justify the arrest of a mere bystander to criminal activity. *See Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."). Viewing the evidence in the light most favorable to plaintiffs, as I am required to do, that is precisely what Samuel Garcia appears to have been.

**\*8** The evidence suggests that Michael Serrano's connection to the drug transaction was even more attenuated. According to plaintiffs' version of the events, which is supported by all three plaintiffs' deposition testimony, Michael was not present when Steven stated aloud that undercover cops were in the area, nor was he outside when the arrests began. Michael testified that he was inside the family apartment when the arrests began and returned outside only after hearing his brother yelling. *See* Declaration of Szczepanski, ECF 44, Ex. 2, at 33:2–24, 37:23–38:2. Defendants have not advanced a alternative version of events, *see* Def. Response Rule 56.1 Statement, ECF 45, at ¶¶ 11, 22–23, and in any event, any

conflicting evidence in the record merely creates a genuine dispute of fact for trial.

Under these circumstances, and given the disputed facts presented by the parties, I cannot say that the officers had probable cause, or even arguable probable cause, to support the arrests of Samuel Garcia and Michael Serrano. As such, defendants' motion for summary judgment on these claims is denied.

**B. Unreasonable Search and Seizure**

Plaintiffs also raise claims for unreasonable search and seizure under § 1983 and state law. Under § 1983, a plaintiff may recover money damages for unreasonable searches and seizures that violate the Fourth Amendment. In analyzing such a claim, "courts look to the reasonableness of the search when determining whether a search violated a plaintiff's constitutional rights." *Hatcher*, 2018 WL 1583036, at \*7 (citing *Terry v. Ohio*, 392 U.S. 1, 9 (1968) ). However, officers are generally permitted to conduct reasonable searches incident to a lawful arrest. *See Arizona v. Gant*, 556 U.S. 332, 338 (2009). Therefore, to the extent that there was probable cause to support plaintiffs' arrests, any reasonable searches incident to their arrests were also lawful, *see Guerrero v. City of New York*, No. 12 CIV. 2916, 2013 WL 673872, at \*4 n.3 (S.D.N.Y. Feb. 25, 2013) ("In addition, to the extent that Guerrero is basing his § 1983 claim on an allegedly unreasonable search, ... this claim fails as well, because a search incident to a lawful arrest is per se reasonable."); *Moore v. Hearle*, 639 F. Supp. 2d 352, 356 (S.D.N.Y. 2009) ("Generally, officers are justified in conducting searches incident to a lawful arrest in order to ensure the safety of officers as well as to prevent the destruction of evidence."); *Walker v. City of New York*, No. 15 CV 500 (NG) (ST), 2017 WL 2799159, at \*6 (E.D.N.Y. June 27, 2017) ("Because there was probable cause for plaintiff's arrest, the search of his person was lawful.").

As such, plaintiffs' unreasonable search and seizure claims turn entirely on the probable cause analysis conducted above. Because I have already found that the officers had at least arguable probable cause to support the arrest of plaintiff Steven Serrano, the officers are also entitled to qualified immunity as to his unreasonable search and seizure claim. [13] *See Walker*, 2017 WL 2799159, at \*6. Defendants' motion for summary judgment is therefore granted as to Steven Serrano. But because I have found that summary judgment is inappropriate on the question of arguable probable cause

Serrano v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 3392869

to arrest plaintiffs Samuel Garcia and Michael Serrano, *see supra* section A.2, their claims for unreasonable search and seizure also must survive. Accordingly, defendants' motion for summary judgment as to Samuel Garcia and Michael Serrano is denied.

13      Unlike his false arrest claim, the discovery of the marijuana cigarette cannot support the officers' search of plaintiff Steven Serrano, for the cigarette was found only once the search began *See Townes,* 176 F.3d at 148 ("Victims of unreasonable searches or seizures may recover damages directly related to the invasion of their privacy—including (where appropriate) damages for physical injury, property damage, injury to reputation, etc.; but such victims cannot be compensated for injuries that result from the discovery of incriminating evidence and consequent criminal prosecution."); *Matthews,* 889 F. Supp. 2d at 431 (finding that "plaintiffs must allege damages attributable to the claims for unreasonable search and seizure to recover under Section 1983" and could not recover damages for false arrest). Regardless, because I find that Steven Serrano's initial arrest was supported by arguable probable cause independent of his marijuana possession, plaintiff cannot maintain an unreasonable search and seizure claim. *See Walker,* 2017 WL 2799159, at *6.

### C. Malicious Prosecution

**\*9** Plaintiffs also raise claims for malicious prosecution under § 1983 and state law. The elements of malicious prosecution under New York law are: "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier,* 316 F.3d 128, 136 (2d Cir. 2003) (internal quotation marks omitted) (quoting *Murphy v. Lynn,* 118 F.3d 938, 947 (2d Cir. 1997) ). Additionally, "[i]n order to allege a cause of action for malicious prosecution under § 1983, [plaintiffs] must assert, in addition to the elements of malicious prosecution under state law, that there was (5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman v. New York City Transit Auth. (NYCTA),* 215 F.3d 208, 215 (2d Cir. 2000); *see also Hatcher,* 2018 WL 1583036, at *5 (applying these elements); *Lynch v. City of New York,* No. 16 CIV. 7355

(LAP), 2018 WL 1750078, at *7 (S.D.N.Y. Mar. 27, 2018) (same).

As with claims for false arrest under § 1983, "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution." *Manganiello v. City of New York,* 612 F.3d 149, 161–62 (2d Cir. 2010) (quoting *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir. 2003) ). However, "[t]he Second Circuit has clarified that 'probable cause' in the malicious prosecution context means 'probable cause to believe that [the prosecution] could succeed.' " *Garcia v. Cty. of Westchester,* No. 11-CV-7258 (KMK), 2017 WL 6375791, at *23 (S.D.N.Y. Dec. 12, 2017) (quoting *Boyd v. City of New York,* 336 F.3d 72, 76 (2d Cir. 2003) ). This is so because "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases." *Stansbury v. Wertman,* 721 F.3d 84, 95 (2d Cir. 2013) Courts must therefore take care not to "conflate probable cause to arrest with probable cause to believe that [a plaintiff] could be successfully prosecuted," for "[o]nly the latter kind of probable cause is at issue with respect to the malicious prosecution claim." *Posr v. Court Officer Shield No. 207,* 180 F.3d 409, 417 (2d Cir. 1999). This distinction is not relevant to this case, however. First, plaintiffs have not attempted to differentiate between the two standards, instead relying solely on the theory that the officers lack probable cause to support their arrests. *See* Pl. Memorandum of Law in Opposition, ECF 44, at 12. Second, this distinction is meant to capture the notion that although probable cause might exist at the time of arrest, "evidence could later surface which would eliminate that probable cause." *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 571 (2d Cir. 1996) (internal quotation marks omitted) (quoting *Cox v. County of Suffolk,* 780 F. Supp. 103, 108 (E.D.N.Y. 1991) ). In such a case, the Second Circuit has explained that "[i]n order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact." *Id.*; *see also Garcia,* 2017 WL 6375791, at *23 ("If, however, 'probable cause existed at the time of the arrest and the plaintiff offers no additional facts to show that it dissipated post-arrest, then the claim for malicious prosecution cannot be maintained.' " (quoting *Jimenez v. City of New York,* No. 15-CV-3257, 2016 WL 1092617, at * 4 (E.D.N.Y. Mar. 21, 2016) ) ). Plaintiffs have not advanced any such theory, nor is there any reason to believe this distinction is relevant to the facts of this case.

As to plaintiff Steven Serrano, I find that the totality of the facts and circumstances described above also support a

2018 WL 3392869

finding of arguable probable cause to support his prosecution. Based on Steven Serrano's statements, the context in which they were made, and the fact that the drug transaction was relocated apparently in response, the officers had probable cause to believe that the prosecution against him could succeed. *Boyd*, 336 F.3d at 76. Accordingly, the officers are entitled to qualified immunity as to plaintiff Steven Serrano's malicious prosecution claims, and the motion for summary judgment is granted as to him. But as to plaintiffs Samuel Garcia and Michael Serrano, I already have held that summary judgment is inappropriate on the question of arguable probable cause to support their arrests. *See supra* section A.2. Because "[t]he probable cause standard in the malicious prosecution context is slightly higher than the standard for false arrest cases," *Stansbury*, 721 F.3d at 95, the officers necessarily lacked sufficient probable cause to support the prosecutions of Samuel Garcia and Michael Serrano.

**\*10** Defendants also argue that plaintiffs have not put forth evidence to "prove the fourth element of [a malicious prosecution] claim—that the prosecution was motivated by malice." *Lowth*, 82 F.3d at 573. To show malice, plaintiffs must demonstrate that "that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Dufort v. City of New York*, 874 F.3d 338, 353 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502–03 (1978) ). I find that plaintiffs have sufficiently established malice to survive summary judgment. First, in most cases, "[a] lack of probable cause generally creates an inference of malice." *Boyd*, 336 F.3d at 78; *see also Dufort*, 874 F.3d at 353 ("Malice may be inferred ... from the absence of probable cause."). Moreover, plaintiffs' theory is that their prosecutions were motivated to induce cooperation in an unrelated investigation into a nearby shooting, which "also supports the inference that the prosecution against him was improperly motivated." *Dufort*, 874 F.3d at 354 (holding that the plaintiff had demonstrated a material dispute of fact when the trial attorney "was told by detectives that they were treating [the plaintiff] as a suspect solely in order to induce him to testify against other participants"). Because the record also presents genuine issues of fact on the question of malice, the motion for summary judgment is denied as to plaintiffs Samuel Garcia and Michael Serrano.

**D. Excessive Force**

Plaintiff Steven Serrano also brings a claim for excessive force, principally arguing that the handcuffs placed on his wrists were too tight and his pleas to loosen the cuffs went unanswered. [14] "A claim of excessive use of force during an arrest is analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Case v. City of New York*, 233 F. Supp. 3d 372, 385 (S.D.N.Y. 2017) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989) ). "As in other Fourth Amendment contexts, ... the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

14      Plaintiffs Samuel Garcia and Michael Serrano do not allege claims for excessive force.

The Second Circuit has "recognized that excessively tight handcuffing that causes injury can constitute excessive force in violation of the Fourth Amendment." *Shamir v. City of New York*, 804 F.3d 553, 557 (2d Cir. 2015). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: (1) the handcuffs were unreasonably tight; (2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and (3) the degree of injury to the wrists." *Case*, 233 F. Supp. 3d at 385 (internal quotation marks omitted) (quoting *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) ); *see also Lloyd v. City of New York*, 246 F. Supp. 3d 704, 724 (S.D.N.Y. 2017). Courts have placed particular emphasis on the injury requirement, *see Usavage v. Port Auth. of New York & New Jersey*, 932 F. Supp. 2d 575, 592 (S.D.N.Y. 2013), and "[t]here is a consensus among courts in this circuit that tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort," *Lynch*, 567 F. Supp. 2d at 468. Although an alleged injury need not be "severe or permanent," *Vogeler v. Colbath*, No. 04 CIV. 6071(LMS), 2005 WL 2482549, at \*9 (S.D.N.Y. Oct. 6, 2005), it must be more than merely "de minimis," *Usavage*, 932 F. Supp. 2d at 592.

Here, even viewing the facts in the light most favorable to plaintiff, defendants are entitled to summary judgment. The record shows that after Steven Serrano complained that his handcuffs were too tight (and initially requested that he be double-cuffed), the officers loosened his handcuffs. The officers did not, as plaintiff claims, ignore his pleas that the handcuffs were too tight. *Case*, 233 F. Supp. 3d at 385.

Serrano v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 3392869

Moreover, plaintiff has not established an injury that rises above a de minimis level. There is no dispute that Steven Serrano never requested medical treatment while in custody, nor did he seek medical treatment following his release. See *Usavage*, 932 F. Supp. 2d at 592 (noting that "[t]he most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage"). As a general rule, "[c]ourts in this Circuit have ... found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." *Lloyd*, 246 F. Supp. 3d at 724 (internal quotation marks omitted) (quoting *Omor v. City of New York*, No. 13-cv-2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015) ). The law is clear that the evidence raised here is insufficient to support an excessive force claim. Accordingly, the motion for summary judgment as to Steven Serrano's excessive force claim is granted.

### E. Assault and Battery
**\*11** Under New York law, "[a]n 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact. A 'battery' is an intentional wrongful physical contact with another person without consent." *Girden v. Sandals Int'l*, 262 F.3d 195, 203 (2d Cir. 2001) (internal quotation marks omitted) (quoting *United Nat'l Ins. Co. v. Waterfront N.Y. Realty Corp.*, 994 F.2d 105, 108 (2d Cir. 1993) ); see also *Green v. City of New York*, 465 F.3d 65, 86 (2d Cir. 2006); *Rucks v. City of New York*, 96 F. Supp. 3d 138, 152 (S.D.N.Y. 2015). Although all three plaintiffs assert claims under New York state law for assault and battery, the claims rest on different theories.

#### 1. Steven Serrano
Plaintiff Steven Serrano's assault and battery claim rests on two grounds: (1) unlawful physical contact incident to an allegedly unlawful arrest, and (2) assault and battery related to the tightness of the handcuffs. On the first of these grounds, the existence of probable cause to support plaintiff's arrest fatally undermines his claim. The law is clear that "where there has been a lawful arrest, intentional contact with the arrested person does not constitute assault and battery, provided such force is reasonable." *Leibovitz v. City of New York*, No. 14 Civ 3297 (RA) (JCF), 2016 WL 3671232, at *8 (S.D.N.Y. Mar. 17, 2016) (internal quotation marks omitted) (quoting *Cunningham v. United States*, 472 F. Supp. 2d 366, 381 (E.D.N.Y. 2007) ); see also *Lloyd*, 246 F. Supp. 3d at 729. Accordingly, because the officers had probable cause to

arrest plaintiff, Steven Serrano cannot maintain an assault and battery claim under New York law.

As to plaintiffs handcuffing theory, assault and battery claims of this kind "are evaluated like excessive force claims." *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 295 (S.D.N.Y. 2015) (internal quotation marks omitted) (quoting *Brown v. City of New York*, No. 11–CV–1068, 2013 WL 491926, at *10 (S.D.N.Y. Feb. 8, 2013) ). This is so because "except for § 1983's requirement that the tort be committed under color of state law, the essential elements of the two claims" are "substantially identical." *POSR V. Doherty*, 944 F.2d 91, 95 (2d Cir. 1991); *Lloyd*, 246 F. Supp. 3d at 729; *Tompkins v. City of New York*, 50 F. Supp. 3d 426, 440 (S.D.N.Y. 2014) ("New York courts analyze assault and battery claims against police officers using the same standard applicable to excessive force claims under Section 1983."). Because plaintiff has failed to establish a claim for excessive force under § 1983, defendants' motion for summary judgment as to Steven Serrano's assault and battery claims is also granted.

#### 2. Michael Serrano
Plaintiff Michael Serrano has not alleged that officers used excessive force during the course of his arrest. [15] Instead, plaintiff relies on the first ground discussed above—i.e., that because his underlying arrest was unlawful, any contact associated with it was also unlawful. See *Rucks*, 96 F. Supp. 3d at 152–53 ("[I]f an arrest is determined to be unlawful, any use of force against a plaintiff may constitute an assault and battery, regardless of whether the force would be deemed reasonable if applied during a lawful arrest."); *Goonewardena v. Spinelli*, No. 15-CV-5239 (MKB) (ST), 2017 WL 4280549, at *11 (E.D.N.Y. Sept. 26, 2017) ("New York law holds that any force used during the course of an unlawful arrest gives rise to assault and battery claims against the arresting officers.").

[15]   As noted above, see supra Note 1, all of plaintiff Samuel Garcia's state law claims have been dismissed.

**\*12** Because the issue of arguable probable cause to arrest Michael Serrano raises a disputed issue of material fact, plaintiffs assault and battery claim also must be put to a jury. See *Goonewardena*, 2017 WL 4280549, at *11 ("Accordingly, because Plaintiff has established a false arrest claim against [defendant police officers], under New York law, Plaintiff has established assault and battery claims against [the defendants].")); *Biswas v. City of New York*, 973

Serrano v. City of New York, Not Reported in Fed. Supp. (2018)

2018 WL 3392869

F. Supp. 2d 504, 530–31 (S.D.N.Y. 2013) ("If an arrest is unlawful, an arresting police officer commits a battery when he or she touches the arrestee, including during the application of handcuffs."); *cf. Lloyd*, 246 F. Supp. 3d at 729 ("But because Plaintiff's excessive force claims based upon the pushing and handcuffing incidents must be decided by a jury, so too must her state law assault and battery claims."). Accordingly, the motion for summary judgment is denied.

**F. Municipal Liability**

Finally, defendants argue that they are entitled to summary judgment as to all claims against the City brought under a theory of *respondeat superior*.

Unlike claims brought under § 1983, "New York law permits plaintiffs to hold municipalities vicariously liable for torts committed by employees while acting within the scope of their employment." *Tompkins*, 50 F. Supp. 3d at 440; *see also Ackerson v. City of White Plains*, 702 F.3d 15, 22 (2d Cir. 2012). However, there can be no vicarious liability in the absence of individual liability on the part of a City's employees. *See Hatcher*, 2018 WL 1583036, at *10 (explaining that where "there are no viable tort claims against the individual Defendants, there is no basis for City liability under a *respondeat superior* theory"); *Jenkins v. City of New York*, No. 10 CIV. 4535 AJN, 2013 WL 870258, at *14 (S.D.N.Y. Mar. 6, 2013).

Therefore, to the extent that plaintiffs retain state law claims against individual officers the City may be held vicariously liable under a theory of *respondeat superior*. *Mesa v. City of New York*, No. 09 CIV. 10464 JPO, 2013 WL 31002, at *34 (S.D.N.Y. Jan. 3, 2013) ("Accordingly, where Plaintiffs' state law claims survive, so too do their *respondeat superior* claims against the City."). Because all of plaintiff Steven Serrano's state law claims have been dismissed, all pendant state law claims against the City also are dismissed. *See Hatcher*, 2018 WL 1583036, at *10. But as to plaintiff Michael Serrano, the City may be held liable for his remaining state law claims for false arrest, malicious prosecution, unreasonable search and seizure, and assault and battery. *See Bleiwas v. City of New York*, No. 15 CIV. 10046 (ER), 2017 WL 3524679, at *4 (S.D.N.Y. Aug. 15, 2017) ("Additionally, because the Court finds that Plaintiff has sufficiently alleged a state false arrest claim, the City may be held liable pursuant to a theory of

*respondeat superior*."); *Ramos v. City of New York*, No. 15 CIV. 6085 (ER), 2017 WL 3267736, at *12 (S.D.N.Y. July 31, 2017) ("Here, the Court has found that Plaintiffs have a viable malicious prosecution claim against Detective Marrero as it relates to the charge of the sale of a controlled substance. Therefore, to the extent Plaintiffs seek to impose liability on the City for the remaining malicious prosecution claim, they are allowed to proceed."); *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 381 (S.D.N.Y. 2010) ("The remaining state law claim of assault and battery against the City of White Plains is alive due to the potential for vicarious liability for actions of its police officers as its employees."). Accordingly, defendants' motion for summary judgment is granted as to all state law claims brought by Steven Serrano, but denied as to all remaining state law claims brought by Michael Serrano.

**Conclusion**

*13 For the reasons stated herein, the motion for summary judgment is granted in part and denied in part. The motion is granted as to all claims asserted by plaintiff Steven Serrano, and his complaint against defendants is dismissed. As to all claims raised by plaintiffs Samuel Garcia and Michael Serrano, the motion is denied. Plaintiffs Samuel Garcia and Michael Serrano shall retain claims for false arrest, unreasonable search and seizure, and malicious prosecution. Michael Serrano shall also retain his state law claim for assault and battery, as well as all pendant state law claims against the City under *respondeat superior*.

The clerk is instructed to terminate the motion (ECF 40). The oral argument, currently scheduled for July 26, 2018, is cancelled. Plaintiffs shall amend their complaint to reflect that the claims of Steven Serrano have been dismissed, and restate, without change, the claims by Samuel Garcia and Michael Serrano. The parties shall appear for a status conference on August 17, 2018, to determine what discovery remains, and if none remains, to set a trial date.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 3392869

---

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Report and Recommendation Adopted as Modified by   Bannister v. Luis,

E.D.N.Y.,   March 2, 2023

2022 WL 19402512
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Henry BANNISTER, Plaintiff,

v.

Detective Marvin LUIS, Ryan Giuffre,
Police Officer Joseph Giannina, Defendant.

18-CV-7285 (EK) (ST)
|
Signed February 16, 2022

**Attorneys and Law Firms**

Henry Bannister, Spartanburg, SC, Pro Se.

Zachary Kalmbach, New York City Law Department, Special
Federal Litigation Division, New York, NY, for Defendants.

## REPORT AND RECOMMENDATION

TISCIONE, United States Magistrate Judge:

## INTRODUCTION

**\*1** This case results from Plaintiff Henry Bannister's arrest,
detention, and subsequent criminal prosecution, which took
place from May 24, 2016, until September of 2018, and
during which Plaintiff alleges his rights were violated by
Defendants. Plaintiff, proceeding *pro se*, filed a complaint
which is a collection of grievances filed to other bodies,
alleging conduct which violated his federal rights. Before this
Court is Defendants' motion for summary judgment on the
claims of false arrest and malicious prosecution, to declare
any state-law claims time-barred, and to dismiss Defendant
Giannina from the action. Defendants also ask that we deem
Plaintiff's claims abandoned. For the reasons discussed below,
I recommend the Defendants' motion be GRANTED IN
PART AND DENIED IN PART.

## BACKGROUND

## I. Facts

On May 24, 2016, Plaintiff was parking a rental car when
two officers, Defendants Luis and Giuffre, approached his
vehicle. Pl. Compl., 15, ECF No. 1. In the driver's seat of the
car was the Plaintiff, while a man named Tashaun Canty was
in the passenger's seat. *Id.* According to Plaintiff's complaint,
Officer Luis opened the passenger side door and removed
Mr. Canty from the vehicle, while Officer Giuffre approached
the driver's side window and tapped on it to get Plaintiff's
attention. *Id.* Plaintiff says Officer Giuffre asked him for his
license and registration and, in lieu of registration, he handed
the Officer his rental contract. *Id.* at 15-16. He claims that
during this exchange he saw Officer Luis escorting Mr. Canty
to an unmarked police vehicle, which pulled away with Mr.
Canty inside. *Id.* at 16. Plaintiff was then asked by Officer
Giuffre if he had anything in the car or on his person that
would cause harm to him, to which Plaintiff responded he did
not. *Id.* Officer Giuffre asked the Plaintiff to get out of the car
and proceeded to frisk him and the area in the vehicle where
Plaintiff had been sitting. *Id.*

At that point, Plaintiff claims, Officer Luis returned, entered
the car, and began to search. *Id.* at 16-17. After approximately
2-3 minutes, Plaintiff heard Officer Luis call out a number to
Officer Giuffre, which he believes to have been a signal to
arrest him. *Id.* at 17. Officer Giuffre then handcuffed Plaintiff
and escorted him to the un-marked sedan, which had returned
in that time, and he was transported to the precinct. *Id.*

The arrest report shows the reason Plaintiff was arrested was
because Officer Luis found a loaded handgun in the center
console of the car. *See Def. R. 56.1 Br.*, ¶ 2, ECF No. 47-2.
Plaintiff himself confirmed this, saying in his deposition,
"The gun that was found in the car wasn't mine." Bannister
Dep., 16, ¶¶ 16-17, ECF No. 47-5. Defendants also submitted
the results of a D.N.A. test performed on the gun, which
showed that the DNA found on a swab of the "slide grip
grooves, slide lock lever and safety" was "approximately 126
billion times more probable if the sample originated from
Henry Bannister and two unknown, unrelated persons than if
it originated from three unknown, unrelated persons." D.N.A.
Rep., ECF No. 47-9.

**\*2** At some point after the arrest, there was a conversation
between Plaintiff and Defendant Luis regarding $5,000 found
in the vehicle. Plaintiff claims that while at the precinct, he
asked Officer Luis if the money inside his luggage bag was
safe and if he could have his sister come to the precinct to
pick it up. *Id.* at 17. He claims Officer Luis responded, "We

don't want your fucking dope money, after were finish [sic] with you, getting that money back would be the least of your problems." *Id.* The police report tells a different story. In the report, Officer Giuffre attests that Officer Luis told him that Plaintiff told Officer Luis he did not have to bring him in for the gun and that Officer Luis could keep what was in the car. Police Rep., 2, ECF No. 47-8.

Plaintiff was charged with criminal possession of a weapon in the second, third, and fourth degree, criminal possession of a firearm, possession of pistol ammunition, and bribery in the second and third degree. Def. R. 56.1 Br., ¶ 4, ECF No. 47-2. The gun was later suppressed, and all charges were dropped. Pl. Compl., 25, ECF No. 1.

The record before the Court as to what happened at Plaintiff's suppression hearing is very sparse (*See* New York State Sup. Ct. Docket, ECF No. 47-10), and Defendants do not provide any further details on why the firearm was suppressed. Plaintiff claims that the Officers had no authority to stop the car, as Plaintiff was lawfully parking, and that Officers Giuffre and Luis gave conflicting testimony on what gave them probable cause to stop and search the vehicle, resulting in the gun's suppression. Pl. Compl., 19-20, 23, ECF No. 1.

At the grand jury proceeding, Plaintiff claims that Officer Giuffre testified that the vehicle was stopped because it was parking too close to a fire hydrant. Pl. Compl., 20, ECF No. 1. But Plaintiff says it was later discovered that the fire hydrant in question was actually over 85 feet away from where his car was stopped. *Id.* at 24. He claims one of the officers also offered up during the grand jury proceeding that they smelled marijuana as they approached the car, which was why they searched it. *Id.* at 21. However, at a later court proceeding, on September 19, 2017, Plaintiff says one of the officers instead testified that they saw what looked like a marijuana cigarette, which is why they searched the car. *Id.* at 22. Plaintiff has not supported these contentions with exhibits from the suppression hearing record.

Subsequent to Plaintiff's arrest, he was brought to the station where he completed booking procedures, after which he says his hands were tightly handcuffed behind his back. *Id.* at 18. He was then taken to a steep stairway. *Id.* Because Plaintiff is a bilateral prosthesis wearer, he struggled to climb the stairs and had to be led by the handcuffs. *Id.* After climbing the stairs he was led to a room where he was read his *Miranda* warnings, and then was led back down the same staircase. *Id.* After this, he claims he was placed in a cell still in the handcuffs. He

claims those tight handcuffs were left on him for several hours and he was left in such a position that they cut off circulation to his hands and arms. *Id.* He claims that he was in tears, and it was not until the facilities' change of shift procedures that they were removed. *Id.*

## II. The Instant Motion

The motion before this Court is a motion for summary judgment by Defendants, filed on May 13, 2021. Def. Mot., ECF No. 47. In their motion, Defendants request summary judgment on any false arrest and malicious prosecution claims. *Id.* They also request the Court dismiss Officer Giannina from the complaint for lack of personal involvement. *Id.* Finally, they request this Court declare that any state law claims relating to Plaintiff's arrest are time-barred. *Id.*

**\*3** Defendants served the motion on Plaintiff in accordance with the notice requirements contained in E.D.N.Y. Local Rule 56.2. Plaintiff did not respond to the motion. Defendants write that they contacted Plaintiff on May 4, 2021, and May 10, 2021, after he failed to respond to the motion, and Plaintiff informed them that he had received Defendants' motion papers and did not intend to file an opposition to the Defendants' motion. *See* Def. May 13, 2021 Ltr., ECF No. 47-12.

## LEGAL STANDARD

Summary judgment is appropriate when the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue of fact is material if the fact "might affect the outcome of the suit under the governing law ..." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine dispute exists as to a material fact when "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

On motions for summary judgment, the moving party bears the initial burden of establishing the absence of a material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets that burden, the non-moving party must then show there is a genuine dispute for trial. *Id.* The burdens on both parties as to the underlying elements are aligned as they would be at trial. *Anderson,* 477 U.S. at 254, 106 S.Ct. 2505.

When considering a motion for summary judgment, the Court must construe "all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

Because Plaintiff is proceeding *pro se*, the Court affords "special solicitude" to him when considering a motion for summary judgment. *See Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988). This "special solicitude" includes reading the filings of a *pro se* litigant "liberally" and interpreting them to "raise the strongest arguments that they suggest." *Minus v. City of New York*, 488 F. Supp. 3d 58, 63 (S.D.N.Y. 2020) (citing *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999)) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). However, a nonmoving *pro se* plaintiff cannot rely solely upon the pleadings to defeat summary judgment and must point to specific evidence in the record to carry his burden in summary judgment. *See Salahuddin v. Goord*, 467 F.3d 263, 273 (2d Cir. 2006). Where the nonmovant bears the burden at trial, the movant may make a prima facie case for summary judgment by either identifying sufficient evidence to negate the nonmovants claims or identifying evidentiary insufficiencies in Plaintiff's case that demonstrate the absence of a genuine issue of material fact. *Id.* at 272-73 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548); *Farid v. Smith*, 850 F.2d 917, 924 (2d Cir. 1988).

A party's failure to respond to contentions raised in a motion to dismiss generally constitutes abandonment of those claims. *Laface v. Eastern Suffolk BOCES*, 349 F. Supp. 3d 126, 161 (E.D.N.Y. 2018). However, where the silent party is *pro se*, abandonment is only generally granted where an intention has been expressed to abandon the claim. *See Omosefunmi v. Weiss*, No. 99-0025, 1999 WL 973516 at *1, 1999 U.S. App. LEXIS 25093 at *4 (2d Cir. Sep. 30, 1999). Ultimately the question of abandonment is "one of intent." *Austin v. Ford Models, Inc.,* 149 F.3d 148, 155 (2d Cir. 1998).

## DISCUSSION

**\*4** Interpreting the Plaintiff's complaint as liberally as possible, the I believe there to be four cognizable legal claims within it, claims for: 1) false arrest; 2) malicious prosecution; 3) illegal stop and search; and 4) excessive force. I presume, though it is not stated in the complaint, that these are brought

under 42 U.S.C. § 1983, which "provides remedies [under federal law] for deprivations of rights established elsewhere." *City of Okla. City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). A claim under § 1983 requires that the individuals sued acted "under color of state law." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994).

Defendants' brief addresses the claims of false arrest and malicious prosecution. Defendants ask that, due to Plaintiff's failure to respond, the Court deem these claims abandoned. I recommend that the Court not do so, given that Plaintiff has not expressed an intent to abandon the claims, and has merely failed to respond. Instead, I will perform a standard summary judgment analysis of those claims and will address each claim I believe raised by Plaintiff's complaint in turn, as well as Defendants' motions to dismiss potential state law claims and Defendant Giannina.

### I. The Court Should Take the Following Actions on Plaintiff's Claims:

#### a. Summary Judgment Should Be Granted to Defendants on Plaintiff's False Arrest Claim.

The Fourth Amendment of the United States Constitution provides a right to be free from unreasonable seizures, which includes the right to be free from arrest without probable cause. *See Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). The elements of a false arrest claim under § 1983 are analogous to those under New York law: to meet his burden, Plaintiff must show the Defendants intentionally confined him without his consent and without justification. *Id.* Probable cause to arrest is justification, and "is a complete defense to an action for false arrest." *Id.* (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994)); *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Broughton v. State*, 37 N.Y.2d 451, 458, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975).

The parties do not dispute that a loaded handgun was found in the car Plaintiff was driving prior to his arrest; Plaintiff merely claims that the gun did not belong to him. Bannister Dep., 16, ¶¶ 16-17, ECF No. 47-5. In New York, a loaded gun in a car is generally probable cause to arrest the driver, regardless of the actual ownership of the gun.

Probable cause requires only "a reasonable ground for belief of guilt" that is "particularized with respect to the person to

be ... seized." *Maryland v. Pringle,* 540 U.S. 366, 370, 124 S.Ct. 795, 157 L.Ed.2d 769 (2003) (quoting in part *Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979)). Reasonableness is judged from the viewpoint of an "objectively reasonable officer." *Ornelas v. United States,* 517 U.S. 690, 776, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

In New York State, a person is guilty of criminal possession of a weapon in the second degree if he or she possesses a loaded firearm and does not have a license to possess such a firearm. *See* N.Y. Penal Law § 265.03. Under New York law, the existence of a firearm in an automobile creates a permissive presumption that all occupants of the vehicle have common constructive possession of the firearm, absent statutory exceptions, none of which apply in this case. *See* N.Y. Penal Law § 265.15(3). If a jury may make a presumption of possession under the law, it is reasonable for a police officer to do the same. Therefore, upon finding the loaded handgun in the car, the officers had probable cause to arrest Plaintiff, which is a justification that defeats any false arrest claim.

**\*5** Nor can Plaintiff maintain that the gun cannot be used as a justification for the arrest because the stop or search which led to the finding of the gun was unlawful. The fruit of the poisonous tree doctrine does not apply to § 1983 claims. *Townes v. City of New York,* 176 F.3d 138, 145 (2d Cir. 1999). We deal only with the situation at the time of the arrest. At that time, an objectively reasonable officer would be well within his rights to believe the loaded handgun was possessed by Plaintiff, giving the officer probable cause that Plaintiff had committed a crime. Because there is no dispute a loaded handgun was found in the car, justification exists for the arrest, and so summary judgment should be granted to Defendants on this claim.

### b. Summary Judgment Should Be Granted to Defendants on Plaintiff's Federal Malicious Prosecution Claim

To prove malicious prosecution, Plaintiff must show "a seizure or other perversion of proper legal procedures implicating [his] personal and privacy interests under the Fourth Amendment" that was "initiated or continued against him, with malice and without probable cause, and [was] terminated in his favor." *See Lanning v. City of Glens Falls,* 908 F.3d 19, 24 (2d Cir. 2018) (quoting in part *Washington v. County of Rockland,* 373 F.3d 310, 316 (2d Cir. 2004)).

It is dubious whether Plaintiff pleads facts that give rise to an inference of malice against him by Officers Giuffre and Luis. Perhaps the closest he gets is in quoting Officer Luis who, he claims, in response to him asking about whether the money left inside his luggage bag was safe, responded, "We don't want your fucking dope money, after were finish [sic] with you, getting that money back would be the least of your problems." *See* Pl. Compl., 17, ECF No.1. After that comment, Plaintiff was charged with bribery and gun charges.

Even if Plaintiff does plead facts that give rise to malice, he must also support the contention there was not probable cause. Plaintiff does say in his complaint that none of the charges were warranted. However, Defendant's submission proving the presence of the loaded gun in the car with Plaintiff's DNA on it demonstrates that there was probable cause for the gun charges, making summary judgment for Defendants appropriate with respect to any malicious prosecution claim on the gun charges.

But Plaintiff also fails to assert an additional essential element of his claim: he makes no assertion that the case was terminated in his favor. Both Plaintiff and the Defendants agree that the criminal prosecution was dropped after the gun was suppressed by a New York court. While federal § 1983 malicious prosecution elements mirror New York State law in many ways, federal courts in this Circuit do not follow the New York State courts on the issue of what is defined as a favorable termination. Under federal law, a Plaintiff alleging a § 1983 malicious prosecution must show that the termination of his prosecution was "an affirmative indication that [the Plaintiff was] innocent of the offense charged." *Lanning,* 908 F.3d at 28. The termination in this case, merely dropping charges after the suppression of evidence, does not affirmatively indicate Plaintiff was innocent of the charges brought. And the D.N.A. results suggest the opposite.

Many courts in the Second Circuit have held similarly. In *Miller v. Cuccia,* the Plaintiff brought a § 1983 malicious prosecution action where his criminal trial was terminated due to suppression of evidence. The District Court granted summary judgment to the Defendant in that case, as it found the suppression of evidence did not constitute termination of the proceedings in the Plaintiff's favor. The Second Circuit reviewed that decision, and found that, "The suppression of the inculpatory evidence [in this case a shotgun, ammunition, and post-arrest statements by the Plaintiff] does not establish or imply appellant's innocence because it was not related to or

based upon the reliability or unreliability of the evidence." *See Miller v. Cuccia,* Nos. 99-7088, 99-7122, 1999 WL 1070084 at *1, 1999 U.S. App. LEXIS 30445 at *3 (2d Cir. Nov. 18, 1999).

**\*6** Similarly, here it appears the central piece of evidence to the gun charges, the gun itself, was suppressed due to either a finding of a lack of probable cause for the stop of the car or the search of the car. I do not have the opinion of the New York State suppression court in the record before me, but in Plaintiff's own complaint he says, "[The] arresting officers never [ ] had reasonable suspicion or probable cause to approach their vehicle or search them or their property therein ... [the] Judge [s]uppressed the evidence." Pl. Compl., 23-24, ECF No. 1. Suppression on these grounds does not relate to the reliability of the loaded gun as evidence of criminal possession. While Plaintiff does say the gun was not his in his deposition testimony, the crime is possession, not ownership, and Defendants provide evidence of a D.N.A. test performed on the weapon which shows with almost certainty that Plaintiff's D.N.A. was found on the "slide grip grooves, slide lock lever and safety" of the gun. *See* Bannister Dep., ECF No. 47-5; D.N.A. Rep., ECF No. 47-9.

As this Court found in *Graham v. City of New York,* "This might be a different case if Plaintiff had put forth a well-pleaded allegation that he did not, in fact, possess the gun ... police recovered from him during the unlawful search." *See Graham v. City of N.Y.,* 2018 WL 1157818 at *6, 2018 U.S. Dist. LEXIS 34554 at *18 (E.D.N.Y. 2018). But Plaintiff did not put forward any allegation that he never possessed the gun. Meanwhile, Defendants have put forward strong evidence that Plaintiff did possess the gun. Therefore, because the prosecution was not resolved in Plaintiff's favor, Defendants should be granted summary judgment on the malicious prosecution claim with relation to the gun charges.

Reading Plaintiff's complaint liberally, he has alleged malice and a lack of probable cause for the bribery charges, based upon his account of Officer Luis' statement to him. However, he provides no details on the circumstances under which the bribery charges were dismissed, let alone an allegation that the circumstances were indicative of his innocence. As Plaintiff bears the burden at trial of proving malicious prosecution and has not made any allegations regarding a necessary element of that claim, I recommend summary judgment be granted to Defendants on all of Plaintiff's federal malicious prosecution claims.

### c. Plaintiff's Complaint Should Be Construed as Asserting Illegal Stop and Search Claims.

Plaintiff's complaint is not formatted as a formal legal complaint. Instead, it is a collection of grievances filed by the Plaintiff to other bodies, including a ten-page factual summary written by Plaintiff about what happened. This makes it difficult for Defendants to respond and for the Court to ascertain which laws Plaintiff is suing under and what legal claims he is making. However, he is proceeding *pro se,* and the Court is to read the complaint so as to raise the strongest arguments it suggests. Therefore, I recommend the court construe the Plaintiff's complaint as also alleging § 1983 actions for an illegal stop and illegal searches under the Fourth Amendment.

Section 1983 provides a remedy where the Defendants, acting under color of state law, have deprived the Plaintiff of a right secured by the Constitution and laws of the United States. *Cox v. County of Suffolk,* 827 F. Supp. 935, 937-38 (E.D.N.Y. 1993). The Fourth Amendment requires that an officer making a traffic stop "have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Gomez,* 877 F.3d 76, 86 (2d Cir. 2017).

According to Plaintiff's complaint, Officers Luis and Giuffre claimed that they stopped the Plaintiff because he was parked adjacent to a fire hydrant, which is illegal. *See* Pl. Compl., 19, ECF No. 1. The Defendants have filed a police report from the incident, which does not mention a reason for the stop. *See* Police Rep., ECF No. 47-8. Plaintiff alleges that he was not parking near a fire hydrant and that, at the suppression hearing, the location of the fire hydrant in question was confirmed to be 85 feet from where Plaintiff was parking the car. Pl. Compl., 23, ECF No. 1. I believe these facts could be construed as a claim by Plaintiff of an illegal stop under § 1983.

**\*7** Additionally, the Fourth Amendment prohibits unreasonable searches.

First, there is the search of Plaintiff himself. Plaintiff says he was frisked after being asked to step out of the car. For such a frisk to be reasonable, the officer performing the search must have reasonably believed Plaintiff was armed and dangerous. *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 20 L.Ed.2d 889

(1968). If Plaintiff's version of events is correct, there does not seem to have been a reason for Officer Giuffre to reasonably believe at that time that Plaintiff was armed and dangerous, giving rise to a claim for an illegal search. The officers clearly had such suspicion once a firearm was located in the car; however, at the time that Plaintiff was actually searched, the officers had not yet searched the car and found the firearm.

Second, there is the search of the car. A search of a car without a warrant is reasonable where there is probable cause to believe the vehicle contains contraband, an exception to the warrant requirement known as the "automobile exception." *United States v. Navas,* 597 F.3d 492, 497 (2d Cir. 2010). Plaintiff claims in his complaint that the Officers Giuffre and Luis have given varying and contradictory answers as to what their probable cause was to search the rental car he was driving. Plaintiff claims that at the grand jury hearing, Officer Giuffre said Officer Luis searched the car because they smelled marijuana as they approached it. Pl. Compl, 21, ECF No. 1. Plaintiff says that at the suppression hearing, the officers instead testified that they observed a marijuana cigarette or cigar on or in a cup holder near the center console in the car. *Id.* at 22. However, Plaintiff points out, this contradicts other testimony by the officers that they observed a "metal object" in the car, which gave them probable cause to search it. *Id.* In the police report submitted by Defendants, it says that Officer Luis observed a .45 caliber semi-automatic pistol in the center arm rest compartment of the vehicle, though it does not specify if that observation was made before or after the search. *See* Police Rep., ECF No. 47-8. The facts Plaintiff alleges gives rise to a claim for an illegal search of the car.

I do not recommend that the Court take a position on whether these allegations would survive a motion for summary judgment. These claims are not included the instant motion and such a motion has not been briefed by the parties. I merely recommend that the Court construe the complaint to include these claims and give leave to Defendants to file a motion for summary judgment on the surviving claims if they elect to do so.

### d. Plaintiff's Complaint Should Be Construed as Asserting an Excessive Force Claim

I further recommend the Court construe Plaintiff's complaint to include allegations of excessive force in violation of the Fourteenth Amendment.

"[T]he right of pretrial detainees to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment." *United States v. Walsh,* 194 F.3d 37, 47 (2d Cir. 1999). To sustain a claim of excessive force, pretrial detainees must show "only that the force purposefully or knowingly used against [them] was objectively unreasonable." *Kingsley v. Hendrickson,* 576 U.S. 389, 396-96, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015).

**\*8** Plaintiff claims in his complaint that after being arrested and brought to the precinct for processing, his hands were tightly handcuffed behind his back. He claims he was then led up some steep stairs by his handcuffs and later was left in a cell handcuffed for several hours, during which time he lost circulation in his hands and arms and began to cry. Pl. Compl., 18, ECF No. 1. I believe Plaintiff has pled sufficient facts for the Court to construe his complaint as alleging unconstitutional excessive force, though I again recommend the Court take no position on whether such an allegation would survive a motion for summary judgment.

### II. All Potential State Law Claims, With the Exception of a State Law Malicious Prosecution Claim, Should Be Dismissed as Time-Barred.

Defendants also argue in their motion that any of Plaintiff's potential state law claims are time-barred under N.Y. Gen. Mun. Law §§ 50-e and 50-i (1) because Plaintiff did not serve notice of claim upon the municipality employing the Defendants within the required ninety days from when the claims arose, and because he did not commence an action within one year and ninety days of the incident. [1] Defendants say the City did not receive Plaintiff's notice of claim until October 2, 2018, over two years after the accrual of the claims. Def. Br., 12, ECF No. 47-3.

[1]    Though the distinction does not affect this action, it should be noted that state-law actions to recover damages for malicious prosecution are governed by CPLR § 215(3), which sets a one-year statute of limitations on those actions. NY CLS CPLR § 215(3).

Under New York State Law, a Plaintiff suing a municipality or its employees acting in their professional capacity is required to submit a notice of claim within ninety days of the state law claim arising and bring suit within one year and ninety-days after the event upon which the claims are based. N.Y. Gen. L. §§ 50-e(1)(a), 50-i (1); *Wharton v. County of Nassau,*

No. 07-CV-2137, 2010 WL 3749077 at *9, 2010 U.S. Dist. LEXIS 99174 at *29-30 (E.D.N.Y. Sep. 20, 2010). Otherwise, the state law claims must be dismissed.

Here, the stop, search, and arrest at issue took place on May 24, 2016. Pl. Compl., 15, ECF No. 1. The New York City Comptroller received a notice of claim on October 2, 2018, well beyond the ninety-day deadline. *See* Def. R. 56.1 Br., ¶7, ECF No. 47-2. This action was filed on December 10, 2018, beyond the one-year and ninety-day deadline set by New York State law. It does appear Plaintiff filed a complaint with the State Supreme Court on September 8, 2017 (Pl. Compl., 37, ECF No. 1) related to the same incident but that complaint only alleged that the NYPD wrongfully took and held $22,091 from him. Regardless, it too was filed beyond the required one-year and ninety days.

New York law strictly construes notice of claim requirements, and, though this is a federal court, we must apply this rule for New York State claims regardless of whether Plaintiff intended the Court to exercise jurisdiction over any potential state law claims as part of its diversity or supplemental jurisdiction. *See Boda v. Phelan,* No. 11-CV-0028, 2014 WL 3756300 at *7, 2014 U.S. Dist. LEXIS 104955 at *22 (E.D.N.Y. July 30, 2014); *Hardy v. New York City Health & Hosps. Corp.,* 164 F.3d 789, 793 (2d Cir. 1999).

However, in malicious prosecution claims, the cause of action does not arise until the underlying legal proceeding is terminated, and the clock on notice and commencement of action does not start until that point. *See Giglio v. Delesparo,* 46 A.D.2d 928, 361 N.Y.S.2d 721 (NY App. 1974). Plaintiff says the charges were dropped against him in September of 2018. Pl. Compl., 25, ECF No. 1. Defendants say the New York City Comptroller received a notice of claim on October 2, 2018, within 90 days of the termination of the action. Def. R. 56.1 Br., ¶7, ECF No. 47-2. This legal proceeding was commenced shortly after, well within the one-year required under CPLR § 215(3).

**\*9** Therefore, to the extent Plaintiff brings any state law claims arising out of this incident, they are time-barred with the exception of any state law claims for malicious prosecution. Should Plaintiff wish to assert such a claim, he should do so with particularity in an amended complaint to afford Defendants the ability to respond, as such a claim would be subject to a different standard for "favorable termination" than a federal malicious prosecution claim.

### III. Summary Judgment Should Be Granted on All Claims Against Defendant Giannina, and He Should Be Dismissed from the Action

Finally, Defendants ask that the Court dismiss Officer Giannina from this action because Plaintiff has not alleged his personal involvement in violations of law.

For a Defendant to be liable under § 1983, he or she must have been personally involved in the conduct at issue. *Singletary v. Russo,* 377 F. Supp. 3d 175, 185 (E.D.N.Y. 2019) ("§ 1983 liability requires a showing that 'each Government-official defendant, through the official's own individual actions, has violated the Constitution.' ") (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "If no reasonable jury could find a particular defendant was personally involved in causing a constitutional violation alleged by plaintiff, then summary judgement should be awarded to that defendant." *Id.*

Plaintiff refers to Mr. Giannina as "transportation officer" in his complaint. His only mention of the transportation officer in his complaint is that he was "transported to [the] precinct by the uniformed transportation officer." Pl. Compl., 17, ECF No. 1. As he does not allege any personal involvement by Mr. Giannina in the conduct he alleges violated his rights, I recommend Defendants be granted summary judgment on any claims against Mr. Giannina, and he be dismissed from this action.

### CONCLUSION

For the forgoing reasons, I recommend Defendants' motion for summary judgment be granted on the false arrest claim and malicious prosecution claims, that the Court construe the complaint as including § 1983 claims for unlawful stop and search, and excessive force, that any pending state law claims arising out of this incident be dismissed as time-barred with the exception of any potential state-law malicious prosecution claims, and that Defendant Giannina be dismissed from the action. I also recommend the Court grant Plaintiff leave to amend the complaint should he be able to allege additional facts in support of his remaining claims or should he be able to allege any of his remaining claims with greater particularity.

### OBJECTIONS TO THIS REPORT
### AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b)(2) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Frydman v. Experian Info. Sols., Inc.*, 743 F. App'x 486, 487 (2d Cir. 2018); *McConnell v. ABC-Amega, Inc.*, 338 F. App'x 24, 26 (2d Cir. 2009); *Tavarez v. Berryhill*, No. 15-CV-5141 (CS) (LMS), 2019 WL 1965832, at *30 (S.D.N.Y. May 1, 2019); *see also Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

**SO ORDERED.**

**All Citations**

Slip Copy, 2022 WL 19402512

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 2325680
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Henry BANNISTER, Plaintiff,

v.

Detective Marvin LUIS et al., Defendants.

18-CV-7285(EK)(ST)
|
Signed March 2, 2023

**Attorneys and Law Firms**

Henry Bannister, Spartanburg, SC, Pro Se.

Zachary Kalmbach, New York City Law Department, Special Federal Litigation Division, New York, NY, for Defendants Detective Marvin Luis, Ryan Giuffre, Police Officer Joseph Giannina.

## MEMORANDUM & ORDER

ERIC KOMITEE, United States District Judge:

 **\*1** The Court has received two Reports and Recommendations from Magistrate Judge Tiscione in this case, dated February 16, 2022 and October 28, 2022. Report & Recommendation ("1st R & R"), ECF No. 49; Report & Recommendation ("2d R & R"), ECF No. 52. In his first R & R, Judge Tiscione recommended that Defendants be granted summary judgment on Bannister's claims of false arrest and malicious prosecution. 1st R & R 7–11. He also recommended that Bannister's Complaint be construed as asserting claims for illegal stop and seizure and excessive force. *Id.* at 11–14. Given that the defense had not addressed those claims, Judge Tiscione received additional briefing, 1st R & R 13, following which he issued the second R & R. In the second R & R, Judge Tiscione recommended that Defendants be granted summary judgment on these latter claims as well. 2d R & R 4–6, 8.

Neither party has filed objections to either R & R, and the time to do so has expired. *See* Fed. R. Civ. P. 72(b) advisory committee's note to 1983 addition; *accord State Farm Mut. Auto. Ins. Co. v. Grafman*, 968 F. Supp. 2d 480, 481 (E.D.N.Y. 2013). Moreover, Bannister submitted no initial opposition to Defendants' summary-judgment motions, no Rule 56.1 statement, no response to either R & R, and no other filing in

connection with these motions. Having reviewed the record, I agree with the R & Rs' conclusions and grant summary judgment to the Defendants on all claims.

### I. Background

Judge Tiscione sets forth a factual summary of the case in his first R & R, which is incorporated herein by reference. 1st R & R 1–5. I adopt the factual and procedural recitations in the R & Rs in full; their reasoning except as expressly set forth below; and I adopt the R & Rs' conclusions in their entirety. Familiarity with both R & Rs is assumed.

### II. Discussion

As noted, Judge Tiscione addressed four claims under 42 U.S.C. § 1983: (1) false arrest; (2) malicious prosecution; (3) excessive force; and (4) illegal stop and seizure. 1st R & R 6. He also construes the Complaint as raising a number of potential state-law claims. *Id.* at 14–16. As Judge Tiscione noted, the only state-law claim that is not time-barred is a claim for malicious prosecution. 2d R & R 6. I discuss each federal claim, as well as Bannister's state-law malicious-prosecution claim, below.

### A. Excessive-Force and Illegal-Stop-and-Seizure Claims

I find no clear error in Judge Tiscione's analysis of the excessive-force or illegal-stop-and-seizure claims. I therefore adopt those portions of the R & R in their entirety and grant Defendants summary judgment on those claims.

### B. False-Arrest Claim

I agree with the R & Rs' analysis of the false-arrest claim and adopt their reasoning in full. I add two observations in support of the conclusion that the false-arrest claim must be dismissed.

First, in making his probable-cause determination, Judge Tiscione applied New York's "presumption of possession," which permits — but does not require — the inference that "all occupants" of a vehicle in which a firearm is discovered "have common constructive possession" of it. *See* 1st R & R 7–8 (citing N.Y. Penal Law § 265.15(3)). This New York law has a long history in federal litigation: the Second Circuit found it unconstitutional on its face in 1977, but the Supreme

Court reversed that holding. *See Cnty. Ct. of Ulster Cnty., N.Y. v. Allen,* 442 U.S. 140, 142 (1979). [1] In doing so, the Court held that the presumption could be constitutionally applied when "there is a rational connection between the *basic facts* that the prosecution proved" — *i.e.* the location of the weapon in relation to a vehicle's occupants, and other circumstances — "and the *ultimate fact* presumed" — *i.e.* common possession. *Id.* at 165 (emphasis added). The party seeking to apply the presumption must demonstrate that "the latter is more likely than not to flow from the former." *Id.* at 165.

[1]   Unless otherwise noted, when quoting judicial decisions this order accepts all alterations and omits all citations, footnotes, and internal quotation marks.

**\*2**  Though the R & Rs do not explicitly assess the rational connection here, it does exist. At the time he was arrested, Bannister was sitting in the driver's seat of the vehicle; another man was in the passenger's seat. 1st R & R 1–2. The firearm was located in the center console of the vehicle, essentially equidistant between the two occupants. *Id.* at 2. No one else was present in the car. *See id.* [2]

[2]   As Judge Tiscione notes, the Plaintiff's DNA was recovered from the firearm, but that recovery of course occurred substantially after the challenged arrest. Defs.' 56.1 Statement ¶¶ 4–5, ECF No. 47-2; State Court Compl. 2, ECF No. 47-8; Laboratory Report 1, ECF No. 47-9.

Moreover, the *Allen* majority's reasoning applies with even more force here. If the presumption may, in proper circumstances, be relied upon by a jury charged with finding guilt beyond a reasonable doubt, then a police officer assessing probable cause may surely be justified in finding *probable cause* based on the same logic. At least one federal court has applied the presumption in the probable-cause context. *See Matthews v. City of New York,* 889 F. Supp. 2d 418, 437 (E.D.N.Y. 2012) (collecting New York state cases relying on the presumption for probable-cause findings).

Accordingly, I grant Defendants summary judgment on Bannister's false-arrest claim.

**C. Malicious Prosecution Claims**
Judge Tiscione construed Bannister's Complaint as asserting federal and state malicious-prosecution claims with respect

to the weapons charges and the bribery charges on which he was prosecuted. (For ease of analysis, I will refer to these claims as the "weapons-arrest claims" and the "bribery-arrest claims," respectively.) He recommends that the state and federal weapons-arrest claims be dismissed because probable cause existed for both sets of charges. 1st R & R 9 (federal); 2d R & R 7 (state). He also recommends that the federal weapons-arrest and bribery-arrest claims be dismissed because Bannister has failed to adduce sufficient evidence that his prosecution ended with a favorable termination. 1st R & R 9–11. (The R & Rs do not, however, explain why the state bribery-arrest claim should be dismissed.)

Although I agree that all these claims are subject to dismissal, I order dismissal for different reasons than the R & Rs recommend.

1. The R & Rs' Favorable-Termination Analysis Has Been Superseded by the Supreme Court
In recommending dismissal of Bannister's federal weapons-arrest and bribery-arrest claims, Judge Tiscione relied on the lack of a favorable termination. 1st R & R 9–11 (citing *Lanning v. City of Glens Falls,* 908 F.3d 19, 28 (2d Cir. 2018)). As the R & R recognized, at the time of its issuance, Second Circuit law required that for purposes of Section 1983 malicious-prosecution claims, a favorable termination exists only where the disposition of a plaintiff's case shows "affirmative indications of [his] innocence." *Lanning,* 908 F.3d at 25.

But two months after that R & R was issued, the Supreme Court abrogated that rule in *Thompson v. Clark,* 142 S. Ct. 1332 (2022): "To demonstrate a favorable termination of a criminal prosecution for purposes of the Fourth Amendment claim under § 1983 for malicious prosecution, a plaintiff need only show that his prosecution ended without a conviction." *Id.* at 1335. That new rule applies to this case. As the Supreme Court has explained:

> When this Court applies a rule of federal law to the parties before it, that rule is the controlling interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events

2023 WL 2325680

predate or postdate our announcement
of the rule.

**\*3** *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993).

Accordingly, because of the intervening change in law, the lack of a favorable termination is no longer a basis on which summary judgment may be granted against Bannister on his federal malicious-prosecution claims.

2. Probable Cause to Prosecute Existed for the Weapons Charges, Though Not for the Reasons Stated in the R & Rs

Nevertheless, the federal and state weapons-arrest claims must still be dismissed on the basis that there was sufficient probable cause to initiate that prosecution. However, the R & Rs' probable-cause analysis is incorrect with respect to these claims.

As the R & Rs recognized, "a plaintiff cannot establish a malicious prosecution claim if there was probable cause for the prosecution." *Danielak v. City of New York*, No. 02-CV-2349, 2005 WL 2347095, at \*10 (E.D.N.Y. Sept. 26, 2005) (Matsumoto, M.J.) (Section 1983 context), *aff'd*, 209 F. App'x 55 (2d Cir. 2006); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *as amended* (May 21, 1996) (same, under New York law). But "the existence of probable cause in a malicious prosecution suit is determined as of the time prosecution is commenced." *Tuccillo v. County of Nassau*, 723 F. App'x 81, 82 (2d Cir. 2018); *see also Danielak*, 2005 WL 2347095, at \*10 ("[A] claim for malicious prosecution must be evaluated in light of the facts known or believed at the time the prosecution is initiated.").

Both R & Rs assert that probable cause for the prosecution existed because Bannister's DNA was identified on the firearm located by the police officers. 1st R & R 9 (federal claim); 2d R & R 7 (state claim). But the Defendants' summary-judgment papers indicate that the criminal complaint was filed on May 25, 2016, while the DNA testing report was dated April 19, 2017, nearly a year later. Defs.' 56.1 Statement ¶¶ 4–5, ECF No. 47-2; State Court Compl. 2, ECF No. 47-8; Laboratory Report 1, ECF No. 47-9. Thus, the DNA evidence was not available to the officers at the time the prosecution was "commenced" and therefore

could not have been a valid basis for probable cause. *Tuccillo*, 723 F. App'x at 82.

Nevertheless, probable cause to commence the firearms prosecution remained for the same reasons there was probable cause to arrest Bannister — namely, Bannister's position in the driver's seat; the firearm's location in the center console, within his easy reach; and the rational inference of (at least) common possession flowing therefrom. *See supra* section II.B; 1st R & R 7–8. "If probable cause existed at the time of arrest, it continues to exist at the time of prosecution unless undermined 'by the discovery of some intervening fact.' " *Johnson v. Constantellis*, 221 F. App'x 48, 50 (2d Cir. 2007); *see also Lowth*, 82 F.3d at 571 (probable cause "present at the time of the arrest" could still "dissipate" if "the groundless nature of the charges [are] made apparent by the discovery of some intervening fact"). But Bannister has not pointed to any such intervening facts here.

**\*4** Moreover, in his Complaint, Bannister asserted that he had been indicted for firearms possession. Compl. 19. That indictment gave rise to a presumption of probable cause that Bannister has not rebutted. "[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (reversing district court's denial of summary judgment where plaintiff failed to produce such evidence). In other words, "for a plaintiff to succeed in a malicious prosecution claim after having been indicted," he must produce "evidence establishing that the police witnesses have not made a complete and full statement of the facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004); *see also Colon v. City of New York*, 455 N.E.2d 1248, 1250 (N.Y. 1983). Bannister has not produced any such evidence and, thus, has not overcome this presumption.

Thus, the weapons-arrest claims must be dismissed.

3. Probable Cause to Prosecute Also Existed for the Bribery Charges

The R & R recommends dismissal of the federal bribery-arrest claims for the sole reason that Bannister failed to establish favorable termination. 1st R & R 11 ("[H]e provides no details

on the circumstances under which the bribery charges were dismissed, let alone an allegation that the circumstances were indicative of his innocence."). As discussed, that is no longer a valid basis for dismissal.

Nevertheless, there remains "a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2009). Here, that essential element is the lack of probable cause, and the lack of evidence in support of that element entitles Defendants to summary judgment.

Here, Bannister declined to file any response to any of Defendants' summary-judgment papers at all; he therefore has adduced no evidence in support of his claim. On the contrary, as Judge Tiscione observed, the record contains evidence showing that Bannister "told Officer Luis he did not have to bring him in for the gun and that *Officer Luis could keep* what was in the car." 1st R & R 3 (emphasis added). This uncontested evidence supports the conclusion that the officers had probable cause to arrest Bannister for bribery.

Thus, Defendants are entitled to summary judgment on Bannister's federal and state malicious-prosecution claims.

### III. Conclusion

For these reasons, I adopt the R & Rs in part, specifically, with the addition of the above discussion and with the following modifications:

- In the first R & R, delete the portion of section I.b starting with the sentence that begins with "Even if Plaintiff does plead facts that give rise to malice...." 1st R & R 9–11.

- In the second R & R, Part II, delete the sentence beginning with "After Plaintiff's arrest, DNA found on the gun," as well as the citation that immediately follows. 2d R & R 7.

- In the sentence that follows, replace "during his subsequent prosecution" with "at the time his subsequent prosecution was initiated." *Id.*

Furthermore, for the foregoing reasons, Defendants are granted summary judgment on all claims. The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, to mail a copy of this Order to Bannister, and to close this case.

SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 2325680

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Johnson v. City of New York, Not Reported in Fed. Supp. (2022)

2022 WL 4133284

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 103 of 166

2022 WL 4133284
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Christopher JOHNSON, Plaintiff,
v.
The CITY OF NEW YORK, Officer Steven Poupos,
Officer Joseph Davin, and John Does 1-2, Defendants.

21-cv-5268 (PKC)
|
Signed September 12, 2022

**Attorneys and Law Firms**

Cyrus Joubin, Cyrus Joubin, Esq., New York, NY, for
Plaintiff.

Andrea Osgood, New York City Law Department, New York,
NY, Matthew William McQueen, Office of New York City
Comptroller, New York, NY, for Defendants City of New
York, Police Officer Steven Poupos, Police Officer Joseph
Davin.

OPINION AND ORDER

CASTEL, United States District Judge

**\*1** Plaintiff Christopher Johnson brings section 1983 claims
against defendants Steven Poupos and Joseph Davin, officers
of the New York City Police Department ("NYPD") (the
"Individual Defendants"), and the City of New York. [1] 42
U.S.C. § 1983. Johnson principally claims that he was
deprived of rights protected by the Constitution when he was
arrested and detained, rather than given a desk appearance
ticket, and given a visual body cavity search. Defendants
move to dismiss the Amended Complaint for failure to state
a claim under Rule 12(b)(6), Fed. R. Civ. P. For reasons that
will be explained, the motion will be granted.

[1]    Plaintiff also named two unidentified officers as
John Doe defendants. Although Johnson sought
and was granted leave to amend his Complaint,
he did not identify the officers who are the John
Doe defendants in the Amended Complaint. The
ninety-day period to serve defendants under Rule
4(m), Fed. R. Civ. P., has expired. The John

Doe defendants will be dismissed from the action
without prejudice.

BACKGROUND

For purposes of the motion, the Court accepts the Amended
Complaint's well-pleaded factual allegations as true, drawing
all reasonable inferences in favor of the non-movant, Johnson.
In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007).

The Amended Complaint alleges that in the early morning
of February 13, 2020, Johnson was driving with a friend in
that friend's car through Harlem. (First Am. Compl't ("FAC")
(Doc 14) ¶ 10.) At around 1 a.m., Johnson and his friend
were pulled over by NYPD officers Steven Poupos and
Joseph Davin for driving with excessively tinted windows.
(FAC ¶ 11.) The Amended Complaint alleges that Johnson
and his friend, the owner of the car, were ticketed for the
same infraction by different NYPD officers minutes before
being pulled over by Poupos and Davin. (Id. ¶ 12.) Johnson's
friend explained this situation to Poupos and Davin, but
they instructed Johnson and his friend to exit the vehicle
and arrested them both. (Id. ¶¶ 12-13.) Poupos and Davin
"claimed" to find a bag of marijuana and a knife upon
searching Johnson's friend's car. [2] (Id. ¶ 14.)

[2]    On the date of Johnson's arrest in February
2020, marijuana was included as a schedule one
controlled substance under N.Y. Pub. Health L. §
3306.

Poupos and Davin brought Johnson to the 32nd precinct
where he was processed, fingerprinted, photographed and
detained in a holding cell. (Id. ¶ 15.) The officers performed
a pat-down search on Johnson, felt something, and at that
point Johnson admitted to having three ecstasy pills hidden
inside his underwear and Viagra pills in his pants pocket.
(Id. ¶¶ 16-17.) After performing the pat-down, the officers
asked Johnson whether he was hiding anything in his body
cavities, to which Johnson replied that he was not. (Id. ¶
18.) The Amended Complaint alleges that the Individual
Defendants then strip searched Johnson, cut off his underwear
and performed a visual body cavity search of his anus. (Id.
¶ 19.) This visual body cavity search yielded no contraband.
(Id. ¶ 20.)

**\*2** After Johnson was searched, he was transported to
Central Booking in lower Manhattan where he was detained
for several hours. (Id. ¶ 23.) Approximately twenty-four
hours after his arrest, Johnson was arraigned in New York

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 104 of 166
Johnson v. City of New York, Not Reported in Fed. Supp. (2022)
2022 WL 4133284

County Criminal Court, charged with criminal possession of a weapon in the fourth degree under New York Penal Law section 265.01, and released on his own recognizance. (Id. ¶¶ 23, 30.) Johnson claims, among other things, that he should have been released from the 32nd precinct with a desk appearance ticket rather than detained until his arraignment. (Id. ¶ 24.)

PROCEDURAL HISTORY

Johnson filed the present action on June 14, 2021. Johnson was granted leave to amend his complaint to add a claim for relief and re-plead certain issues in response to Defendants' pre-motion letter to dismiss (Docs 9 & 10), and Johnson filed his Amended Complaint on November 8, 2021 (Doc 14). Accordingly, the Court assumes that the Amended Complaint provides the best and strongest formulation of Johnson's claims.

DISCUSSION

Johnson brings four claims under section 1983 against the defendants. He alleges that (i) he was strip searched in violation of the Fourth Amendment, (ii) the decision to detain him rather than grant him a desk appearance ticket denied him due process of law, (iii) the Individual Defendants failed to intervene to prevent the constitutional violations, and (iv) the City is liable for the constitutional violations. The Court will address each claim in turn and begins with a discussion of the legal standard on a motion to dismiss for failure to state a claim.

A. Legal Standard for a Motion to Dismiss under Rule 12(b)(6).

Defendants move to dismiss the Amended Complaint pursuant to Rule 12(b)(6), Fed. R. Civ. P. On a motion to dismiss, the Court accepts the complaint's well-pled factual allegations as true and draws all reasonable inferences in favor of the non-movant. In re Elevator Antitrust Litig., 502 F.3d 47, 50 (2d Cir. 2007). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Nevertheless, legal conclusions are "[t]hreadbare recitals of the elements of a cause of action" are not entitled to the presumption of truth. Iqbal, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard ...

asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "Under Iqbal, factual allegations must be sufficient to support necessary legal conclusions." Ruston v. Town Bd. For Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

In addition to the allegations contained in the complaint, a court may properly consider on a motion to dismiss "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, ... and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007).

B. Defendants' Motion to Dismiss the Illegal Strip Search Claim will be Granted.

Johnson's first claim is brought under section 1983 for a strip search in violation of his Fourth Amendment rights. In particular, Johnson complains of the visual body cavity search performed by the Individual Defendants while he was detained at the 32nd precinct. For the following reasons, Johnson's claim for unlawful strip search is dismissed.

*3  The Fourth Amendment protects individuals against searches of their person without a warrant. A search incident to an arrest, however, "constitutes an exception to the warrant requirement" imposed by the Fourth Amendment. Riley v. California, 573 U.S. 373, 382 (2014). Nevertheless, there are limitations upon the scope of an appropriate search incident to an arrest. Indeed, whether a search incident to an arrest was lawful turns upon whether such search was "reasonable." See Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 652 (1995).

Visual body cavity searches in particular are "invasive and degrading" and a "serious invasion of privacy," even more intrusive than a typical strip search. [3] Sloley v. VanBramer, 945 F.3d 30, 38 (2d Cir. 2019). An arresting officer may only conduct a visual body cavity search if he "has reason to believe, based on 'specific and articulable facts ..., taken together with rational inferences from those facts,' ... that an arrestee is secreting contraband inside a body cavity[.]" Id. (citing Terry v. Ohio, 392 U.S. 1, 21 (1968)). To justify a visual body cavity search "the question is whether the criminal conduct for which a person was arrested speaks to the likelihood that he or she secreted contraband inside a body cavity." Id. at 39. Indeed, a visual body cavity search "must be based on reasonable suspicion to believe that the arrestee is secreting evidence inside the body cavity to be

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 105 of 166

Johnson v. City of New York, Not Reported in Fed. Supp. (2022)

2022 WL 4133284

searched." Id. To determine whether a visual body cavity search was reasonable under the circumstances, "courts also consider whether the individual's preceding arrest was for a misdemeanor or felony, whether it involved drugs, whether the individual would soon be surrounded by other inmates or arrestees or housed alone, whether the search occurred privately, and whether the search was performed pursuant to reasonable suspicion or because of a blanket policy." Monroe v. Gould, 372 F.Supp.3d 197, 204 (S.D.N.Y. Mar. 14, 2019) (citing Gonzalez v. City of Schenectady, 728 F.3d 149, 162 (2d Cir. 2013)).

3        Visual body cavity searches, however, are less intrusive than manual body cavity searches. See Monroe v. Gould, 372 F.Supp.3d 197, 204 (S.D.N.Y. Mar. 14, 2019) (comparing strip searches, visual body cavity searches, and manual body cavity searches).

Defendants urge the Court to consider body-worn camera footage which purportedly shows video of the strip search of Johnson while he was detained. But the Court declines to do so on a motion to dismiss. The facts as pled in the Amended Complaint, however, establish that the visual body cavity search of Johnson was reasonable.

Johnson was arrested after Poupos and Davin "claimed" to find "a bag of marijuana and a knife" inside the vehicle in which Johnson was a passenger. (FAC ¶ 13.) Johnson does not plausibly allege that Poupos and Davin did not actually find the marijuana and knife in the vehicle, and does not otherwise challenge the lawfulness of his arrest or that Poupos and Davin had probable cause to arrest him. After transporting Johnson to the 32nd precinct, the Individual Defendants performed a pat-down of Johnson and felt an object or objects in his underwear, which Johnson then admitted were pills of ecstasy. (Id. ¶ 17.) Johnson denied concealing any contraband in his body cavities when asked by the Individual Defendants, but after finding the ecstasy pills concealed in Johnson's underwear the Individual Defendants performed a visual body cavity search of his anus. (Id. ¶¶ 18-19.)

*4   Because (1) the search was pursuant to a lawful arrest, (2) Poupos and Davin discovered a controlled substance, marijuana, and a knife during the arrest, (3) Poupos and Davin found ecstasy pills concealed in Johnson's underwear and Viagra pills in his pants pocket, and (4) the visual body cavity search occurred in a holding cell at the 32nd precinct police station and not in public, the Court concludes that it was not

constitutionally unreasonable for the Individual Defendants to perform the visual body cavity search.

In arguing that the visual body cavity search was not reasonable, Johnson relies on Bobbit v. Marzan, 16-cv-2042, 2020 WL 5633000 (S.D.N.Y. Sept. 21, 2020). There, the body cavity search was held to be unreasonable because the officer found drugs concealed in the defendant's sock before performing a body cavity search of the defendant's anus. Bobbit, 2020 WL 5633000 at *11 ("It is not reasonable to infer from the discovery of contraband in Plaintiff's sock that she was also concealing contraband on her body in locations where it could only be accessed by requiring her to fully disrobe, squat to expose her private parts, and use the bathroom, all in view of an officer."). Here, however, it was reasonable to suspect that Johnson may be concealing contraband in his anus after finding drugs hidden inside his underwear, where the drugs were concealed in close proximity to his anus and the location of those drugs signaled his willingness to hide contraband in the region of his privates.

The Court concludes that Johnson has failed to plausibly allege that the visual body cavity search was unreasonable and unlawful under the totality of circumstances. Accordingly, the defendants' motion to dismiss the claim will be granted.

C. Johnson's Denial of Due Process Claim will be Dismissed.

Johnson alleges that in violation of his right to due process of law, Poupos and Davin detained him until arraignment instead of issuing him a desk appearance ticket. [4] Notably, Johnson does not assert a claim for false arrest or unlawful seizure, and Johnson does not contend that Poupos and Davin did not have probable cause to arrest him or that his arrest was otherwise unlawful. (See generally FAC.) Rather, Johnson argues that he was denied his procedural due process rights because he had a state-created liberty interest in being released with a desk appearance ticket pursuant to New York Criminal Procedure Law section 150.20, and that he was deprived of that liberty interest without due process when the officers detained him until his arraignment. (See Pl.'s Opp. Mem. at 6.)

4        Although Johnson's pleading does not specify whether he is alleging a violation of procedural or substantive due process, his brief asserts a violation of procedural due process. (See Pl.'s Opp. Mem. at 4-7.)

Johnson v. City of New York, Not Reported in Fed. Supp. (2022)

2022 WL 4133284

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 106 of 166

The Court will analyze the legal standard to be applied to Johnson's denial of procedural due process claim. "In evaluating plaintiff['s] procedural due process claim, we analyze '(1) whether plaintiffs possessed a protected liberty or property interest, and, if so, (2) what process plaintiffs were due before they could be deprived of that interest.' " Adams v. Suozzi, 517, F.3d 124, 127 (2d Cir. 2008) (quoting Sealed v. Sealed, 332 F.3d 51, 55 (2d Cir. 2003)). "Although some due process protections stem independently from the Fourteenth Amendment, state law may also create liberty or property interests entitled to due process protection." Sealed v. Sealed, 332 F.3d at 55.

At the outset, the Court notes that Johnson has cited to no cases which have held that New York Criminal Procedure Law section 150.20, as amended January 1, 2020, created a federally protected liberty interest in being released with a desk appearance ticket when arrested for a misdemeanor or violation. The Court is also unaware of any cases, either within the Second Circuit or within the New York state courts, that have held that section 150.20 created a protected liberty interest. Generally, a violation of a right protected by state law does not morph into a federal due process violation. [5] Nevertheless, assuming that section 150.20 does create a federally protected liberty interest, the Individual Defendants had probable cause to arrest Johnson for a class D felony for which he was not entitled to a desk appearance ticket.

[5]    See, e.g., Wharton v. City of New York, 08-cv-510, 2009 WL 700704, at *2 (E.D.N.Y. Mar. 13, 2009) ("Plaintiff's § 1983 claims based on violations of only state law must also be dismissed as § 1983 only applies to the deprivation of federal rights."); Daniels v. City of Binghamton, 947 F.Supp. 590, 596 (N.D.N.Y. Nov. 20, 1996) ("[I]t is well-established that § 1983 does not provide a remedy for official conduct that violates only state law.")

 *5   The Court assumes that the first prong of the procedural due process analysis is met and considers now the second prong; that is, whether Johnson was afforded appropriate process pursuant to section 150.20. This first requires a determination of the process afforded under section 150.20. Under section 150.20, "[w]henever a police officer is authorized pursuant to section 140.10 of this title to arrest a person without a warrant for an offense other than a class A, B, C or D felony ... he shall ... instead issue to and serve upon such person an appearance ticket" subject to certain exceptions, none of which are applicable to the present

circumstances. See N.Y. Crim. P. L. § 150.20. Thus, whether Johnson was afforded adequate process under section 150.20 depends upon whether Poupos and Davin were "authorized pursuant to [New York Criminal Procedure Law] section 140.10" to arrest Johnson for "a class A, B, C or D felony[.]" And whether Poupos and Davin were authorized to arrest Johnson for a felony pursuant to section 140.10 depends upon whether Poupos and Davin had "reasonable cause to believe" that Johnson had committed a felony. See N.Y. Crim. P. L. § 140.20. This necessitates an analysis of probable cause.

"An officer has probable cause to arrest when he or she has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Kee v. City of New York, 12 F.4th 150, 158 (2d Cir. 2021) (citing Jaegly v. Couch, 439 F.3d 149, 151-52 (2d Cir. 2006)). "Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence ... have no place in the [probable-cause] decision." Florida v. Harris, 568 U.S. 237, 243-44 (2013) (internal quotations and citations omitted). The probable cause test "is not reducible to precise definition or quantification" and instead turns on an evaluation of the "totality of the circumstances." Id. "To assess probable cause, a court considers only the facts 'available to the officer at the time of arrest and immediately before it.' " Ashley v. City of New York, 992 F.3d 128, 136 (2d Cir. 2021) (quoting Stansbury v. Wertman, 721 F.3d 84, 89 (2d Cir. 2013)). "Probable cause ... is not a high bar: It requires only the 'kind of fair probability on which reasonable and prudent [people,] not legal technicians, act.' " Kaley v. United States, 571 U.S. 320, 338 (2014) (internal citations omitted).

There is no allegation in the Amended Complaint that Johnson was arrested on February 13, 2020 by the Individual Defendants without probable cause. [6] Johnson's arrest report indicates that he was arrested for, among other charges, two class D felonies: criminal possession of a controlled substance in the fifth degree under New York Penal Law section 220.06, and criminal possession of a weapon in the third degree under New York Penal Law section 265.02. (Doc 19, Ex. B ("Arrest Report") at 1.) The Arrest Report is properly considered in deciding this motion to dismiss. The Arrest Report is a matter of public record and is considered only to determine the statements contained therein and not for the truth of the matters asserted. See Roth v. Jennings, 489 F.3d 499, 509 (2d Cir. 2007); see also Shmueli v. City of New York, 424 F.3d 231, 233 (2d Cir. 2005). Indeed, "[i]n considering a motion

Case 6:23-cv-01171-AMN-TWD Document 4 Filed 11/14/23 Page 107 of 166

Johnson v. City of New York, Not Reported in Fed. Supp. (2022)

2022 WL 4133284

to dismiss, the Court may consider ... public records such as Plaintiff's arrest reports, indictments, and criminal disposition data." Corley v. Vance, 365 F.Supp.3d 407, 432 (S.D.N.Y. Mar. 27, 2019).

6    Johnson only states in a conclusory fashion in his brief that the Arrest Report charges were "bogus" and that the officers were not "authorized" to arrest Johnson on the felony charges. (Pl.'s Opp. Mem. at 4.) The brief makes no claim of a lack of probable cause to arrest and cites to no authority that would support such a claim.

Johnson was ultimately arraigned on the charge of criminal possession of a weapon in the fourth degree, a class A misdemeanor under New York Penal Law section 265.01, for allegedly possessing a knife and a Billy club recovered from the vehicle. (FAC ¶ 30.) Johnson contends that he was in fact only in violation of a different statute: "a [class A] misdemeanor under New York Penal [Law] Section 220.03," criminal possession of a controlled substance in the seventh degree. (Pl.'s Opp. Mem. at 4.) These points, however, are immaterial to the decision on the motion.

*6 Section 150.20, on which Johnson's claim hinges, provides that a "police officer ... authorized ... to arrest a person without a warrant for an offense other than a class A, B, C or D felony ... shall ... instead issue" a desk appearance ticket. Here, Johnson was arrested for a class D felony, and, thus, he had no right under section 150.20 to a desk appearance ticket. The subsequent decision by the prosecutor to charge him with a misdemeanor and not a felony has no impact on the probable cause determination by the Individual Defendants to arrest Johnson for a class D felony.

The Amended Complaint alleges that Poupos and Davin "claimed" to have found a bag of marijuana and a knife inside the vehicle in which Johnson was a passenger and discovered ecstasy and Viagra pills hidden on Johnson's person, including certain pills concealed in his underwear. Based on these circumstances, it was reasonable for Poupos and Davin to believe that Johnson "knowingly and unlawfully possesse[d] ... a controlled substance with intent to sell it" in violation of New York Penal Law section 220.06, a class D felony. The presence of the knife, bag of marijuana, Viagra pills and concealed ecstasy pills, taken together, established probable cause for Poupos and Davin to reasonably believe that Johnson had the requisite "intent to sell" a controlled substance as is required under section 220.06, a class D felony.

The Court concludes that Johnson has failed to plausibly allege that the failure to issue a desk appearance ticket upon his arrest for a class D felony deprived him of rights protected by the due process clause of the Fourteenth Amendment. For this reason, the motion to dismiss Johnson's claim for denial of due process will be granted.

D. Johnson's Claims for Failure to Intervene and Municipal Liability Cannot Stand Without an Underlying Constitutional Violation and Therefore are Dismissed.

Johnson's remaining claims are for failure to intervene and municipal liability. For the following reasons, both claims are dismissed.

Johnson's claim for failure to intervene fails because he has not plausibly alleged a constitutional violation. "A plaintiff cannot succeed on a claim for failure to intervene under [section] 1983 when there is no underlying constitutional violation." Kayo v. Mertz, 531 F.Supp.3d 774, 799 (S.D.N.Y. Mar. 31, 2021) (citing Wieder v. City of New York, 569 Fed.App'x 28, 30 (2d Cir. 2014)). Because Johnson's claims for illegal strip search and denial of due process are dismissed, the claim for failure to intervene cannot proceed. The motion to dismiss Johnson's failure to intervene claim will be granted.

Generously construed, Johnson's claim for municipal liability under section 1983 is brought against the City of New York pursuant to Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). As discussed above, Johnson's claims for the constitutional violations of unlawful strip search and denial of due process, which underlie Johnson's Monell claim, are dismissed. "It is well-settled that a Monell claim cannot succeed without an underlying constitutional violation, and here there is no constitutional violation." Mastromonaco v. Cty. Of Westchester, 779 F.App'x 49, 51 (2d Cir. 2019) (citing City of Los Angeles v. Heller, 475 U.S. 799 (1986)). Accordingly, the motion to dismiss Johnson's municipal liability claim will be granted.

CONCLUSION
The Court has considered all arguments presented by the parties, including those not explicitly addressed herein. Defendants' motion to dismiss the Amended Complaint is GRANTED.

*7 SO ORDERED.

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 108 of 166

**Johnson v. City of New York, Not Reported in Fed. Supp. (2022)**

2022 WL 4133284

**All Citations**

Not Reported in Fed. Supp., 2022 WL 4133284

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

KeyCite Yellow Flag - Negative Treatment
Distinguished by Pettiford v. City of Yonkers,   S.D.N.Y.,   September 28, 2022

2021 WL 1164185
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Raiquan K. FALLS, Plaintiff,
v.
(POLICE OFFICER) DETECTIVE MICHAEL PITT;
(Police Officer) Carlos Canario; (Police Officer)
Andres Arestin; (Police Officer) Jonathan Saintiche;
(Police Officer) Sergeant William Anderson; (Police
Officer) John Perez; (Police Officer) Carlos Mendez;
(Nurse) Blanca Lemos; (Nurse Practitioner) Hillary
Durbin-french; (Physician) Alan Madell, Defendants.

16-CV-8863 (KMK)
|
Signed 03/26/2021

**Attorneys and Law Firms**

Raiquan K. Falls, Brocton, NY, Pro Se Plaintiff.

David L. Posner, Esq., Kimberly H. Lee, Esq., McCabe
& Mack LLP, Poughkeepsie, NY, Counsel for Defendants
Michael Pitt, Carlos Canario, Andres Arestin, Jonathan
Saintiche, John Perez, Carlos Mendez, and William
Anderson.

Milan P. Spisek, Esq., Sean B. Maraynes, Esq., Wilson
Elser Moskowitz Edelman & Dicker LLP, White Plains, NY,
Counsel for Defendants Alan Madell, M.D., Hillary Durbin-
French, N.P., and Blanca Lemos, R.N..

OPINION & ORDER

KENNETH M. KARAS, United States District Judge

**\*1** Plaintiff Raiquan K. Falls ("Plaintiff") brought this
Action against seven members of the Newburgh Police
Department ("Police Defendants") and three members of
the hospital staff at Saint Luke's Cornwall Hospital ("St.
Luke's") in Newburgh, New York ("Medical Defendants").[1]
Plaintiff alleges various civil rights violations stemming from
his arrest and subsequent treatment while in police custody.

(See generally Second Am. Compl. ("SAC") (Dkt. No. 111).)
Before the Court are Police Defendants' Motion for Summary
Judgment, (Dkt. No. 159), Medical Defendants' Motion for
Summary Judgment, (Dkt. No. 173), and Plaintiff's Partial
Motion for Summary Judgment, (Dkt. No. 183). For the
following reasons, Police Defendants' Motion is granted
in part and denied in part, Medical Defendants' Motion is
granted in part and denied in part, and Plaintiff's Motion is
granted in part and denied in part.

1    Police Defendants are Detective Michael Pitt
     ("Pitt" or "Detective Pitt"), Police Officer
     Carlos Canario ("Canario" or "Officer Canario"),
     Police Officer Andres Arestin ("Arestin" or
     "Officer Arestin"), Police Officer Jonathan
     Saintiche ("Saintiche" or "Officer Saintiche"),
     Patrol Sergeant William Anderson ("Anderson" or
     "Sergeant Anderson"), Police Officer John Perez
     ("Perez" or "Officer Perez"), and Police Officer
     Carlos Mendez ("Mendez" or "Officer Mendez").
     Medical Defendants are Doctor Alan Madell
     ("Madell" or "Dr. Madell"), Nurse Practitioner
     Hilary Durbin-French ("Durbin-French" or "Nurse
     Practitioner Durbin-French"), and Nurse Blanca
     Lemos ("Lemos" or "Nurse Lemos").

I. Background

A. Factual History
The Court has described the allegations and procedural
history of this case in two prior Opinions. See Falls v. Pitt,
No. 16-CV-8863, 2020 WL 2097626 (S.D.N.Y. May 1, 2020);
Falls v. Pitt, No. 16-CV-8863, 2018 WL 3768036 (S.D.N.Y.
Aug. 8, 2018). The Court therefore assumes familiarity
with the dispute and will provide factual and procedural
background only as relevant to the instant Motions.

Unless otherwise noted, the following facts are taken from
Plaintiff's Second Amended Complaint, (see generally SAC),
Defendants' statement pursuant to Local Civil Rule 56.1,
(see Defs.' Local Civil Rule 56.1 Statement in Supp. of
Mot. ("Defs.' 56.1") (Dkt. No. 168)), Plaintiff's Counter
56.1 Statement in Opposition to Defendants' 56.1, (see Pl.'s
Counter 56.1 Statement in Opp'n to Defs.' 56.1 ("Pl.'s
Counter 56.1") (Dkt. No. 204)), and Plaintiff's own statement
pursuant to Local Civil Rule 56.1, (see Pl.'s Local Civil Rule
56.1 Statement in Supp. of Mot. ("Pl.'s 56.1") (Dkt. No.
183)).[2][3] Defendants have sent the required Local Civil

**56.2** Notice to Plaintiff. (*See* Police Defs.' Local Civil Rule 56.2 Not. (Dkt. No. 169); Med. Defs.' Local Civil Rule 56.2 Not. (Dkt. No. 176).)

[2]   On July 6, 2020, the Court granted Medical Defendants' request to adopt the Local Civil Rule 56.1 Statement submitted by Police Defendants. (*See* Dkt. No. 182.)

[3]   Local Civil Rule 56.1(a) requires the moving party to submit a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." Local Civ. R. 56.1(a). The nonmoving party must then submit "a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short[,] and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." *Id.* at 56.1(b). "If the opposing party ... fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule." *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009) (same). "A pro se litigant is not excused from this rule." *Brandever v. Port Imperial Ferry Corp.*, No. 13-CV-2813, 2014 WL 1053774, at *3 (S.D.N.Y. Mar. 13, 2014) (citation and italics omitted).

Where the Parties identify disputed facts but with semantic objections only or by asserting irrelevant facts, the Court will not consider these purported disputes, which do not actually challenge the factual substance described in the relevant paragraphs, as creating disputes of fact. *See Baity*, 51 F. Supp. 3d at 418 ("Many of [the] [p]laintiff's purported denials—and a number of his admissions—improperly interject arguments and/or immaterial facts in response to facts asserted by [the] [d]efendants, often speaking past [the] [d]efendants' asserted facts without specifically controverting those same facts."); *id.* ("[A] number of [the] [p]laintiffs' purported denials quibble with [the] [d]efendants' phraseology, but do not address the factual substance asserted by [the]

[d]efendants."); *Pape v. Bd. of Educ. of Wappingers Cent. Sch. Dist.*, No. 07-CV-8828, 2013 WL 3929630, at *1 n.2 (S.D.N.Y. July 30, 2013) (explaining that the plaintiff's 56.1 statement violated the rule because it "improperly interjects arguments and/or immaterial facts in response to facts asserted by [the] [d]efendant, without specifically controverting those facts," and "[i]n other instances, ... neither admits nor denies a particular fact, but instead responds with equivocal statements"); *Goldstick v. The Hartford, Inc.*, No. 00-CV-8577, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002) (noting that the plaintiff's 56.1 statement "does not comply with the rule" because "it adds argumentative and often lengthy narrative in almost every case[,] the object of which is to 'spin' the impact of the admissions [the] plaintiff has been compelled to make").

Any party's failure to provide record support for its challenge to another party's factual statement could allow the Court to deem the challenged facts undisputed. *See Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (explaining that the court is not required to search the record for genuine issues of material fact that the party opposing summary judgment failed to bring to the court's attention); *Baity*, 51 F. Supp. 3d at 418 (collecting cases holding that "responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact." (alteration and quotation marks omitted)). Therefore, where the Court cites to only one of the Parties' Rule 56.1 Statements or Counterstatements, that fact is materially undisputed unless noted otherwise.

**\*2** This case stems from a series of events that unfolded on the evening of May 8, 2015. For conceptual clarity in resolving the instant Motions, the Court will group these events into roughly four distinct episodes: (1) Plaintiff's apprehension and arrest; (2) Plaintiff's body cavity search at the Newburgh police station; (3) Plaintiff's attempt to swallow recovered narcotics; and (4) Plaintiff's subsequent treatment and examination at St. Luke's.

### 1. Plaintiff's Apprehension and Arrest

On May 8, 2015 at approximately 5:00 P.M., Plaintiff was arrested following a pursuit on foot near 15 Lutheran Street in the City of Newburgh, New York. (SAC ¶¶ 20, 28; Pl.'s 56.1 ¶¶ 1, 6, 9.) [4] City of Newburgh Police Department Officers Canario, Perez, and Mendez were dispatched to the area in response to a 911 call from a nearby resident who reported ongoing drug sales. (SAC ¶ 20; Pl.'s Counter 56.1 ¶ 11.) [5] By Plaintiff's own admission, the 911 caller "fully describ[ed] [him] as the suspect selling narcotics[,]" (SAC ¶ 20; see also Pl.'s Counter 56.1 ¶ 11), and accurately described what he was wearing, (Pl.'s Counter 56.1 ¶ 13). [6] Plaintiff testified that he was holding marijuana, which he was "just about to smoke," when officers arrived on the scene. (Aff. of David L. Posner, Esq., in Supp. of Police Defs.' Mot. ("Posner Aff.") Ex. K ("Pl.'s Dep."), at 19:7–9 (Dkt. Nos. 160, 160-10).)

[4]   Plaintiff's Rule 56.1 Statement is located at ECF pages 5–7 of Dkt. No. 183.

[5]   Plaintiff's Counter 56.1 Statement is located at ECF pages 223–52 of Dkt. No. 204.

[6]   Quotations to Plaintiff's submissions occasionally reflect minor corrections in grammar, punctuation, and spelling.

At some point after exiting the patrol car, Officer Canario began walking toward Plaintiff. (See SAC ¶ 25; Pl.'s Counter 56.1 ¶ 15.) [7] According to Plaintiff's account, Canario approached him with his hand on his service weapon, yelling, "Falls, I'll shoot you right in your back if you make me run!" (SAC ¶¶ 25–26.) Both sides agree that Plaintiff began to flee as soon as Canario approached him. (Id. ¶ 27; Pl.'s Counter 56.1 ¶ 15.) Plaintiff avers that the chase "lasted for about 20 seconds" before he was apprehended. (SAC ¶ 28.)

[7]   In both his Second Amended Complaint and at his deposition, Plaintiff stated that Canario first approached the residence at 15 Lutheran Street and spoke to a resident on the porch before eventually walking toward Plaintiff. (See SAC ¶¶ 24–25; Pl.'s Dep. 33:13–16.)

What happened next is in dispute. According to Police Defendants, Plaintiff "was captured by Officer Mendez a few blocks away and arrested without incident." (Defs.' 56.1 ¶ 16.) They maintain that "[n]o force was used by the arresting officers beyond restraining him in handcuffs." (Id. ¶ 17.) Plaintiff, by contrast, alleges that he was "slammed ... to the

ground" and handcuffed by Perez and Mendez, who held him there for several seconds until Canario, Pitt, Saintiche, Arestin, and Anderson arrived. (SAC ¶¶ 28–30.) [8] Plaintiff alleges that the officers then "dragged [him] into a nearby backyard" behind 12 Dubois Street. (Id. ¶ 31.) There, he alleges, the officers "overtightened [his] handcuffs to the point where the metal was press[ing] against and squeezing [his] wrist bones[,] causing substantial pain and bruising." (Id. ¶ 32.) He claims the officers then took turns pummeling him with their "closed fists," striking Plaintiff in his stomach, ribs, chest, and thighs. (Id. ¶ 33.) He also claims that the officers "reach[ed] down inside of [his] pants from the front ... all the way from [his] underwear to [his] socks." (Id.)

[8]   Besides disputing Plaintiff's general characterization of the arrest, Police Defendants assert that Anderson, Pitt, and Saintiche were "not present at the scene of the arrest." (Defs.' 56.1 ¶ 27.) Although Arestin eventually arrived at the scene of the arrest, he allegedly did so after Plaintiff was in custody. (Id. ¶ 28.) Similarly, while Plaintiff asserts that it was Perez and Mendez who captured and forced him to the ground, (see SAC ¶¶ 28–30), Police Defendants maintain that Plaintiff was initially apprehended by Mendez and Canario, (see Aff. of Carlos Mendez in Supp. of Mot. ("Mendez Aff") ¶ 4 (Dkt. No. 163); Aff. of Carlos Canario in Supp. of Mot. ("Canario Aff.") ¶ 5 (Dkt. No. 165)), and that Perez arrived a few moments thereafter, (see Aff. of John Perez in Supp. of Mot. ("Perez Aff.") ¶¶ 3–4 (Dkt. No. 162)).

**\*3**  Plaintiff was eventually placed in a patrol car and driven to the Newburgh police station. (See Defs.' 56.1 ¶¶ 29–30; SAC ¶ 35.) Although Plaintiff claims he was seated in the back seat between two detectives who interrogated him on the ride to the police station, (see SAC ¶¶ 35–36), video evidence shows there was no one else in the car besides Perez, the driver, and Plaintiff, (Defs.' 56.1 ¶¶ 30–31; Posner Aff. Ex. C ("Secure Bay Video"), at 5:26:35–5:27:39). [9]

[9]   All videos discussed in this Opinion were transmitted by DVD as Exhibit C to the Posner Affidavit, and are on file with the Court. In this Opinion, each video is identified by the title of the camera angle as it appears on the DVD.

### 2. Police Defendants' Cavity Search
### at the Newburgh Police Station

Video footage shows that after arriving at the police station, Plaintiff spent approximately half an hour waiting in the booking room. (Defs.' 56.1 ¶ 34; Booking 1 Video at 5:28:02–6:00:40.) During this time, Plaintiff can be seen sitting, lying down, and occasionally interacting with Canario and other officers. (Defs.' 56.1 ¶ 34; Booking 1 Video at 5:28:02–6:00:40.) Eventually, Sergeant Anderson authorized a "visual body cavity search" of Plaintiff. (Defs.' 56.1 ¶ 36.)[10] He allegedly did so for two reasons: first, Plaintiff had been arrested in a part of Newburgh "known to be rife with drug activity"; and second, "[s]treet dealers such as [Plaintiff] are known to 'cheek' drugs," placing them "between the cheeks of their buttocks to avoid detection. (*Id.* ¶¶ 38–39; Anderson Aff. ¶¶ 3–4.) Police Defendants maintain that "drugs are often recovered at the station during visual body cavity searches." (Defs.' 56.1 ¶ 40.) The search authorized by Anderson was not without limit, however. According to Police Defendants, "there is no touching or digital penetration of a body orifice[ ]" during a "visual body cavity search." (*Id.* ¶ 41; Pl.'s Counter 56.1 ¶ 41.) The Newburgh Police Department's internal strip-search policy "requires a search warrant for digital penetration of a body orifice," and such an examination must be performed by medical staff. (Defs.' 56.1 ¶ 42; Pl.'s Counter 56.1 ¶ 42.)

[10]      The Court notes at the outset that the terminology used to describe different types of invasive body searches is often imprecise and inconsistent. This observation applies to the relevant case law as well as to Defendants' various submissions. For example, although Defendants' 56.1 statement refers to the authorized search as a "visual body cavity search," (*see* Defs.' 56.1 ¶¶ 36–37), Sergeant Anderson refers to the search alternatively as a "strip search," (*see* Aff. of William Anderson in Supp. of Mot. ("Anderson Aff") ¶ 2, 9 (Dkt. No. 161)), and as a "visual body cavity inspection," (*id.* ¶ 7), and the Newburgh Police Department's official strip search policy recognizes only two types of searches—a "strip search" and a "body cavity search," the latter of which must be performed "by a physician or ... other medically trained personnel at the physician's direction," (Posner Aff. Ex. G ("Strip

Search Policy"), at 1–2, 3 (Dkt. No. 160-6)). Thus, although Defendants claim that Anderson authorized a "visual body cavity search," Plaintiff, relying on the Newburgh Strip Search Policy, maintains that Anderson authorized only a "strip search." (*See* Pl.'s Counter 56.1 ¶ 36.) Plaintiff has a valid point in this regard, for the department's strip search policy does not contain an explicit category labeled "visual body cavity search." In truth, however, the Parties appear to be talking past one another. Although Defendants refer to the search using different terms, it seems apparent that Anderson authorized a search that included an invasive look at Plaintiff's genitals and body cavity, but which did not include any touching. (*See* Anderson Aff. ¶¶ 7–8; Pl.'s Counter 56.1 ¶¶ 41–42.)

**\*4** At approximately 6:00 P.M., Officers Canario and Saintiche escorted Plaintiff into a separate room—without video cameras—to perform the search. (Defs.' 56.1 ¶ 43; *see also* SAC ¶¶ 44–45.) In affidavits submitted in support of Police Defendants' Motion, Canario and Saintiche state that Plaintiff initially went along with the strip search protocol, removing one article of clothing at a time until he was completely naked. (Canario Aff. ¶ 13; *see also* Aff. of Jonathan Saintiche in Supp. of Mot. ("Saintiche Aff.") ¶ 6 (Dkt. No. 167) (stating that Plaintiff was initially "cooperative with the process").) But although Plaintiff agreed to "lift his genitals for visual inspection[,]" he "refused to turn around, bend over[,] and spread his buttocks." (Canario Aff. ¶ 13; *see also* Saintiche Aff. ¶ 6 (stating that Plaintiff "balked at turning around, squatting[,] and spreading the cheeks of his buttocks").) In response, Canario and Saintiche gave Plaintiff "several loud verbal commands to comply[.]" (Canario Aff. ¶ 13; *see also* Saintiche Aff. ¶ 6 ("[N]o amount of verbal instruction from us could gain [Plaintiff's] cooperation.").) Around this time, Pitt and Arestin entered the room "because they heard indications that [Plaintiff] was being uncooperative." (Defs.' 56.1 ¶¶ 45–46.)

Each of the four officers in the room provides essentially the same account of what happened next. In their telling, Pitt and Saintiche each took one of Plaintiff's arms and "held him facing the wall." (Canario Aff. ¶ 15; Saintiche Aff. ¶ 7; *see also* Aff. of Michael Pitt in Supp. of Mot. ("Pitt Aff.") ¶ 7 (Dkt. No. 164); Aff. of Andres Arestin in Supp. of Mot. ("Arestin Aff.") ¶ 4 (Dkt. No. 166).) At that point, according to the officers, Plaintiff voluntarily squatted, and "a small plastic bag drop[ped] from his rectal

area." (Canario Aff. ¶ 15; *see also* Saintiche Aff. ¶ 7; Pitt. Aff. ¶ 7; Arestin Aff. ¶ 4; Defs.' 56.1 ¶ 47 ("While naked and squatting a small plastic bag later determined to [be] cocaine, fell from [Plaintiff's] rectal area, observed by both Arestin and Canario.").) They maintain that "[n]one of the four [D]efendants with [Plaintiff] in the strip search room digitally penetrated his rectum." (Defs.' 56.1 ¶ 48.) Accordingly, "[t]he only physical contact between [Plaintiff] and any of the four officers in the room was the contact [o]fficers Pitt and Saintiche had with [Plaintiff's] arms." (Canario Aff. ¶ 16; *see also* Saintiche Aff. ¶ 8; Arestin Aff. ¶ 5.) In this version of events, "there was no physical struggle." (Arestin Aff. ¶ 5; *see also* Saintiche Aff. ¶ 8 ("[Plaintiff] was not thrown to the ground or into the wall or punched by Detective Pitt.").)

Plaintiff has given a different account of what happened. He alleges that Pitt and Saintiche "slammed [him] onto the floor face first," whereupon Pitt "punched [him] directly on the right side of [his] face between [his] right ear and right eye," that is, "on [his] temple." (SAC ¶¶ 59–60.) Plaintiff alleges that his "head bounced off the floor[,] and Pitt then immediately pinned [Plaintiff's] face against the floor with force." (*Id.* ¶ 61.) "While [his] head was pinned against the floor by Pitt," Plaintiff explains, "Saintiche, Canario[,] and Arestin then began punching and kneeing [him] in [his] ribs in a rapid motion." (*Id.* ¶ 62.) Plaintiff "[t]hen ... felt one of these officers forcefully penetrate [his] anal cavity and snatch the plastic sandwich baggie containing the white-rock like substance [he] had hidden there." (*Id.* ¶ 63.) After the officers had recovered the contraband, they allegedly threw Plaintiff's clothes at him and left the strip search room. (*Id.* ¶ 64.)

### 3. Plaintiff's Attempt to Swallow Contraband and the Ensuing Scuffle

Security camera footage from the booking room shows what happened next. A few moments after being brought back into the booking room and having one ankle shackled to a bench, Plaintiff leapt toward Officer Canario and snatched from his hands the contraband that had been recovered in the strip search room. (*See* Pl.'s Counter 56.1 ¶¶ 54, 57; Booking 1 Video at 6:17:35.) The ensuing scuffle is described in detail in Section II.B.2.c *infra*. In brief, Plaintiff stuffed the contraband in his mouth in an attempt to "eat" the drugs and thereby destroy the evidence. (*See* Pl.'s Counter 56.1 ¶ 57; Pl.'s Dep. 70:16–17 ("[M]y intent was to eat it, yes."); *id.* 70:18–20 (Q: "You thought by doing that you would destroy that evidence? A: "Yes."); SAC ¶ 66 (stating that he

placed the drugs in his mouth "intending to chew and destroy it").) Officer Canario tackled Plaintiff, and Pitt, Saintiche, and Arestin rushed to restrain Plaintiff on the ground and pry the contraband from his mouth. (*See* Pl.'s Counter 56.1 ¶¶ 58–60; Booking 1 Video at 6:17:37–49.) About 12 seconds later, as the officers continue struggling to subdue Plaintiff and recover the drugs, Canario uses pepper spray on Plaintiff. (*See* Booking 1 Video at 6:17:49.) The struggle continues for approximately 20 more seconds until Arestin uses his taser on Plaintiff, (*see id.* at 6:18:11), and the officers are finally able to restrain Plaintiff's hands in handcuffs and retrieve the contraband from his mouth, (*see id.* at 6:18:16).

**\*5** The video footage of this episode substantially undermines Plaintiff's version of events outlined in the Second Amended Complaint. Plaintiff, for example, alleges that he was pepper sprayed "[a]s soon as [he] hit the floor," (SAC ¶ 69), and was "punched and kneed in [his] ribs," (*id.* ¶ 71), both of which are belied by the footage. He also alleges that he spit out the contraband within 20 seconds from when he first snatched it from Canario's hands. (*Id.* ¶ 70.) Again, the video proves otherwise. And finally, he alleges that Arestin used the taser on him when he was lying face-down on the floor with "[his] hands on [his] head, not resisting at all." (*Id.* ¶ 72.) As with his other allegations from this incident, this statement is not true.

Finally, Canario avers that at some point before he and Saintiche took Plaintiff to St. Luke's, *see* Part I.A.4 *infra*, Plaintiff told him that "he had more drugs inside his rectum but they were too far in and [the police] would not be able to get them." (Canario Aff. ¶ 25.) Canario advised Pitt and Sergeant Anderson about these remarks. (*Id.*) Plaintiff denies that he made such a comment. (*See* Pl.'s Decl. in Supp. of Mot. for Partial Summ. J. ("Pl.'s Decl.") ¶¶ 23, 25 (Dkt. No. 183).) [11]

[11]   Plaintiff's Declaration is located at ECF pages 1–4 of Dkt. No. 183.

### 4. Medical Treatment and Examination at St. Luke's

Shortly after the events just described, Canario and Saintiche drove Plaintiff to St. Luke's. (SAC ¶ 75; Pl.'s Counter 56.1 ¶ 74.) The Parties agree that at the hospital, Plaintiff received medical care to have the residual pepper spray washed from his eyes and to have the taser barbs removed from his lower back. (*See* SAC ¶ 83; Posner Aff. Ex. D ("ER Records"), at 8

(Dkt. No. 160-3); Posner Aff. Ex. L ("Madell Aff'n") ¶¶ 15, 20 (Dkt. No. 160-11).) [12] But at this point in the narrative, the Parties' respective accounts of the evening diverge significantly. As discussed below, Defendants maintain there were two separate visits to the hospital—an initial visit in which medical staff rinsed Plaintiff's eyes and removed the taser barbs from his lower back, and a subsequent visit later in the evening in which medical staff performed a manual body cavity search and x-ray examination pursuant to a search warrant. But according to Plaintiff, only the initial visit took place, and the cavity search and x-ray were performed without the search warrant, which was not obtained until later in the evening.

[12]    Citations to Plaintiff's medical records refer to the ECF stamp at the top of the page.

### a. Defendants' Version of Events at St. Luke's

According to Defendants, Dr. Alan Madell treated Plaintiff during his first visit to St. Luke's, which took place between approximately 6:50 P.M. and 7:40 P.M. (*See* Defs.' 56.1 ¶¶ 108, 113.) During this visit, medical staff rinsed Plaintiff's eyes with water to remove any residual pepper spray, (*see* Madell Aff'n ¶¶ 11–12), and Dr. Madell removed the taser barbs, cleansed the area with antiseptic, and applied antibacterial ointment and a bandage, (*see id.* ¶ 20). Dr. Madell also conducted a "head to toe" examination of Plaintiff and observed no signs "of trauma, such as bruising, contusions[,] or reflexes of pain." (*Id.* ¶ 24.) According to Dr. Madell, Plaintiff "denied any neck pain, back pain[,] or any other complaints except for eye pain." (*Id.* ¶ 13.) The first visit ended sometime between around 7:25 P.M. and 7:40 P.M. (*See* Defs.' 56.1 ¶¶ 81, 113.)

Meanwhile, Pitt prepared a search warrant application based on Plaintiff's alleged statement that he was secreting more drugs inside his body cavity or stomach. (*See* Pitt. Aff. ¶ 14; Anderson Aff. ¶¶ 9–10.) Obtaining a search warrant would allow the police to have Plaintiff's anal cavity manually examined by hospital personnel. (*See* Pitt Aff. ¶ 14; Anderson Aff. ¶ 8.) Pitt prepared an affidavit in support of the search warrant, noting in part that police had already recovered contraband from Plaintiff's "rectum area" during a "strip search," and that Plaintiff had "made a statement that he does have more narcotics in his rectum." (Posner Aff. Ex. I ("Search Warrant & Supporting Aff."), at 4 (Dkt. No. 160-8).) [13] Pitt's affidavit was presented to the Honorable

Judge E.L. Williams of the Newburgh City Court ("Judge Williams"), who issued the requested search warrant. (*See* Pitt Aff. ¶ 14; Search Warrant & Supporting Aff. 2.) Pitt delivered the search warrant to St. Luke's and "gave it to its medical personnel." (Pitt Aff. ¶ 14; Canario Aff. ¶ 27.)

[13]    Citations to Police Defendants' Exhibit I refer to the ECF stamp at the top of the page.

**\*6** Having obtained a search warrant, Canario and Saintiche took Plaintiff to St. Luke's once again, arriving around 11:00 P.M. (Defs.' 56.1 ¶ 84.) After a triage nurse took Plaintiff's vital signs, Nurse Blanca Lemos received Plaintiff in "Bay 5." (Posner Aff. Ex. M ("Lemos Aff.") ¶¶ 7–8 (Dkt. No. 160-12).) However, it was Nurse Practitioner Hillary Durbin-French who actually examined Plaintiff. (*See* Defs.' 56.1 ¶¶ 119, 136–39.) Durbin-French is "trained to do rectal exams" and has performed "countless" such searches over the course of her career. (Posner Aff. Ex. N ("Durbin-French Aff.") ¶ 18 (Dkt. No. 160-13).) Having been shown the search warrant, Durbin-French asked Plaintiff to cooperate with the rectal examination. (*Id.* ¶¶ 20, 23.) Although he initially refused to consent to the search, Plaintiff eventually turned over on his side and voluntarily "pulled down his pants and agreed to the examination." (*Id.* ¶ 23.) Donning examination gloves and a "liberal amount of lubricant," Durbin-French quickly inserted her forefinger into Plaintiff's rectum and "palpate[d] for abnormalities." (*Id.* ¶ 19.) She identified no foreign body. (*Id.* ¶ 21.)

After performing this search, Durbin-French ordered a "KUB" (kidney, ureter, and bladder) x-ray examination to ensure that there were no foreign objects "further in the rectal cavity." (*Id.* ¶ 24.) Durbin-French states that an x-ray was performed because "good medical practice requires" it, and "not because a police officer requested it." (*Id.* ¶¶ 24–25.) At 1:30 A.M., Durbin-French reviewed the x-rays, which indicated there was no foreign body inside Plaintiff. (*Id.* ¶ 28.) Plaintiff was discharged back into police custody at approximately 1:40 A.M. on May 9, 2015. (Defs.' 56.1 ¶ 118.)

### b. Plaintiff's Version of Events at St. Luke's

Plaintiff agrees that he initially arrived at St. Luke's at around 6:50 P.M. (*See* SAC ¶ 75.) Plaintiff states that his "emergency room doctors" were Dr. Madell *and* Nurse Practitioner Durbin-French. (*Id.* ¶ 76.) He alleges that he did complain about additional injuries he had sustained—

including injuries to his wrists, (*see* Pl.'s Dep. 50:20–52:4), and face, (*id.* at 104:18–105:15)—but that Dr. Madell and Durbin-French "caused [his] complaints to go ignored," (SAC ¶ 77). After Plaintiff changed into a hospital gown and was handcuffed to a gurney, Officers Canario and Sainiche left the room "to go find medical personnel." (SAC ¶ 80.) Plaintiff then "overheard Canario and Saintiche saying to someone out in the hallway" that they had a "search warrant for [Plaintiff's] rectum," that they had observed Plaintiff "swallowing drugs," and that Plaintiff had told them he had more drugs hidden in his rectum. (*Id.* ¶ 81.) Plaintiff alleges that "[a]t about 6:52 P.M.," Nurse Lemos informed him that "she was given authorization to search [his] body cavity." (*Id.* ¶ 84.) [14] Plaintiff allegedly tried to show Lemos the "vis[i]ble bruises on [his] face and [his] wrists," told her that it felt as though his neck and back were broken, and explained that he was experiencing "sharp pains in [his] rectum" from having the police manually extract the contraband. (*Id.* ¶ 86.) But Lemos "ignored [him]" and told him that the police "ha[d] a search warrant and ... [could] use deadly force" to ensure his compliance with the search. (*Id.* ¶¶ 86, 88.) Officers Canario and Saintiche reportedly told Plaintiff that the taser barbs and pepper spray would not be removed unless he complied with the search. (*Id.* ¶ 90.) Then, the officers allegedly forced him onto one side and pinned him to the hospital bed as Nurse Lemos "pulled [his] pants down and penetrated [his] rectum without any lubrication for about [five] seconds." (*Id.* ¶¶ 92–93.)

[14]   As discussed in Section II.B.7.a *infra*, Nurse Lemos's timesheet for the evening of May 8, 2015 indicates that she did not clock in until 10:45 P.M., (*see* Lemos Aff. ¶ 5 & attached timesheet), posing something of a problem for Plaintiff's narrative that she performed his rectal examination during his first and only visit to the hospital.

**\*7**   After Lemos announced that there were no drugs in Plaintiff's cavity, Canario and Saintiche "suggested" that Lemos should perform an x-ray examination. (*Id.* ¶¶ 96–97.) Plaintiff allegedly had his "stomach/abdomen" x-rayed at 7:00 P.M., after which Lemos removed the taser barbs from his back and washed the pepper spray from his eyes. (*Id.* ¶¶ 98–100.) At around 7:35 P.M., Lemos returned with the results of the x-ray and reported that there were no "unknown substances" inside Plaintiff's stomach, and said that Plaintiff was ready to be discharged. (*Id.* ¶ 101.)

Although there is a discharge release form in Plaintiff's medical records indicating that he was discharged at 1:35 A.M. on May 9 following the rectal examination and x-ray, (*see* ER Records 36), Plaintiff maintains that this form has been forged, (*see* SAC ¶ 102). Indeed, Plaintiff alleges that to the extent his medical records clearly indicate there were two visits to St. Luke's, thereby corroborating Defendants' version of events, these records have been forged or falsified. (*See id.* ¶¶ 112, 137.) Likewise, Plaintiff alleges that Pitt fabricated his statement that he was concealing additional drugs, and then used this fabricated evidence not only to obtain a search warrant, but also to "build[ ] a stronger case for the prosecution." (*Id.* ¶¶ 108–09.) According to Plaintiff's theory, the search warrant obtained from Judge Williams was "brought back to the hospital by Canario and Saintiche so that they could conspire with ... Lemos and Durbin-French to ... cover-up the fact that [Plaintiff] was illegally" subjected to a manual body cavity search and x-ray before the warrant was obtained. (*Id.* ¶ 111.) These Defendants allegedly conspired "to record[ ] these events as if they [had] happened" during a non-existent second visit later in the evening, around 11:00 P.M., and to doctor the records such that the first visit only documented treatment of Plaintiff's back and eyes. (*See id.*)

Based on the foregoing events, Plaintiff has brought claims against Police Defendants for false arrest (Count One), excessive force (Counts Two, Five, and Eight), sexual harassment and sexual abuse (Counts Three and Four), an unreasonable search (Count Six), deliberate indifference (Count Seven), and malicious abuse of process (Count 10). [15] Against Police Defendants *and* Medical Defendants, Plaintiff has brought claims for sexual harassment and sexual abuse (Counts 12 and 13), unreasonable searches (Counts 15 and 16), and conspiracy (Counts 14 and 20). Against Medical Defendants alone, Plaintiff has brought claims for violation of his right to privacy (Count 17) and deliberate indifference (Counts 18 and 19).

[15]   As discussed in Section II.B.6 *infra*, the Court has construed Plaintiff's malicious abuse of process claim as a claim for denial of his right to a fair trial.

### B. Procedural History

Plaintiff filed his initial Complaint on November 15, 2016 against Arestin, Pitt, Canario, Saintiche, and "Registered Nurse Jane Doe." (Compl. (Dkt. No. 2).) On November 17, 2016, Plaintiff's application to proceed in forma pauperis was granted. (*See* Dkt. No. 4.) On November 18, 2016, the Court directed the County Attorney for the County of

Orange to ascertain the identity of the Jane Doe nurse at St. Luke's involved in the events on May 8, 2015. (*See* Dkt. No. 6.) On February 7, 2017, Plaintiff submitted the Amended Complaint, (*see* Am. Compl. (Dkt. No. 22)), along with a list of parties in the Amended Complaint, (*see* Dkt. No. 19). The Amended Complaint added Dr. Madell, Nurse Practitioner Durbin-French, Nurse Lemos, Sergeant Anderson, Officer Perez, and Officer Mendez as Defendants. (*See* Am. Compl.) On April 27, 2017, Plaintiff submitted an application asking the Court to appoint pro bono counsel to represent him. (*See* Dkt. No. 26.) On May 2, 2017, the Court denied the request without prejudice. (*See* Dkt. No. 27.)

**\*8** On October 6, 2017, Madell and Durbin-French moved to dismiss all claims filed against them (the "Motion To Dismiss"). (*See* Dkt. Nos. 64–66.) Plaintiff failed to file an opposition or otherwise respond, (*see* Dkt. No. 80), and on January 22, 2018, the Court deemed the Motion To Dismiss fully submitted, (*see* Dkt. No. 81).

Meanwhile, discovery proceeded as to the other Defendants. Following the completion of discovery, on July 9, 2018, Police Defendants sought leave to file a summary judgment motion. (*See* Dkt. No. 101.) The same day, Medical Defendants sought leave to file a summary judgment motion, but noted that the decision on Madell and Durbin-French's Motion To Dismiss was still pending. (*See* Dkt. No. 102.) On July 18, 2018, the Court set a briefing schedule for all Defendants to file summary judgment motions. (*See* Dkt. No. 104.)

On August 8, 2018, the Court issued an Opinion & Order granting Madell and Durbin-French's Motion To Dismiss. (*See* Op. & Order ("Aug. 2018 Op.") (Dkt. No. 109).) However, the Court granted Plaintiff 30 days to amend his complaint and correct the deficiencies with respect to the dismissed claims. (*See* Aug. 2018 Op. 15.) On September 6, 2018, Plaintiff signed his Proposed Second Amended Complaint ("PSAC"), which was docketed on September 11, 2018. (*See* Dkt. No. 111.) On September 14, 2018, Police Defendants filed a letter objecting to the PSAC on the grounds that it "purports to assert new matters and claims with regard to them ... without leave of the Court on the eve of summary judgment practice." (*See* Dkt. No. 113.) On November 7, 2018, the Court issued an Order construing Plaintiff's PSAC as a Motion To Amend, and setting a schedule for Police Defendants' Response and Plaintiff's Reply. (*See* Order ("Nov. 2018 Order") (Dkt. No. 125).) The Court simultaneously stayed the briefing of Defendants' expected

summary judgment motions pending resolution of Plaintiff's Motion To Amend. (*See id.* at 5.) On December 4, 2018, Police Defendants filed their Response and accompanying papers. (*See* Dkt. Nos. 126–27.) On February 26, 2019, Plaintiff filed his Reply. (*See* Dkt. No. 133.) On April 23, 2020, Plaintiff filed a "Declaration in Support of the Plaintiff's Motion for Appointment of Counsel," (Dkt. No. 146), thereby renewing his earlier (previously rejected) Application for appointment of pro bono counsel, (*see* Dkt. No. 26).

On May 1, 2020, the Court issued an Order granting in part and denying in part the Motion To Amend and denying Plaintiff's renewed Application for appointment of pro bono counsel. (*See* Order ("May 2020 Order") (Dkt. No. 147).) The Court found that two of the claims raised in the PSAC—a First Amendment retaliation claim and a malicious prosecution claim—were never raised in the Amended Complaint. (*See id.* at 9 & n.2.) The Court also concluded that neither claim satisfied the standard that governs motions to amend under Fed. R. Civ. P. 15(a). (*See id.* at 10–14.) Finally, the Court denied Plaintiff's renewed Application for appointment of pro bono counsel, observing in part that "Plaintiff has demonstrated his ability to present the case himself through his submissions in this Action that adequately express his arguments and desired forms of relief." (*Id.* at 16–17.) Having deemed the PSAC the new operative complaint (henceforth the Second Amended Complaint), the Court lifted the stay on Defendants' Motions for Summary Judgment and set a briefing schedule. (*See id.* at 17.)

**\*9** After the Court granted Defendants a 30-day adjournment in light of the Covid-19 pandemic, (*see* Dkt. No. 150), and granted their request for a page extension on their Memorandum of Law, (*see* Dkt. No. 155), Police Defendants and Medical Defendants filed their Motions for Summary Judgment and supporting papers on July 1, 2020, (*see* Police Defs.' Not. of Mot. (Dkt. No. 159); Med. Defs.' Not. of Mot. (Dkt. No. 173)). Plaintiff filed a cross-Motion for Partial Summary Judgment on July 7, 2020. (*See* Dkt. No. 183.) Police Defendants filed their Opposition to Plaintiff's Motion on August 10, 2020. (*See* Dkt. No. 193.) After receiving multiple extensions from the Court, (*see* Dkt. Nos. 191, 200), Plaintiff filed his Opposition to Defendants' Motions on October 23, 2020, (*see* Dkt. No. 204). Police Defendants submitted their Reply on November 19, 2020, (*see* Dkt. No. 207), and, after receiving an extension from the Court, (*see* Dkt. No. 210), Medical Defendants submitted their Reply on December 11, 2020, (*see* Dkt. No. 212). Plaintiff failed to

submit a Reply in further support of his Partial Motion for Summary Judgment.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same). "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and ... resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (citation omitted); *see also Borough of Upper Saddle River v. Rockland Cnty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Berry v. Marchinkowski*, 137 F. Supp. 3d 495, 521 (S.D.N.Y. 2015) (same).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (citation, alteration, and quotation marks omitted). Further, "[t]o survive a [summary judgment] motion ..., [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,' " *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis added) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (citation and quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials

of his pleading ...."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (citation and quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (citation omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). However, a district court should consider only evidence that would be admissible at trial. *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits ... to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant ... is competent to testify on the matters stated.' " *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

**\*10** As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)). Where the evidence presents "a question of 'he said, she said,' " the court "cannot ... take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (stating that "[w]here each side ... tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and

apportion liability, and not for the court"). And, even if the non-movant's evidence is "thin, [a non-movant's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

Finally, the Second Circuit has instructed that when a court considers a motion for summary judgment, "special solicitude" should be afforded a pro se litigant, *see Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988); *accord Mercado v. Div. of N.Y. State Police*, No. 96-CV-235, 2001 WL 563741, at *7 (S.D.N.Y. May 24, 2001) (same), and a court should construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (italics and citation omitted). Moreover, "the failure to oppose a motion for summary judgment alone does not justify the granting of summary judgment." *Vt. Teddy Bear Co.*, 373 F.3d at 244; *see also Jackson v. Fed. Exp.*, 766 F.3d 189, 196 (2d Cir. 2014) (explaining that "an examination of the legal validity of an entry of summary judgment should ... be[ ] made in light of the opposing party's pro se status" (italics omitted)). "Nonetheless, proceeding pro se does not otherwise relieve a litigant of the usual requirements of summary judgment, and a pro se party's bald assertions unsupported by evidence[ ] are insufficient to overcome a motion for summary judgment." *Houston v. Teamsters Local 210, Affiliated Health & Ins. Fund-Vacation Fringe Benefit Fund*, 27 F. Supp. 3d 346, 351 (E.D.N.Y. 2014) (alterations, italics, citation, and quotation marks omitted); *see also Flores v. City of New York*, No. 15-CV-2903, 2017 WL 3263147, at *2 (S.D.N.Y. July 31, 2017) (same).

B. Analysis

For reasons discussed in the May 2020 Order, the Court will not consider Plaintiff's First Amendment retaliation claim (Count Nine) or his malicious prosecution claim (Count 11). Of the remaining claims, Police Defendants have moved for summary judgment on Counts 1–5, 7–8, 10, 12–16, and 20. (*See generally* Police Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Police Defs.' Mem.") (Dkt. No. 170).) Medical Defendants have moved for summary judgment on Counts 12–20. (*See generally* Med. Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Med. Defs.' Mem.") (Dkt. No. 177).) Plaintiff has moved for summary judgment on Count Six and cross-moved for summary judgment on Counts One, Seven,

and 10. (*See* Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J. ("Pl.'s Mem.") 8 (Dkt. No. 183).) [16]

[16] Plaintiff's Memorandum of Law in Support of his Motion for Partial Summary Judgment is located at ECF pages 8–17 of Dkt. No. 183. Citations to his Memorandum of Law refer to the ECF stamp at the top of the page.

1. False Arrest Claim (Count One)

**\*11** In Count One, Plaintiff asserts a claim for false arrest against Police Defendants Canario, Perez, and Mendez based on the incidents leading to his arrest. (SAC ¶¶ 20–29, 118.) Both Plaintiff and Police Defendants have moved for summary judgment on this claim. (*See* Pl.'s Mem. 8, 11–13; Police Defs.' Mem. 20–21, 32.)

A "§ 1983 claim for false arrest derives from [the] Fourth Amendment right to remain free from unreasonable seizures, which includes the right to remain free from arrest absent probable cause." *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006); *see also Widget v. Town of Poughkeepsie*, No. 12-CV-3459, 2013 WL 1104273, at *4 (S.D.N.Y. Mar. 18, 2013) (same). "In analyzing § 1983 claims for unconstitutional false arrest, [courts] have generally looked to the law of the state in which the arrest occurred." *Jaegly*, 439 F.3d at 151 (citation omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) ("A § 1983 claim for false arrest ... is substantially the same as a claim for false arrest under New York law." (ellipsis in original) (citation omitted)). Under New York law, which is applicable here, "an action for false arrest requires that the plaintiff show that '(1) the defendant intended to confine him [or her], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged.' " *Ackerson*, 702 F.3d at 19 (quoting *Broughton v. State*, 335 N.E.2d 310, 314 (N.Y. 1975)).

"Probable cause 'is a complete defense to an action for false arrest' brought under New York law or § 1983." *Ackerson*, 702 F.3d at 19 (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)); *see also Deanda v. Hicks*, 137 F. Supp. 3d 543, 568 (S.D.N.Y. 2015) (same); *Conte v. County of Nassau*, No. 06-CV-4746, 2010 WL 3924677, at *12 (E.D.N.Y. Sept. 30, 2010) (same). "Probable cause to arrest exists when the officers have ... reasonably trustworthy information as to[ ] facts and circumstances that are sufficient to warrant

a person of reasonable caution in the belief that an offense has been ... committed by the person to be arrested." *Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007); *see also Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (same). To determine whether probable cause existed for an arrest, a court "assess[es] whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Ackerson*, 702 F.3d at 19 (citation and quotation marks omitted). Moreover, "probable cause does not require an awareness of a particular crime, but only that some crime may have been committed." *Id.* at 20 (citation and quotation marks omitted). In other words, "[Police] Defendants prevail if there was probable cause to arrest Plaintiff for any single offense." *Id.* (alteration, citation, and quotation marks omitted). "Whether probable cause is established depends on the totality of the circumstances, ... including the information possessed by the officer prior to making the arrest and [his or] her experience." *Daniels v. City of New York*, No. 15-CV-2251, 2016 WL 4368378, at *3 (S.D.N.Y. Aug. 14, 2016) (citation omitted). "The burden of establishing the absence of probable cause rests on the plaintiff," and "[t]he question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *4 (E.D.N.Y. June 3, 2014) (citations omitted); *see also Nickey v. City of New York*, No. 11-CV-3207, 2013 WL 5447510, at *5 (E.D.N.Y. Sept. 27, 2013) ("[W]hen the facts material to a probable cause determination are undisputed, the matter is a question of law properly decided by the [c]ourt.").

**\*12** "Even if probable cause to arrest is ultimately found not to have existed, an arresting officer will still be entitled to qualified immunity from a suit for damages if he can establish that there was 'arguable probable cause' to arrest." *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004). "Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007) (citation and quotation marks omitted); *see also Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010) (same). Accordingly, "the analytically distinct test for qualified immunity is more favorable to the officers than the one for probable cause; arguable probable cause will suffice to confer qualified immunity for the arrest." *Escalera*, 361 F.3d at 742 (quotation marks omitted). "This forgiving standard protects 'all but the plainly incompetent or those who

knowingly violate the law.' " *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). To deny a motion for summary judgment on qualified immunity grounds, a court must find that the officer's judgment was "so flawed that no reasonable officer would have made a similar choice." *Provost*, 262 F.3d at 160 (citation omitted).

As relevant here, "[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubts as to the person's veracity." *Curley v. Village of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) (citations omitted); *see also Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (observing that "information gleaned from informants can be sufficient to justify the existence of probable cause," and recognizing the "well-established" principle "that a law enforcement official has probable cause to arrest if he received his information from some person, normally the putative victim or eyewitness, unless the circumstances raise doubt as to the person's veracity" (citations and quotation marks omitted)). Moreover, the information furnished by "an identified bystander with no apparent motive to falsify has a peculiar likelihood of accuracy," and the Second Circuit has "endorsed the proposition that an identified citizen informant is presumed to be reliable." *Panetta*, 460 F.3d at 395 (citation and quotation marks omitted).

Here, it is undisputed that the officers in question were responding to a 911 call in which the caller "fully describ[ed] [Plaintiff] as the suspect selling narcotics." (SAC ¶ 20; *see also* Defs.' 56.1 ¶ 11.) The officers had no reason to question this informant's credibility; indeed, Plaintiff himself acknowledges that the information provided to the officers was accurate. (*See* SAC ¶ 20.) Officer Canario, who first approached Plaintiff, recognized him as the individual who "matched the description given by the caller." (Canario Aff. ¶ 4.) Joining the pursuit moments later, Officer Mendez also recognized that Plaintiff's clothing "matched" the "description [that had] come over the radio." (Mendez Aff. ¶ 4.)[17] All of this occurred in an area where illegal drug activity was common, (*see* Anderson Aff. ¶ 3), and in which Plaintiff admits to having sold drugs shortly before the officers arrived, (Pl.'s Dep. 23:4–17).

[17]    By the time Officer Perez arrived on the scene, Plaintiff was already "in the custody of Officers Mendez and Canario." (Perez Aff. ¶ 4.)

Relying on credible, contemporaneous information from an eyewitness, the responding officers here undoubtedly had arguable probable cause to arrest Plaintiff. Courts have found the existence of probable cause and arguable probable cause in similar circumstances where police officers make an arrest based on information from a 911 call. *See, e.g., Gatling v. West*, No. 18-CV-275, 2020 WL 564604, at *8 (N.D.N.Y. Feb. 5, 2020) (finding that a police officer had probable cause to arrest an erratic driver based in part on a "near-contemporaneous citizen complaint" that was "communicated to [the officer] through the 911 operator," and therefore dismissing the plaintiff's false arrest claim on summary judgment), *appeal docketed*, No. 20-827 (2d Cir. Mar. 6, 2020); *Pagan v. City of New York*, No. 15-CV-5825, 2019 WL 8128482, at *6–7 (E.D.N.Y. Mar. 28, 2019) (granting summary judgment based on conclusion that police officers had "arguable probable cause" where the officers were acting in response to a 911 caller who described the suspect as "disturbed, uncontrollable, and potentially carrying a weapon"). [18] Likewise, courts have found the existence of arguable probable cause where, as here, officers make an arrest based on a contemporaneous, eyewitness description of the suspect's clothing. In *Steinbergin v. City of New York*, No. 19-CV-1314, 2021 WL 396690 (S.D.N.Y. Feb. 4, 2021), for example, the officer "arrived at the scene" of a reported drug deal "only a few minutes" after the sale and "saw [the plaintiff] ... wearing distinctive clothing matching [the undercover officer's] description of the suspect's clothing." *Id.* at *4. "Given the proximity in time and location to the crime and the fact that [the plaintiff's] distinctive attire matched the suspect's," the court concluded that "a reasonable officer in [the defendant's] position could have concluded that [the plaintiff] had sold cocaine to [the undercover officer] as soon as he saw him." *Id.* The court therefore found that the defendant officer was entitled to qualified immunity and dismissed the plaintiff's false arrest claim on a motion for summary judgment. *See id.* at *4–5. In *Falls v. Rude*, No. 17-CV-1339, 2019 WL 3715087 (S.D.N.Y. Aug. 7, 2019), another case involving Plaintiff, the court found that the defendant officers had arguable probable cause to arrest Plaintiff based on "a particularly distinctive feature of [his] clothing[,]" a description of which had been provided to the officers by a victim who called the police to report that Plaintiff had threatened her with a gun, *see id.* at *8. Accordingly, the court held that defendants were entitled to qualified immunity with respect to Plaintiff's false arrest claim on a motion for summary judgment. *See id.*

[18] In *Pagan*, the parties disputed whether, when officers arrived on the scene, the suspect "was still flailing about or was instead lying calmly on the floor." 2019 WL 8128482, at *6. As the court explained, "[t]here could be no question that the information officers received before arriving at the apartment would have established probable cause to arrest [the suspect], had he continued acting as described on the 911 calls." *Id.* "[V]iewing the evidence in the light most favorable to [the] [p]laintiff," however, the court found "it [was] a closer call whether probable cause was subsequently dissipated upon officers' arrival on the scene." *Id.*

Ultimately, the *Pagan* court found it unnecessary to resolve this question. Because the court found that the officers had "arguable probable cause" to effectuate the arrest *even under the plaintiff's version of events*, it dismissed the false arrest claim on grounds of qualified immunity, without deciding whether there was *actual* probable cause for the arrest.

In this respect, *Pagan* is distinguishable. Here, there is nothing in the record to suggest that Plaintiff's behavior minimized probable cause when the officers arrived on the scene. Quite the opposite. By deciding to run from police, Plaintiff's behavior further contributed to the existence of probable cause—a point discussed briefly *infra*.

**\*13** Finally, Plaintiff's decision to run from the responding officers is another factor that supports the existence of arguable probable cause. *See Greene v. Bryan*, No. 15-CV-249, 2018 WL 3539811, at *12 (E.D.N.Y. July 23, 2018) ("Unprovoked flight from the police is certainly suggestive of wrongdoing and can be treated as suspicious behavior that factors into the totality of the circumstances." (citation and quotation marks omitted)); *McClellan v. City of New York*, No. 15-CV-6759, 2017 WL 4217144, at *3 (S.D.N.Y. Sept. 20, 2017) (observing that courts may consider a suspect's "flight from the police, presence at the scene, and similarity ... to witness descriptions" when deciding whether there was probable cause).

Based on the totality of circumstances, the Court concludes that "it was objectively reasonable for the [responding] officer[s] to believe that probable cause existed," or, at the very least, "officers of reasonable competence could disagree on whether the probable cause test was met." *See Walczyk*, 496 F.3d at 163. These officers therefore had

"arguable probable cause" to arrest Plaintiff, and they are entitled to qualified immunity with respect to Plaintiff's false arrest claim. For these reasons, Police Defendants' Motion is granted, and Plaintiff's Motion is denied, with respect to Count One. Count One is therefore dismissed.

### 2. Excessive Force Claims (Counts Two, Five, and Eight)

Plaintiff has brought three excessive force claims, each based on a different episode on the night of May 8. In Count Two, Plaintiff brings an excessive force claim against each of the seven Police Defendants based on their alleged treatment of Plaintiff in the yard behind 12 Dubois Street shortly after he was apprehended. (*See* SAC ¶¶ 31–33, 119.) In Count Five, Plaintiff brings an excessive force claim against Canario, Pitt, Saintiche, and Arestin based on their alleged treatment of Plaintiff during the cavity search at the Newburgh police station. (*See id.* ¶¶ 59–63, 122.) In Count Eight, Plaintiff brings an excessive force claim against these same four Police Defendants based on their efforts to restrain him after he tried to swallow the drugs that were recovered during the search. (*See id.* ¶¶ 67–73, 125.) Police Defendants have moved for summary judgment on each count. (*See* Police Defs.' Mem. 13–19.)

"Claims that law enforcement officers have used excessive force in the course of an arrest, investigatory stop, or other seizure of a free citizen [are] analyzed under the Fourth Amendment and its reasonableness standard." *Usavage v. Port Auth. of N.Y. & N.J.*, 932 F. Supp. 2d 575, 591 (S.D.N.Y. 2013) (citation, alteration, and quotation marks omitted). Thus, as noted in the Court's May 2020 Order, although Plaintiff labels his excessive force claims as arising under the Fourteenth Amendment, (*see* SAC ¶¶ 119, 122, 125), the Court will "construe[ ] these claims as arising under the Fourth Amendment as incorporated by the Fourteenth Amendment," (*see* May 2020 Order 7 n.1). *See also Graham v. Connor*, 490 U.S. 386, 394–95 (1989) ("Because the Fourth Amendment provides an explicit textual source of constitutional protection against ... physically intrusive governmental conduct [during an arrest or investigatory stop of a free citizen], that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.").

"When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (alteration in original) (quoting *Graham*, 490 U.S. at 397). To evaluate the reasonableness of an officer's conduct, a court should "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999). "Additionally, on an excessive force claim a plaintiff must present sufficient evidence to establish that the alleged use of force is objectively sufficiently serious or harmful enough to be actionable." *Washpon v. Parr*, 561 F. Supp. 2d 394, 406 (S.D.N.Y. 2008) (citation and quotation marks omitted). "Generally, the force used by the [d]efendant must be more than de minimis in order for an excessive force claim to be actionable." *Musso v. City of New York*, No. 05-CV-2511, 2008 WL 3200208, at *4 (E.D.N.Y. July 24, 2008) (citation, alterations, and italics omitted).

### a. Use of Force During Plaintiff's Arrest (Count Two)

**\*14** Within Count Two itself, Plaintiff alleges three distinct acts that could arguably constitute excessive force. As discussed in Section I.A.1 *supra*, Plaintiff alleges that Police Defendants (1) overtightened his handcuffs (the "Handcuff Claim"), (2) repeatedly punched him in the stomach, ribs, chest, and thighs (the "Assault Claim"), and (3) "reach[ed] down inside of [his] pants from the front ... all the way from [his] underwear to [his] socks" (the "Search Claim"). (SAC ¶¶ 31–33.) The Court will address each of these specific claims in turn. *See Dunkelberger v. Dunkelberger*, No. 14-CV-3877, 2015 WL 5730605, at *14–17 (S.D.N.Y. Sept. 30, 2015) (addressing separately the plaintiff's allegations of tight handcuffing, threats of arrest and property destruction, brandishing weapons, and physical force); *Keeney v. City of New London*, 196 F. Supp. 2d 190, 198 (D. Conn. 2002) (addressing separately alleged force used before an individual was handcuffed and restrained and after an individual was handcuffed and restrained).

### i. Count Two: The Handcuff Claim

"Courts apply a separate standard to claims for excessive force in the use of handcuffs." *Sachs v. Cantwell*, No. 10-

CV-1663, 2012 WL 3822220, at *14 (S.D.N.Y. Sept. 4, 2012). "While handcuffs must be reasonably tight to be effective, handcuffs that are overly tight may constitute an excessive use of force on the part of the officer using them." *Id.* (citing *Lynch ex rel. Lynch v. City of Mount Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)). When evaluating a claim of excessive force based on the defendants' use of handcuffs, courts are to consider three factors: (1) whether the handcuffs were "unreasonably tight"; (2) whether the "defendants ignored the plaintiff's pleas that the handcuffs were too tight"; and (3) the "degree of injury to the [plaintiff's] wrists." *Id.* (citation, alteration, and emphasis omitted). Of these three factors, the third is "particularly important," for a plaintiff "must suffer some form of injury from the tight handcuffs in order for such a claim to be actionable." *Id.* (quoting *Vogeler v. Colbath*, No. 04-CV-6071, 2005 WL 2482549, at *9 (S.D.N.Y. Oct. 6, 2005)). Indeed, there is agreement throughout the Second Circuit that "tight handcuffing does not constitute excessive force unless it causes some injury beyond temporary discomfort." *Id.* (quoting *Lynch*, 567 F. Supp. 2d at 468–69) (gathering authorities).

Here, Plaintiff alleges that after Police Defendants handcuffed him, they "overtightened [his] handcuffs to the point where the metal was pressed against and squeezing [his] wrist bones[,] causing substantial pain and bruising." (SAC ¶ 32.) Describing this injury in more detail during his deposition, Plaintiff said his wrists had "dents," "bruises," and broken skin. (Pl.'s Dep. 51:4–21.) Plaintiff has provided a similar description of his injury in other submissions as well. (*See* Pl.'s Decl. in Opp'n to Defs.' Mot. ("Pl.'s Opp'n Decl.") ¶ 14 (Dkt. No. 204) (stating that he "sustained intensive bruising on his wrists caused by the assaults while in overtightened handcuffs"); Pl.'s Mem. of Law in Opp'n to Defs.' Mot. ("Pl.'s Opp'n") 3 (Dkt. No. 204) (explaining that the "only injuries he claims to have sustained as a result of the assault were intensive pain, bruising, scrapes[,] and redness in/on his wrists").) [19]

19    Plaintiff's Declaration in Support of his Opposition to Summary Judgment is located at ECF pages 253–66 of Dkt. No. 204. Plaintiff's Memorandum of Law in Opposition to Summary Judgment is located at ECF pages 1–46 of Dkt. No. 204. Citations to the latter document refer to the ECF stamp at the top of the page.

Even if the Court accepted Plaintiff's allegations and supporting testimony as true, the alleged injury he has described—temporary pain, bruising, scrapes, and redness —"does not rise to the level of injury necessary to sustain an excessive use of force claim for tight handcuffs." *Sachs*, 2012 WL 3822220, at *15 (concluding on summary judgment that a plaintiff's swelling in her wrists, which lasted 24 hours, did not constitute a sufficient injury to support an excessive force claim based on tight handcuffs); *see also Selvaggio v. Patterson*, 93 F. Supp. 3d 54, 74–75 (E.D.N.Y. 2015) (granting summary judgment for the defendants where the plaintiff's injuries consisted of scabbing and abrasions); *Richardson v. N.Y.C. Health & Hosps. Corp.*, No. 05-CV-6278, 2009 WL 804096, at *13–14 (S.D.N.Y. Mar. 25, 2009) (granting the defendants' summary judgment motion on an excessive force claim where the plaintiff suffered pain, bruises, swelling, and red marks, and was given an over-the-counter pain reliever at the hospital); *Bratton v. N.Y. State Div. of Parole*, No. 05-CV-950, 2008 WL 1766744, at *9–10 (N.D.N.Y. Apr. 14, 2008) (concluding on summary judgment that the plaintiff did not satisfy the injury requirement despite medical records showing that his wrists were swollen and bruised for three weeks as a result of handcuffs); *Hamlett v. Town of Greenburgh*, No. 05-CV-3215, 2007 WL 119291, at *3 (S.D.N.Y. Jan. 17, 2007) (concluding on summary judgment that the plaintiff's "brief numbness as a result of the handcuffs being too tight" did not "rise to the level of force required to sustain an excessive force claim"); *Vogeler*, 2005 WL 2482549, at *10 (granting the defendant's motion for summary judgment where the plaintiffs had failed to show "any measurable harm" from the handcuffing); *Wilder v. Village of Amityville*, 288 F. Supp. 2d 341, 344 (E.D.N.Y. 2003) ("Plaintiff's allegation of sore, yet uninjured, wrists simply does not rise to the level of ... unlawful conduct in an arrest situation."), *aff'd*, 111 F. App'x 635 (2d Cir. 2004). By contrast, "[t]he most common injuries found to satisfy the injury requirement in handcuff cases are scarring and nerve damage." *Usavage*, 932 F. Supp. 2d at 592, 598 (gathering cases and denying summary judgment where there was evidence that the plaintiff suffered from nerve damage after handcuffing); *see also Golio v. City of White Plains*, 459 F. Supp. 2d 259, 265 (S.D.N.Y. 2006) (denying defendants' motion for summary judgment where plaintiff had alleged swelling and lasting nerve damage due to the handcuffing). No such injuries are present here. (*See* Pl.'s Dep. 51:9–15 (Q: "Are there any marks on your wrists now?" A: "No, not right now." Q: "How long did those marks on your wrists last?" A: "Probably a couple of days, like that.").) Here, "the fact that the tight handcuffing did not cause [Plaintiff] any continuing injury is fatal to the excessive force claim[,]" *Lynch*, 567 F.

Supp. 2d at 468, and thus, the Court will dismiss the Handcuff Claim on this basis.

### ii. Count Two: The Assault Claim

**\*15** Insofar as Plaintiff's excessive force claim is predicated on the alleged assault by Police Defendants, Plaintiff has not produced evidence "that the alleged use of force was serious or harmful enough to be actionable." *Ferebee v. City of New York*, No. 15-CV-1868, 2017 WL 2930587, at \*8 (S.D.N.Y. July 6, 2017), *reconsideration denied*, 2017 WL 3208602 (S.D.N.Y. July 27, 2017). Although the "focus of inquiry in an excessive-force claim is on the force used rather than the injuries sustained, '[t]he extent of injury may also provide some indication of the amount of force applied.' " *Sullivan v. City of New York*, No. 17-CV-3779, 2018 WL 3368706, at \*11 (S.D.N.Y. July 10, 2018) (alteration in original) (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (per curiam)); *see also Marlin v. City of New York*, No. 15-CV-2235, 2016 WL 4939371, at \*12 (S.D.N.Y. Sept. 7, 2016) (observing that "[a]lthough the severity of [a] plaintiff's alleged injuries is not dispositive, it is nonetheless highly relevant to the inquiry about whether the force applied was reasonable" (citation and quotation marks omitted)). "A de minimis use of force will rarely suffice to state a constitutional claim," and "de minimis injury can serve as conclusive evidence that de minimis force was used." *Ferebee*, 2017 WL 2930587, at \*8 (citations and italics omitted); *see also Cunninham v. New York City*, No. 04-CV-10232, 2007 WL 2743580, at \*6 (S.D.N.Y. Sept. 18, 2007) (same).

Although Plaintiff's account of his arrest includes a violent beating in which Police Defendants repeatedly pummeled his thighs and parts of his torso, (*see* SAC ¶ 33), his own subsequent testimony belies this account. At his deposition, for example, Plaintiff testified that despite being punched with closed fists "[e]ight to ten times," (Pl.'s Dep. 47:13–17), he suffered no injuries, (*see id.* 47:3–8 (explaining that the officers kept "hitting [him] in the body area," but that he "really didn't get injured off of that" and "didn't pay it [any] mind"); *id.* 48:2–9 (Q: "What part of your body did they punch? ... A: "Ribs, chest, stomach." Q: "You said you were not injured?" A: "I was not injured. Yeah, I wasn't injured.")). The alleged assault caused neither bleeding nor bruising. (*See id.* 48:10–14 (Q: "Were you bleeding from any part of your body?" A: "No." Q: "So, did you have any bruising?" A: "Not that I recall, no.").) After being taken to the hospital later in the evening, Plaintiff did not raise this alleged assault

because he "didn't pay [it] [any] mind," and "[it] didn't [faze] [him]." (*Id.* 50:4–5.) Similarly, in his Memorandum of Law in Opposition to Summary Judgment, Plaintiff describes his pain from the alleged assault as "minor" and "momentar[y]." (*See* Pl.'s Opp'n 3.)

Thus, by Plaintiff's own admission, he suffered minor, momentary pain and no injuries from the officers' alleged beating. Under these circumstances, Plaintiff's "de minimis injury ... serve[s] as conclusive evidence that de minimis force was used." *Ferebee*, 2017 WL 2930587, at \*8 (citation and italics omitted). Accordingly, "no reasonable trier of fact could determine that [Police Defendants] used excessive force when arresting Plaintiff." *Id.* (granting summary judgment and dismissing the plaintiff's excessive force claim where the "[p]laintiff himself testified that he suffered no physical injuries as a result of the arrest"); *Cunninham*, 2007 WL 2743580, at \*7 (granting summary judgment for defendants where the only injuries plaintiffs alleged from being sprayed with mace were temporary discomfort and disorientation, which were held to be de minimis). Although this Court and others have allowed excessive force claims to survive summary judgment where a plaintiff has suffered only minor injuries, *see, e.g.*, *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974, 2017 WL 4326540, at \*13 (S.D.N.Y. Sept. 28, 2017) (gathering cases), the Court has not located a case in which a court allowed such a claim to survive in the absence of *any* injury. And while the force allegedly used by Police Defendants when arresting Plaintiff may *not* have been de minimis, Plaintiff's testimony renders this particular aspect of his account "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys*, 426 F.3d at 555 (citation and quotation marks omitted). Accordingly, the Assault Claim is dismissed.

### iii. Count Two: The Search Claim

**\*16** The third component of Plaintiff's excessive force claim is based on the allegation that during the arrest, certain Police Defendants "empt[ied] out [Plaintiff's] pockets, check[ed] [his] waistline, [and] reach[ed] down inside of [Plaintiff's] pants from the front side all the way from [his] underwear to [his] socks." (SAC ¶ 33.) Accordingly, this component of Count Two is more properly analyzed as an unreasonable search claim, rather than as a claim based on alleged excessive

force. Police Defendants have not addressed this aspect of Plaintiff's claim. (*See generally* Police Defs.' Mem.)

The search of a person incident to an arrest is presumptively reasonable under the Fourth Amendment. *See United States v. Robinson*, 414 U.S. 218, 235 (1973). "Nevertheless, a search incident to a lawfully executed arrest may still violate the Fourth Amendment, if conducted in an otherwise unreasonable manner." *Wang v. Vahldieck*, No. 09-CV-3783, 2012 WL 119591, at *10 (E.D.N.Y. Jan. 9, 2012); *see also Bolden v. Village of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004) (noting "[a] lawful arrest ... creates a presumption of reasonableness regarding an attendant search" that "can be rebutted by a showing that the search was conducted in an otherwise unreasonable manner"). "[U]nreasonable, non-consensual, inappropriate touching," for example, "can constitute unreasonable intrusions into a plaintiff's bodily integrity in violation of the Fourth Amendment." *Golden v. County of Westchester*, No. 10-CV-8933, 2012 WL 4327652, at *5 (S.D.N.Y. Sept. 18, 2012) (brackets and quotation marks omitted) (quoting *Fontana v. Haskin*, 262 F.3d 871, 880–81 (9th Cir. 2001)); *see also Anderson v. Waterbury Police Dep't*, No. 14-CV-829, 2017 WL 1157843, at *11 (D. Conn. Mar. 28, 2017) ("[C]ourts in [the Second] Circuit have found that claims that a police officer's actions during and following the arrest of a suspect rise to the level of a sexual assault are properly analyzed under the Fourth Amendment and could give rise to at least one genuine issue of material fact that precludes summary judgment on the Fourth Amendment claim." (citation and quotation marks omitted)). However, "not every truthful allegation of sexual bodily intrusion during an arrest is actionable as a violation of the Fourth Amendment." *Fontana*, 262 F.3d at 880. "Some bodily intrusions may be provably accidental or de minimis and thus constitutionally reasonable." *Id.* (italics omitted); *see also Wright v. City of Waterbury*, No. 07-CV-306, 2011 WL 1106217, at *6 (D. Conn. Mar. 23, 2011) (same).

Plaintiff has raised a triable issue of fact regarding the reasonableness of the search incident to his arrest. Although courts have found that an officer's brief contact with an arrestee's breasts or genital area, without more, does not violate the Fourth Amendment, those cases have involved pat-downs *on top of* an arrestee's clothing. *See Pascual v. Fernandez*, No. 11-CV-7075, 2013 WL 474292, at *6 (S.D.N.Y. Jan. 29, 2013) (finding that a pat-down of a female arrestee's breasts, buttocks, and inner thigh area *over her clothing* by a male officer was not

constitutionally unreasonable); *Golden*, 2012 WL 4327652, at *6 (granting summary judgment on Fourth Amendment claim where the officer's search "was a minimally intrusive, *above the clothing*-pat down," even though it "included incidental contact with [the plaintiff's] breasts and genital area" (emphasis added)); *Wright*, 2011 WL 1106217, at *7 (finding that the police officer who "cupped [the plaintiff's] groin area, while she was frisking him, on two occasions," did "not rise to the level of unreasonableness required for a Fourth Amendment violation" because the officer "did not grab [the plaintiff's] groin area *or touch underneath his clothing*, and the search of [the] groin area was extremely quick" (emphasis added)); *Garcia v. N.Y. State Police Investigator Aguiar*, 138 F. Supp. 2d 298, 304 (N.D.N.Y. 2001) (dismissing Fourth Amendment claim where the plaintiff alleged that the officer "cupped her crotch or breasts" in part because the defendant "*did not touch underneath her clothing*" (emphasis added)). The search Plaintiff has described—in which the arresting officer(s) reached "down inside of [his] pants from the front side all the way from [his] underwear to [his] socks," (SAC ¶ 33)—goes beyond an over-the-clothing pat-down. This allegation raises a genuine dispute regarding the reasonableness of Police Defendants' search incident to arrest. *See Anderson*, 2017 WL 1157843, at *11 (denying defendants summary judgment on unreasonable search claim where the plaintiff testified that an officer "put one hand into [the plaintiff's] pants, ... inside [the plaintiff's] underwear[,] ... [and] moved [his hand] directly between [the plaintiff's] butt cheeks in a swiping motion from front to back"); *Thomas v. O'Brien*, No. 08-CV-318, 2010 WL 3155817, at *9 (N.D.N.Y. Aug. 9, 2010) (denying summary judgment on unreasonable search claim where the plaintiff alleged that the defendant officer "shoved his hand into [his] pants and groped and painfully squeezed [his] scrotum"); *cf. Martinez v. Belcourt*, No. 20-CV-286, 2020 WL 5118016, at *6 (D. Conn. Aug. 31, 2020) (concluding that the plaintiff had adequately stated an unreasonable search claim where the officer allegedly had "put his hands down [the plaintiff's] pants and fondled and squeezed his genitals").

**\*17** Accordingly, Police Defendants' Motion is granted in part and denied in part with respect to Count Two. The Handcuff Claim and Assault Claim are dismissed, but the Search Claim survives.

b. Use of Force During Cavity
Search at Police Station (Count Five)

The excessive force claim in Count Five is predicated on Plaintiff's allegation that Canario, Pitt, Saintiche, and Arestin violently beat him in the strip search room at the Newburgh police station. (*See* SAC ¶ 122.) Insofar as Plaintiff's excessive force claim encompasses the cavity search itself, (*see id.* ¶¶ 63, 122), the Court treats that allegation as part of Plaintiff's unreasonable search claim in Count Six, discussed in Section II.B.3 *infra*.

As an initial matter, the Court notes that the Fourth Amendment's objective reasonableness standard continues to govern any excessive force claims based on events at the Newburgh police station. The Second Circuit "decided long ago that the objective reasonableness standard established in *Graham* applies to actions taken with respect to a person who asserts, as does the plaintiff here, a claim for excessive force after [he] has been arrested and detained, but 'prior to the time when [he] is arraigned or formally charged, and remains in the custody (sole or joint) of the arresting officer.'" *Cugini v. City of New York*, 941 F.3d 604, 612 (2d Cir. 2019) (quoting *Powell v. Gardner*, 891 F.2d 1039, 1044 (2d Cir. 1989)); *see also Franks v New Rochelle Police Dep't*, No. 13-CV-636, 2015 WL 4922906, at *9 (S.D.N.Y. Aug. 18, 2015) (recognizing that, under *Powell*, the Fourth Amendment standard applies until the person is arraigned or formally charged, and remains in the custody of the arresting officer). Accordingly, the Court will analyze the excessive force claim in Count Five—as well as the excessive force claim in Count Eight—under the Fourth Amendment standard.

As recounted in Part I.A.2 *supra*, Plaintiff and Police Defendants give strikingly divergent accounts of what occurred in the strip search room. In Plaintiff's version, he is slammed to the ground, beaten, and digitally penetrated by one of the officers. (*See* SAC ¶¶ 59–63.) In the officers' version, Plaintiff voluntarily squats after having his arms held against a wall, and the small bag of drugs falls from his body cavity without any further intervention by the officers. (*See, e.g.*, Canario Aff. ¶ 15; Defs.' 56.1 ¶ 47.) In the latter version, there is no "physical struggle," (Arestin Aff. ¶ 5), and none of the officers places his hands on or inside Plaintiff's buttocks, (*see* Defs.' 56.1 ¶ 48).

The Parties therefore present two conflicting versions of the relevant events. There is no camera in the strip search room, and thus, no video footage to review. Because the Court "may not weigh evidence or assess the credibility of witnesses at the summary judgment stage[,]" *Jeffreys*, 426 F.3d at 551, it may not resolve the "he said, she said" factual conflict presented

by Count Five at this point in time, *see Fincher*, 604 F.3d at 726.

Police Defendants maintain that summary judgment is warranted in light of two considerations. First, they argue that Plaintiff gave inconsistent testimony regarding which side of his face Pitt allegedly punched. (*See* Police Defs.' Mem. 6–7, 14–15.) In the Second Amended Complaint, Plaintiff alleges that Pitt punched him on the right side of his face. (SAC ¶ 60.) But Police Defendants argue that at his deposition, when Plaintiff "pointed to a picture taken of him at the hospital and his intake photo at the [Orange County Jail] ... to identify swelling ... from Pitt's alleged punch[,] ... he pointed to marks on the left side of his face, not the right [side] where he says Pitt punched him." (Police Defs.' Mem. 6–7; *see also id.* at 14–15 (arguing that Plaintiff "pointed to the left side of his face to identify the area struck and noted a mark under his left eye and pointed to a photo showing an unrelated injury").) Police Defendants cite to three parts of the deposition transcript—pages 64, 77, and 148—in support of this claim. (*See id.* at 6–7.) Page 64 contains the following exchange:

**\*18**  Q: Where did [Pitt] punch you in the face?

A: He punched me on this side of my face.

Q: The right side?

A: Yes.

Q: Between your eye and your ear?

A: Yes, like right here. Like in my head.

(Pl.'s Dep. 64:13–21.) Although the Court has not seen video footage of the deposition, the only reasonable inference to be drawn from this excerpt is that Plaintiff pointed to the right side of his face. After Plaintiff indicates where he was punched, the examiner's follow-up question—"[t]he right side?"—indicates that Plaintiff had pointed to the right side of his face. (*See id.*) Plaintiff responds in the affirmative, leaving no doubt as to his testimony. (*See id.*) On page 77, Plaintiff testifies that in the photo taken of him "when [he] was first admitted to the hospital[,]" his "whole face was bruised from that punch where Detective Pitt punched [him] in the eye." (Pl.'s Dep. 77:15–20; *see also* Posner Aff. Ex. E ("Hospital Photo") (Dkt. No. 160-4).) This statement does not conflict with Plaintiff's original allegation or his testimony from earlier in the deposition that Pitt punched him on the right side of his face. And without video footage of

the deposition, the Court has no way of verifying whether Plaintiff pointed to the left side of his face in the photo, as Police Defendants claim. Finally, on pages 148 through 149 of the transcript, the examiner shows Plaintiff the hospital photo, at which point the following exchange occurs:

> Q: I think earlier you pointed to that photograph before we had marked it when I was examining you initially and pointed [sic] to underneath your left eye to show what happened as a result of being punched by Detective Pitt; is that correct?

> A: Yes. Just to note I did have lumps on my forehead, too. I think you could see that lump, too.

(Pl.'s Dep. 148:25–149:9.) In responding "[y]es" to the examiner's question, Plaintiff appears to indicate that he had previously pointed to the left side of his face in the hospital photo. But even assuming this answer constitutes an inconsistency in Plaintiff's testimony, the Court cannot say that his testimony was so "contradictory or rife with inconsistencies such that it was facially implausible[,]" *Fincher*, 604 F.3d at 726, particularly in light of his earlier testimony—in the same deposition—that *did* comport with his initial allegations. The Court therefore declines to grant summary judgment based on Police Defendants' first argument.

Police Defendants also argue summary judgment is warranted because "there are no hospital records corroborating any facial injury, which records also reflect he had no complaint of any." (*See* Police Defs.' Mem. 15; *see also* ER Records 13 (stating "no gross deformity" to head and face); *id.* (stating that Plaintiff "denies any neck pain, back pain[,] or any other complaints"); Madell Aff'n ¶¶ 16, 24 (stating that "there was no gross deformity of the head and face," that his "objective physical examination of the plaintiff did not exhibit any evidence of trauma, such as bruising, contusions[,] or reflexes of pain," and that, if Plaintiff had "made any complaints resulting from a physical altercation, [he] would have documented the same"); Durbin-French Aff. ¶¶ 15–17 (same)). But although Madell, Durbin-French, and the St. Luke's medical records suggest Plaintiff did not complain about any facial injury, Plaintiff maintains that he *did* complain to hospital staff about a facial injury resulting from the alleged assault in the strip search room. (*See* SAC ¶ 86; Pl.'s Dep. 49:18–21 (explaining that when he arrived at the hospital, the "injuries [he] was stressing to [hospital staff] [were] [his] body cavity injuries and the bruise on [his] face [arising from the officers' alleged] excessive force on [him]

just before the hospital"); *id.* 104:15–21 (Q: "Did you make any complaint about any injury to your face to the hospital?" A: "I was like, look at my face, look at my face. They beat me up, all that. That's when I was explaining the body cavity search.... My neck was strained because I was like – I had so much tension on me. I told them my neck. I told them about everything.... But the bruises clearly seen right there in the face, they didn't treat me for that.").) Thus, Plaintiff has provided an account that is flatly at odds with the evidence and testimony produced by Police Defendants.

**\*19** In considering these conflicting accounts, the Court is mindful that "it is undoubtedly the duty of district courts *not* to weigh the credibility of the parties at the summary judgment stage." *Jeffreys*, 426 F.3d at 554 (emphasis added). Even where, as here, a plaintiff has relied exclusively on his own testimony, courts have denied summary judgment to defendants, as long as the plaintiff's "testimony was not contradictory or rife with inconsistencies such that it was facially implausible." *Fincher*, 604 F.3d at 726; *see also Bridgewater v. Taylor*, No. 08-CV-3593, 2011 WL 6762931, at \*5 (S.D.N.Y. Dec. 21, 2011) (denying summary judgment where the plaintiff's evidence consisted "solely of his own testimony," but this testimony offered "a plausible alternate version of events"); *Butler v. Gonzalez*, No. 09-CV-1916, 2010 WL 3398156, at \*8 (S.D.N.Y. May 18, 2010) (denying summary judgment where, although the plaintiff's evidence was "minimal," and his allegations "suffer[ed] from a lack of corroboration," there were no "material inconsistencies" in his account), *adopted by* 2010 WL 3398150 (S.D.N.Y. Aug. 26, 2010); *Sash v. United States*, 674 F. Supp. 2d 531, 541–42 (S.D.N.Y. 2009) (denying summary judgment because the court did not find the plaintiff's "version of events to be so incredible, or in such discord with other evidence, as to find his allegations 'wholly fanciful,' " where the plaintiff's claim relied "almost entirely" on his own consistent testimony (citation omitted)).

Indeed, courts have even denied summary judgment to defendants where, as here, a plaintiff's version of the events is contradicted by substantial evidence. *See, e.g.*, *Scott*, 344 F.3d at 289–91 (holding that "[a]lthough [the plaintiff's] evidence may be thin, his own sworn statement is adequate to counter summary judgment," and that "[b]y finding against [the plaintiff] on the basis of the disparity between some of [the plaintiff's] medical records and statements in his affidavit, the district court made an impermissible credibility determination and weighed contradictory proof ... [which] may only be evaluated by a finder of fact"); *Vital*, 168 F.3d at 622

("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (citation omitted)); *Archer v. Dutcher*, 733 F.2d 14, 16 (2d Cir. 1984) (reversing grant of summary judgment and noting that although "[i]t appears from the affidavits filed by appellees that [the plaintiff's] case may well be without merit[,]" the plaintiff's "affidavit in opposition to the motion for summary judgment does raise material factual disputes, irrespective of their likely resolution"); *cf. DeBlasio v. Rock*, No. 09-CV-1077, 2011 WL 4478515, at *13 (N.D.N.Y. Sept. 26, 2011) (partially denying summary judgment where the plaintiff relied exclusively on his own testimony, which was contradicted by evidence produced by the defendants, because the plaintiff's complaint and deposition testimony were "moderately contradictory," but "far less contradictory" than the testimony at issue in decisions granting summary judgment); *Bennett v. Falcone*, No. 05-CV-1358, 2009 WL 816830, at *5 (S.D.N.Y. Mar. 25, 2009) (partially denying summary judgment where the plaintiff's story was "certainly inconsistent with other evidence and [was] subject to serious question," but was "not so blatantly false that the [c]ourt may simply reject it as a matter of law" (citation omitted)); *Rossi v. Stevens*, No. 04-CV-01836, 2008 WL 4452383, at *5–6 (S.D.N.Y. Sept. 30, 2008) (partially denying summary judgment where the defendants' testimony, third-party eyewitness testimony, and other evidence contradicted the plaintiff's uncorroborated version of events, because the plaintiff's story did not have any "fatal internal inconsistencies").

Here, although Plaintiff's account of his facial injury relies exclusively on his own testimony and is contradicted by other testimony and medical evidence in the record, his account still provides "a plausible alternate version of events," *Bridgewater*, 2011 WL 6762931, at *5, that is neither "wholly fanciful," *Sash*, 674 F. Supp. 2d at 541 (citation omitted), nor "rife with inconsistencies," *Fincher*, 604 F.3d at 726. It is true that some district courts in the Second Circuit have granted summary judgment on the basis of medical records where there is "direct[ ] and irrefutabl[e] contradict[ion]" of a plaintiff's descriptions of his injuries, such that "no reasonable jury could credit [the] plaintiff's account of the happening." *Henry v. Brown*, 406 F. Supp. 3d 211, 214–15 (E.D.N.Y. 2016) (citation and emphasis omitted) (granting summary judgment for the defendant where, although the plaintiff alleged that he nearly lost his left leg and had a head injury so severe that he was "unconscious [and] lying in a pool of blood" for over an hour, the medical records reflected only a scab on his leg and no head injury whatsoever); *see also Allah v. Wilson*, No. 13-

CV-4269, 2017 WL 4350611, at *4 (S.D.N.Y. July 31, 2017) (granting summary judgment where the plaintiff's medical records six days after an alleged beating revealed only a possible foot fungus); *Musaid v. Manka*, No. 13-CV-7880, 2016 WL 540806, at *5 (S.D.N.Y. Feb. 9, 2016) (granting the defendant's summary judgment motion where, although the plaintiff alleged that he had suffered broken bones, the x-ray images showed no broken bones at all). But Plaintiff's excessive force claim in Count Five does not present such a case. Although his alleged facial injury does not appear in his medical records, neither is his allegation "directly and irrefutably contradicted" by these records as was true in *Henry*, *Allah*, or *Musaid*. Cf. *Morehouse v. Vasquez*, No. 17-CV-4836, 2020 WL 1049943, at *14 (S.D.N.Y. Mar. 4, 2020) (citation omitted) (denying summary judgment on excessive force claim where, although "a number of [the] [p]laintiff's alleged injuries [did] not appear in the medical records, or [were] seemingly more serious than those that [did], not all of [the] [p]laintiff's allegations [were] 'directly and irrefutably contradicted' by the record" (citation omitted)). Because Plaintiff has offered an alternative version of events that is not "facially implausible," *Fincher*, 604 F.3d at 726, it is for the jury to determine whose account is more credible.

**\*20** Finally, unlike the Handcuff Claim, which did not "rise to the level of injury necessary to sustain an excessive force claim for tight handcuffs," *see Sachs*, 2012 WL 3822220, at *15, Plaintiff's alleged facial injury does constitute a cognizable injury in the excessive force context, *see Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) ("[W]e have permitted a plaintiff's claim to survive summary judgment on allegations that, during the course of an arrest, a police officer twisted her arm, 'yanked' her, and threw her up against a car, causing only bruising."); *Ong*, 2017 WL 4326540, at *13 (concluding that defendant was not entitled to summary judgment on excessive force claim where the plaintiff's only injuries were a "very small" bruise on his abdomen and a second bruise on his chest); *Hamilton v. City of New York*, Nos. 07-CV-3633, 07-CV-3825, 2009 WL 2226105, at *3, *11 (E.D.N.Y. July 23, 2009) (holding that defendants were not entitled to summary judgment on plaintiff's excessive force claim where the alleged injury was a one-centimeter cut to plaintiff's right temple); *Sforza v. City of New York*, No. 07-CV-6122, 2009 WL 857496, at *15 (S.D.N.Y. Mar. 31, 2009) (denying summary judgment where the plaintiff had suffered bruises to her head, because "[a] plaintiff need not demonstrate serious injury to prevail in an excessive force claim; bruising and other nonpermanent injuries are sufficient").

For these reasons, Police Defendants' Motion is denied with respect to Count Five.

### c. Use of Force During Plaintiff's
### Attempt to Swallow Drugs (Count Eight)

Police Defendants argue that the Booking Room Video demonstrates beyond dispute that excessive force was not used by Canario, Pitt, Saintiche, and Arestin when they tried to prevent Plaintiff from swallowing the recovered contraband. (*See* Police Defs.' Mem. 13, 15.) The Court agrees.

The Court has reviewed the relevant video footage in detail. At 6:17:35 P.M., Plaintiff—whose ankle was shackled to a bench—leaps to his left and swipes the recovered contraband from the hands of Officer Canario. As Plaintiff quickly spins 180 degrees to his right, he can be seen drawing his hands toward his mouth. (*See* Booking 1 Video at 6:17.37.163–.390.) Canario immediately pivots to his right, grabs the right side of Plaintiff's upper body with his right arm, pulls his left arm over the left side of Plaintiff's upper body, and drags Plaintiff to the ground. Although this initial sequence unfolds in a flash, Plaintiff can be seen drawing his left arm toward his mouth as Canario pins him to the ground. (*See id.* at 6:17.37.924; *see also* Pl.'s Dep. 71:14–16 (Q: "So, you stuffed it in your mouth, correct?" A: "Yes.").) Canario wraps his right arm around Plaintiff's head, and the two begin to tussle on the ground as Officers Saintiche, Arestin, Pitt, and a fourth police official swarm the scene. (*See* Booking 1 Video at 6:17:38.179–.711.) A fifth, unidentified officer runs toward the scene from the left side of the frame and stands near the edge of the commotion. (*See id.* at 6:17:41.147.) Canario, Saintiche, Arestin, and Pitt can be seen kneeling around Plaintiff and struggling to subdue him as several seconds pass. (*See id.* at 6:17:45–49.) Canario suddenly pulls his head from the scuffle, wincing and wiping his eyes, and begins to walk away, apparently having just deployed pepper spray. (*See id.* at 6:17:49.920.) Plaintiff was not in handcuffs and still had the drugs in his mouth when Canario used pepper spray. (*See* Canario Aff. ¶ 23; Saintiche Aff. ¶ 13; Arestin Aff. ¶ 7.) Pitt, Saintiche, and Arestin continue trying to subdue Plaintiff and remove the drugs from his mouth. (*See* Pl.'s Dep. 72:2–4 (stating that Pitt was "all in [his] mouth" attempting to "get the drugs out of [his] mouth"); *id.* 72:24–25 (officers were yelling, "he's trying to swallow it; he's trying to swallow it"); *id.* 74:2–3 (officers were yelling "he's resisting, he's

resisting").) Saintiche can be seen kneeling over Plaintiff's left side, Arestin is crouched near Plaintiff's head, and Pitt straddles Plaintiff's lower body. A female officer, identified as Myra Rude ("Officer Rude"), (*see* Arestin Aff. ¶ 7), runs toward the fray, (*see* Booking 1 Video at 6:17:55), and another unidentified officer approaches several seconds later, (*see id.* at 6:18:03). At 6:18:06, Pitt, Saintiche, Arestin, and the female officer are kneeling and crouching around Plaintiff, continuing to try to subdue him and remove the drugs from his mouth. Five seconds later, with the drugs still in Plaintiff's mouth, Arestin deploys his taser on Plaintiff. (*See id.* at 6:18:11; *see also* Arestin Aff. ¶ 7; Saintiche Aff. ¶ 13.) As he does this, Pitt holds Plaintiff's legs while Saintiche backs away. After Arestin uses the taser, Plaintiff rolls onto his left side several seconds later. (*See id.* at 6:18:16.) The officers lean back in and begin to restrain Plaintiff, with Officer Rude helping to secure his hands in handcuffs. As Plaintiff's hands are being secured, an unidentified officer appears to remain crouched over Plaintiff, with his right knee securing Plaintiff's upper legs. Meanwhile, Pitt restrains Plaintiff's lower legs with his left knee and left hand. By 6:19:09, there is only one officer leaning over Plaintiff, with his left hand near Plaintiff's right shoulder. Plaintiff is lying on his left side. Plaintiff rolls over onto his stomach at 6:19:17, and from roughly 6:19:32 until 6:21:01, Plaintiff is only restrained by a single officer, who has his right hand near Plaintiff's right shoulder blade. From then until 6:21:58, Plaintiff remains handcuffed on the floor, with no officer restraining him. At that point, one of the officers secures his legs using a pair of leg restraints. Plaintiff is lifted to his feet at 6:23:52.

**\*21** When courts are confronted with an excessive force claim, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Estate of Jaquez v. City of New York*, 104 F. Supp. 3d 414, 433 (S.D.N.Y. 2015) (quoting *Graham*, 490 U.S. at 396–97). Such was the case here. By attempting to swallow the contraband that had been recovered moments earlier, Plaintiff not only threatened to destroy evidence, but also placed his own safety in peril. Plaintiff easily could have choked on the drugs, or, if he had managed to swallow them, there was a risk that the small bag holding the drugs could break inside Plaintiff's system, particularly given that it had been chewed moments earlier. (*See, e.g.*, Canario Aff. ¶ 22; Durbin-French Aff. ¶ 24.) Confronted with these threats, the officers responded swiftly and professionally. There were no kicks, punches, or

other signs of gratuitous force. Moreover, it is clear that until Arestin deployed his taser, Plaintiff continued to resist the officers' attempts to subdue him and remove the contraband from his mouth. Under these circumstances, it was reasonable for the officers to respond with some amount of force. *See Graham*, 490 U.S. at 396 (noting that two factors courts may consider in evaluating the reasonableness of force are (1) "whether the suspect poses an immediate threat to the safety of the officers *or others*, and whether he is *actively resisting arrest*" (emphasis added)); *Mobley v. Matayeva*, No. 15-CV-3418, 2020 WL 5577711, at *4 (E.D.N.Y. Sept. 17, 2020) (recognizing that force may be used to prevent "an immediate threat to [the] [p]laintiff's health and safety," particularly where, "[h]ad the bag [of drugs inserted in plaintiff's rectum] perforated, the drugs contained therein would have made their way into [p]laintiff's system, putting his health at grave risk"). Moreover, the nature of the force used—holding Plaintiff against the ground, securing his arms and legs, and attempting to pry the contraband from his mouth—was entirely reasonable under the circumstances. *See Casiano v. Ashley*, — F. Supp. 3d —, 2021 WL 281460, at *4 (W.D.N.Y. Jan. 28, 2021) (dismissing excessive force claim on summary judgment where video evidence showed that the defendants "did not strike [the pretrial detainee]," but "grappled with her and wrestled her to the ground"); *Frost v. City of New York*, No. 15-CV-4843, 2019 WL 1382323, at *5, *11 (S.D.N.Y. Mar. 27, 2019) (dismissing excessive force claim on summary judgment where video evidence "establishe[d] that defendants used only force [against a pretrial detainee] that was objectively reasonable"), *aff'd in relevant part, rev'd and vacated in part on other grounds*, 980 F.3d 231, 256 (2d Cir. 2020) (observing that "although perhaps the struggle between [plaintiff] and the [defendants] could have been gentler," the defendants "were justified in using nontrivial amounts of force" in light of the "security problem at issue; the threat reasonably perceived by the [defendants]; and the fact that [plaintiff] was actively resisting" (brackets and citation omitted)); *Boomer v. Lanigan*, No. 00-CV-5540, 2002 WL 31413804, at *2, *6 (S.D.N.Y. Oct. 25, 2002) (granting summary judgment where video evidence showed a "scuffle" in which the defendants pushed the plaintiff into a cell and held him in place for several minutes, none of which showed "wantonness" on the part of defendants).

Canario's use of pepper spray was also reasonable under the circumstances. "The use of pepper spray is not an actionable constitutional violation where there is no lasting injury, and where the subject was not cooperating with law enforcement." *Walton v. Lee*, No. 15-CV-3080, 2019 WL 1437912, at *6

(S.D.N.Y. Mar. 29, 2019); *see also Williams v. City of New York*, No. 05-CV-10230, 2007 WL 2214390, at *12 (S.D.N.Y. July 26, 2007) (holding that an excessive force claim based on an officer's use of mace was "not actionable" where the plaintiff had not alleged any injuries apart from "the expected side-effects: temporary discomfort and disorientation"). As was true of another Newburgh police officer in *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306 (S.D.N.Y. 1998), "it was not unreasonable for [Canario] to direct a stream of pepper spray at [Plaintiff]," particularly "[g]iven the undisputed evidence that he believed [Plaintiff] was about to swallow contraband," *id.* at 315; *see also Casiano*, 2021 WL 281460, at *4 (granting summary judgment where video evidence showed that the pretrial detainee "received one burst of pepper spray," without "any lasting or serious effects," and "was subdued relatively quickly and without resort to punches, kicks, or other forceful blows that might have inflicted greater injury").

Arestin's use of the taser was likewise reasonable. The Court is mindful that use of a taser constitutes a "serious intrusion." *Read v. Town of Suffern Police Dep't*, No. 10-CV-9042, 2013 WL 3193413, at *8 (S.D.N.Y. June 25, 2013) (citation omitted) (finding that issues of fact precluded summary judgment where the defendant had allegedly tased the plaintiff a second time after he was already immobilized). Here, however, the circumstances justified this technique. The video shows that even after Canario deployed the pepper spray, (*see* Booking 1 Video at 6:17:49.920), the officers continued struggling to subdue Plaintiff and remove the contraband for approximately 22 additional seconds until Arestin used the taser, (*see id.* at 6:18:11). Where, as here, an arrestee is unrestrained and actively non-compliant with officers' directives, it is reasonable for officers to use a taser. *See Scoma v. City of New York*, No. 16-CV-6693, 2021 WL 230295, at *9 (E.D.N.Y. Jan. 22, 2021) (granting summary judgment because defendant's first taser deployment was reasonable to subdue an "unrestrained, uncooperative" arrestee who had engaged in a serious offense); *Gomez v. Village of Sleepy Hollow*, No. 07-CV-9310, 2011 WL 2652450, at *11 (S.D.N.Y. July 6, 2011) (holding that an officer's use of a taser was reasonable in light of an "uncertain[ ] and volatil[e]" situation in which the plaintiff resisted arrest and refused to comply with the officer's orders not to move); *Towsley v. Frank*, No. 09-CV-23, 2010 WL 5394837, at *7–8 (D. Vt. Dec. 28, 2010) (concluding on summary judgment that a defendant's first taser deployment was reasonable in an "increasingly tense and uncertain" situation where the officers used the taser to

subdue an arrestee "who was under the influence of drugs," was "verbally combative" with officers, and was threatening to jump out of a window).[20] For the reasons above, Police Defendants' Motion is granted with respect to Count Eight.

[20]   Although the Court need not reach the qualified immunity analysis in light of its finding that the use of force itself was objectively reasonable, the Court has little doubt that Arestin would be entitled to qualified immunity under these circumstances. *See, e.g., Sanders v. City of Dothan*, 409 F. App'x 285, 287 (11th Cir. 2011) (concluding that an officer was entitled to qualified immunity where he had "tasered [the plaintiff] in furtherance of the legitimate law-enforcement activity of searching for contraband in [the plaintiff's] mouth to prevent him from possibly destroying it by swallowing the contraband").

### 3. Unreasonable Search Claim (Count Six)

**\*22**  In Count Six, Plaintiff asserts that Police Defendants Canario, Pitt, Saintiche, and Arestin conducted an unreasonable search in violation of his Fourth Amendment rights. (SAC ¶ 123.) As opposed to the unreasonable search claims in Counts 15 and 16, which are based on events that unfolded later in the evening at St. Luke's, (*see id.* ¶¶ 92–98, 132–33), Count Six is based on the search that took place in the strip search room at the Newburgh police station, (*see id.* ¶¶ 46–65, 123).[21]  Although Police Defendants have not moved for summary judgment on Count Six, (*see* Police Defs.' Mem. 35), Plaintiff has, (*see* Pl.'s Mem. 8).

[21]   In the Second Amended Complaint, Plaintiff indicates that Count Six is based on Police Defendants' (1) "repeated orders to strip search"; (2) "using physical force to secure [Plaintiff's] arms and legs against wall"; (3) "touching and grabbing [Plaintiff's] buttocks"; (4) "punch[ing] [Plaintiff] in the face"; (5) "punching and kneeing [Plaintiff] in the ribs[,] causing noticeable injuries"; and (6) "penetrating [Plaintiff's] body cavity[,] causing physical and emotional injuries." (SAC ¶ 123.) The second, fourth, and fifth actions described by Plaintiff go toward his excessive force claim in Count Five, and the Court has therefore addressed these actions in a separate context *supra*. For

purposes of analyzing Count Six, the Court will consider only the remaining actions described by Plaintiff, which are appropriately construed as supporting an unreasonable search claim.

In evaluating Plaintiff's claim, the Court will adopt the same terminology some courts in the Second Circuit have used when evaluating similar actions in the law-enforcement context. Thus,

> (1) a "strip search" occurs when a suspect is required to remove his clothes; (2) a "visual body cavity search" is one in which the police observe the suspect's body cavities without touching them (as by having the suspect to bend over, or squat and cough, while naked); (3) a "manual body cavity search" occurs when the police put anything into a suspect's body cavity, or take anything out.

*Gonzalez v. City of Schenectady*, 728 F.3d 149, 158 (2d Cir. 2013) (citing *People v. Hall*, 886 N.E.2d 162, 165 (N.Y. 2008)); *see also Sloley v. VanBramer*, 945 F.3d 30, 36–37 (2d Cir. 2019) (relying on the categorical definitions adopted in *Gonzalez*); *Bobbit v. Marzan*, Nos. 18-CV-2465, 16-CV-2042, 2020 WL 5633000, at \*9 (S.D.N.Y. Sept. 21, 2020) (same). Thus, a "strip search" enables officers to examine a subject when "he stands naked in their presence." *Monroe v. Gould*, 372 F. Supp. 3d 197, 204 (S.D.N.Y. 2019) (quoting *United States v. Gonzalez*, 111 F. Supp. 3d 416, 431 (S.D.N.Y. 2015)). A "visual body cavity search" is more invasive, and may require, for example, that the subject squat, bend over, or even "hold his buttocks open to allow officers to visually inspect his anus." *Monroe*, 372 F. Supp 3d at 204 (citation omitted). However, this type of search involves no touching by the officers. *Id.* The "most invasive type of search" is the "manual body cavity search," which "crosses from a visual to a manual inspection of the subject's body cavity," *id.* (citation omitted), and includes "some degree of touching or probing of body cavities," *id.* (quoting *Harris v. Miller*, 818 F.3d 49, 58 (2d Cir. 2016)). Framing the relevant events within this terminology, all Parties agree that a "strip search" and "visual body cavity search" occurred at the Newburgh police station. (*See* SAC ¶¶ 48–50; Saintiche Aff. ¶¶ 6–7; Anderson Aff. ¶ 7.) But while Police Defendants maintain that their search of Plaintiff ended there, (*see* Defs.' 56.1 ¶ 48), Plaintiff

alleges further, performing a "manual body cavity search" by "forcefully penetrat[ing] [his] anal cavity and snatch[ing]" the small bag of drugs hidden within, (SAC ¶ 63).

**\*23** As an initial matter, Police Defendants make a procedural objection based on Plaintiff's main argument in support of his Motion. In the Second Amended Complaint, Plaintiff's unreasonable search claim appears to be predicated on his allegation that Police Defendants unlawfully conducted a manual body cavity search. (*See id.* ¶¶ 46–65, 123.) But in the Memorandum of Law Plaintiff has submitted in support of his Motion, he argues that the visual body cavity search *itself* constituted an unreasonable search. (*See* Pl.'s Mem. 13–15.) Police Defendants argue that "no such claim is raised in the Second Amended Complaint[,]" which "only asserts [that] the manual spreading of his buttocks and [the] digital exam were unlawful." (Police Defs.' Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. ("Police Defs.' Opp'n") 1, 2 (Dkt. No. 193).) They contend that Plaintiff should not be permitted to "amend his [Second Amended] [C]omplaint via a motion for summary judgment[,]" and that "[i]t is equally inappropriate to affirmatively seek summary judgment on a claim that is not pled in [this document]." (*Id.* at 2.)

Although there is some merit to Police Defendants' complaint of whipsawing, the Court will nevertheless consider Plaintiff's argument regarding the visual body cavity search, for two reasons. First, the factual allegations underpinning this argument were all pled in detail in the Second Amended Complaint, a critical feature that distinguishes this case from each of those relied upon by Police Defendants. *Cf. Wilson v. City of New York*, 480 F. App'x 592, 594 (2d Cir. 2012) (summary order) (concluding that a plaintiff had waived any argument based on his excessive pre-*arraignment* detention where his complaint "contain[ed] no factual allegation regarding the length of his detention before being arraigned, or the times at which he was arrested or presented in court[,]" but had instead "focuse[d] on [his] ... prolonged pre-*trial* detention, [without] ma[king] [any] reference to an excessive delay in arraignment" (emphasis added)); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (concluding that the plaintiffs could not raise an argument based on the defendant's alleged failure to issue a timely disclaimer where the complaint "[did] not make any reference to [the defendant's] alleged failure to disclaim coverage"); *Froio v. Monroe-Woodbury Cent. Sch. Dist.*, No. 17-CV-604, 2020 WL 2731970, at \*7 n.6 (S.D.N.Y. May 26, 2020) (declining to consider a failure-to-accommodate claim where the plaintiff

had entirely failed to allege such a claim in her second amended complaint, and had "not describe[d] a reasonable accommodation to which she was entitled but ... [had] not receive[d]"). Second, because Plaintiff is proceeding pro se—another feature that distinguishes this case from each of those cited by Police Defendants—the Court has an obligation to construe his submissions "liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman*, 470 F.3d at 474. Accordingly, the Court will consider Plaintiff's argument that the visual body cavity search itself was unreasonable.

### a. Whether Visual Body Cavity Search Violated Fourth Amendment

In *Sloley v. VanBramer*, the Second Circuit held that law enforcement must have "reasonable suspicion" to conduct a lawful visual body cavity search. *See* 945 F.3d at 38. Although the Second Circuit had previously applied the "reasonable suspicion" standard to strip searches, *Sloley* recognized that "visual body cavity searches are even more intrusive[,]" requiring a person not only to "strip naked in front of a stranger, but also to expose the most private areas of [his] body to others[,]" often while "assum[ing] degrading and humiliating positions." *Id.* (citation omitted). Accordingly, *Sloley* formally extended the "reasonable suspicion" standard to visual body cavity searches, *see id.* at 38, notwithstanding the fact that some district courts in the Second Circuit had been applying this standard to such searches already, *see id.* at 40–41 (gathering cases and observing that, "[a]s numerous district courts in this Circuit have recognized, Supreme Court and Second Circuit precedent clearly foreshadowed the rule we clarify today"); *see also, e.g., Sims v. Farrelly*, No. 10-CV-4765, 2013 WL 3972460, at \*8 (S.D.N.Y. Aug. 2, 2013); *Sarnicola v. County of Westchester*, 229 F. Supp. 2d 259, 274 (S.D.N.Y. 2002). After *Sloley*, there is no doubt that "a visual body cavity search conducted as an incident to a lawful arrest for any offense must be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity." *Sloley*, 945 F.3d at 38 (citation and quotation marks omitted).

### i. Whether Police Defendants Had Reasonable Suspicion

**\*24** Reasonable suspicion requires more than a "mere hunch," but "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a

preponderance of the evidence, and obviously less than is necessary for probable cause." *Sloley*, 945 F.3d at 43 (quoting *Navarette v. California*, 572 U.S. 393, 397 (2014)). To decide whether an officer had reasonable suspicion that would warrant a visual body cavity search, courts "must look at the totality of the circumstances." *Id.* at 43 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also Bobbit*, 2020 WL 5633000, at *11 ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances known to the officers at the time the search was begun." (quoting *United States v. Chirino*, 483 F.3d 141, 148 (2d Cir. 2007))). An officer must be able to "point to specific objective facts and rational inferences that [he] [is] entitled to draw from those facts in light of [his] experience." *Bobbit*, 2020 WL 5633000, at *9 (quoting *Hartline v. Gallo*, 546 F.3d 95, 100 (2d Cir. 2008)). Finally, courts in the Second Circuit have repeatedly emphasized that the reasonable suspicion standard requires an *individualized* inquiry. That is, "[t]he standard requires individualized suspicion, specifically directed to the person who is targeted for the strip [or visual body cavity] search." *Hartline*, 546 F.3d at 100; *see also Sloley*, 945 F.3d at 46 (concluding that, "in the absence of indicia" which the Second Circuit and New York State courts have "found to support *individualized* reasonable suspicion" that an arrestee is "secreting drugs inside his anal cavity," the defendant officer was not entitled to qualified immunity in connection with his visual body cavity search of the plaintiff (emphasis added) (citation omitted)); *Cannon v. Port Auth. of N.Y. & N.J.*, No. 15-CV-4579, 2020 WL 6290665, at *4 (S.D.N.Y. Oct. 27, 2020) (recognizing that "visual body cavity searches at a police station 'are still subject to the *Hartline* standard requiring individualized reasonable suspicion' " (quoting *Blue v. City of New York*, No. 14-CV-7836, 2018 WL 1136613, at *15 (S.D.N.Y. Mar. 1, 2018))); *Bobbit*, 2020 WL 5633000, at *9 (recognizing the "individualized suspicion" requirement in considering whether officers had reasonable suspicion to perform visual body cavity search).

Gathering relevant authority from New York State courts, *Sloley* identified various factors that can support a reasonable suspicion that an arrestee is secreting narcotics inside his person. *See* 945 F.3d at 46.[22] For example, officers may have reasonable suspicion where the arrestee is seen placing his hands down his pants or making similarly suspicious movements. *People v. Hunter*, 902 N.Y.S.2d 678, 679–80 (App. Div. 2010) (finding reasonable suspicion based in part on the officers' observation of the arrestee "fidgeting with his hands down the back of his pants"); *People v. Harry*, 884 N.Y.S.2d 712, 712–13 (App. Div. 2009) (finding reasonable

suspicion where an arrestee was placed in a patrol car and observed "moving around a lot, like sliding up and down in his seat and making movements with his hands" as though he were attempting to place or remove something from his pants); *People v. Clayton*, 868 N.Y.S.2d 303, 305–06 (App. Div. 2008) (finding reasonable suspicion where the arrestee was observed "wiggling around" in the patrol car and placing his hands in an area where the officer had felt a hard object during a pat-and-frisk). An officer may also have reasonable suspicion based on information that a particular arrestee is secreting objects in his person, or that he has a custom of doing so. *See Hunter*, 902 N.Y.S.2d at 680 (finding reasonable suspicion based in part on information the officers had received from a confidential informant that the arrestee "had a habit of carrying narcotics in his rectum"); *Clayton*, 868 N.Y.S.2d at 306 (finding reasonable suspicion based in part on the defendant's "history of secreting contraband in his rectum"). Finally, an officer clearly has reasonable suspicion where he has watched a suspect "retriev[e] an item from his buttocks area and exchang[e] it for money from a person found in possession of drugs minutes later." *People v. Barnville*, 819 N.Y.S.2d 234, 236 (App. Div. 2006).

22    New York courts and the Second Circuit share the same reasonable suspicion standard with respect to visual body cavity searches. Indeed, the rule adopted in *Sloley*—that officers must have "a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity"—was borrowed from a 2008 decision by New York's highest court. *See Sloley*, 945 F.3d at 41 & n.8 (discussing the New York Court of Appeals' decision in *Hall*, 886 N.E.2d 162, which interpreted the Fourth Amendment, rather than the New York state constitution).

**\*25**  None of these factors is present in this case. Instead, Police Defendants have invoked two separate considerations which they maintain give rise to reasonable suspicion. First, they argue that "Plaintiff was observed selling drugs in an area of Newburgh known for a great deal of drug activity." (Police Defs.' Opp'n 5.) And second, they argue that "it was well known to police, prescient in this case, that drug dealers 'cheek' their drugs to conceal them from police." (*Id.*) The Court will address each in order.

That Plaintiff was observed selling drugs shortly before his arrest must of course bear some weight in the Court's analysis. *See Sloley*, 945 F.3d at 39 ("To be sure, the type of crime

for which someone is arrested may play some role in the analysis of whether a visual body cavity search incident to that arrest is supported by reasonable suspicion."). As the court observed in *Sloley*, "one may well more reasonably expect someone arrested for a misdemeanor drug offense to be secreting contraband than someone arrested for felony tax fraud." *Id.*

But although the "crime of arrest" is "one [factor] officers may take into account in their consideration of the totality of the circumstances surrounding [a] search[,]" it "is not a determinative factor[.]" *Id.* Indeed, courts in the Second Circuit have repeatedly recognized the rule that "being arrested for a narcotics offense does not *automatically* give rise to a reasonable suspicion to justify a strip search and visual cavity inspection." *Quiles v. City of New York*, No. 15-CV-1055, 2016 WL 6084078, at *11 (S.D.N.Y. Oct. 12, 2016) (emphasis in original); *see also Nelson v. City of New York*, No. 18-CV-4636, 2019 WL 3779420, at *8 (S.D.N.Y. Aug. 9, 2019) (stating same rule); *Monroe*, 372 F. Supp. 3d at 204 (same); *Cordero v. City of New York*, 282 F. Supp. 3d 549, 562 (E.D.N.Y. 2017) (same); *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 292 (S.D.N.Y. 2015) (same); *Sims*, 2013 WL 3972460, at *8 (same); *Sarnicola*, 229 F. Supp. 2d at 273–74 (same, and noting that "[a]n automatic justification for strip searches based on an arrest for a drug-related crime would be inconsistent with the legal concept of reasonable suspicion based on the *totality* of the circumstances"). In *Sims v. Farrelly*, for example, the plaintiff was arrested at the scene of a drug bust, taken to the police station, and subjected to a visual body cavity search. *See* 2013 WL 3972460, at *2–3. The stated basis for this search was "the narcotics nature of the incident, the easy concealability ... of crack cocaine, and the criminal history of many of the subjects." *Id.* at *8 (record citation omitted). Denying the defendant's motion for summary judgment on the plaintiff's unreasonable search claim, Judge Ramos concluded that this "general[ ]" rationale was insufficient to sustain an "individualized reasonable suspicion ... that [the] [p]laintiff was secreting narcotics on his person." *Id.* Similarly, in *Sarnicola v. County of Westchester*, the defendant officer had "ordered a strip search [of the plaintiff] simply and solely because [the plaintiff] was arrested for suspected involvement in a drug-related felony." 229 F. Supp. 2d at 274. Granting the plaintiff's motion for summary judgment on her unreasonable search claim, then- (now Chief) Judge McMahon concluded that because the defendant "had no particularized reason to suspect that [the plaintiff] was secreting drugs on her person[,]" his search failed to "pass constitutional muster."

*Id.* Thus, Plaintiff's arrest for a narcotics offense does not, without more, establish reasonable suspicion for the visual body cavity search that was performed.

**\*26** Here, of course, Police Defendants argue they had reasonable suspicion for the search not merely because Plaintiff was arrested for a narcotics offense, but because he was actually *observed* dealing drugs. (*See* Police Defs.' Opp'n 5 (noting that "Plaintiff was *observed* selling drugs" (emphasis added)).) But in the absence of specific signs that Plaintiff was actually secreting drugs inside a body cavity, there is still no individualized reasonable suspicion to justify the search. The Second Circuit applied this principle in *Hartline v. Gallo*. There, the plaintiff was arrested following a traffic stop in which the officer observed the stem of a marijuana plant on the floor of her car and subsequently found the butt of a marijuana cigarette, a pipe, and a container with a few seeds. 546 F.3d at 97–98. The plaintiff was subjected to a visual body cavity search when she arrived at the police station. *See id.* at 98. Reversing the district court's decision granting summary judgment for the defendants, the Second Circuit held that the officer's search had violated the Fourth Amendment. *See id.* at 101. In the court's analysis, the absence of any indication that the plaintiff was concealing drugs in her body proved decisive. The officer, for example, "had no reason to believe that [the plaintiff] was under the influence of narcotics at the time of her arrest." *Id.* He "found no useable narcotics in [her] vehicle, nor did he see [her] take any suspicious actions which might have suggested she was hiding something as he approached her vehicle." *Id.* He noticed nothing in her "physical appearance that suggested she was secreting drugs on her person, nor did he engage in a less invasive pat down search that suggested the presence of contraband." *Id.* [23] Under these facts, the officer's visual body cavity search was not supported by individualized reasonable suspicion, and the plaintiff's "Fourth Amendment rights were violated," *id.* at 102.

23      Though the Second Circuit also observed that the plaintiff "had been arrested for nothing more serious than a B-misdemeanor[,]" *Hartline*, 546 F.3d at 101, the Second Circuit held in *Sloley* that whether an offense is a misdemeanor or felony makes no difference in the Fourth Amendment reasonable-suspicion analysis, *see Sloley*, 945 F.3d at 38–39 (noting that "it makes little sense in this context to draw Fourth Amendment lines that rest on the felony-misdemeanor distinction[,]" and "clarify[ing] ... that th[e] rule [that strip searches

conducted incident to a misdemeanor arrest be supported by reasonable suspicion] applies equally to visual body cavity searches incident to all arrests").

Similarly, in *Sloley*, an officer had performed a visual body cavity search on an arrestee whom the officer suspected was involved in illegal drug activity. *See* 945 F.3d at 35 ("According to [the officer], he recognized [the plaintiff's] name 'as referring to an individual who was well known in the area for being wrapped up in illegal drugs.' " (record citation omitted)). Although there was a factual dispute over whether the officer had recovered crack cocaine from the plaintiff's vehicle prior to the visual body cavity search, the Second Circuit concluded that "once th[at] disputed fact ... [was] disregarded, the evidence available to [the officer] support[ed] no more than a mere hunch that [the plaintiff] was secreting drugs inside his anal cavity." *Id.* at 46. There was "no evidence," for example,

> that [the plaintiff] was fidgeting or moved about suspiciously, that he reached or attempted to reach his hands down his pants, that anyone observed [him] putting drugs down his pants or retrieving drugs (or anything else) from inside his pants, or that [he] himself was previously known to secrete drugs inside his anal cavity.

*Id.* (citations omitted). Reversing the district court's grant of summary judgment for the defense, the Second Circuit concluded that the officer's " 'hunch of criminal activity [was] insufficient' to establish reasonable suspicion." *Id.* (citation omitted).

Lower courts in the Second Circuit have reached the same conclusion under similar facts. In *Bobbit v. Marzan*, for example, the police performed a visual body cavity search after the plaintiff tried to enter Green Haven Correctional Facility "with pills, vials of an unknown liquid substance, and bread, together in plastic wrap," that were discovered in her sock during a security scan. 2020 WL 5633000, at *11. The court concluded that these facts did not "give rise to reasonable suspicion that would justify the intrusive search performed on [the] [p]laintiff," *id.* The court observed that "[i]t [was] not reasonable to infer from the discovery of contraband in [the] [p]laintiff's sock that she was also

concealing contraband on her body in locations where it could only be accessed by requiring her to fully disrobe, squat to expose her private parts, and use the bathroom, all in view of an officer." *Id.* "If anything," the court explained, "the natural inference is the reverse: a smuggler would not risk concealing a bulky package in her sock if she also was willing to secrete contraband in more sensitive parts of her body." *Id.* Moreover, there was "no evidence" the plaintiff had shown any signs of concealing contraband in a body cavity, such as fidgeting suspiciously or reaching down her pants, nor was there evidence to suggest she had a reputation for such concealment. *Id.* Accordingly, the court granted the plaintiff's motion for summary judgment on her Fourth Amendment claim. *See id.* at *12.

**\*27** In *Monroe v. Gould*, an officer had performed a manual body cavity search on the plaintiff after the latter was arrested for possessing marijuana and a gravity knife. *See* 372 F. Supp. 3d at 204. But although the police had "found [the] plaintiff walking away from a vehicle containing cocaine, and a subsequent search of [the] plaintiff [had] revealed marijuana and a gravity knife on his person," the police could "not point to [the] plaintiff's physical appearance, apparent discomfort, or any suspicious actions or other articulable facts which might have suggested he was hiding something inside his body." *Id.* at 204–05 (emphasis omitted). Having found that the officer lacked reasonable suspicion for the search, the court denied the defendants' motion for summary judgment based on this search. *See id.* at 205.

As the foregoing cases suggest, without some particular indicator that Plaintiff was secreting drugs inside his body, the fact that he was arrested for reportedly dealing drugs is insufficient to establish reasonable suspicion. Although Police Defendants muddy the waters by invoking Plaintiff's subsequent testimony that it was his practice to conceal drugs in his anal cavity, (*see* Police Defs.' Opp'n 5; Pl.'s Dep. 25:19–26:7), there is no evidence the officers knew this fact at the time of the search, and thus, it is irrelevant, *see Bobbit*, 2020 WL 5633000, at *11 ("Reasonable suspicion must be assessed 'in light of the totality of the circumstances known to the officers at the time the search was begun.' " (citation omitted)). In sum, Police Defendants' first asserted basis for reasonable suspicion—the fact that Plaintiff was observed dealing drugs, (*see* Police Defs.' Opp'n 5)—does not, without more, support such a suspicion. Insofar as Police Defendants also rely on the fact that Plaintiff was observed dealing drugs "in an area of Newburgh known for a great deal of drug activity," (*id.*), this argument fails for the obvious reason that

it does not describe an "individualized suspicion, specifically directed to the person who is targeted for the [visual body cavity] search." *Bobbit*, 2020 WL 5633000, at *9 (quoting *Hartline*, 546 F.3d at 100). Unsurprisingly, Police Defendants provide no authority for the proposition that police have reasonable suspicion to invade a suspect's privacy when they arrest him in a neighborhood afflicted by crime. Such a notion runs contrary to well-established law and offends the protections enshrined in the Fourth Amendment.

Police Defendants' second asserted basis for reasonable suspicion—that "it was well known to police ... that drug dealers 'cheek' their drugs to conceal them from police," (Police Defs.' Opp'n 5)—fails for the same reason. This statement describes a generalized suspicion, rather than one individualized to Plaintiff specifically. Without a particular reason to believe that Plaintiff himself had a custom of secreting drugs inside his body cavity, the officers' knowledge regarding drug dealers *generally* does not establish reasonable suspicion. *See Sloley*, 945 F.3d at 46 (finding no reasonable suspicion where the plaintiff "himself was [not] previously known to secrete drugs inside his anal cavity"). Indeed, another court in this District has rejected an argument similar to the one advanced by Police Defendants. *See Bobbit*, 2020 WL 5633000, at *11–12 (finding no reasonable suspicion for visual body cavity search notwithstanding the assertion, proffered by the officer who ordered the search, "that in his experience, behavior like [the] [p]laintiff's [was] consistent with an effort to hide drugs"). In view of the basic principle that reasonable suspicion must be "specifically directed to the person who is targeted" for a visual body cavity search, *id.* at *9, Police Defendants did not have such suspicion based on the alleged custom of other drug dealers. For this and the reasons stated above, Police Defendants Canario, Pitt, Saintiche, and Arestin did not have reasonable suspicion to perform a visual body cavity search on Plaintiff.

ii. Whether Police Defendants Are Qualifiedly Immune

**\*28** Of course, "[c]oncluding that a constitutional violation has been established is only the first step in a two-step inquiry." *Murcia v. County of Orange*, 226 F. Supp. 2d 489, 496 (S.D.N.Y. 2002). The Court must also consider the possibility that Canario, Pitt, Saintiche, and Arestin are entitled to qualified immunity. *See id.* "To be entitled to qualified immunity at the summary judgment stage of a case, a defendant must show that, even viewing the evidence

in the light most favorable to the plaintiff, the defendant's actions did not violate clearly established law." *Bobbit*, 2020 WL 5633000, at *4 (quoting *Husain v. Springer*, 494 F.3d 108, 131 (2d Cir. 2007)). Where, as here, an officer must "have reasonable suspicion before undertaking a search, [he] is entitled to qualified immunity unless [a court] can say on the somewhat unique facts before [it] that it is clearly established that no reasonable suspicion justified a visual body cavity search." *Sloley*, 945 F.3d at 43 (citation and quotation marks omitted). "Stated differently, qualified immunity is unavailable if 'no reasonable officer could have believed that there was reasonable suspicion.' " *Id.* (quoting *Dancy v. McGinley*, 843 F.3d 93, 108 (2d Cir. 2016)).

*Sloley* precludes qualified immunity in this case. *Sloley* held that as of 2013,

> every reasonable officer in the [defendants'] position as New York State Troopers would have known [the rule] that visual body cavity searches conducted incident to any arrest must additionally be supported by a specific, articulable factual basis supporting a reasonable suspicion to believe the arrestee secreted evidence inside a body cavity.

*Sloley*, 945 F.3d at 40 (citation and quotation marks omitted); *Sanchez v. Bonacchi*, 799 F. App'x 60, 62 (2d Cir. 2020) (summary order) (recognizing that "[u]nder *Sloley*, as of 2013, ... [this rule] was clearly established"); *Bobbit*, 2020 WL 5633000, at *12 (recognizing same). Thus, after finding that the defendant lacked reasonable suspicion to perform a visual body cavity search, the Second Circuit concluded as follows:

> [I]n the absence of indicia that this [c]ourt or New York State courts have found to support individualized reasonable suspicion that [a suspect] was secreting drugs inside his anal cavity, ... no reasonable officer could have believed that there was

reasonable suspicion to conduct a visual body cavity search.

*Sloley*, 945 F.3d at 46 (citations, brackets, and quotation marks omitted). Because the events in this case occurred on May 8, 2015, well after the reasonable-suspicion rule with respect to visual body cavity searches was "clearly established," the Police Defendants who performed such a search on Plaintiff are not entitled to qualified immunity. In the absence of any evidence that has been held to support reasonable suspicion in this context—such as fidgeting or moving suspiciously, reaching into one's pants, or having an *individual* reputation for concealing drugs inside one's body cavity—this Court must conclude, as did the Second Circuit in *Sloley*, that "no reasonable officer could have believed ... there was reasonable suspicion to conduct a visual body cavity search." *Id.* (quotation marks omitted).

Accordingly, Plaintiff's Motion for Summary Judgment with respect to the visual body cavity search alleged in Count Six is granted.

### b. Alleged Manual Body Cavity Search

Insofar as Plaintiff moves for summary judgment with respect to the alleged manual body cavity search, the Motion is denied. Whereas Plaintiff maintains that "one of the[ ] officers "forcefully penetrate[d] [his] anal cavity and snatch[ed]" the bag of drugs secreted there, (SAC ¶ 63), the officers deny that any such manual inspection occurred, (*see* Canario Aff. ¶ 16; Arestin Aff. ¶ 5). The Court is therefore presented with a "factual clash" it may not resolve on summary judgment. *See Kassel*, 272 F. Supp. 3d at 535. Accordingly, Plaintiff's Motion is denied with respect to that portion of Count Six that involves the alleged manual body cavity search.

### 4. Sexual Harassment and Sexual Abuse Claims Based on Events at Police Station (Counts Three and Four)

**\*29** Plaintiff styles Count Three as a claim for "sexual harassment" against Canario, Pitt, Saintiche, and Arestin based on "repeated orders to strip search a second time, using physical force, touching and grabbing [his] buttocks[,] and penetrating [his] body cavity." (SAC ¶ 120.) This claim is based on the allegations in paragraphs 48–57 of the Second Amended Complaint, which recount Plaintiff's version of

what occurred in the strip search room at the Newburgh police station. (*See id.* ¶¶ 48–57, 120.) Similarly, Plaintiff styles Count Four as a claim for "sexual abuse" against Canario, Pitt, Saintiche, and Arestin for "using physical force, touching and grabbing [his] buttocks[,] and penetrating [his] body cavity." (*Id.* ¶ 121.) This claim is based on paragraphs 63–64 of the Second Amended Complaint, which describe the specific moment at which Plaintiff allegedly felt an unidentified officer "forcefully penetrate [his] anal cavity and snatch the plastic sandwich baggie containing the white-rock like substance [Plaintiff] had hidden there." (*Id.* ¶ 63.) The crux of Plaintiff's theory is that "the officers['] actions in conducting the strip search rise to the level of sexual assault," and thus, he argues, "there is a genuine issue of material fact regarding whether their actions were unreasonable under the Fourth Amendment." (Pl.'s Opp'n 9.)

Police Defendants have moved for summary judgment on both claims, arguing that, "[w]ithout some evidence the officers did the exam with a sexualized motive such as their own gratification or [Plaintiff's] sexual humiliation[,] there is nothing to support a claim of sexual harassment or abuse." (Police Defs.' Mem. 28.) They also note that "[d]ismissal of these [two] causes of action will not prevent [Plaintiff] from offering evidence in support of his [s]ixth [c]ause of [a]ction" alleging an unreasonable search in violation of the Fourth Amendment, (*id.* at 29), which the Court has already discussed *supra*. But "[t]he record," Police Defendants argue, "does not support separate claims of sexual abuse and harassment." (*Id.*)

In opposition to Police Defendants' Motion, Plaintiff invokes *Boddie v. Schnieder*, 105 F.3d 857 (2d Cir. 1997). (*See* Pl.'s Opp'n 10.) In *Boddie*, the Second Circuit considered whether "the sexual abuse of an inmate by a corrections officer may reach constitutional dimensions and give rise to an Eighth Amendment claim under [§] 1983." *See* 105 F.3d at 859. As the Court explained, the Eighth Amendment "sets constitutional boundaries on the conditions of imprisonment[,]" proscribing the "unnecessary and wanton infliction of pain" that constitutes "cruel and unusual punishment." *Id.* at 861. An Eighth Amendment violation has two components: "First, the alleged 'punishment' must be, 'objectively, sufficiently serious[ ]' "; and second, "the prison official involved must have a 'sufficiently culpable state of mind.' " *Id.* (citations omitted). In *Boddie*, the court concluded that allegations of sexual abuse *may* satisfy both elements of the constitutional test, "thereby stating an Eighth Amendment claim under [§] 1983." *Id.*

*Boddie*, however, does not govern this case. Plaintiff was not incarcerated when the alleged violations occurred, and thus, his claims do not arise under the Eighth Amendment. As discussed in Section II.B.2.b *supra*, because Plaintiff was still in the custody of the police and had not been formally arraigned when the alleged abuses occurred, his claims are properly examined under the Fourth Amendment.

It is well-established, moreover, that "sexual misconduct by a police officer during a 'seizure' is analyzed under the Fourth Amendment." *Spencer v. Sullivan County*, No. 18-CV-365, 2019 WL 4514011, at *6 (S.D.N.Y. Sept. 19, 2019) (citation and alteration omitted); *see also Jackson v. Mastrangelo*, 405 F. Supp. 3d 488, 491 (W.D.N.Y. 2019) (same); *Santiago v. City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *6 (S.D.N.Y. Oct. 30, 2015) (same); *Wright*, 2011 WL 1106217, at *6 (same). As a number of cases illustrate, however, claims for "sexual harassment" and "sexual abuse" are not independently cognizable causes of action under the Fourth Amendment. Instead, courts evaluate an officer's alleged sexual conduct as part of the inquiry into whether a search was unreasonable and invasive. For example, in *Wright*, the plaintiff alleged that two police officers had "sexually assaulted him" when they searched the plaintiff in connection with his arrest. *See* 2011 WL 1106217, at *6. The sexual assault claim was based on the fact that one of the two officers had allegedly "cupped [the plaintiff's] groin area, while she was frisking him, on two occasions[,]" while the other officer "failed to intervene." *Id.* at *7. The court's analysis focused on whether the officers' conduct constituted an unreasonable search under the Fourth Amendment. *See id.* at *6–7. Similarly, in *Love v. Town of Granby*, No. 03-CV-1960, 2004 WL 1683159 (D. Conn. July 12, 2004) (recommended ruling), the plaintiff alleged that two police officers had committed sexual assault and battery in connection with his arrest and confinement, *id.* at *4. According to the plaintiff, one of the officers grabbed [the plaintiff's] scrotum, used profanity, and referred to him using a homophobic slur. *Id.* at *5. Although the defendants argued that sexual assault and battery were state law claims over which the court should decline to exercise pendent jurisdiction, the court concluded that the plaintiff's claims [were] properly analyzed under the Fourth Amendment." *Id.* at *4–5. "Beyond the specific proscription of excessive force," explained the court, "the Fourth Amendment generally proscribes unreasonable intrusions on one's bodily integrity, and other harassing and abusive behavior that rises to the level of unreasonable seizure." *Id.* at *5 (quoting *Fontana*,

262 F.3d at 878–79 (evaluating a plaintiff's allegations of sexually harassing behavior by a police officer following an arrest under the Fourth Amendment's "unreasonable seizure" standard)).

**\*30** Plaintiff's constitutional claims for "sexual harassment" and "sexual abuse" are therefore duplicative of his unreasonable search claim in Count Six. Indeed, Count Six is based on the same allegations underpinning Counts Three and Four. (*See* SAC ¶ 123.) Because the alleged sexually harassing behavior is properly analyzed with respect to the unreasonable search alleged in Count Six, Counts Three and Four do not give rise to separately cognizable constitutional claims, and should therefore be dismissed. *Cf., e.g., Lopes v. Westchester County*, No. 18-CV-8205, 2020 WL 7029002, at *10 (S.D.N.Y. Nov. 30, 2020) (dismissing substantive due process claim as duplicative of equal protection claim); *Matthews v. City of New York*, No. 15-CV-2311, 2016 WL 5793414, at *5–6 (S.D.N.Y. Sept. 30, 2016) (dismissing substantive due process claims that were duplicative of Fourth Amendment claims). Police Defendants' Motion is therefore granted with respect to Counts Three and Four.

### 5. Deliberate Indifference Based on Failure to Supervise (Count Seven)

In Count Seven, Plaintiff asserts a deliberate indifference claim against Sergeant Anderson based on his "failure to supervise Canario, Pitt, Saintiche[,] and Arestin in conducting [the] strip search which resulted in injuries that [were] serious and [which constituted a] deprivation of the Fourteenth Amendment." (SAC ¶ 124.) This claim is predicated on paragraph 45 of the Second Amended Complaint, in which Plaintiff explains that "[t]here [were] no cameras in th[e] strip searching room[,] nor was there anyone ... to supervise/ monitor the search." (*Id.* ¶ 45; *see also id.* ¶ 124 (incorporating ¶ 45).) Plaintiff alleges that "Sergeant Anderson held the responsibility to supervise his subor[d]inates during this search but failed to do so, and as a result [Plaintiff] was seriously injured and deprived of [his] Fourth and Fourteenth Amendment[ ] [rights]." (*Id.* ¶ 45.)

In his Memorandum of Law, Plaintiff elaborates on this failure-to-supervise allegation. (*See* Pl.'s Mem. 15.) Anderson, he argues, "had a direct responsibility in monitoring the strip search in order to [e]nsure that the strip search was conducted in a manner that best [preserved] the Plaintiff's dignity and minimize[d] the potential abuse

and humiliation[.]" (*Id.*) He argues that Anderson's "gross negligence in failing to supervise his subordinates in conducting the strip search, thus[ ] giving them the right to conduct the search in any manner they pleased[,] was the proximate cause of the constitutional violations that ... occurred during the strip/visual body cavity search." (*Id.*) Plaintiff also argues that Anderson "had constructive notice of such unconstitutional practices ... through prior disciplinary violations of his subordinates [such] that[,] as a supervisory official, he had a direct responsibility [to] monitor[ ] the strip search ... to [e]nsure that [no constitutional violations occurred]." (*Id.* at 16.) In view of these arguments and the allegations in the Second Amended Complaint, the Court understands Plaintiff to raise a deliberate indifference claim based on Anderson's alleged failure to supervise his subordinates.

### a. Plaintiff's Newly Added Unreasonable Search Claim Against Anderson

In addition to this deliberate indifference claim, Plaintiff's Memorandum of Law suggests a separate theory of liability based on Anderson's *order* to have the search performed. (*See id.* at 15 ("Sgt. Anderson ... had ordered Pitt, Canario, Arestin[,] and Sainticle to conduct a strip search on the Plaintiff ...."); *id.* at 16 (arguing that Anderson "directly participated in the[ ] [unconstitutional search] by ordering Pitt, Canario, Arestin, and Sainticle to conduct a 'strip search' and [then] failing to supervise [them]").) Indeed, Plaintiff explicitly raises this theory of liability in a single sentence, arguing that "Anderson should also be held liable for the unreasonable search claim [in Count Six]." (*Id.* at 15.)

**\*31** As noted, this Court is obligated to construe liberally the pleadings of pro se litigants and interpret them to raise the strongest arguments they suggest. *See Triestman, 470 F.3d at 474.* Indeed, that is why the Court has considered Plaintiff's new legal theory under Count Six over Police Defendants' procedural objection, *see supra* Section II.B.3, and has liberally construed Plaintiff's malicious abuse of process claim in Count 10 as a claim for denial of the right to a fair trial, *see infra* Section II.B.6.

Here, however, the Court would be overextending its discretion by allowing Plaintiff to pursue his second theory of liability with respect to Anderson. Whereas Plaintiff's legal theory in Count Six and the fair trial claim in Count 10 are both grounded in facts alleged in the Second Amended

Complaint, that submission contained no allegations—and asserted no claims—with respect to Anderson's role in *ordering* the search. (*See generally* SAC.) The Second Amended Complaint—filed after the close of discovery— is quite clear in specifying the relevant facts and legal theory Plaintiff would use to establish Anderson's liability. Anderson, Plaintiff alleged, was "deliberate[ly] indifferen[t]" in "fail[ing] to supervise" his subordinates while they "conduct[ed] [the] strip search." (*Id.* ¶ 124.) Plaintiff may not now, on a motion for summary judgment, constructively amend his pleadings to incorporate a new claim against Anderson (unreasonable search) based on facts (Anderson's ordering of the search) that were never alleged in the Second Amended Complaint. *See Richardson v. City of New York*, No. 17-CV-8622, 2020 WL 5801476, at *7 (S.D.N.Y. Sept. 29, 2020) (concluding that a pro se plaintiff "may not belatedly assert [new] claims at the summary judgment stage"), *appeal docketed*, No. 20-3560 (2d Cir. Oct. 16, 2020); *Mediavilla v. City of New York*, 259 F. Supp. 3d 82, 106 (S.D.N.Y. 2016) ("It is well settled that a litigant may not raise new claims not contained in the complaint in opposition to a motion for summary judgment."); *Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers."); *Cross v. State Farm Ins. Co.*, 926 F. Supp. 2d 436, 450 (N.D.N.Y. 2013) ("It is well settled that papers on a motion for summary judgment is not the proper vehicle to add a new claim."); *cf. AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726–27 (2d Cir. 2010) (affirming district court's denial of plaintiffs' attempt to amend complaint "several months after cross-summary judgment motions had been filed"). Thus, the Court need not consider Plaintiff's putative unreasonable search claim against Anderson.

### b. Deliberate Indifference Based on Failure to Supervise

As noted, Plaintiff seeks to hold Anderson liable for the alleged unconstitutional acts of his subordinates. (*See* SAC ¶¶ 45, 124.) The gravamen of Plaintiff's claim seems to be that Anderson was not present in the strip search room to supervise the visual body cavity search, thereby giving Pitt, Canario, Sainticle, and Arestin "the right to conduct the search in any manner they pleased." (Pl.'s Mem. 15.) Although Plaintiff does not specify which particular acts occurred as a result of Anderson's absence, the Court understands Plaintiff to refer to (1) the alleged excessive force and (2) the alleged digital penetration. (*See* SAC ¶¶ 53–63, 122–23.)

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013); *see also Davila v. Johnson*, No. 15-CV-2665, 2015 WL 8968357, at *4 (S.D.N.Y. Dec. 15, 2015) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." (citation and quotation marks omitted)). Until recently, plaintiffs could establish the liability of a supervisory official for a subordinate's conduct under § 1983 by showing that:

> **\*32** (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of the plaintiffs by failing to act on information indicating that unconstitutional acts were occurring.

*Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020) (brackets omitted) (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). But in *Tangreti*, the Second Circuit held that "there is no special rule for supervisory liability[,]" thereby doing away with "the special standards for supervisory liability set forth in *Colon*." *Tangreti*, 983 F.3d at 617–18. As the court explained, the Supreme Court's 2009 decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), had "cast doubt on the continued viability" of these special standards. *Tangreti*, 983 F.3d at 617. In *Iqbal*, the Supreme Court stated that in § 1983 suits against state officials, such officials "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Id.* at 616 (italics omitted) (quoting *Iqbal*, 556 U.S. at 676). In the years since *Iqbal* was decided, district courts

in this Circuit tried, "with inconsistent results, to determine [its effect] on supervisory liability." *Id.* at 617 & n.3. *Tangreti* put the matter to rest by rejecting a special standard for supervisory liability and clarifying that "a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' " *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676). Accordingly, when a plaintiff brings a § 1983 suit against a supervisory official, " '[t]he factors necessary to establish a [constitutional] violation will vary with the constitutional provision at issue[,]' because the elements of different constitutional violations vary." *Id.* at 618 (quoting *Iqbal*, 556 U.S. at 676). Whatever the alleged constitutional violation, after *Tangreti*, "[t]he violation must be established against the supervisory official directly." *Id.* at 618.

The Second Circuit's analysis in *Tangreti* illustrates how the Court may resolve the instant claim without reference to the supervisory liability factors in *Colon*. In *Tangreti*, an inmate at York Correctional Institute had been sexually abused by three correctional officers "on numerous occasions" over a span of more than a year from 2013 to 2014. *See id.* at 612. The inmate brought a § 1983 suit against eight prison supervisors alleging that they had shown deliberate indifference to the substantial risk of sexual abuse in violation of the Eighth Amendment. *Id.* The district court granted summary judgment to all but one of these defendants. *Id.* With respect to this last defendant, the district court found that she "was conceivably personally involved" in the alleged constitutional violations based on *Colon* factors four (gross negligence in supervising the subordinates who committed the violations) and five (deliberate indifference based on failure to act on information that unconstitutional acts were occurring). *See Tangreti v. Semple*, No. 17-CV-1420, 2019 WL 4958053, at *19–21 (Oct. 8, 2019), *reversed and remanded*, 983 F.3d 609 (2d Cir. 2020). Reversing the district court, the Second Circuit explained that the plaintiff "must ... establish that [the defendant] violated the Eighth Amendment by [the defendant's] own conduct, not by reason of [the defendant's] supervision of others who committed the violation." *Tangreti*, 983 F.3d at 619. In other words, "[s]he must show that [the defendant] herself acted with 'deliberate indifference,' " which in the Eighth Amendment context means "that [the defendant] personally knew of and disregarded an excessive risk to [the plaintiff's] health or safety." *Id.* (citation and some quotation marks omitted). The plaintiff could not, however, "rely on a separate test of liability specific to supervisors." *Id.*

**\*33** Here, in light of *Tangreti*, Plaintiff must establish that Anderson committed a constitutional violation through his own conduct, rather than through his supervision of Pitt, Canario, Sainteche, and Arestin. That is, Plaintiff must establish that Anderson himself showed deliberate indifference. Because Plaintiff was a pretrial detainee at the time of the alleged violations, his deliberate indifference claim is analyzed under the Due Process Clause of the Fourteenth Amendment. *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("[Because Plaintiff] was in pretrial detention at the time of the alleged incidents ... [t]he district court correctly concluded that [his] claims ar[o]se under the Due Process Clause ...."). [24] Deliberate indifference claims under the Fourteenth Amendment are analyzed somewhat differently than the same claims under the Eighth Amendment, which applies to inmates who have been convicted and sentenced. *See Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017) (explaining the different mens rea requirements for Eighth Amendment and Fourteenth Amendment deliberate indifference claims). To be sure, the overarching framework remains the same. Under both the Eighth and Fourteenth Amendments, to prevail on a deliberate indifference claim a plaintiff must establish (1) "that he suffered a sufficiently serious constitutional deprivation," and (2) that the defendant "acted with deliberate indifference." *Feliciano v. Anderson*, No. 15-CV-4106, 2017 WL 1189747, at \*8 (S.D.N.Y. Mar. 30, 2017).

24      Because Plaintiff was in police custody at the time of the alleged constitutional violation, he is treated as a pre-trial detainee for purposes of the deliberate-indifference analysis. *See Fredericks v. Doe*, No. 20-CV-11043, 2021 WL 308808, at \*2, \*4 (S.D.N.Y. Jan. 29, 2021) (treating a plaintiff who was allegedly assaulted by three detectives at a police precinct as a pretrial detainee for purposes of the deliberate-indifference analysis).

The first element "is evaluated the same way under both the Eighth Amendment and Fourteenth Amendment." *Ackridge v. Aramark Corr. Food Servs.*, No. 16-CV-6301, 2018 WL 1626175, at \*19 n.19 (S.D.N.Y. Mar. 30, 2018) (citing *Darnell*, 849 F.3d at 30). This requirement is "objective"; the detainee must show that "the alleged deprivation" is "sufficiently serious." *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (citation and quotation marks omitted). In other words, the plaintiff must show that he was "[detained] under conditions posing a substantial risk of serious harm." *Blandon v. Capra*, No. 17-

CV-65, 2017 WL 5624276, at \*7 (S.D.N.Y. Nov. 20, 2017) (quoting *Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996)).

The second element "applies differently to claims under the Eighth Amendment and the Fourteenth Amendment." *Howard v. Brown*, No. 15-CV-9930, 2018 WL 3611986, at \*4 (S.D.N.Y. July 26, 2018) (citing *Darnell*, 849 F.3d at 34–35). While the Eighth Amendment imposes a subjective standard —that the defendant-official "knows of and disregards an excessive risk to inmate health or safety," *Darnell*, 849 F.3d at 32 (citation omitted)—the Fourteenth Amendment, applicable here, imposes an objective standard. That is, the defendant-official need only "recklessly fail[ ] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Id.* at 35. However, "[d]espite the slightly lower standard" applicable to pretrial detainees, "which is akin to objective recklessness, any § 1983 claim or a violation of due process requires proof of a mens rea greater than mere negligence." *Miller v. County of Nassau*, No. 16-CV-5843, 2018 WL 1597401, at \*3 (E.D.N.Y. Mar. 31, 2018) (quotation marks and italics omitted) (ultimately quoting *Darnell*, 849 F.3d at 36).

Assuming Plaintiff satisfies the first element of his deliberate-indifference claim, he still has produced no evidence that Anderson recklessly failed to mitigate a risk that he either knew or should have known about. *See Darnell*, 849 F.3d at 35. Although Plaintiff asserts that Anderson "had constructive notice of ... unconstitutional practices ... through prior disciplinary violations of his subordinates," (Pl.'s Mem. 16), he has not pointed the Court to a single such violation. There is no evidence in the record, for example, regarding prior complaints or legal actions against Pitt, Canario, Sainteche, or Arestin. Nor is there evidence in the record regarding prior unreasonable search or excessive force claims against other members of the Newburgh Police Department more generally.

**\*34** Though it preceded *Tangreti* and involved a motion to dismiss, this Court's decision in *Gantt v. Ferrara*, No. 15-CV-7661, 2018 WL 4636991 (S.D.N.Y. Sept. 27, 2018), is nevertheless instructive here. In *Gantt*, the plaintiff alleged that Newburgh's police chief had failed to properly train and supervise one of his subordinate officers who allegedly had used excessive force against the plaintiff. *See id.* at \*6, \*8. To determine whether the plaintiff had adequately alleged the police chief's personal involvement in the putative

violation, this Court looked to the fourth *Colon* factor—whether "the defendant was grossly negligent in supervising subordinates who committed the wrongful acts." *Id.* at *6 (quoting *Grullon,* 720 F.3d at 139). Although after *Tangreti* courts must now resolve claims against supervisor-defendants without reference to *Colon*'s special standards for supervisory liability, the legal standard under the fourth *Colon* factor is virtually identical to the Fourteenth Amendment deliberate-indifference standard applicable here. To establish personal involvement based on this factor, a plaintiff formerly had to show that a defendant:

> knew or should have known that there was a high degree of risk that his subordinates would behave inappropriately, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [the] [p]laintiff.

*Id.* (quoting *Frederick v. Sheahan,* No. 10-CV-6527, 2014 WL 3748587, at *8 (W.D.N.Y. July 29, 2014)); *see also Kucera v. Tkac,* No. 12-CV-264, 2013 WL 1414441, at *6 (D. Vt. Apr. 8, 2013) (noting that an "alleged failure [to supervise or train] [would] satisfy the fourth *Colon* factor if [the officers] 'knew or should have known that there was a high degree of risk that subordinates would behave inappropriately but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable officer would find necessary to prevent such a risk' " (alterations and citation omitted)). Much like Plaintiff has done here, the plaintiff in *Gantt* alleged that the defendant "had knowledge of [his subordinate's] prior use of excessive force" by virtue of numerous prior "civil complaints and lawsuits alleging excessive force and police misconduct." *Gantt,* 2018 WL 4636991, at *7 (record citation omitted). But because the plaintiff had "provide[d] no detail of these other complaints, such as when they were filed and whether the alleged misconduct was similar," this Court concluded that his allegations were "insufficient to make out a claim" that the defendant had been deliberately indifferent. *See id.* (citing *Guillory v. Cuomo,* No. 14-CV-971, 2014 WL 11173632, at *4 (N.D.N.Y. Dec. 2, 2014) (dismissing claim for lack of personal involvement where "[the] [p]laintiff cite[d] to his four prior lawsuits but d[id] not allege how any defendant [named] ... had any involvement or any knowledge of any of the incidents described in any of those lawsuits")).

Here too, Plaintiff has alleged in conclusory fashion that Anderson "was aware of ... [his subordinates'] prior disciplinary violations," (Pl.'s Mem. 16), but has offered no evidence in support of that claim. Without record evidence that Anderson knew about or should have known about an excessive risk to Plaintiff's safety, *see Darnell,* 849 F.3d at 35, the Court must deny Plaintiff's Motion in this respect and grant summary judgment in favor of Police Defendants, *see Rodriguez v. Goins,* No. 18-CV-1380, 2020 WL 6150984, at *4 (N.D.N.Y. Aug. 17, 2020) (granting summary judgment where there was no evidence that the defendant knew or should have known about the threat allegedly posed by the pretrial detainee's fellow inmate), *adopted by* 2020 WL 6146597 (N.D.N.Y. Oct. 20, 2020); *Charles v. Rockland Cnty. Off. of Sheriff,* No. 16-CV-166, 2019 WL 1299804, at *4 (S.D.N.Y. Mar. 21, 2019) (same).

Accordingly, Police Defendants' Motion is granted with respect to Count Seven.

### 6. Abuse of Process and Denial of Right to Fair Trial Claims (Count 10)

**\*35** In Count 10, Plaintiff asserts what is styled as a claim for malicious abuse of process against Police Defendants Canario and Pitt. (SAC ¶ 127.) In the Second Amended Complaint, this claim is predicated on the allegations that Canario and Pitt "falsified incriminating statements to obtain, secure[,] and execute [a] search warrant [in order] to carry out body cavity / x-ray examinations," and that they "provided statements to [the] prosecution and falsely charg[ed] / fil[ed] [a] felony and misdemeanor complaint." (*Id.*) Plaintiff and Police Defendants have both moved for summary judgment on this claim. (*See* Police Defs.' Mem. 23–25; Pl.'s Mem. 16–17.)

As his Memorandum of Law makes clear, however, Plaintiff is actually asserting a cause of action for denial of the right to a fair trial. (*See* Pl.'s Mem. 16–17.) Such a claim is distinct from a claim for malicious abuse of process. *See Frost v. N.Y.C. Police Dep't,* 980 F.3d 231, 244–51 (2d Cir. 2020) (discussing the cause of action for denial of one's right to a fair trial); *Thagard v. Lauber,* 317 F. Supp. 3d 669, 684 (W.D.N.Y. 2018) (explaining that a claim for the denial of the right to a fair trial

"is a separate legal theory from a claim for abuse of process under § 1983"); *Hoyos v. City of New York*, 999 F. Supp. 2d 375, 391–95 (E.D.N.Y. 2013) (analyzing malicious abuse of process claim and fair trial claim as distinct causes of action); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 343–44, 346–47 (S.D.N.Y. 2009) (same).

Although ordinarily the Court would decline to consider a claim that was not explicitly pled in the Second Amended Complaint, the Court is ever mindful of its obligation to construe "the submissions of a pro se litigant ... liberally" and interpret them "to raise the strongest arguments that they suggest," *Triestman*, 470 F.3d at 474 (italics omitted). Count 10 is predicated in part on the allegation that Pitt "provided false statements to the ... D[istrict] A[ttorney]," that "[t]he substance of these false statements violated [Plaintiff's] rights to a fair trial," and that "Pitt was maliciously building a stronger case for the prosecution when providing such false statements to the prosecution." (SAC ¶¶ 108–09; *id.* ¶ 127 (incorporating these allegations).) As discussed *infra*, these allegations clearly sound in a Fourteenth Amendment fair trial claim, rather than a Fourth Amendment abuse of process claim. Moreover, while Police Defendants have objected to what they characterize as Plaintiff's constructive amendment with respect to Count Six, *see* discussion *supra*, they raise no such objection with respect to Count 10. Indeed, they have responded to Plaintiff's arguments regarding his fair trial claim. (*See* Police Defs.' Opp'n 8–9.) Accordingly, the Court will consider this claim on its merits.

### a. Plaintiff's Fair Trial Claim

A criminal defendant's "right to a fair trial" is enshrined in the Due Process Clause of the Fourteenth Amendment. *Frost*, 980 F.3d at 244 (quoting *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010)). "This right is violated 'when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors.' " *Frost*, 980 F.3d at 244 (quoting *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997)). "[T]he harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130. Despite the "nomenclature, a criminal defendant's right to a fair trial protects more than the fairness of the trial itself," and, as relevant here, "a criminal defendant can bring a fair trial claim even when no trial occurs at all." *Frost*, 980 F.3d at 249; *see also Ricciuti*, 124 F.3d at 130 (reversing dismissal of fair trial claim despite the fact that

all criminal charges were dismissed before trial); *Polanco v. City of New York*, No. 14-CV-7986, 2018 WL 1804702, at *11 (S.D.N.Y. Mar. 28, 2018) ("Somewhat counterintuitively, a claim for denial of the right to a fair trial does not require that the underlying action actually proceeded to a trial on the merits."); *Soomro v. City of New York*, 174 F. Supp. 3d 806, 815 (S.D.N.Y. 2016) (fair trial claim does not require "an actual trial").

**\*36** To prevail on his fair trial claim, Plaintiff "must show that 'an (1) investigating official (2) fabricate[d] evidence (3) that [was] likely to influence a jury's decision, (4) forward[ed] that information to prosecutors, and (5) [Plaintiff] suffer[ed] a deprivation of liberty as a result." *Soomro*, 174 F. Supp. 3d at 815 (quoting *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order); *Ricciuti*, 124 F.3d at 130). Thus, Plaintiff is required to establish not only that the police fabricated evidence, but also that this evidence *caused* his deprivation of liberty. *See Moroughan v. County of Suffolk*, — F. Supp. 3d —, 2021 WL 298714, at *34 (E.D.N.Y. Jan. 20, 2021) ("The Second Circuit has held that the fabricated evidence must *cause* the deprivation of liberty." (citing *Zahrey v. Coffey*, 221 F.3d 342, 350–51 (2d Cir. 2000))). In this respect, the relevant inquiry is "whether the liberty deprivations that occurred are legally traceable back even further to the earlier investigatory act of fabrication ...." *Zahrey*, 221 F.3d at 352.

As a threshold matter, the Parties dispute whether the information allegedly forwarded to prosecutors—i.e., Plaintiff's putative statement that he was secreting more drugs inside his body—was fabricated to begin with. [25] If this were the only factual dispute with respect to Plaintiff's fair trial claim, the Court could still grant summary judgment for Police Defendants based on the lack of causal connection between the alleged fabrication and Plaintiff's deprivation of liberty. *See Zahrey*, 221 F.3d at 348 ("[I]f [the plaintiff] had claimed only that [the defendant] fabricated evidence and did nothing to precipitate the sequence of events that resulted in a deprivation of [the plaintiff's] liberty, no constitutional violation would have been alleged."). Here, however, there is also a genuine dispute as to whether Police Defendants' alleged fabrication could have caused Plaintiff's deprivation.

25    Plaintiff maintains he never made such a statement. (*See* SAC ¶ 108; Pl.'s Mem. 16–17.) But as noted in Section I.A.3 *supra*, Canario avers that "[a]t some point prior to [when Canario] [took] [Plaintiff] to the hospital at approximately 6:40 p.m.[,]

[Plaintiff] told [Canario] he had more drugs inside his rectum but they were too far in and [the police] would not be able to get them." (Canario Aff. ¶ 25.) Canario "advised both Sergeant Anderson and Detective Pitt about these comments," which became part of the basis for the acquisition of the search warrant. (*See id.*) Pitt echoes Canario's account, explaining that at some point after he had helped remove the drugs from Plaintiff's mouth, he "learned that Officer Canario had reported [that] [Plaintiff] had told him he had additional drugs secreted in his body that had not been located[,] and [he] was directed to prepare an application for a search warrant based upon this information so that a digital rectal search could be performed at a local hospital." (Pitt. Aff. ¶ 14.) Thus, there is a factual dispute as to whether Plaintiff ever said he was concealing more drugs.

Police Defendants appear to argue there was no causation in part because "no false information was turned over to the prosecutor." (Police Defs.' Mem. 24.) But Plaintiff has provided two documents, evidently filed in connection with his prosecution, that complicate that assessment. (*See* Pl.'s Mem. Ex. J (Dkt. No. 183).) [26] Dated October 13, 2015 and submitted by Orange County District Attorney David M. Hoovler ("Hoovler"), both documents are labeled "Notice to Defendant of Intention to Offer Confessions or Admissions." (*See id.*) In the first document, Hoovler informs Plaintiff that he "intend[ed] to offer into evidence certain voluntary statements made by [Plaintiff] to Detective Michael Pitt of the City of Newburgh Police Department on May 8, 2015 at the City of Newburgh Police Department[,]" the substance of which was "that the police did not get it all and he has more up his buttocks." (*Id.*) In the second document, Hoovler informs Plaintiff of an additional statement he intended to offer into evidence. (*Id.*) In that statement, Plaintiff purportedly told Canario, Arestin, Saintiche, and/or Pitt: "[Y]ou guys are gay; you just want to see my ass; is this what you want[?]; that's not mine; you won't find the rest; it's either up too far or I ate it[.]" (*Id.*) Plaintiff also purportedly suggested "that it was his knife from the ground; [and] that the object that was recovered was just a lighter." (*Id.*) [27] Without question, these documents at least raise the possibility that the investigating officers "forward[ed] th[e] [allegedly fabricated] information to prosecutors." *Soomro*, 174 F. Supp. 3d at 815. Thus, Police Defendants' argument that "no false information was turned over to the prosecutor," (Police

Defs.' Mem. 24), simply ignores the genuine dispute of fact regarding the alleged fabrication. [28]

[26] Plaintiff's Exhibit J is located at ECF pages 30–31 of Dkt. No. 183.

[27] The second document also contains a disclaimer which states that "[a]lthough notice pursuant to [Criminal Procedure Law] § 710.30 has been gratuitously given, the People reserve their right to not introduce such statements in their case-in-chief against [Plaintiff] as not relevant to the charged criminal transaction." (Pl.'s Mem. Ex. J.)

[28] Although Police Defendants dismiss the significance of the documents submitted by Plaintiff, the Court finds their arguments unpersuasive. Police Defendants note, for example, that the forms on which the District Attorney provided notice to Plaintiff "are those of the District Attorney, not the [Police] [D]efendants." (Police Defs.' Opp'n 9.) The relevance of this fact eludes the Court, for part of the inquiry is whether police forwarded fabricated evidence to the prosecution. *See, e.g.*, *Moroughan*, 2021 WL 298714, at *34; *Soomro*, 174 F. Supp. 3d at 815. That Plaintiff's alleged statements to the police subsequently showed up on the District Attorney's "forms" suggests that the police provided these statements to the prosecution. Police Defendants also point to various discrepancies between the two documents filed by the District Attorney and the evidence in the record, noting, for example, that while the District Attorney's first document indicates that Plaintiff made the relevant statement to Pitt, (*see* Pl.'s Mem. Ex. J), Pitt indicates that he heard the statement from someone else, (*see* Pitt. Aff. ¶ 14). (*See* Police Defs.' Opp'n 9.) But such discrepancies do not alter the Court's analysis: Whether the District Attorney accurately characterized the circumstantial details surrounding Plaintiff's alleged statements is not particularly relevant; what matters is that he had learned of these statements in the first place.

**\*37** Police Defendants also appear to argue there was no causation because "no charges alleging [Plaintiff] had additional drugs were [ever] filed," and Plaintiff "was solely prosecuted on the evidence tampering charge to which he pled guilty[,] and does not even know the disposition of the sole

2021 WL 1164185

drug possession charge which only related to what was found at the police station." (Police Defs.' Mem. 24 (record citations omitted).) The problem with this argument is that it frames the potential harm from the allegedly fabricated evidence too narrowly. In other words, Plaintiff may still establish the causation element of his fair trial claim even if the prosecutor did not *use* the fabricated evidence. The recent decisions in *Frost* and *Moroughan* are instructive on this point.

In *Frost*, the plaintiff alleged that detectives had coerced a witness into identifying him as the shooter in connection with a murder investigation, and then provided that evidence to prosecutors, who used it to seek the plaintiff's detention and prosecution. 980 F.3d at 244–45. Although the allegedly coerced identification was never used at trial, *see id.* at 249, the court held that the plaintiff's fair trial claim survived summary judgment because there were triable questions as to whether (1) the witness's identification was coerced in the first instance, and (2) whether such evidence "would likely have influenced the jury" had such evidence been presented at trial, *see id.* at 250. As the court observed, a "prosecutor's decision to pursue charges rather than to dismiss a complaint without further action may depend on the prosecutor's assessment of the strength of the case, which in turn may be critically influenced by fabricated evidence." *Id.* at 248 (brackets and ellipsis omitted) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 277–78 (2d Cir. 2016)). Taken together, the two triable questions identified by the court "create[d] a genuine dispute as to whether [the witness's] identification "critically influenced" the decision to prosecute [the plaintiff], thereby resulting in a deprivation of his liberty." *Id.* at 250.

In *Moroughan*, the plaintiff alleged that police officers fabricated his confession and provided this fabricated evidence to the prosecution. *See* 2021 WL 298714, at *3, *34. Ultimately, however, the charges against the plaintiff were dismissed before trial. *See id.* at *13. The defendants argued—much as Police Defendants have argued here—that because "the plaintiff's statement was never used, or even considered during his brief pending criminal prosecution," his fair trial claim had to be dismissed, *id.* at *36 (record citation omitted). The court disagreed, observing that "the Second Circuit recently rejected [that] precise argument [in *Frost*]." *Id.* (noting that "the fair trial claim survived summary judgment in *Frost* even though the allegedly fabricated evidence was presented to the prosecutor, but never used at any trial"). In *Moroughan*, moreover, there was evidence in the record that the district attorney, while investigating the

charges, had considered the allegedly fabricated confession, which he found "corroborated [the defendants'] accounts as evidence against [the] plaintiff." *Id.* In light of this evidence, as well as the Second Circuit's holding in *Frost*, the court concluded there were genuinely disputed issues of material fact precluding summary judgment. *Id.* at *37. Here, as in *Frost* and *Moroughan*, disputed issues of material fact preclude summary judgment on Plaintiff's fair trial claim. The documents filed by District Attorney Hoovler raise the distinct possibility that Plaintiff's allegedly fabricated statements "critically influenced" Hoovler's "assessment of the strength of the case." *See Frost*, 980 F.3d at 248. Although Police Defendants rely on the fact that Plaintiff "was solely prosecuted on the evidence tampering charge to which he pled guilty," (Police Defs.' Mem. 24), they cannot get around the fact that Hoovler evidently thought Plaintiff's alleged statements had *some* potential relevance to his prosecution. Indeed, even if the disclaimer on Hoovler's second document were interpreted to suggest that he had no intention of introducing Plaintiff's alleged statement at trial, (*see* Police Defs.' Opp'n 9), that is not the relevant inquiry, as the discussion above illustrates. The Court's concern is whether the statement "would be likely to influence a jury's decision, *were that evidence presented to the jury*." *Frost*, 980 F.3d at 250. Because there is a genuine dispute of material fact regarding the causation element of Plaintiff's fair trial claim, the Court may not grant summary judgment. Thus, Plaintiff's Motion and Police Defendants' Motion are both denied with respect to this claim.

**\*38** Finally, the Court notes that to the extent Plaintiff has framed his fair trial claim around Police Defendants' acquisition of a search warrant, (*see* Pl.'s Mem. 16–17), he seems to misconceive the nature of his own claim. In a fair trial claim such as the one he has raised, the relevant injury is a plaintiff's deprivation of liberty. *See, e.g., Frost*, 980 F.3d at 250 (explaining that the fair trial right "protects against deprivation of liberty"); *Zahrey*, 221 F.3d at 349 (explaining that "the right at issue" in a fair trial claim "is appropriately identified as the right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity"); *Soomro*, 174 F. Supp. 3d at 815 (stating that the plaintiff must suffer a deprivation of liberty to prevail on a fair trial claim); *Moroughan*, 2021 WL 298714, at *34 (noting that "the fabricated evidence must cause the deprivation of liberty"). Whereas "the claim of denial of the right to a fair trial finds its roots in the Sixth Amendment, as well as the due process clauses of the Fifth and the Fourteenth Amendments," *Aguirre v. City of New York*, No. 15-CV-6043,

2017 WL 4236552, at *10 n.13 (E.D.N.Y. Sept. 22, 2017); *see also Gogol v. City of New York*, No. 15-CV-5703, 2017 WL 3449352, at *11 (S.D.N.Y. Aug. 10, 2017) (same); *but cf. Garnett*, 838 F.3d at 276 n.6 (stating that "[w]hether this right is rooted in the Sixth Amendment or Fifth and Fourteenth Amendments, or both, is an issue we need not decide"), the right to be free from an unreasonable search by law enforcement arises under the Fourth Amendment, *see Maldonado v. Town of Greenburgh*, 460 F. Supp. 3d 382, 392 (S.D.N.Y. 2020). Although a deprivation of liberty may arise "from an allegedly fabricated statement in a search warrant," *see Polanco*, 2018 WL 1804702, at *12 & n.13, the relevant injury in such a scenario would still be the deprivation of liberty, rather than the resultant search itself. Thus, insofar as Plaintiff alleges that the search warrant was procured through fabricated evidence, (*see* Pl.'s Mem. 16–17), he appears to be challenging the legality of the search that was subsequently undertaken pursuant to that warrant. Such a challenge is appropriately framed as an unreasonable search claim, rather than a fair trial claim.

### b. Malicious Abuse of Process Claim

Although Count 10, as discussed, is appropriately treated as a fair trial claim, the Court will briefly address Plaintiff's putative abuse of process claim to avoid any doubt.

"The elements of a § 1983 cause of action for malicious abuse of process are provided by state law." *Sorrell v. County of Nassau*, 162 F. Supp. 3d 156, 171 (E.D.N.Y. 2016) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). In New York,

> a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act, (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

*Deanda*, 137 F. Supp. 3d at 576 (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). The third element —a collateral objective—is "[t]he crux of a malicious abuse of process claim." *Marshall v. Port Auth. of N.Y. & N.J.*, No.

19-CV-2168, 2020 WL 5633155, at *8 (S.D.N.Y. Sept. 21, 2020) (quoting *Douglas v. City of New York*, 595 F. Supp. 2d 333, 344 (S.D.N.Y. 2009)). Thus, to prevail on such a claim, "a plaintiff must establish that the defendants had an improper <u>purpose</u> in instigating the action," and must establish that the defendants "aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Marshall*, 2020 WL 5633155, at *8 (brackets omitted) (quoting *Savino*, 331 F.3d at 77). "A collateral objective is usually characterized by personal animus, and may include infliction of economic harm, extortion, blackmail[,] or retribution." *Dash v. Montas*, —F. Supp. 3d—, 2020 WL 1550708, at *10 (E.D.N.Y. Mar. 31, 2020) (citations, brackets, and quotation marks omitted).

Here, Plaintiff has not come forward with *any* evidence to suggest that Pitt or Canario sought to investigate or facilitate the prosecution of Plaintiff with any collateral objective. Without evidence that these Defendants maintained some personal animus toward Plaintiff, or "aimed to achieve a collateral purpose beyond or in addition to his prosecution," *Marshall*, 2020 WL 5633155, at *8, his claim for malicious abuse of process fails. Thus, insofar as Count 10 purports to raise a malicious abuse of process claim, that claim is denied. *See id.* at *9 (granting summary judgment for defendants where the plaintiff "ha[d] not offered any evidence that the officers had an 'improper motive or pursued a collateral purpose outside the legitimate ends of process' " (citation omitted)); *Dash*, 2020 WL 1550708, at *11 (granting summary judgment for defendants where plaintiff provided no evidence that the defendant "harbored any personal animus toward [him] or acted with some other collateral objective ... not related to law enforcement").

**\*39** For the reason above, Police Defendants' Motion and Plaintiff's Motion are both denied with respect to Count 10.

### 7. Unreasonable Search and Right to Privacy Claims Based on Events at St. Luke's (Counts 15, 16, and 17)

To resolve Defendants' Motions with respect to the claims arising from the events at St. Luke's, the Court must address two threshold issues. First, the Court must address Plaintiff's contention that the manual body cavity search and x-ray examination at St. Luke's occurred during the first—and, according to Plaintiff, the *only*—visit to the hospital, before the police had secured a search warrant. (*See* SAC ¶¶ 75–102; Pl.'s Opp'n 18–20; Pl.'s Dep. 102:8–13.) Second, the Court must consider the validity of the warrant itself, and

whether Police Defendants had a good-faith basis to rely on the warrant.

#### a. Timing and Sequence of the Manual Body Cavity Search and X-Ray Examination at St. Luke's

As noted in Section I.A.4.b *supra*, Plaintiff maintains that a manual body cavity search and x-ray examination were performed during his first visit to St. Luke's, and that, contrary to Defendants' version of events, there was no second visit to the hospital later in the evening. According to Plaintiff's account, therefore, the manual body cavity search and x-ray were performed without a search warrant, (*see* Pl.'s Opp'n 19; Pl.'s Dep. 103:10–104:8), which the police did not obtain until later in the evening, (*see* Defs.' 56.1 ¶¶ 81–83).

Plaintiff's medical records from St. Luke's, however, corroborate Defendants' version of events. According to the digital timestamps from these records, Plaintiff was first admitted to St. Luke's at "1847" (6:47 P.M.) on May 8, 2015. (*See* ER Records 4; Posner Aff. Ex. O ("Berberich Aff.") ¶ 10 (Dkt. No. 160-14).) These records indicate that he left the hospital "in police custody" either at "1939" (7:39 P.M.), (*see* ER Records 4), or at "1927" (7:27 P.M.), (*see id.* at 16).[29] The Court has thoroughly reviewed the first 20 pages of Police Defendants' Exhibit D, which contains the medical records pertaining to Plaintiff's initial visit to St. Luke's. (*See* ER Records 2–21.) These records indicate that between "1905" (7:05 P.M.) and "1935" (7:35 P.M.), medical staff flushed Plaintiff's eyes (to remove residual pepper spray), performed an "EKG" (an electrocardiogram), and performed "wound care [on] [a] small abrasion to [the] patient[']s back," which included "cleans[ing] [the abrasion] with [a] normal saline antibiotic" and covering the wound with a bandage, after which Plaintiff was "discharged back into [the] custody of [the] police department." (*See id.* at 8.) But although these records contain information regarding Plaintiff's vital signs, (*see id.* at 5, 10, 13–14), medical history, (*see id.* at 12), and discharge instructions, (*see id.* at 14, 16–19), there is no mention of either a manual body cavity search or x-ray examination having been performed.

[29] Although there is a 12-minute difference between the digital timestamps on page four and page 16 of these records, the Court finds this difference immaterial. The Court also notes that the time stamp on page 16—"1927"—appears on a sheet of

paper that was printed and then signed by Plaintiff and the caregiver. (*See* ER Records 16.) It makes intuitive sense that there is a short gap of time between when the sheet was printed (7:27 P.M.) and when, according to the hospital's time-keeping system, Plaintiff was formally discharged (7:39 P.M.). (*See* ER Records 4). Moreover, although Laura Berberich, St. Luke's Director of Health Information Management, states that Plaintiff was discharged at "1938" (7:38 P.M.), (*see* Berberich Aff. ¶ 10), this disparity is also immaterial.

**\*40** Exhibit D also contains a second set of records pertaining to a subsequent emergency room visit later in the evening. According to the digital timestamps in these records, Plaintiff was admitted a second time at "2300" (11:00 P.M.) on May 8, 2015, and discharged at "0137" (1:37 A.M.) on May 9, 2015. (*See id.* at 23; *see also id.* at 36–37 (indicating discharge time of "0135"); Berberich Aff. ¶ 10 (stating that discharge time was "01:39").) The "Emergency Room Note" for this second visit indicates that Plaintiff was "seen earlier today" at the hospital and was now there "for [a] search warrant rectal exam." (*Id.* at 29; *see also id.* at 24 (stating that "police [were] present ... with search warrant to search the rectal area"); *id.* at 31 (listing "secondary impression" as "search warrant rectal exam").) The same note states: "Per Sergeant, [x-ray] if needed may be completed as well." (*Id.* at 29.) According to the records, Plaintiff was "seen" and an "eval[uation]" was performed by Nurse Practitioner Durbin-French at "00:30" (12:30 A.M.). (*See id.* at 25; *cf.* Durbin-French Aff. ¶¶ 13, 21 (indicating that she saw Plaintiff at 12:25 A.M. and performed a rectal examination).) An x-ray examination was performed at approximately "00:37" (12:37 A.M.). (*See* ER Records 25; Durbin-French Aff. ¶¶ 24–27 (discussing the x-ray examination performed on Plaintiff).) And at "01:30" (1:30 A.M.), the x-rays were "reviewed by [Durbin-French]," Plaintiff was "cleared for [discharge]," and discharge instructions were provided to Plaintiff and the police. (*See* ER Records 25–26; Durbin-French Aff. ¶¶ 28–31.) The records reflect that no "foreign body" was found in Plaintiff's rectum. (ER Records 28, 31, 34, 37; *see also* Durbin-French Aff. ¶ 28.)

Further undermining Plaintiff's version of events is the testimony and timesheet of Nurse Lemos. As discussed in Part I.A.4.b *supra*, Plaintiff maintains that the manual body cavity search and x-ray were performed by Nurse Lemos during his first and only visit to St. Luke's between approximately 6:50 P.M. and 7:40 P.M. But Nurse Lemos's time records for that evening show that she did not clock in until 10:45 P.M., a fact

to which she has testified. (*See* Lemos Aff. ¶ 5 & attached timesheet.) Thus, there is no way she could have examined Plaintiff as he claims.

In the Court's view, these records "directly and irrefutably contradict" Plaintiff's version of events. *See Henry*, 406 F. Supp. 3d at 214 (citation and italics omitted). As discussed in Section II.B.2.b *supra*, the Court may not grant summary judgment merely because a Plaintiff's alleged injuries do "not appear in the medical records," provided his allegations are not "directly and irrefutably contradicted" by those records. *See Morehouse*, 2020 WL 1049943, at *14 (quoting *Henry*, 406 F. Supp. 3d at 214). But although the Court declined to dismiss Count Five notwithstanding the tension between Plaintiff's allegations and the evidence in his medical records, the conflict here is of a different character and magnitude. For example, with respect to Count Five, the Court relied on Plaintiff's allegations that he complained to hospital staff about his supposed injuries. In that context, the Court observed that although Plaintiff's account relies exclusively on his own testimony and is contradicted by his medical records, his account still provides a "plausible alternative version of events" that could preclude summary judgment. *See Bridgewater*, 2011 WL 6762931, at *5. That is not the case here. The digital timestamps in the medical records conclusively establish that there were two visits—one between approximately 6:45 P.M. and 7:40 P.M., and another between approximately 11:00 P.M. and 1:40 P.M. Likewise, the Director of Health Information Management at St. Luke's, Laura Berberich, has reviewed the "audit trail" of Plaintiff's electronic medical records and affirmed that "there were two visits to St. Luke's Emergency Department on 5/8/2015"— the first of which lasted from "18:47" to "19[:]38," and the second of which lasted from "23:00" to "01:39." (Berberich Aff. ¶¶ 9–10.) [30]  As noted, the records for the first hospital visit contain no mention of a manual body cavity search or an x-ray. Given the other detail in these records, it is implausible that hospital staff would perform these two procedures without including them in the records. Although Plaintiff may create a triable issue of fact by alleging that he complained about a bruise or contusion which do not appear in his records, he may not do the same by alleging in conclusory fashion—without a shred of supporting evidence —that hospital staff performed two significant procedures and then simply omitted them from the records. Nor has he plausibly challenged the timesheet produced by Nurse Lemos.

[30]  Plaintiff's argument that Ms. Berberich is an expert witness, (*see* Pl.'s Opp'n 15), is misguided. "To

testify as an expert witness, an individual must be 'qualified as an expert by knowledge, skill, experience, training, or education.' " *SEC v. Lek Sec. Corp.*, No. 17-CV-1789, 2019 WL 1512713, at *3 (S.D.N.Y. Apr. 8, 2019) (quoting Fed. R. Evid. 702). An expert witness is one who "assists the jury in comprehending and deciding issues beyond the understanding of a layperson." *Lek*, 2019 WL 1512713, at *3 (citation and quotation marks omitted). That does not describe Ms. Berberich, who is serving as an ordinary fact witness.

**\*41**  Plaintiff's response is to argue that the police and medical staff must have conspired to falsify the medical records, fabricating evidence of a second hospital visit that took place after police had obtained a search warrant. (*See, e.g.*, Pl.'s Opp'n 17 (referring to the "falsified hospital medical records"); *id.* at 20 (stating that evidence of a second hospitalization was "forged and falsified"); SAC ¶¶ 102, 112, 137.) But as courts have routinely held, a plaintiff may not survive summary judgment through a conclusory assertion that relevant records were forged or falsified. *See, e.g.*, *Goonewardena v. Spinelli*, No. 15-CV-5239, 2020 WL 1557745, at *11 (E.D.N.Y. Mar. 5, 2020) (granting summary judgment for the defendants where the plaintiff "ha[d] not adduced any evidence [to support his theory] that the certified court documents and transcripts [relied upon by the defendants] may have been fabricated, [and] ha[d] [not] ... uncovered any reason to believe that the documents [were] inaccurate"), *report and recommendation adopted in relevant part*, 2020 WL 1550724 (E.D.N.Y. Mar. 31, 2020); *Engles v. Dougherty*, No. 14-CV-1185, 2017 WL 6466309, at *11 (N.D.N.Y. Aug. 22, 2017) (holding, for purposes of summary judgment, that the "[p]laintiff's conclusory allegation that the medical professionals and other officers 'covered up,' and fabricated [the] plaintiff's medical records and logbooks to suppress evidence of his alleged injuries is highly suspect and would, in this court's view, ... be insufficient to sway any rational fact finder" (record citation omitted)), *report and recommendation adopted sub nom. Engles v. Souza*, 2017 WL 6463074 (N.D.N.Y. Dec. 18, 2017); *Hilton v. Maltese*, No. 09-CV-1373, 2012 WL 6965105, at *6 & n.10 (N.D.N.Y. Dec. 14, 2012) ("Plaintiff's conclusory assertion that the transcript and other records of his disciplinary hearing were completely fabricated is not sufficient to establish a material issue of fact ...."), *report and recommendation adopted*, 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013); *Lewis v. Johnson*, No. 08-CV-482, 2010 WL 3785771, at *20 (N.D.N.Y. Aug. 5, 2010) (concluding that the "[p]laintiff's conclusory allegation that multiple medical professionals in two different

prisons fabricated [the] plaintiff's medical records to suppress evidence of his alleged injuries ... would ... be insufficient to sway any rational fact finder"), *report and recommendation adopted*, 2010 WL 3762016 (N.D.N.Y. Sept. 20, 2010); *Farid v. Ellen*, No. 01-CV-8292, 2006 WL 59517, at *11 (S.D.N.Y. Jan. 11, 2006) (dismissing the plaintiff's Eighth Amendment deliberate-indifference claim on summary judgment in part because "[t]he most that plaintiff ha[d] provided [to establish the defendant's conscious disregard] [was] his speculation that [the] defendant ... had somehow doctored plaintiff's medical records to fabricate details of his medical history"), *aff'd*, 593 F.3d 233 (2d Cir. 2010). Accordingly, there are no genuine disputes of material fact regarding the basic timing and sequence of the manual body cavity search and x-ray examination at St. Luke's. The evidence establishes that both procedures took place during Plaintiff's second visit to the hospital, after the police had obtained a search warrant.

### b. Whether Police Defendants Are Entitled to Qualified Immunity Based On Good-Faith Reliance On Search Warrant

Because the manual body cavity search and x-ray examination at St. Luke's were conducted pursuant to a search warrant, they are presumed reasonable. *See Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) ("Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause."); *see also Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("Normally, the issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause ...."); *Vaher v. Town of Orangetown*, 916 F. Supp. 2d 404, 426 (S.D.N.Y. 2013) ("A search is presumptively reasonable when executed pursuant to a warrant."). Although Plaintiff's theory is that the manual body cavity search and x-ray examination were performed without a search warrant, he has also challenged the validity of the warrant itself, arguing that Police Defendants "wrongfully procur[ed]" the warrant by relying on the fruits of a "prior illegal search" and fabricating Plaintiff's statement that he had more drugs inside of him. (Pl.'s Mem. 16–17; *see also* SAC ¶ 108.) Because the Court has concluded that Defendants did rely on the search warrant during the second visit to St. Luke's, Plaintiff's challenge to the warrant merits consideration.

"To be valid under the Fourth Amendment, a search warrant must (1) be based on probable cause, (2) be supported by oath or affirmation, (3) describe with particularity the place to be searched, and (4) describe with particularity the things to be seized." *Green*, 96 F. Supp. 3d at 286 (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004)). It is well-established, however, that a "police officer who relies in good faith on a warrant issued by a neutral and detached magistrate upon a finding of probable cause is presumptively shielded by qualified immunity." *Id.* at 286 (quoting *Simms v. Village of Albion*, 115 F.3d 1098, 1106 (2d Cir. 1997)). Thus, courts confronted with a suppression motion "have recognized that evidence obtained by government agents 'in objectively reasonable reliance' on a warrant subsequently invalidated by a reviewing court is not generally subject to exclusion." *United States v. Scully*, 108 F. Supp. 3d 59, 103 (E.D.N.Y. 2015) (quoting *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008)). "When a government agent genuinely believes that he has obtained a valid warrant from a magistrate and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter.' " *Scully*, 108 F. Supp. 3d at 103 (quoting *United States v. Leon*, 468 U.S. 897, 920–21 (1984)); *see also United States v. Raymonda*, 780 F.3d 105, 118 (2d Cir. 2015) (same). These same principles "appl[y] in civil cases, like this one, brought pursuant to § 1983, in which a plaintiff seeks to challenge a warranted search as unlawful." *Calderon v. City of New York*, No. 14-CV-1082, 2015 WL 2079405, at *5 (S.D.N.Y. May 4, 2015) (gathering cases); *see also Conroy v. Caron*, 275 F. Supp. 3d 328, 346–47 (D. Conn. 2017) (stating same principle). Accordingly, if the Court finds that Police Defendants reasonably relied on the search warrant in good faith, it need not determine whether the search was, in fact, supported by probable cause. *See Scully*, 108 F. Supp. 3d at 103 (gathering cases and observing that "the Second Circuit and district courts in this Circuit have, at times, declined to evaluate a probable cause showing altogether and instead decided Fourth Amendment claims based on the good faith exception").

**\*42** To invoke the good faith exception, however, an officer's reliance on a duly issued warrant "must be objectively reasonable." *Id.* at 103 (quoting *Leon*, 468 U.S. at 922); *see also Raymonda*, 780 F.3d at 118 (same). Courts have recognized four circumstances in which the good faith exception "cannot shield even an officer who relie[d] on a duly issued warrant":

2021 WL 1164185

(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable.

*Raymonda*, 780 F.3d at 118 (quoting *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011)).

The second and fourth factors do not apply here. With respect to the second factor, although the judge issuing a search warrant "must 'perform his neutral and detached function' as a judicial officer 'and not serve merely as a rubber stamp for the police,'" courts will not "hastily assume a magistrate's surrender of his judicial independence to the police or prosecution." *Clark*, 638 F.3d at 100, 101 (quoting *Leon*, 468 U.S. at 914). Here, there is no evidence that Judge Williams "allowed himself to become a member, if not the leader, of the search party," as was the case, for example, in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 327 (1979). There, the Supreme Court invalidated a warrant where the issuing judge had accompanied police and prosecutors to an adult bookstore and, over the course of six hours, determined for himself which obscene materials could be seized. *See id.* at 322. Moreover, even if the reviewing court determines that the issuing judge "committed legal error in his assessment of probable cause," it may not infer "abandonment of judicial neutrality and detachment" on that basis alone. *Clark*, 638 F.3d at 101. Here, there is no evidence to suggest that Judge Williams abandoned his judicial role, and thus, "this factor did not preclude the officers' good faith reliance on the challenged warrant." *Id.*

With respect to the fourth factor, "a warrant is facially defective when it omits or misstates information specifically required to be contained therein," such as "the place to be searched, and the persons or things to be seized." *Id.* at 102 (quoting U.S. Const. amend. IV). This factor is also inapposite here. The search warrant issued by Judge Williams authorized law enforcement personnel and medical staff to search for and seize "cocaine[,] marihuana[,] or other controlled substances and/or packaging material consistent with the sale of such

items." (Search Warrant & Supporting Aff. 2.) The warrant authorized them "to search and inspect, and photograph and/or record in any way the person of [Plaintiff,] including an inspection of the rectal area[,]" for these products. (*Id.*) Because the warrant identified with particularity both the items to be seized and the place to be searched, it was not facially defective so as to preclude good faith reliance. *Cf. Groh*, 540 U.S. at 564 (concluding that a search warrant's failure to identify the items to be seized prevented reasonable reliance); *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984) (upholding a lower court's conclusion that a "warrant was constitutionally defective [where] the description [of items to be seized] in the warrant was completely inaccurate and the warrant did not incorporate the description contained in the affidavit").

**\*43** Here, rather, Plaintiff's challenge to the warrant implicates the first and third factors that may vitiate good faith reliance. He argues that Pitt "provided false statements to [Judge Williams] ... in order to secure a search warrant," (SAC ¶ 108), thereby suggesting that "the issuing magistrate [was] knowingly misled[,]" *Raymonda*, 780 F.3d at 118. He also argues that the search warrant was obtained by using the fruits of a prior unconstitutional search, (*see* Pl.'s Mem. 16), thereby suggesting that the warrant "application [was] so lacking in indicia of probable cause as to render reliance upon it unreasonable[,]" *Raymonda*, 780 F.3d at 118. The Court will consider each challenge in turn.

### i. Whether Judge Williams Was Misled

"Where an officer knows, or has reason to know, that he has materially misled a magistrate on the basis for a finding of probable cause, ... the shield of qualified immunity is lost." *Velardi v. Walsh*, 40 F.3d 569, 573 (2d Cir. 1994) (ellipsis in original) (quoting *Golino*, 950 F.2d at 871)). "A [§] 1983 plaintiff challenging a warrant on this basis must make the same showing that is required at a suppression hearing under *Franks v. Delaware*, 438 U.S. 154, 155–56 [(1978).]" *Id.* In such cases, "the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." *Id.*; *see also United States v. Lahey*, 967 F. Supp. 2d 698, 709 (S.D.N.Y. 2013) ("To require suppression, a movant must demonstrate, by a preponderance of the evidence, both the affiant's *intent* to mislead the issuing judge and the *materiality*

Case 6:23-cv-01171-AMN-TWD   Document 4   Filed 11/14/23   Page 150 of 166

of the affiant's falsehoods or omissions.' " (citing *United States v. Rajaratnam*, 719 F.3d 139, 145–46 (2d Cir. 2013))). It is not enough for a plaintiff to set forth "[u]nsupported conclusory allegations of falsehood or material omission"; rather, he "must make specific allegations accompanied by an offer of proof." *Velardi*, 40 F.3d at 573; *see also Calderon*, 2015 WL 2079405, at *5 (same). With respect to the materiality requirement, "a false statement is material when 'the alleged falsehoods or omissions were necessary to the [issuing] judge's probable cause finding.' " *Calderon*, 2015 WL 2079405, at *6 (quoting *United States v. Martin*, 426 F.3d 68, 73 (2d Cir. 2005)); *see also Lahey*, 967 F. Supp. 2d at 711. "To determine if misrepresentations or omissions are material, a court corrects the errors and then resolves de novo whether the hypothetical corrected affidavit still establishes probable cause." *Lahey*, 967 F. Supp. 2d at 711; *Conroy*, 275 F. Supp. 3d at 347 (same); *see also Calderon*, 2015 WL 2079405 (same). Thus, "to survive the defendants' motion for summary judgment on this issue," plaintiffs must meet three criteria:

> [T]hey must have made an offer of proof supporting specific allegations of deliberate or reckless misrepresentation, as required by *Franks*; the alleged misrepresentations must be legally relevant to the probable cause determination; and there must be a genuine issue of fact about whether the magistrate would have issued the warrant on the basis of 'corrected affidavits.'

*Velardi*, 40 F.3d at 574. The *Franks* standard is therefore considered "a high one." *Rivera v. United States*, 928 F.2d 592, 604 (2d Cir. 1991); *Calderon*, 2015 WL 2079405, at *5 (same).

Here, Plaintiff alleges that Pitt "intentionally, knowingly[,] and with reckless disregard for the truth" fabricated Plaintiff's statement that he had more drugs inside his anal cavity, and that he did so to support the application for a search warrant. (Pl.'s Mem. 16; *see also* SAC ¶ 108; Search Warrant & Supporting Aff. 4 ["[Plaintiff] then made a statement that he does have more narcotics in his rectum."].) The Court assumes there is a genuine issue of fact about whether Judge Williams would have issued the warrant on the basis of an affidavit omitting this statement, just as it assumes that Pitt's alleged fabrication is legally relevant to the probable cause determination.[31] But even with these assumptions in place, Plaintiff has not provided a sufficient "offer of proof" in support of his allegations as required by *Franks*. *Velardi* and its progeny have made clear that even in a § 1983 action, and even in the context of a summary judgment motion, a plaintiff challenging the validity of a warrant must still satisfy the rigorous standards in *Franks*. *See Velardi*, 40 F.3d at 573; *Calderon*, 2015 WL 2079405, at *5; *Conroy*, 275 F. Supp. 3d at 347; *Spafford v. Romanowsky*, 348 F. Supp. 2d 40, 46 (S.D.N.Y. 2004). Under *Franks*, "a challenge to the veracity of the affidavit [on which a warrant was based] merits a [suppression] hearing only if the challenger makes a 'substantial preliminary showing' that the affiant knowingly and intentionally made a false statement that was 'necessary to the finding of probable cause.' " *Simms*, 115 F.3d at 1107 (brackets and ellipsis omitted) (quoting *Rivera*, 928 F.2d at 604). As noted, this "substantial preliminary showing" requires that the plaintiff's allegations be "supported by an offer of proof." *Calderon*, 2015 WL 2079405, at *5 (citing *Velardi*, 40 F.3d at 573). Courts have made clear that a plaintiff's own, uncorroborated statements do not constitute a sufficient offer of proof under *Franks*. *See United States v. Nix*, No. 15-CR-6126, 2016 WL 11268960, at *5 (W.D.N.Y. Apr. 25, 2016) (challenge to search warrants did not warrant a *Franks* hearing where the defendant "provide[d] no basis for his claim and no sworn, corroborating statements other than his own"); *Bourguignon v. Guinta*, 247 F. Supp. 189, 194 (D. Conn. 2003) (granting summary judgment for defendants on a pro se plaintiff's § 1983 false arrest claim where the plaintiff "presented no evidence to support his claims" that the arrest warrant affidavit contained material misrepresentations and omissions); *United States v. Rollack*, 90 F. Supp. 2d 263, 270 (S.D.N.Y. 1999) (concluding that a defendant's own affidavit submitted in support of his challenge to the veracity of a search warrant affidavit "[was] insufficient to establish the substantial preliminary showing required to warrant a *Franks* hearing").

31    Both assumptions are almost certainly true. Contrary to Police Defendants' argument, (*see* Police Defs.' Mem. 26), the case for probable cause would likely sustain a fatal blow if Plaintiff's alleged statement were omitted from the warrant application. Stated differently, Plaintiff's putative statement that he had more drugs in his anal cavity was almost certainly a material factor in Judge Williams' decision to issue the warrant.

Indeed, without this statement, it is not clear what the basis for probable cause would be. Without evidence that drug dealers routinely store *multiple* bags of narcotics in their anal cavity, the fact that the officers had already discovered Plaintiff's contraband would arguably suggest there was no need for an additional search. Though the Court need not pursue this discussion in light of its finding that Plaintiff has failed to provide a sufficient offer of proof, it is safe to say that if Plaintiff *had* come forward with such proof, Police Defendants would not be entitled to qualified immunity based on the good faith exception.

**\*44** Although Plaintiff denies having said there were more drugs in his anal cavity, he has provided no "offer of proof" besides his own conclusory allegation that this statement was fabricated. (*See* Pl.'s Mem. 16–17.) Under the "stringent" standard in *Franks*, such "unadorned conclusory charges" do not make out a "substantial preliminary showing," *Nix, 2016 WL 11268960, at \*5*, and are therefore insufficient to defeat a summary judgment motion, *see Velardi, 40 F.3d at 574.* Plaintiff's only other challenge to the search warrant affidavit is based on perceived inconsistencies between Pitt's testimony and other statements by the officers. (*See* Pl.'s Mem. 17.) Although Plaintiff's argument is a confusing swirl of theories and allegations, his principle contention seems to be that one of Pitt's statements in an incident report is inconsistent with an account offered by Arestin. (*See id.*) In an incident report summarizing his involvement in the events of May 8, Pitt stated that after he and the other officers retrieved the drugs Plaintiff had tried to swallow, and after Plaintiff had been transported to the hospital, Pitt was "advised by [Sergeant] Weaver and [Officer] Canario that [Plaintiff] had stated to officers that he had more 'drugs' up his ass that [they] didn't find." (*See* Pl.'s Opp'n Ex. K (Dkt. No. 204).) [32] In a separate incident report, Arestin states that Plaintiff made this alleged statement after he had tried to swallow the recovered contraband. (*Id.* Ex. J.) [33] Plaintiff appears to argue that Arestin's account is inconsistent with Pitt's account, because "Pitt's police report indicates that [he] was advised by Canario and Sgt. Weaver that the Plaintiff had made such admissions during the strip search." (Pl.'s Mem. 17.) In fact, that is not what Pitt's incident report says. His report does not specify *when* Plaintiff had reportedly made the remark about having additional drugs. (*See* Pl.'s Opp'n Ex. K.) Thus, Plaintiff has attacked an inconsistency that does not exist. Although Plaintiff complains of other perceived inconsistencies among the officers' incident reports, they are not significant. (*See*

Pl.'s Mem. 17.) At most, these perceived inconsistencies might be read to suggest some ambiguity as to *when* Plaintiff made the alleged remark, but not *whether* he made the remark in the first place.

[32]    Exhibit K to Plaintiff's Opposition submission is located at ECF page 295 of Dkt. No. 204.

[33]    Exhibit J to Plaintiff's Opposition submission is located at ECF page 294 of Dkt. No. 204.

Because Plaintiff has offered no more than "[u]nsupported conclusory allegations of falsehood or material omission," which are insufficient to "support a *Franks* challenge," *Velardi, 40 F.3d at 573*, he has failed to establish that Judge Williams "was knowingly or recklessly misled by any statements or omissions in [Pitt's] affidavit," *Falso, 544 F.3d at 128*. Thus, on this basis at least, Plaintiff has failed to establish that Defendants' good faith reliance on the warrant was not objectively reasonable.

ii. Whether Warrant Application Was So Lacking in Indicia of Probable Cause As To Render Reliance Upon it Unreasonable

Plaintiff also argues that Pitt used the fruits of a prior unconstitutional search to obtain the search warrant. (*See* Pl.'s Mem. 16.) In paragraph 8 of the affidavit submitted in support of the search warrant, Pitt wrote the following:

> [Plaintiff] was transported to the City of Newburgh Police Department. While at the station he [sic] was advised by his supervisor Sgt. Anderson that he wanted Strip Search conducted. While conducting a strip search for any possible narcotics, officers located a small clear plastic bag containing an off white rock like substance, which later field tested possible for the presence of cocaine, in the rectum area of [Plaintiff].

(Search Warrant & Supporting Aff. 4.) Relying on a 1975 case from Maryland's Court of Appeals, Plaintiff argues that "[e]vidence derived as a result of a prior illegal search or

seizure[ ] cannot be used as a valid basis to justify the existence of probable cause in a subsequent application for a search warrant." (Pl.'s Mem. 16 (citing *Everhart v. State*, 274 Md. 459, 481 (1975).) The Court interprets Plaintiff's argument to implicate the third circumstance in which officers may not claim the good faith exception—that is, "where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable ...." *Raymonda*, 780 F.3d at 118.

Liberally construed to raise the strongest possible argument in the context of the instant analysis regarding qualified immunity and the good faith exception, Plaintiff's position is "that agents who have engaged in a predicate Fourth Amendment violation may not rely on a subsequently issued warrant to establish good faith." *United States v. Ganias*, 824 F.3d 199, 222 (2d Cir. 2016). The Second Circuit, though, has declined to adopt such a rule on at least three occasions, beginning with *United States v. Thomas*, 757 F.2d 1359 (2d Cir. 1985), and continuing with *United States v. Reilly*, 76 F.3d 1271 (2d Cir. 1996), and *United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016). *See also United States v. Calhoun*, No. 16-CR-92, 2017 WL 1078634, at \*14 (D. Conn. Mar. 21, 2017) (observing that the Second Circuit has applied the "good faith exception to circumstances where the warrant affidavit included information arguably tainted by a Fourth Amendment violation, if it would nevertheless be objectively reasonable for the officers to believe that the resulting warrant had validly issued").

 **\*45** In *Thomas*, an agent for the Drug Enforcement Agency ("DEA"), acting without a search warrant, used a drug-sniffing dog to perform a "canine sniff" at an apartment. 757 F.2d at 1366. The canine sniff indicated there were narcotics inside the apartment, and the agent submitted this evidence to a magistrate in support of a search warrant application. *Id.* Relying on this and other evidence, the judge determined there was probable cause and issued a warrant. *Id.* The defendant moved to suppress the evidence uncovered during execution of the search warrant, arguing that the canine sniff was a predicate constitutional violation, and that the fruits of this unlawful search were material to the judge's finding of probable cause. *Id.* at 1366. The Second Circuit decided as a matter of first impression that the canine sniff constituted a search, *id.* at 1367, and further concluded that without the evidence obtained from that search, there would have been no probable cause, *id.* at 1368. The court nevertheless concluded that suppression was not warranted because the

agent's reliance on the warrant was objectively reasonable. *See id.* As the court explained:

> The DEA agent brought his evidence, including the positive "alert" from the canine, to a neutral and detached magistrate. That magistrate determined that probable cause to search existed, and issued a search warrant. There is nothing more the officer could have or should have done under these circumstances to be sure his search would be legal. The magistrate, whose duty it is to interpret the law, determined that the canine sniff could form the basis for probable cause; it was reasonable for the officer to rely on this determination.

*Id.* Accordingly, the court found that the agent was entitled to the good faith exception. *Id.*

The Second Circuit distinguished *Thomas* when deciding *Reilly*. In *Reilly*, two police officers unlawfully went onto the defendant's curtilage and observed "a clearing with about 20 marijuana plants." 76 F.3d at 1274. To obtain a search warrant, the officers submitted to the county court judge a "bare-bones" description of the defendant's land," and "failed to give [the judge] information as to their behavior." *Id.* at 1280. The omitted information "was crucial," the court explained, and "[w]ithout it, the issuing judge could not possibly make a valid assessment of the legality of the warrant that he was asked to issue." *Id.* In short, the affidavit submitted to the judge "was almost calculated to mislead." *Id.* The court held that in such a situation, "[t]he good faith exception ... does not protect searches by officers who fail to provide all potentially adverse information to the issuing judge." *Id.* In dicta, the *Reilly* court suggested that the good faith exception also did not apply for a second reason: "The issuance of the warrant was itself premised on material obtained in a prior [illegal] search." *Id.* The court was quick to clarify, however, that

> [i]n deciding that the good faith exception does not apply when officers do not provide an issuing judge with details about their conduct during a

pre-warrant search, *we do not hold that the fruit of illegal searches can never be the basis for a search warrant that the police can subsequently use in good faith*.

*Id.* at 1280–81 (emphasis added). There is a clear tension between the court's first and second statements that was never fully resolved in *Reilly*. But despite this ambiguity, the court still clarified that the good faith inquiry is focused not on whether there was a predicate unconstitutional search, but on whether the officers fully disclosed their actions to the issuing magistrate in good faith. As it observed:

> The facts surrounding th[e] prior search ... raise[d] serious doubts about the officers' good faith at that earlier time. The officers went to [the judge] with the fruits of this prior search in hand, and it was on the basis of that evidence that they asked him to issue a warrant. Yet the officers never gave [the judge] a full account of what they did. And without such an account, [the judge] could not possibly decide whether their conduct was sufficiently illegal and in bad faith as to preclude a valid warrant. This fact, *by itself*, makes [the good faith exception] inapplicable.

**\*46** *Id.* at 1280 (emphasis added). Thus, the court made clear that its holding was based solely on the officers' bad faith when failing to describe their actions to the issuing magistrate.

Whatever ambiguity lingered after *Reilly* was laid to rest in *Ganias*. There, agents for the U.S. Army's Criminal Investigation Division executed a search warrant and obtained several mirrored hard drives belonging to an accountant as part of an investigation into two of the accountant's clients (but not the accountant himself). 824 F.3d at 202–03. But even after the government had finished "identifying and segregating" the files that fell within the scope of the warrant, it continued to retain all the data that had been seized in the raid. *Id.* at 205–06. Roughly three years after the raid, government investigators began to suspect

that the accountant himself may have been involved in tax-related crimes. *Id.* at 206. Accordingly, the investigating agent sought a search warrant to search files which she knew to be on the mirrored hard drives, but which had not previously been accessed. *Id.* at 207. The magistrate issued the warrant, and the government ultimately indicted the accountant for tax evasion. *Id.* On appeal, the defendant argued that the government could not rely in good faith on the search warrant because the issuance of the warrant was based on an alleged constitutional violation—unlawful retention of the mirrored hard drives. *Id.* at 222. [34] Invoking *Reilly*, he made the same argument Plaintiff essentially raises here: "that agents who have engaged in a predicate Fourth Amendment violation may not rely on a subsequently issued warrant to establish good faith." *Id.* But *Reilly*, the Second Circuit said, "stands for no such thing." *Id.* The basis of the holding in *Reilly*, the court explained, was the officers' failure to provide the magistrate "with an account of what they did," such that the magistrate "was unable to ascertain whether the evidence on which the officers relied in seeking the warrant was 'itself obtained illegally and in bad faith.' " *Id.* (quoting *Reilly*, 76 F.3d at 1281). Contrasting the facts in *Reilly* to those in *Thomas*, the *Ganias* court said that the distinction between those cases "did not turn on whether the violation found was *predicate*, or prior to, the subsequent search warrant on which the officers eventually relied, but on whether the officers' reliance on the warrant was reasonable." *Ganias*, 824 F.3d at 223. Thus, "it is not the case that good faith reliance on a warrant is never possible in circumstances in which a predicate constitutional violation has occurred." *Id.* In *Ganias*, the court found that the agent had "provided sufficient information in her affidavit to apprise the magistrate judge of the pertinent facts regarding the retention of the mirrored copies of [the defendant's] hard drives—the alleged constitutional violation on which [the defendant] relie[d]." *Id.* at 224. As in *Thomas*, then, the magistrate had enough information to determine whether the alleged unconstitutional act precluded issuance of the warrant, and the government agents were entitled to rely in good faith on the warrant that followed. *See id.* at 224–25.

[34]    The Second Circuit declined to decide whether the government's retention of the hard drives constituted a Fourth Amendment violation. *See Ganias*, 824 F.3d at 209.

**\*47** The Court concludes that here, as in *Thomas* and *Ganias*, the search warrant affidavit contained sufficient information to apprise the issuing judge of the officers'

prior conduct. Although the Court has found that Police Defendants' visual body cavity search violated the Fourth Amendment, *see supra* Section II.B.3.a, the search warrant affidavit submitted to Judge Williams clearly states that the officers had performed a "strip search" of Plaintiff and had uncovered a small bag of drugs inside Plaintiff's "rectum area," (*see* Search Warrant & Supporting Aff. 4). Even if Judge Williams, applying strict definitional categories, interpreted "strip search" to connote something less invasive than what took place, Pitt's statement that drugs were found in Plaintiff's "rectum area" likely would have disabused him of that notion. Thus, in contrast to the affidavit in *Reilly*, the affidavit submitted to Judge Williams was not a "bare-bones" document "calculated to mislead." 76 F.3d at 1280. Like the agents in *Thomas* and *Ganias*, Pitt apprised Judge Williams "of the relevant conduct, so that [Judge Williams] was able to determine whether any predicate illegality precluded issuance of the warrant." *Ganias*, 824 F.3d at 223. Whether this Court would have reached the same probable cause determination as Judge Williams is not the relevant inquiry, for "a court reviewing a challenged warrant—whether at the district or appellate level—'must accord considerable deference to the probable cause determination of the issuing magistrate.' " *Clark*, 638 F.3d at 93 (quoting *Walczyk*, 496 F.3d at 157). What matters is whether Pitt "disclosed all crucial facts for the legal determination in question to the [issuing] judge." *Ganias*, 824 F.3d at 223. The Court concludes that he did.

There is one final point that merits comment. In *Reilly*, the Second Circuit distinguished *Thomas* not only based on the agent's full disclosure to the issuing magistrate, but also based on the novelty of the predicate constitutional violation in question: Whereas no court in the Second Circuit had held a canine sniff unconstitutional before *Thomas* was decided, it was well-established before *Reilly* that an invasion of curtilage was unconstitutional. *See Reilly*, 76 F.3d at 1281. Thus, in contrast to the officers in *Reilly*, the DEA agent in *Thomas* "did not have any significant reason to believe that what he had done was unconstitutional." *Id.* The Second Circuit invoked this distinction once again in *Ganias*, where it observed that, at the time of the alleged constitutional violation there—retention of mirrored hard drives—"no court in this Circuit had held that [such] retention ... could violate the Fourth Amendment," and thus, the government agent had no particular reason to suspect that her conduct was unconstitutional. 824 F.3d at 225; *see also Calhoun*, 2017 WL 1078634, at *16 (observing that "[i]n *Thomas* and *Ganias*, the Second Circuit was deciding novel questions at the very edge of Fourth Amendment law"). In this sense, the instant case

falls more in line with *Reilly* than with *Thomas* or *Ganias*. As noted *supra* Section II.B.3.a.ii, reasonable police officers in New York state would have known as of 2013 that visual body cavity searches require reasonable suspicion. *See Sloley*, 945 F.3d at 40. Thus, in contrast to the canine sniff in *Thomas* or the retention of mirrored hard drives in *Ganias*, the visual body cavity search here does not sit at the vanguard of Fourth Amendment violations. But while the novelty of the predicate conduct may provide an *additional* basis for distinguishing the facts in *Thomas* and *Ganias* from those in *Reilly*, that was not the *primary* distinction on which the Second Circuit relied in either *Reilly* or *Ganias*. In both cases, the court focused mainly on whether the law enforcement officers had sufficiently disclosed their underlying conduct to the issuing magistrate. *See Ganias*, 824 F.3d at 222–24; *Reilly*, 76 F.3d at 1280–81. Nothing in either opinion suggests that where, as here, a predicate constitutional violation has occurred, the novelty of that violation is a *sine qua non* for an officer's subsequent good faith reliance on a warrant, particularly when the officer has sufficiently disclosed the circumstances of that violation to the issuing magistrate. Thus, although the visual body cavity search at the police station was not a novel constitutional violation, this fact does not foreclose Police Defendants' good faith reliance on the subsequently issued warrant.

If Pitt and his fellow officers believed they had committed a constitutional offense, Pitt might well have omitted certain details from his affidavit to Judge Williams. But instead, his affidavit acknowledged the "strip search," as well as the fact that drugs had been located in Plaintiff's "rectum area." (Search Warrant & Supporting Aff. 4.) [35] His transparency in the matter suggests his good faith in seeking the warrant. Most important, Judge Williams was sufficiently apprised of the underlying facts to reach a determination not only whether there was probable cause, but also "whether any predicate illegality precluded issuance of the warrant." *Ganias*, 824 F.3d at 223. Having "disclose[d] all potentially adverse information to the issuing judge," Police Defendants were entitled to rely on the subsequently issued warrant. *Id.* at 221.

[35]     Indeed, the description Pitt provided in the search warrant affidavit is arguably *more* incriminating to the officers than the account they have given elsewhere. As discussed in Section I.A.2 *supra*, the officers in the strip search room have affirmed that the bag of drugs *fell out* of Plaintiff's buttocks. But Judge Williams might easily have

read the language in Pitt's affidavit to suggest that the officers had manually retrieved the drugs from Plaintiff's "rectum area." (Search Warrant & Supporting Aff. 4.) Thus, Pitt's imprecise use of language actually may have suggested that a more serious constitutional infraction took place —namely, a manual body cavity search. Pitt's description further suggests he was not trying to conceal the officers' underlying conduct.

**\*48** Based on the foregoing analysis, the Court cannot say that Pitt's application was "so lacking in indicia of probable cause as to render reliance upon it unreasonable." *Raymonda,* 780 F.3d at 118. Because none of the four circumstances that might preclude good faith reliance apply to the facts of this case, the Court finds that Police Defendants' good faith reliance on the warrant was "objectively reasonable," *see id.,* and they are therefore shielded by qualified immunity with respect to the searches that occurred pursuant to the search warrant, *see Simms,* 115 F.3d at 1106; *Green,* 96 F. Supp. 3d at 286.

Having determined that the Police Defendants who reasonably relied on the search warrant in good faith are entitled to qualified immunity, the Court turns to consider the relevant claims themselves.

### c. Manual Body Cavity Search at St. Luke's (Count 15)

In Count 15, Plaintiff brings an unreasonable search claim against Police Defendants Canario and Saintiche and Medical Defendant Lemos. (SAC ¶ 132.) The gravamen of the claim is that these Defendants performed a manual body cavity search "without [a] warrant, consent[,] or trained medical doctors." (*Id.*) Plaintiff alleges in relevant part that Canario and Saintiche "forcefully turned [him] over onto [his] side and pinned [him] down on the hospital bed." (*Id.* ¶ 92; *see also* Pl.'s Opp'n 29 (arguing that Canario and Saintiche "physically assisted Lemos in performing the digital rectal examination by forcefully pinning the Plaintiff to the hospital bed while he was handcuffed to it").) According to his account, Lemos then "came over, pulled [his] pants down and penetrated [his] rectum without any lubrication for about [five] seconds," which "consist[ed] of her twirling [two] fingers around in a circular motion as far up as she could go." (SAC ¶¶ 93– 94.) The Court will consider the claim against Canario and Saintiche separately from the claim against Lemos.

### i. Unreasonable Search Claim
### Against Canario and Saintiche

Officers Canario and Saintiche have both affirmed that they took Plaintiff to St. Luke's for his second visit after learning that a judge had issued a search warrant to inspect Plaintiff's anal cavity for additional narcotics. (*See* Canario Aff. ¶ 26; Saintiche Aff. ¶ 19.) Apart from his meritless claim that the manual body cavity search actually took place during the first and only visit to St. Luke's, which the Court has already rejected, *see supra* Section II.B.7.a, Plaintiff has offered no credible basis to question Canario and Saintiche's good faith reliance on the search warrant. Accordingly, for the reasons just discussed, Canario and Saintiche are entitled to qualified immunity with respect to Plaintiff's unreasonable search claim in Count 15.

Having concluded that Canario and Saintiche are shielded by qualified immunity, the Court need only consider whether they exceeded the scope of the authorized search or carried out the search in an unreasonable manner. *See Walter v. United States,* 447 U.S. 649, 656 (1980) (plurality opinion) ("When an official search is properly authorized—whether by consent or by the issuance of a valid warrant—the scope of the search is limited by the terms of its authorization."); *United States v. Shi Yan Liu,* 239 F.3d 138, 141 (2d Cir. 2000) ("[A] search that greatly exceeds the bounds of a warrant and is not conducted in good faith is essentially indistinguishable from a general search."); *Vaher,* 916 F. Supp. 2d at 426 ("[E]ven when a search is conducted pursuant to a valid search warrant, police officers must still execute the warrant in good faith and within the confines of the limitations contained in the search warrant."); *Bolden,* 344 F. Supp. 2d at 416 ("No search warrant shields a police officer from carrying out a search in an unreasonable manner or from employing excessive force during a search.").

**\*49** Insofar as Count 15 is predicated on the manual body cavity search, Canario and Saintiche neither exceeded the scope of the authorized search nor conducted the search in an unreasonable manner. The only allegation that could remotely suggest improper behavior is Plaintiff's contention that Canario and Saintiche forcefully pinned him to the hospital bed. (*See* SAC ¶ 92.) But even if the Court accepts Plaintiff's allegations as true, Canario and Saintiche's actions do not constitute an unreasonable or excessive use of force under the circumstances. "Physical force is often necessary when effectuating arrests or executing search warrants and, thus,

'not every push or shove' is unconstitutionally excessive, 'even if it may later seem unnecessary in the peace of a judge's chambers.' " *Genovese v. Town of Southampton*, 921 F. Supp. 2d 8, 20–21 (E.D.N.Y. 2013) (quoting *Maxwell*, 380 F.3d at 108). Here, quite apart from the valid law enforcement interest in locating and seizing the supposed narcotics, (*see generally* Search Warrant & Supporting Aff.), the evidence shows there was also an urgent medical interest in performing the search, (*see* Durbin-French Aff. ¶ 24 (explaining that a "foreign object, whether swallowed or inserted into the rectum[,] could cause an obstruction which could be a surgical emergency")). Under these circumstances, it would have been reasonable for Canario and Saintiche to restrain Plaintiff in order to allow medical staff to perform the search. *Cf. J.L. v. E. Suffolk Boces*, No. 14-CV-4565, 2018 WL 1882847, at *10–11 (E.D.N.Y. Apr. 19, 2018) (concluding on summary judgment that, in the context of a Fourth Amendment seizure, the defendant's use of force—tackling the plaintiff and holding his arms—was objectively reasonable in light of a "fast-moving and potentially dangerous situation"); *see also Spencer v. Roche*, 755 F. Supp. 2d 250, 257, 260–61, 268 (D. Mass. 2010) (concluding on summary judgment that a manual body cavity search had been performed in a reasonable manner where the arrestee—who was handcuffed to the gurney—had his arms and legs held down by police during the search), *aff'd*, 659 F.3d 142 (1st Cir. 2011).

Accordingly, Police Defendants' Motion is granted with respect to Count 15.

ii. Unreasonable Search Claim Against Medical Defendant

Although Plaintiff brings his unreasonable search claim against Nurse Lemos based on his discredited theory that there was only one trip to St. Luke's, (*see* SAC ¶ 132; Pl.'s Opp'n 21–22), his medical records establish that it was Nurse Practitioner Durbin-French who performed the manual body cavity search during the second visit to the hospital, (*see* ER Records 25; *see also* Durbin-French Aff. ¶¶ 6, 11–23). Accordingly, Medical Defendants argue that the Court should dismiss Counts 12 through 18 because Plaintiff has named the wrong Defendant. (*See* Med. Defs.' Mem. 17.) Although here it is questionable whether Plaintiff's mistake in naming the wrong party was the result of mistake rather than bad faith, *cf. Park B. Smith, Inc. v. CHF Indus. Inc.*, 811 F. Supp. 2d 766, 772 (S.D.N.Y. 2011), in light of the latitude afforded to pro se litigants, as well as federal courts' preference "to resolve disputes on their merits rather than based on technical

deficiencies in the pleadings or motion papers," *Simon v. City of New York*, No. 09-CV-1302, 2011 WL 317975, at *3 (E.D.N.Y. Jan. 3, 2011), *report and recommendation adopted*, 2011 WL 344757 (E.D.N.Y. Feb. 1, 2011), the Court will exercise its discretion and allow a substitution of Defendant Durbin-French for Nurse Lemos in Counts 12 through 18.

To determine whether Plaintiff's claim survives summary judgment, the Court must first decide whether Durbin-French was functioning as a state actor. "*Section 1983* provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law." *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (citation omitted). Thus, to prevail on a *§ 1983* claim, a plaintiff must establish (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (citation and quotation marks omitted). Although the first (i.e., "color-of-state-law") requirement is often fulfilled by defendants who are government officials acting with state power, a plaintiff may also establish a *§ 1983* claim against a "private individual defendant" where that individual and a "state official were acting in concert." *Porter-McWilliams v. Anderson*, No. 07-CV-407, 2007 WL 4276801, at *2 (S.D.N.Y. Dec. 3, 2007); *see also Ciambriello v. County of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) ("A private actor acts under the color of state law when the private actor is a willful participant in joint activity with the State or its agents." (quotation marks omitted) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970))). Three main tests have emerged to determine when a private entity functions as a state actor:

> **\*50** For the purposes of [§] 1983, the actions of a nominally private entity are attributable to the state ... (1) [when] the entity acts pursuant to the coercive power of the state or is controlled by the state ("the compulsion test"); (2) when the state provides significant encouragement to the entity, the entity is a willful participant in joint activity with the state, or the entity's functions are entwined with state policies ("the joint action test" or "close nexus test"); or (3) when the entity has been delegated

a public function by the state, ("the public function test").

*Sybalski v. Indep. Grp. Home Living Program, Inc.*, 546 F.3d 255, 257 (2d Cir. 2008) (alterations and some quotation marks omitted).

As a general matter, "private hospitals do not act under the color of law for § 1983 purposes." *Sykes v. McPhillips*, 412 F. Supp. 2d 197, 200 (N.D.N.Y. 2006) (quotation marks omitted); *see also Kia P. v. McIntyre*, 235 F.3d 749, 755–57 (2d Cir. 2000) (holding that a private hospital was not a state or municipal facility and thus was not liable pursuant to § 1983, insofar as it was acting "as a private actor providing medical care"); *Goonewardena v. N. Shore Long Island Jewish Health Sys.*, No. 11-CV-2456, 2014 WL 1271197, at *11 n.14 (E.D.N.Y. Mar. 26, 2014) (finding that, because the defendant was a private hospital and the plaintiff failed to plead any facts suggesting that the hospital acted in concert with state actors, the hospital could not be a state actor under § 1983). However, private medical providers may be held liable as state actors under certain circumstances; thus, when a private company provides medical care in prisons, it "performs a role traditionally within the exclusive prerogative of the municipality." *Bess v. City of New York*, No. 11-CV-6704, 2013 WL 1164919, at *2 (S.D.N.Y. Mar. 19, 2013). But "courts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test." *Hollman v. County of Suffolk*, No. 06-CV-3589, 2011 WL 280927, at *5 (E.D.N.Y. Jan. 27, 2011); *see also Kavazanjian v. Rice*, No. 03-CV-1923, 2008 WL 5340988, at *12 (E.D.N.Y. Dec. 22, 2008) ("Providing isolated emergency treatment to a prisoner on equal terms with the general public ... does not constitute state action."); *Morse v. City of New York*, No. 00-CV-2528, 2001 WL 968996, at *8 (S.D.N.Y. Aug. 24, 2001) ("The fact that [the plaintiff] was brought to the hospital from police custody and was released from the hospital into police custody is insufficient to transform this private hospital and its staff into state actors for [§] 1983 purposes.").

This case presents the less common scenario in which a private hospital employee did act as an instrumentality of the state. In performing the cavity search and x-ray, Durbin-French was helping the police locate and seize any illegal narcotics, and thus, she was primarily performing a law-

enforcement function rather than a medical function. While there may also have been a compelling medical interest in identifying and removing any contraband secreted inside Plaintiff's body cavity, this interest was ancillary to the law-enforcement interest. It is unlikely, for example, that the search would have occurred without the search warrant signed by Judge Williams, and the purpose of the search warrant was to "search for and seize" illegal narcotics. (*See* Search Warrant & Supporting Aff. 2.) By searching Plaintiff's person at the compulsion of the police in order to locate and seize illegal narcotics, Durbin-French was "perform[ing] a role traditionally within the exclusive prerogative of the state." *Bess*, 2013 WL 1164919, at *2. This feature distinguishes the case from those in which hospitals and their staff act primarily to provide medical care, in which case they are held not to be state actors. *Cf., e.g., Kavazanjian*, 2008 WL 5340988, at *2–3 (finding that a hospital's treatment of an arrestee —which included x-rays and CT scans for spinal fractures and other internal injuries, a rectal examination to check for blood or pelvic fractures, and insertion of a catheter to identify any blood coming from the kidneys or bladder— constituted "isolated emergency treatment [provided] ... on equal terms with the general public," and therefore did not constitute state action). Indeed, the Court has found guidance in the Second Circuit's *Kia P.* decision, which underscores the importance of examining the nature of a healthcare provider's actions on a case-by-case basis. There, for example, the court held that where a private hospital had tested and treated a newborn for suspected methadone withdrawal, it was acting "in its capacity as a private provider of medical care," and was not a state actor for purposes of § 1983 liability. *See* 235 F.3d at 756. But the court also observed that insofar as the hospital delayed releasing the newborn due to the "specter of potential child abuse or neglect," the hospital was acting "in its social welfare role" and "as part of the reporting and enforcement machinery for" the government agency responsible for detecting and stopping child abuse, in which case the hospital *was* functioning as a state actor. *Id.* Although the court ultimately concluded that the hospital's "actions in its capacity as a state actor had no effect, and thus did not subject it to liability under § 1983," *id.* at 757, the court's analysis illustrates the subtle distinctions that are relevant when deciding whether a private healthcare provider functions as a state actor.

**\*51** The Court's conclusion that Durbin-French acted under color of law by performing the cavity search and x-ray finds support in another recent case from this Circuit. In *Turner v. Procopio*, No. 13-CV-693, 2020 WL 2220244 (W.D.N.Y.

Mar. 27, 2020), *report and recommendation adopted*, 2020 WL 2219503 (W.D.N.Y. May 7, 2020), *appeal dismissed*, 2020 WL 7329107 (2d Cir. 2020), the police obtained a search warrant for a cavity search "of the vaginal and rectal area" of the plaintiff, who was suspected of smuggling drugs, 2020 WL 2220244, at *3. The search warrant also authorized an x-ray of the plaintiff's pelvic area. *Id.* The plaintiff was transported to the hospital, where a doctor performed an x-ray and then performed a manual body cavity search of the plaintiff's vaginal and rectal cavities. *Id.* The plaintiff brought a § 1983 action against the doctor, as well as a nurse who was present during the search, alleging that she had been subjected to an unlawful search. *Id.* at *1. The court concluded that the doctor and nurse were both "entitled to qualified immunity as private individuals and medical personnel acting pursuant to a facially valid search warrant," thereby assuming that these defendants were state actors for purposes of § 1983 liability. *See id.* at *13. In reaching this conclusion, the court relied in part on *Rodriques v. Furtado*, 950 F.2d 805 (1st Cir. 1991), a case in which the First Circuit, under nearly identical facts, held that the doctor performing the cavity inspection functioned as a state actor, *id.* at 814. As the court in *Rodriques* observed, "[t]he scope and motivation for the search were established solely by the state's investigatory goals and justified solely by the search warrant." *Id.* That rationale is equally apt here. Durbin-French's "role in the search was purely that of an auxiliary to normal police search procedures," and she "exercised the power of search traditionally reserved exclusively to the State because of the 'coercive power' and 'significant encouragement' represented by the search warrant." *See id.* (citation omitted). For these reasons, the Court finds that Durbin-French was functioning as a state actor and is subject to liability under § 1983.

The Court must also consider the possibility, however, that Durbin-French is entitled to qualified immunity. The question whether qualified immunity may extend to private individuals functioning as state actors "is a more complicated question than one might think." *P.P. v. City of New York*, No. 13-CV-5049, 2014 WL 4704800, at *16 (S.D.N.Y. Sept. 19, 2014). The Supreme Court's opinions in *Richardson v. McKnight*, 521 U.S. 399 (1997), and *Filarsky v. Delia*, 566 U.S. 377 (2012), provide the touchstone for this Court's analysis.

In *Richardson*, the Supreme Court held that two prison guards employed by a private, for-profit company that managed a correctional facility in Tennessee were not entitled to qualified immunity. *See* 521 U.S. at 412. In reaching this conclusion, the Court considered whether the rationale for qualified immunity justified extending the protection to private prison guards. *See id.* at 407–12. The Court concluded that "the most important special government immunity-producing concern—unwarranted timidity—is less likely present, or at least is not special, when a private company subject to competitive market pressures operates a prison." *Id.* at 409. The Court explained that when a private firm whose guards are too aggressive faces claims for damages, that will raise costs, "thereby threatening [the firm's] replacement." *Id.* At the same time, however, a firm with overly timid guards will also face competitive pressures from other firms "that demonstrate their ability to do both a safer and more effective job." *Id.* Thus, the Court reasoned, "marketplace pressures provide the private firm with strong incentives to avoid overly timid, insufficiently vigorous, unduly fearful, or 'nonarduous' employee job performance." *Id.* at 410. That was particularly true given several factors in *Richardson*, where (1) the defendants worked for "a large, multistate private prison management firm"; (2) that firm was "systematically organized to perform a major administrative task for profit"; (3) the firm "perform[ed] that task independently, with relatively less ongoing direct state supervision"; (4) the firm was required to buy insurance to compensate civil rights tort victims; and (5) the firm's contract expired after three years, meaning its performance was "disciplined, not only by state review," but also by general marketplace pressures. *Id.* at 409–10. The Supreme Court contrasted this system to that in which government employees operate, which "is often characterized by multidepartment civil service rules that, while providing employees security, may limit the incentives or the ability of individual departments or supervisors flexibly to reward, or to punish, individual employees." *Id.* at 410–11.

**\*52** In concluding that private prison guards were not entitled to qualified immunity, the *Richardson* Court underscored the narrow nature of its holding. That is, *Richardson* involved a context in which a private firm, "with limited direct supervision by the government," undertook a major administrative task for profit, and "in competition with other firms." *Id.* at 413. The Court explicitly noted that the case did "not involve a private individual briefly associated with a government body, serving as an adjunct to government on an essential government activity, or acting under close official supervision." *Id.*

The Supreme Court confronted this latter scenario 15 years later in *Filarsky*. In that case, the defendant was a private employment attorney hired on an ad hoc basis by the City of Rialto, California to interview a firefighter in connection with an administrative investigation. 566 U.S. at 381. The firefighter was suspected of using medical leave to conduct a home-improvement project. *Id.* at 380–81. As part of the interview, the attorney ordered the firefighter to produce certain building supplies he had been observed purchasing. *Id.* at 381. After complying with the order, the firefighter brought a § 1983 action against the municipality and the lawyer, among others, arguing that the order to produce the materials violated his rights under the Fourth and Fourteenth Amendments. *Id.* at 382. The Ninth Circuit denied qualified immunity to the lawyer, reasoning that he was a private attorney, and not a City employee. *Id.* at 382–83. The Supreme Court unanimously reversed. "Affording immunity not only to public employees but also to others acting on behalf of the government," the Court said, "serves to ensure that talented candidates are not deterred by the threat of damages suits from entering public service." *Id.* at 390 (citation, quotation marks, and brackets omitted). The Court observed that the government often "must look outside its permanent work force to secure the services of private individuals," particularly where there is a need "for specialized knowledge or expertise." *Id.* Of particular relevance here, the Court noted that

> [s]ometimes ... private individuals will work in close coordination with public employees, and face threatened legal action for the same conduct ... Because government employees will often be protected from suit by some form of immunity, those working alongside them could be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity. Under such circumstances, any private individual with a choice might think twice before accepting a government assignment.

*Id.* at 391 (record citation omitted). Accordingly, the Court held that private individuals "engaged in public service on a temporary or occasional basis" are "entitled to seek the protection of qualified immunity." *Id.* at 388–89, 393–94.

To determine whether a private actor is entitled to seek the protection of qualified immunity, another court in this District has analyzed whether the private actor more resembles the private attorney in *Filarsky* or the private prison guards in *Richardson*. In *P.P. v. City of New York*, the defendants included individual social and case workers employed by non-profit corporations that provided foster-care services pursuant to a contract with the City of New York. *See* 2014 WL 4704800, at *1–2. Then-Judge (now Chief Judge) McMahon explained that in contrast to private prison operators, whose profit motives "can be counted upon to draw the most talented candidates," private foster-care homes would have a harder time recruiting "talented candidates to be social workers (an already thankless job) if those employees were exposed to § 1983 liability without the safe harbor of qualified immunity." *Id.* at *19. Thus, the defendants in *P.P.* were more like the private lawyer in *Filarsky*, and therefore able to invoke the protections of qualified immunity. Another court in this District has extended the protections of qualified immunity to private actors, *see Sullivan v. City of New York*, No. 14-CV-1334, 2015 WL 5025296, at *8 (S.D.N.Y. Aug. 25, 2015) (extending qualified immunity to an employee of the New York City Criminal Justice Agency, which is a "not-for-profit entity under contract with the City of New York to aid the City's administration of the criminal justice system by, among other things, performing bail interviews"), and, as noted *supra*, another court in the Second Circuit has extended qualified immunity to private healthcare providers under circumstances virtually identical to those in this case, *see Turner*, 2020 WL 2220244, at *13.

**\*53** Here, the Court has no difficulty concluding that Durbin-French is entitled to qualified immunity. Police Defendants came to St. Luke's to conduct a highly invasive search that required "specialized knowledge or expertise" beyond its "permanent work force." *Filarsky*, 566 U.S. at 390. Like the lawyer in *Filarsky*, Durbin-French participated in this public service on a brief, limited basis, working "in close coordination with public employees." *Id.* at 391. Under these circumstances, it would make no sense for Durbin-French to "be left holding the bag—facing full liability for actions taken in conjunction with government employees who enjoy immunity for the same activity." *Id.* The Court therefore holds that Durbin-French is entitled to qualified immunity in connection with the visual body cavity search and x-ray performed on Plaintiff.

But even if Durbin-French has qualified immunity based on her good faith reliance on the search warrant, she—like Police Defendants—is only protected to the extent her search was conducted in a reasonable manner within the scope of the warrant. *See Walter*, 447 U.S. at 656; *Shi Yan Liu*, 239 F.3d at 140–41; *Vaher*, 916 F. Supp. 2d at 426; *Bolden*, 344 F. Supp. 2d at 416. Here, Plaintiff alleges that the nurse did not use lubricant when probing his anal cavity. (*See* SAC ¶ 135; Pl.'s Opp'n 24.) [36] By contrast, Durbin-French maintains that whenever she performed a search of this nature, she "would don examination gloves and apply a liberal amount of lubricant" before penetrating the person's anal cavity. (Durbin-French Aff. ¶ 19.) Although the Court has not identified a case explicitly holding that lubricant is a requisite part of a reasonable manual body cavity search, the relevant case law suggests as much. *See United States v. Fowlkes*, 804 F.3d 954, 964, 967 (9th Cir. 2015) (concluding that police officers performed an unreasonable search when they extracted contraband from an arrestee's anal cavity without the use of lubricant, medical personnel, or a sanitary setting); *Diggins v. Coe*, No. 16-CV-242, 2019 WL 2491909, at *1 (S.D. Ill. June 14, 2019) (noting that on summary judgment, the court had concluded "it was possible for a jury to find" that the "lack of lubrication rendered [a manual body cavity] search unreasonable"); *cf. Davenport v. Tanner*, No. 13-CV-505, 2015 WL 4635449, at *2 *7–9 (E.D. La. July 31, 2015) (manual body cavity search not performed in unreasonable manner where the examining physician used a "lubricated index finger" to perform the search); *Roche*, 659 F.3d at 257, 260–61 (concluding on summary judgment that a manual body cavity search had been reasonably performed where the doctor "lubricated his fingers" before the search). [37] Thus, whether the manual body cavity search was performed in a reasonable manner turns on a disputed issue of fact—namely, whether Durbin-French used lubricant. Because the Court is confronted with a "he said, she said" scenario, it may not resolve this issue on summary judgment. *See Fincher*, 604 F.3d at 726. The jury will have to decide for itself whose version of events to believe.

[36]     Insofar as Plaintiff's claim against Durbin-French is also predicated on the allegation that she told him the police had "a search warrant and ... [could] use deadly force in order to get [him] to comply," (*see* SAC ¶ 88), the claim fails, for "[g]eneralized fear or intimidation alone is not enough to ... render [a]

search unlawful," *Chambers v. Lombardi*, No. 17-CV-7557, 2020 WL 2097558, at *7 (S.D.N.Y. May 1, 2020).

[37]     To the extent Plaintiff also argues the search was unreasonable because it was performed without anesthesia or medical dilation, (*see* SAC ¶ 135; Pl.'s Opp'n 24), his claim is baseless. Plaintiff appears to rely on *Fowlkes, supra*, where several police officers retrieved contraband from an arrestee's anal cavity without "summon[ing] medical personnel, [without] mov[ing] [the arrestee] to a sanitary location, ... [and] without the assistance of anesthesia, lubricant, or medical dilation." 804 F.3d at 959. Here, by contrast, the search was performed by a trained nurse in a hospital setting. Moreover, when the Ninth Circuit discussed why the search in *Fowlkes* was unreasonable, the court only mentioned the fact that it was performed (i) without lubrication, (ii) outside a sanitary setting, and (iii) without "the guidance or assistance of medical personnel." *See id.* at 964, 967.

***54** Accordingly, Medical Defendants' Motion is denied with respect to Count 15.

---

#### d. X-Ray Examination (Count 16)

Plaintiff's unreasonable search claim in Count 16 is based on the x-ray that was performed in addition to the manual body cavity search. (*See* SAC ¶ 133; Pl.'s Opp'n 23.) Having found that Canario, Saintiche, and Durbin-French are entitled to qualified immunity, the only question to resolve is whether the x-ray examination exceeded the scope of the search warrant. [38]

[38]     As with Count 15, Plaintiff's claim in Count 16 is based on the allegation that the search was performed "without [a] warrant, consent[,] or trained medical doctors." (SAC ¶ 133.) The Court has already concluded that the second visit to St. Luke's occurred after the police had obtained a search warrant, and thus, the police and medical staff did not need Plaintiff's consent to execute a search pursuant to the warrant, *see Michigan v. Tyler*, 436 U.S. 499, 506 (1978) ("[A] search of private property without proper consent is

unreasonable unless it has been authorized by a valid search warrant" (citation and quotation marks omitted)); *see also* Bumper v. North Carolina, 391 U.S. 543, 553 (1968) (Harlan, J., concurring) (observing that "if the officers had a valid search warrant, no consent was required to make the search lawful"). Plaintiff's claim that the medical personnel performing the manual body cavity search and x-ray lacked appropriate medical training is baseless and unsupported by the record.

The Court notes at the outset that there is some inconsistency in the record as to who ordered the x-ray examination and for what purpose. Plaintiff alleges that Canario and Saintiche were responsible for suggesting that an x-ray examination be performed. (*See* Pl.'s Opp'n 23.) Durbin-French states that the x-ray was performed "not because a police officer requested it," but because "good medical practice requires that a KUB x-ray be done ... [when the patient has possibly] ingest[ed] a foreign object or plac[ed] objects in the rectum." (Durbin-French Aff. ¶¶ 24–25.) However, there is also a note in the medical records which states, "[p]er Sergeant, [x-ray] if needed may be completed as well," (ER Records 29), which suggests that the x-ray request may have come from the police.

But regardless of who decided to have the x-ray examination performed, the Court concludes that this search was still within the scope of the warrant. Another court in this District has observed in a slightly different context that "x-ray searches are less invasive than a strip search," and thus, "a prisoner's rights are not violated by x-ray searches conducted pursuant to a reasonable prison policy." *See* Manley v. Ramos, No. 13-CV-2662, 2014 WL 1496094, at *2 (S.D.N.Y. Apr. 16, 2014). Here too, the x-ray performed on Plaintiff was far less invasive than the manual body cavity search performed a few minutes earlier. And although the search warrant issued by Judge Williams did not explicitly provide for an x-ray examination, *cf.* Turner, 2020 WL 2220244, at *3 (involving a search warrant that authorized an x-ray of the plaintiff's pelvic and stomach area), the breadth of the search warrant's language still encompasses such a procedure. Specifically, the warrant provides that police and medical personnel were authorized not only "to search and inspect," but also to "*photograph* and/or record *in any way the person* of [Plaintiff,] including an inspection of the rectal area." (Search Warrant & Supporting Aff. 2 (emphasis added).) Two conclusions follow from this language. First, police and medical personnel were authorized to search Plaintiff's entire "person," not just his "rectal area." (*Id.*)

Second, they were authorized to "photograph" Plaintiff "in any way." (*Id.*) To perform an x-ray examination is "to examine, treat, or photograph with X-rays," *see* Merriam-Webster, *x-ray*, Merriam-Webster.com/dictionary/x-ray (last visited Mar. 1, 2021), and thus, this procedure fell squarely within the scope of the warrant.

**\*55** In reaching this conclusion, the Court has found persuasive guidance in *Spencer v. Roche*, a case in which the plaintiff likewise argued that a KUB x-ray exceeded the scope of a search warrant authorizing a manual body cavity search of the plaintiff's anal cavity. *See* 659 F.3d at 144, 146, 148–49. Rejecting this argument, the First Circuit observed that a diagnostic x-ray "is a routine medical procedure that is brisk, painless, and generally regarded as safe," and there was no evidence the x-ray was performed in a dangerous or inappropriate manner, particularly given that it had been performed "by trained professionals in a hospital setting." *Id.* at 147. (*Cf.* Durbin-French Aff. ¶ 27 (noting that Plaintiff's KUB x-ray "was performed in the x-ray department, by a trained radiology technician[ ] in a hospital setting and with minimal intrusion upon the [P]laintiff").) Insofar as the x-ray had revealed areas of the plaintiff's body beyond the scope authorized in the warrant, such as his stomach, the court said that such viewing "was incidental to the valid anal cavity search and, thus, did not require an independent showing of probable cause." 659 F.3d at 148. The court also observed that based on evidence in the record, a KUB x-ray "is the only type of x-ray that can capture the entire anal cavity." *Id.* (*Cf.* Durbin-French Aff. ¶ 24.) "It follows inexorably," the court said, "that the KUB x-ray was within the scope of the warrant." 659 F.3d at 148.

Although *Spencer*'s rationale is equally applicable to the facts of this case, the conclusion here is even more straightforward in light of the expansive authorizing language in the search warrant. The Court therefore concludes that the x-ray did not exceed the scope of the warrant, and Canario, Saintiche, and Durbin-French are each entitled to qualified immunity. Police Defendants and Medical Defendants' respective Motions are both granted with respect to Count 16.

e. Right to Privacy Claim (Count 17)

In Count 17, Plaintiff brings a cause of action for violation of his right to privacy. (*See* SAC ¶ 134.) This count is based on the fact that Durbin-French—a nurse of the opposite sex—performed the anal cavity search. (*See id.*)

The Second Circuit has recognized that a visual body cavity search—and, *a fortiori*, a manual body cavity search—is invasive "[r]egardless of who performs the search." *Harris,* 818 F.3d at 58. But although "all forced observations or inspections of the naked body implicate a privacy concern, it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Id.* at 59 (citation omitted). Accordingly, the Second Circuit has stated that in the prison context, "cross-gender strip searches of inmates conducted in the absence of an emergency or other exigent circumstances are generally frowned upon." *Id.* at 62.

In *Holland v. City of New York,* 197 F. Supp. 3d 529 (S.D.N.Y. 2016), another court in this District had occasion to apply these principles in the pretrial-detainee context. While being held as a pretrial detainee at Rikers Island, the plaintiff in *Holland* was subjected to an invasive visual body cavity search by a female corrections officer during an emergency lockdown inspection that arose in response to a stabbing in the plaintiff's housing unit. *Id.* at 536. The court dismissed the unreasonable search claim, holding that the corrections officer was entitled to qualified immunity. *See id.* at 542–45. As Judge Torres explained, "there appear to be no Supreme Court or Second Circuit decisions establishing that, in an emergency situation, inmates have a Fourth Amendment right to be free from strip searches—even body cavity searches—by officers of the opposite sex." *Id.* at 544. The court therefore found that, in the absence of allegations "that the search was unnecessarily prolonged or repeated," the cross-gender search was justified in light of the exigent circumstances. *Id.*

As in *Holland,* exigent circumstances justified the cross-gender search at issue here. Given the urgency in locating and removing any illegal contraband—not least for the sake of Plaintiff's safety—it was not unreasonable for Durbin-French to perform the search herself. As she explains in an affidavit, she and Dr. Madell "would alternate patients as they presented to the [Emergency Department] after 11 pm." (Durbin-French Aff. ¶ 12.) Thus, the fact that Durbin-French was assigned to Plaintiff indicates that Dr. Madell—a male nurse—was occupied with another patient. Given the pressing law-enforcement interest in locating any illegal contraband, as well as the medical interest in protecting Plaintiff's health and safety, it was reasonable for Durbin-French to proceed with the search herself. Accordingly, Medical Defendants' Motion is granted with respect to Count 17.

## 8. Sexual Harassment and Sexual Abuse Claims Based on Events at St. Luke's (Counts 12 and 13)

**\*56** In Count 12, Plaintiff asserts a claim for "sexual harassment" based on the manual body cavity search at St. Luke's. (*See* SAC ¶ 129.) Insofar as this claim is predicated on Defendants' "repeated orders to submit to [an] unlawful body cavity search," (*id.*), the Court has already established that the search was lawful, *see supra* Section II.B.7.a–b, and that any orders to comply were not unreasonable under the circumstances, *see supra* note 36. To the extent this claim is based on Canario and Saintiche's "using physical force," (SAC ¶ 129), the Court has already considered—and rejected—that theory of liability, *see supra* Section II.B.7.c.i. Finally, to the extent this claim is based on Durbin-French's "touching and grabbing [Plaintiff's] buttocks and penetrating [his] body cavity," (SAC ¶ 129), the claim is duplicative of the unreasonable search claim in Count 15 and must therefore be dismissed for the same reasons already discussed in Section II.B.4 *supra.*

In Count 13, Plaintiff asserts a claim for "sexual abuse," also based on the manual body cavity search at St. Luke's. (*See* SAC ¶ 130.) Insofar as this claim is predicated on Defendants' "using physical force to secure [Plaintiff's] body to [the] bed," (*id.*), the Court already rejected that argument, *see supra* Section II.B.7.c.i. To the extent this claim is predicated on Durbin-French's "touching and grabbing [Plaintiff's] buttocks and penetrating [his] body cavity," (SAC ¶ 130), the claim is duplicative of the unreasonable search claim in Count 15 and, like Count 12, must be dismissed for the same reasons already discussed in Section II.B.4 *supra.*

Accordingly, Police Defendants' Motion and Medical Defendants' Motion are both granted with respect to Counts 12 and 13.

## 9. Deliberate Indifference Claims Based on Events at St. Luke's (Counts 18 and 19)

Plaintiff brings a deliberate indifference claim in Count 18 and a supervisory liability claim in Count 19, both of which stem from his medical treatment at St. Luke's. (*See* SAC ¶¶ 135–36.) In his Opposition to Defendants' respective summary judgment motions, Plaintiff also purports to raise new state-law claims for medical malpractice. (*See* Pl.'s Opp'n 37.) The Court will not consider these putative claims

for the same reasons discussed in Section II.B.5.a *supra*. Plaintiff may not constructively amend his pleadings on summary judgment in order to assert claims that appear nowhere in the Second Amended Complaint.

#### a. Deliberate Indifference (Count 18)

Although the deliberate indifference claim in Count 18 is brought against Defendant Lemos, (*see* SAC ¶ 135), as with Counts 12 through 17, Plaintiff has named the wrong defendant. To the extent Count 18 is predicated on Medical Defendants' "failure to x-ray [Plaintiff's] back and neck, examine [his] body cavity for infection, ... [and] prescribe pain medications," as well as their "ignoring [his] complaints," (*id.*; *see also id.* ¶¶ 86, 116), these alleged failures all pertain to Plaintiff's first visit to St. Luke's. (*See generally* ER Records 2–21.) According to Plaintiff's medical records, the Medical Defendant who treated Plaintiff during this first visit was Dr. Madell. (*See id.* at 3–4, 14, 16–21.)

But even if Plaintiff had named the proper defendant, his deliberate indifference claim must be dismissed insofar as it is based on his first visit to St. Luke's. In contrast to Plaintiff's second visit to the hospital, when police and medical personnel executed a search warrant, the sole purpose of the first visit was to provide Plaintiff with appropriate medical care after the police had used a taser and pepper spray to subdue him at the police station. But as discussed in Section II.B.7.c.ii *supra*, "courts have held that the provision of medical care by a private hospital to an individual in police custody on the same terms as the hospital would provide to the public at large does not satisfy the state action test." *Hollman,* 2011 WL 280927, at *5. Here, then, "[t]he fact that [Plaintiff] was brought to the hospital from police custody and was released from the hospital into police custody is insufficient to transform this private hospital and its staff into state actors for [§] 1983 purposes." *Morse,* 2001 WL 968996, at *8. Thus, to the extent Plaintiff has plausible claims based on perceived medical failures during the first visit, those claims are not cognizable under § 1983, for Dr. Madell and his colleagues were not functioning as state actors.

**\*57** To the extent that Count 18 is predicated on Durbin-French's failure to "use lubricant and anesthesia" during the manual body cavity search, (*see* SAC ¶ 135), that claim is duplicative of Plaintiff's unreasonable search claim in Count 15. Even if this allegation were considered on its own as a deliberate indifference claim, Plaintiff has failed to show either that (1) the "deprivation of medical care [was] sufficiently serious," or that (2) the defendant "acted or failed to act with a sufficiently culpable state of mind." *Dumel v. Westchester County,* No. 19-CV-2161, 2021 WL 738365, at *8 (S.D.N.Y. Feb. 25, 2021) (alteration in original) (citation, alterations, and quotation marks omitted). For example, even accepting Plaintiff's allegation that Durbin-French failed to use lubricant when conducting the manual body cavity search, Plaintiff has failed to establish that such a failure rises above the level of mere negligence. *See id.* at *9 (explaining that the second element of a deliberate indifference claim under the Fourteenth Amendment "requires proof of a mens rea greater than mere negligence" (citation omitted)). Thus, to the extent Count 18 is based on the manual body cavity search, it cannot survive summary judgment.

For these reasons, Medical Defendants' Motion is granted with respect to Count 18.

#### b. Supervisory Liability Based on X-Ray and Removal of Taser Barbs (Count 19)

In Count 19, Plaintiff brings a deliberate indifference claim against Dr. Madell and Durbin-French based on their alleged "failure to supervise Lemos in conducting [the] body cavity / x-ray examinations and [their] failure to supervise Lemos when treating / removing taser barbs out of [Plaintiff's] back," which, according to Plaintiff, "resulted in serious physical and emotional injuries and the deprivation of [his] Fourth and Fourteenth Amendment [rights]." (SAC ¶ 136.) As discussed, Lemos neither removed the taser barbs nor performed the manual body cavity search or x-ray examination. But as with Count 18, even if Plaintiff had named the proper defendants, this claim would still fail, for several reasons.

To the extent Count 19 is predicated on Dr. Madell's removal of the taser barbs, because he was providing ordinary medical treatment "to an individual in police custody on the same terms as the hospital would provide to the public at large," *Hollman,* 2011 WL 280927, at *5, neither he nor his supervisors were functioning as state actors, thus precluding § 1983 liability. Insofar as Count 19 is predicated on the manual body cavity search and x-ray examination, Plaintiff's claim runs into a different dead-end. As explained in Section II.B.5.b *supra*, after *Tangreti*, a plaintiff must establish that a defendant committed a constitutional tort through the defendant's "own conduct, not by reason of [his] supervision of others who committed the violation."

*Tangreti*, 983 F.3d at 619. Here, that means Plaintiff must show that Durbin-French's supervisor "recklessly fail[ed] to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the defendant-official knew, or should have known, that the condition posed an excessive risk to health or safety." *Maldonado*, 460 F. Supp. 3d at 395 (quoting *Darnell*, 849 F.3d at 35). Apart from his own conclusory assertions, Plaintiff has made no showing that Durbin-French's cavity search (or the x-ray) constituted an excessive risk to his health or safety, let alone that Durbin-French's supervisor knew about or should have known about that risk and failed to take appropriate action. Accordingly, the deliberate indifference claim in Count 19 cannot survive summary judgment and must be dismissed. Medical Defendants' Motion is therefore granted in this regard.

### 10. Conspiracy Claims (Counts 14 and 20)

In Count 14, Plaintiff alleges that Canario, Saintiche, and Lemos conspired to deprive him of his "rights to be free from unreasonable search and seizures." (SAC ¶ 131.) This claim stems from Plaintiff's baseless theory that there was only one visit to the hospital. He has alleged that the search warrant signed by Judge Williams was at some point

> **\*58** brought back to the hospital by Canario and Saintiche so that they could conspire with the medical staff ... to make them cover-up the fact that [he] was illegally body cavity searched and x-rayed earlier[,] and to record th[o]se events as if they [had] happened ... almost ... [four] hours later .... And they all came to an agreement that between 6:47 P.M. and 7:39 P.M.[,] ... [Plaintiff] was only treated for [his] back and eyes.

(*Id.* ¶ 111.) In Count 20, Plaintiff alleges that Pitt, Canario, Saintiche, Lemos, and Durbin-French all conspired to deprive Plaintiff of "medical care," and all "participated in falsifying medical records and police documents stating that [Plaintiff] was re-admitted at the hospital, [and] that [he] made no complaints concerning pain and injuries"—all so that the co-

conspirators could "cover-up their illegal activities." (*Id.* ¶ 137.)

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson*, 200 F.3d 65, 72 (2d Cir. 1999); *see also Corsini v. Brodsky*, 731 F. App'x 15, 19 (2d Cir. 2018) (summary order) (same) (citing *Ciambriello*, 292 F.3d at 324–25). "[C]onspiracies are by their very nature secretive operations, and may have to be proven by circumstantial, rather than direct, evidence." *Pangburn*, 200 F.3d at 72 (quotation marks omitted). To state a conspiracy claim, Plaintiff "must provide some factual basis supporting a meeting of the minds." *Webb v. Goord*, 340 F.3d 105, 110 (2d Cir. 2003) (quotation marks omitted). "To survive a motion for summary judgment, [the] plaintiff's evidence of a [§] 1983 conspiracy must, at least, reasonably lead to the inference that the defendants positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan." *House v. City of New York*, No. 18-CV-6693, 2020 WL 6891830, at \*20 (S.D.N.Y. Nov. 24, 2020) (quoting *Stein v. Janos*, 269 F. Supp. 2d 256, 261–62 (S.D.N.Y. 2003)); *see also Warren v. Fischl*, 33 F. Supp. 2d 171, 177 (E.D.N.Y. 1999) (observing that a plaintiff must "make an effort to provide some details of time and place and the alleged effects of the conspiracy ... [including] facts to demonstrate that the defendants entered into an agreement, express or tacit, to achieve the unlawful end" (citations and quotation marks omitted)).

Unsurprisingly, Plaintiff has produced no evidence to substantiate his fanciful tale that police and medical personnel orchestrated an elaborate scheme to fabricate and falsify records. Although his handwritten, single-spaced, 46-page Opposition brief is filled with conclusory allegations that such a conspiracy occurred, he offers only one remotely substantive argument in support. (*See* Pl.'s Opp'n 46.) Specifically, he argues that a timestamp in the upper left-hand corner of his medical records shows that the records can be tampered with. (*Id.*) The medical records are constructed such that each page contains a banner at the top of the page with Plaintiff's name, age, sex, account number, and unit number. (*See* ER Records 4–11, 23–28.) Below the banner, the records contain a detailed digital trail of Plaintiff's respective visits, including his admission and discharge times, when he was seen (and by whom), and what treatment he received, among other data. (*See id.*) Above the banner, the medical

records contain three additional fields—(1) "Run Date"; (2) "Run Time"; and (3) "Run User." (*See id.*) The data in these fields are identical on each page of the records pertaining to a particular visit. Thus, the records pertaining to Plaintiff's first visit all indicate a "Run Date" of May 10, 2015, a "Run Time" of "0102," and a "Run User" named "N. KDC." (*See id.* at 4–11.) The records pertaining to Plaintiff's second visit indicate a "Run Date" of May 12, 2015, a "Run Time" of "0022," and a "Run User" named "N. CCD." (*See id.* at 23–28.) In her supporting affidavit, the St. Luke's official charged with overseeing the hospital's electronic medical records system explains that, "[t]o make an entry in the [electronic medical record system], a staff member must log-in and use their [sic] own secure password. Anyone accessing the [system] or making an entry in the [system] automatically generates a date/time entry." (Berberich Aff. ¶ 8.) She goes on to explain that the date and time entries on Plaintiff's medical records—i.e., the information below the banner—corresponds with Defendants' version of events, (*see id.* ¶¶ 9–12), which is true. But Plaintiff argues that the data fields above the banner show that "once [a] user logs in[to] the [electronic medical record system], any date/time, notes, names[,] and signatures can be edited/entered into the audit trail." (Pl.'s Opp'n 46.)

**\*59** This argument has several problems. First, so far as Plaintiff purports to dispute Berberich's testimony regarding the functionality of the electronic medical records system, he has no personal knowledge of how the system actually operates. *See Myers v. County of Nassau*, 825 F. Supp. 2d 359, 366 (E.D.N.Y. 2011) (observing that affidavits or deposition testimony offered to defeat summary judgment "must be based upon the personal knowledge of the witness, ... and the speaker must be shown competent to testify [to facts admissible in evidence]"). Relatedly, Plaintiff's argument—that the data fields above the banner show that a user can enter the system after the fact to cook the books—is pure speculation. Moreover, even if Plaintiff's theory had some empirical grounding, it would mean that Defendants or some accomplice modified the hospital records for the first visit on May 10, 2015, and then waited another two days to falsify the records for the second visit. That is a terribly odd way to go about covering one's tracks. The more natural inference, of course, is that the data fields above the banner pertain to routine administrative processing, and do not constitute indicia of some sinister plot.

But the Court need not trouble itself with this issue further, for even if the records did betray some sign of tampering, that alone provides no evidence of an agreement "between a state actor and a private entity" to "act in concert to inflict an unconstitutional injury." *Pangburn*, 200 F.3d at 72. If a summary judgment motion "is supported by documentary evidence and sworn affidavits and 'demonstrates the absence of a genuine issue of material fact,' the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or 'rely on conclusory allegations or unsubstantiated speculation.' " *Estate of Ferrara v. United Pub. Serv. Emps. Union*, No. 18-CV-527, 2020 WL 7714542, at \*5 (D. Conn. Dec. 29, 2020) (quoting *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015)) (granting summary judgment for defendants where plaintiff had presented only "diffuse and expansive allegations" of conspiracy, and where the plaintiff's testimony "simply underscore[d] the [u]nion's alleged antipathy towards him," but did not establish an agreement between the union and police to act "in concert" (citations omitted)). Because Plaintiff has failed to raise a triable issue of fact regarding either of his two conspiracy claims, summary judgment is appropriate. *See Hardy v. Baird*, No. 13-CV-7402, 2016 WL 2745852, at \*13–14 (S.D.N.Y. May 10, 2016) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff failed to provide any evidence that the defendants had reached an agreement to fabricate evidence to secure a search warrant); *Cuellar v. Love*, No. 11-CV-3632, 2014 WL 1486458, at \*9 (S.D.N.Y. Apr. 11, 2014) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff had failed to "cite any evidence demonstrating an agreement between [the defendants] to use excessive force"); *Phoenix v. Reddish*, 175 F. Supp. 2d 215, 218–19 (D. Conn. 2001) (dismissing § 1983 conspiracy claim on summary judgment where the plaintiff had provided no evidence that the defendants "had an understanding, either tacit or explicit, to act in concert," and had only offered "rank speculation and conjecture"). Accordingly, Police Defendants and Medical Defendants' Motions are both granted with respect to Counts 14 and 20, which are dismissed.

### III. Conclusion

For the reasons stated above, Police Defendants' Motion is granted in part and denied in Part. The Motion is granted with respect to Counts 1, 3–4, 7–8, 12–16, and 20. With respect to Count Two, the Motion is granted as to Plaintiff's Handcuff Claim and Assault Claim, but denied as to Plaintiff's Search Claim. The Motion is denied with respect to Counts Five and 10.

Medical Defendants' Motion is granted in part and denied in part. The Motion is granted with respect to Counts 12–14 and 16–20. The Motion is denied with respect to Count 15.

Plaintiff's Motion is granted in part and denied in part. With respect to Count Six, the Motion is granted as to the visual body cavity search and denied as to the alleged manual body cavity search. The Motion is denied as to Counts One, Seven, and 10.

 **\*60**  Accordingly, Counts 1, 3–4, 7–8, 12–14, and 16–20 are dismissed. The Handcuff Claim and Assault Claim within

Count Two are also dismissed. Count 15 is dismissed as to Police Defendants only.

The Clerk of Court is respectfully directed to terminate the pending Motions, (Dkt. Nos. 159, 173), and mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 1164185

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.